# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF NEW YORK; and STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, in her official capacity as former Acting Secretary of Education and current acting Chief Operating Officer, Federal Student Aid; LINDA MCMAHON, in her official capacity as Secretary of Education, <br><br> Defendants. | Case No. 1:25-cv-10548 <br><br><br> **(Leave to File Granted Mar. 6, 2025)** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STATES' MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................. 1

Background ................................................................................................... 2

    I.      Congress's Response to the National Teacher Shortage ........................... 2

          A.      The National Teacher Shortage ...................................................... 2

          B.      The Federal Teacher Pipeline Programs ........................................ 4

                1.       The Teacher Quality Partnership Grant Program ............. 4

                2.       The Supporting Effective Educator Development Grant Program ................................................................. 6

          C.      Plaintiff States' Implementation of, and Reliance on, the Federal Teacher Pipeline Programs ................................................ 7

    II.     Defendants' Termination of the Federal Teacher Pipeline Programs ........ 9

          A.      President Trump's Anti-Equity Executive Orders ......................... 9

          B.      Department of Education Directive Implementing the Executive Orders ........................................................................... 9

          C.      Department of Education Teacher Pipeline Program Grant Terminations ................................................................................ 10

          D.      Impact of Grant Terminations on Schools, Students, and Plaintiff States .......................................................................... 12

Argument ................................................................................................... 13

    I.      Plaintiff States Have Standing to Assert Their Claims. ......................... 13

    II.     Plaintiff States Have Established a Likelihood of Success on the Merits. ................................................................................................. 15

          A.      The Department's Termination of the Teacher Pipeline Grants Constitutes Final Agency Action. ..................................... 15

          B.      The Department's Termination of the Teacher Pipeline Grants Is Arbitrary and Capricious. ............................................. 16

          C.      The Department's Termination of the Teacher Pipeline Grants Violates the Department's Own Regulations and Is Therefore Contrary to Law. ....................................................... 21

    III.    Plaintiff States Will Be Irreparably Harmed Absent a Temporary Restraining Order. ................................................................................ 24

# TABLE OF CONTENTS
## (continued)

**Page**

IV.    The Public Interest and the Balance of Equities Strongly Favor Entry of a Temporary Restraining Order. ........................................................... 28

V.    Plaintiff States Are Entitled to Preliminary Relief in the Form Requested. ................................................................................................. 29

Conclusion ..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

CASES

*Allscripts Healthcare, LLC v. DR/Decision Res., LLC*
    386 F. Supp. 3d 89 (D. Mass. 2019)................................................................26

*Armstrong v. Exceptional Child Ctr., Inc.*
    575 U.S. 320 ..........................................................................................................29

*Bennett v. Spear*
    520 U.S. 154 (1997)..............................................................................................15

*Biden v. Nebraska*
    143 S. Ct. 2355 (2023)..........................................................................................13

*Brown v. Bd. of Educ.*
    347 U.S. 483 (1954)..............................................................................................28

*Califano v. Yamasaki*
    442 U.S. 682 (1979)..............................................................................................30

*City & Cnty. of S.F. v. USCIS*
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) ...........................................................25

*Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*
    743 F. Supp. 3d 325 (D.N.H. 2024)..................................................................24

*Dep't of Com. v. New York*
    588 U.S. 752 (2019).......................................................................................14, 16

*Dep't of Homeland Sec. v. Regents of the Univ. of California*
    591 U.S. 1 (2020)..................................................................................................19

*Does 1-6 v. Mills*
    16 F.4th 20 (1st Cir. 2021)..................................................................................28

*FCC v. Prometheus Radio Project*
    592 U.S. 414 (2021).......................................................................................16, 17

*Fort Stewart Sch. v. Fed. Lab. Rels. Auth.*
    495 U.S. 641 (1990)..............................................................................................23

# TABLE OF AUTHORITIES
## (continued)

Page

*Gustavsen v. Alcon Labs., Inc.*
    272 F. Supp. 3d 241 (D. Mass. 2017) ................................................................. 3

*In re Evenflo Co., Inc., Marketing, Sales Practices and Prods. Liab. Litig.*
    54 F.4th 28 (1st Cir. 2022) ............................................................................. 15

*Kennedy v. U.S. Dept. of State*
    Civil Action No. 24-cv-11556-DJC (D. Mass. Feb. 28, 2025) ......................... 3

*Larson v. Domestic & Foreign Com. Corp.*
    337 U.S. 682 (1949) ..................................................................................... 30

*League of Women Voters of U.S. v. Newby*
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................ 28

*Madsen v. Women's Health Crt, Inc.*
    512 U.S. 753 (1994) ..................................................................................... 30

*Manguriu v. Lynch*
    794 F.3d 119 (1st Cir. 2015) ........................................................................ 21

*McBreairty v. Miller*
    93 F.4th 513 (1st Cir. 2024) ........................................................................ 13

*Me. Forest Prods. Council v. Cormier*
    586 F. Supp. 3d 22 (D. Maine 2022) ........................................................... 28

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983) ................................................................................. 16, 18

*Nat'l Council of Nonprofits v. Office of Mgmt. and Budget*
    No. 25-239 (LLA), 2025 WL 368852 (D.D.C. Feb. 3, 2025) ......................... 20

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*
    No. 1:25-cv-333-ABA, 2025 WL 53764 (D. Md. Feb. 21, 2025) ................... 24

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*
    407 F. Supp. 2d 323 (D. Mass. 2005) ........................................................... 28

*Packard Elevator v. I.C.C.*
    782 F. 2d 112 (8th Cir. 1986) ...................................................................... 24

# TABLE OF AUTHORITIES
## (continued)

Page

*Planned Parenthood of N.Y.C., Inc. v. HHS*
    337 F. Supp. 3d 308 (S.D.N.Y. 2018)......................................................................28, 29

*Plyler v. Doe*
    457 U.S. 202 (1982).......................................................................................................29

*Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*
    313 F. Supp. 3d 62 (D.D.C. 2018) ................................................................................18

*R.I.L-R v. Johnson*
    80 F. Supp. 3d 164 (D.D.C. 2015) ................................................................................29

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*
    397 F.3d 56 (1st Cir. 2005)...........................................................................................24

*SEC v. Chenery Corp.*
    332 U.S. 194 (1947).......................................................................................................17

*Tennessee v. Dep't of Educ.*
    104 F.4th 577 (6th Cir. 2024) ................................................................................13, 25

*Town of Weymouth v. Massachusetts Dep't of Env't Prot.*
    961 F.3d 34, 47 (1st Cir.), *on reh'g*, 973 F.3d 143 (1st Cir. 2020)................................21

*TransUnion LLC v. Ramirez*
    594 U.S. 413 (2021).......................................................................................................13

*United States ex rel. Accardi v. Shaughnessy*
    347 U.S. 260 (1954).......................................................................................................21

*Webb v. Injured Workers Pharmacy, LLC*
    72 F.4th 365 (1st Cir. 2023)..........................................................................................13

*Wilson v. Commm'r of Soc. Sec.*
    378 F.3d 541 (6th Cir. 2004) ........................................................................................21

# TABLE OF AUTHORITIES
## (continued)

Page

**STATUTES**

5 U.S.C.
 § 706 ..............................................................................................................29
 § 706(2)(A) ...............................................................................................20, 21

20 U.S.C.
 § 1021(6) .........................................................................................................5
 § 1022 ..............................................................................................................5
 § 1022a(a) ........................................................................................................5
 § 1022a(c)(1) ...................................................................................................5
 § 1022a(d) ........................................................................................................5
 § 1022a(d)(5) ...................................................................................................5
 § 1022a(d)(5)(A) ...........................................................................................18
 § 1022a(e) ........................................................................................................5
 § 1022a(e)(2)(C) ...........................................................................................20
 § 1022b(a)(1) .............................................................................................5, 20
 § 1022b(b)(3) ...................................................................................................5
 § 1022e ..........................................................................................................18
 § 1022e(b) ........................................................................................................2
 § 1022h ............................................................................................................5
 § 1232 ..............................................................................................................4
 § 1232(d) ....................................................................................................4, 19
 § 6672(a) ......................................................................................................1, 7
 § 6672(a)(1) ..................................................................................................18
 § 6672(a)(2) ..................................................................................................18
 § 6672(b) ...................................................................................................6, 20
 § 6672(b)(3) ....................................................................................................7
 § 7906a(b) .....................................................................................................18

Administrative Procedure Act ............................................................... *passim*

**OTHER AUTHORITIES**

2 C.F.R. ..............................................................................................................24

# TABLE OF AUTHORITIES
## (continued)

**Page**

2 C.F.R.
    § 200 ................................................................................................................22
    § 200.1 .............................................................................................................22
    § 200.208(c) ....................................................................................................24
    § 200.339 .........................................................................................................22
    § 200.339-343 ..........................................................................................21, 23
    § 200.339(c) ....................................................................................................24
    § 200.340(a)(4) ........................................................................................ *passim*
    § 200.340(a)(4)–341 .......................................................................................10
    § 200.340(b) ............................................................................................22, 23
    § 3474.1 ...........................................................................................................21

34 C.F.R.
    § 75.105 .............................................................................................................4
    § 75.105(b)(1) ...................................................................................................4
    § 75.105(b)(2) .................................................................................................19
    § 75.253 ...............................................................................................11, 12, 23

84 Fed. Reg. 65300 (Nov. 27, 2019) .....................................................................19

85 Fed. Reg. 13640 (March 9, 2020) ....................................................................19

85 Fed. Reg. 29691 (May 18, 2020) .....................................................................19

86 Fed. Reg. 36217-20 (July 9, 2021) ....................................................................6

87 Fed. Reg. 10906-12 (Feb. 25, 2022) ..................................................................6

87 Fed. Reg. 19487 (Apr. 4, 2022) .........................................................................7

89 Fed. Reg. 23573-80 (Apr. 4, 2024) ....................................................................6

89 Fed. Reg. 30046 (Apr. 22, 2024) .....................................................................21

89 Fed. Reg. 30089 (Apr. 22, 2024) .....................................................................22

89 Fed. Reg. 30136-30208 (Apr. 22, 2024) ..........................................................21

89 Fed. Reg. 70612-33 (June 4, 2024) ....................................................................6

90 Fed. Reg. 8339-41 (Jan. 20, 2025) .....................................................................9

# TABLE OF AUTHORITIES
## (continued)

**Page**

90 Fed. Reg. 8633-36 (Jan. 21, 2025)........................................................................9

90 Fed. Reg. 8853-57 (Jan. 29, 2025)......................................................................10

Educ. Statistics, *School Pulse Panel: Surveying high-priority, education-related topics*, https://tinyurl.com/yc2rewfk (last visited Mar. 6, 2025) .........................4

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025)......................................9

Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025)......................................9

Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025)......................................9

Learning Policy Institute, *State Teacher Shortages 2024 Update* 1 (July 31, 2024), https://tinyurl.com/58phtwf4 .................................................................3

Nat'l Ctr. For Educ. Statistics, Press Release, Most U.S. public elementary and secondary schools faced hiring challenges for the start of the 2024-25 academic year (Oct. 17, 2024), https://tinyurl.com/ha6prwap....................................3

Prem Thakkar (@premthakker.bsky.social), Bluesky (Feb. 5, 2025, 2:08 p.m.), https://tinyurl.com/k6vc642n......................................................................10

Amer. Federation of Teachers, *Here Today, Gone Tomorrow? What America Must Do to Attract and Retain the Educators and School Staff Our Students Need* 7 (July 2022), https://tinyurl.com/u6amp8yh ...................................3

## INTRODUCTION

Public schools across the country are facing a critical shortage of qualified K-12 classroom teachers. The shortage is especially dire in hard-to-fill subject areas—such as math, science, special education, and English as a Second Language (ESL)—and at schools in hard-to-staff regions, including in rural and urban school districts. Congress sought to address this critical shortage by authorizing and appropriating funds to federal grant programs designed to develop a more robust pipeline of highly qualified teachers. These programs, the Teacher Quality Partnership (TQP) Program and the Supporting Effective Educator Development (SEED) Grant Program, have operated in states across the country, in some cases for many years.

In the face of these critical shortages, the United States Department of Education (Department) arbitrarily terminated all previously-awarded grants under these Congressionally authorized teacher pipeline programs, with immediate effect and with no warning. According to materials shared with grant recipients, the terminations were issued because the grant awards were "inconsistent with, and no longer effectuate[d], Department priorities." However, the Department's own regulations do not authorize termination on the independent grounds of changed "Department priorities." Instead, termination is permitted only "pursuant to the terms and conditions of the award," which here do not authorize termination on the grounds the Department asserts. *See* 2 C.F.R. § 200.340(a)(4). Moreover, the form letter setting forth the Department's stated rationale for these terminations does not explain how any grant fails to conform to any new Departmental "priorities." An internal Department directive suggests that the terminations were part of an effort to eliminate lawful policies promoting diversity and inclusion in furtherance of the administration's "policy objectives," but any such effort would run counter to language in the statutes authorizing these grant programs, which includes assisting "traditionally underserved local education agencies," 20 U.S.C. § 6672(a), and ensuring "general education teachers receive

1

training in providing instruction to diverse populations, including children with disabilities, limited English proficient students, and children from low-income families." 20 U.S.C. § 1022e(b).

Plaintiff States, their institutions of higher education, and their public schools and the students they serve will suffer immediate and irreparable harm from the withholding of federal grants worth a total value of at least $250 million and the loss of thousands of teachers prepared to fill teaching positions in hard-to-fill subject areas and in urban and rural school districts. Across the institutions of higher education represented in the declarations filed with this motion, Plaintiff States face a likely loss of more than one thousand teachers and teachers-in-training.[1] *See* Ex. 1 ¶ 13; Ex. 3 ¶¶ 28, 35-36; Ex. 4 ¶ 20; Ex. 5 ¶ 23; Ex. 7 ¶ 13; Ex. 8 ¶ 19; Ex. 10 ¶ 26; Ex. 11 ¶ 24; Ex. 12 ¶ 11; Ex. 14 ¶ 22; Ex. 17 ¶ 39; Ex. 18 ¶ 5. Plaintiff States thus file this request for a temporary restraining order to immediately restore these critical programs.[2]

## BACKGROUND

### I.  CONGRESS'S RESPONSE TO THE NATIONAL TEACHER SHORTAGE

#### A.  The National Teacher Shortage

There is a nationwide shortage of well-prepared, high-quality teachers, resulting in cancelled courses, crowded classrooms, and underserved students. Schools across the country struggle to find certified teachers. In 2024, more than 400,000 teaching positions in the U.S.—representing about one eighth of all teaching positions nationwide—were vacant or filled by uncertified

---

[1] Citations to "Ex. _" refer to the exhibits of the Declaration of Adelaide Pagano. The Declaration attaches individual declarations from teacher preparation grant witnesses in all eight Plaintiff States; those are attached as numbered exhibits and will be referred to herein as Exhibits 1 through 18, with any exhibits attached to those declarations cited as Exhibits A through Z.

[2] In the event that the Court determines that this motion for temporary restraining order should be converted into a motion for preliminary injunction, Plaintiff States would respectfully request an expedited briefing schedule and hearing as soon as possible.

teachers.[3] According to the National Center for Education Statistics (NCES), 74% of public schools in the United States reported that they had difficulty filling teacher vacancies.[4] The difficulty finding certified teachers is exacerbated by the turnover in existing personnel. The American Federation of Teachers reports that nearly 300,000 teachers leave the profession each year, with two-thirds of them leaving before retirement age.[5] That turnover rate is nearly double that of other occupations, including engineers, nurses, and lawyers.[6]

The problem is especially acute in specific subject areas. According to NCES, the percentages of teaching vacancies filled with fully certified teachers was only 83% for math, 81% for biology or life science, 77% for special education, and 75% for English as a second language or bilingual education.[7] That means that for some high-need subject areas, nearly one in four public school teaching vacancies were unfilled before the start of this school year.

Public schools within Plaintiff States experience these shortages firsthand. For example, according to the Learning Policy Institute, the estimated number of teachers not fully certified for their teaching assignments exceeded 32,200 in California (2022-23), 5,200 in Massachusetts

---

[3] Learning Policy Institute, *State Teacher Shortages 2024 Update* 1 (July 30, 2024), https://tinyurl.com/58phtwf4.

[4] Ex. 19, Nat'l Ctr. For Educ. Statistics, Press Release, Most U.S. public elementary and secondary schools faced hiring challenges for the start of the 2024–25 academic year (Oct. 17, 2024), https://tinyurl.com/ha6prwap. The Court may take judicial notice of this document and its contents, as the NCES is a federal statistical agency, and it publishes its data on an official government website. *See, e.g., Gustavsen v. Alcon Labs., Inc.*, 272 F. Supp. 3d 241, 252 (D. Mass. 2017) ("Courts in the District of Massachusetts have considered information on the FDA's website subject to judicial notice"), *aff'd*, 903 F.3d 1 (1st Cir. 2018); *Kennedy v. U.S. Dept. of State*, Civil Action No. 24-cv-11556-DJC, *7 (D. Mass. Feb. 28, 2025) (taking judicial notice of Department of State statistics).

[5] Amer. Federation of Teachers, *Here Today, Gone Tomorrow? What America Must Do to Attract and Retain the Educators and School Staff Our Students Need* 7 (July 2022), https://tinyurl.com/u6amp8yh.

[6] *Id.*

[7] Nat'l Ctr. For Educ. Statistics, *supra* note 4.

(2023-24), and 2,800 in New Jersey (2022-23).[8] A primary cause for the shortage is a limited pool of qualified candidates. Based on a nationwide sample survey of 4,000 K-12 public schools, the top two challenges schools reported in filling vacancies with certified teachers entering the 2024–25 school year were: (1) an overall lack of qualified candidates (64%); and (2) too few candidates applying (62%), the latter an eight-point decrease from the previous year.[9]

When schools are unable to hire qualified teachers, students suffer. Teacher shortages can result in larger class sizes, cancelled courses, or classes staffed with teachers less prepared to teach a subject. Teacher shortages may also result in significant learning disruption, as classes are staffed with temporary or substitute teachers, negatively impacting student achievement.

### B.    The Federal Teacher Pipeline Programs

The TQP and SEED grant programs are competitive federal grant programs. The Secretary of Education (Secretary) is required to establish the specific priorities that are included in the application for each competitive grant program. 34 C.F.R. § 75.105(b)(1); 20 U.S.C. § 1232(d). The priorities for these programs must be set by Congress in the programs' authorizing statutes or through the notice-and-comment rulemaking process. *See* 34 C.F.R. § 75.105; 20 U.S.C. § 1232.

### 1.    The Teacher Quality Partnership Grant Program

Congress established the TQP Program to improve student achievement; enhance the skills of prospective and new teachers by improving preparation and professional development activities; support teacher preparation programs at institutions of higher education in preparing teachers to meet applicable certification and licensure requirements; and recruit highly qualified individuals,

---

[8] Learning Policy Institute, *supra* note 3, at 4, 10, 12.
[9] Nat'l Center for Educ. Statistics, *School Pulse Panel: Surveying high-priority, education-related topics*, https://tinyurl.com/yc2rewfk (last visited Mar. 4, 2025).

including minorities and individuals from other occupations, into the teaching force. 20 U.S.C. § 1022. Grants awarded "shall be awarded for a period of five years." 20 U.S.C. § 1022b(a)(1).

To implement TQP, Congress authorized the Secretary to award grants, on a competitive basis, to "eligible partnerships"—which must include a high-need local educational agency and a partner institution of higher education—to carry out programs for teacher preparation, teacher residency, and school leader preparation. 20 U.S.C. §§ 1021(6), 1022a(a), 1022a(c)(1), 1022h. The Secretary must determine which applications shall receive funding and the grant amounts based on a peer review process. 20 U.S.C. § 1022b(b)(3).

Eligible partnerships that are awarded TQP grants to carry out teacher residency programs must implement a teacher residency program that prepares teachers to serve in high-need schools and subject areas. These partnerships must: implement rigorous graduate-level course work, teaching residency cohorts, teacher mentoring, and professional development; apply selection criteria for teaching residents based on strong content knowledge or record of accomplishments, strong verbal and written communication skills, and other attributes linked to effective teaching; and provide a one-year living stipend or salary to teaching residents. 20 U.S.C. § 1022a(e).

Moreover, eligible partnerships are required to carry out programs that implement effective mechanisms to recruit highly qualified individuals to become teachers. 20 U.S.C. § 1022a(d). These recruitment efforts may include emphasis on attracting "individuals from underrepresented populations," individuals who will "teach in rural communities," "mid-career professionals from other occupations," and "teacher shortage areas, including mathematics, science, special education, and the instruction of limited English proficient students." 20 U.S.C. § 1022a(d)(5).

The Department published a Notice of Final Priorities for certain discretionary grant programs, including the TQP and SEED Programs, in the Federal Register on July 9, 2021, which

5

included "Priority 1 - Supporting Educators and Their Professional Growth" and "Priority 2 - Increasing Educator Diversity." 86 Fed. Reg. 36217-20. The Department later published Supplemental Priorities on December 10, 2021, *see* 89 Fed. Reg. 70612-33, which consisted of:

1. "Addressing the Impact of COVID-19 on Students, Educators, and Faculty,"
2. "Promoting Equity in Student Access to Educational Resources and Opportunities,"
3. "Supporting a Diverse Educator Workforce and Professional Growth To Strengthen Student Learning,"
4. "Meeting Student Social, Emotional, and Academic Needs,"
5. "Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success," and
6. "Strengthening Cross-Agency Coordination and Community Engagement To Advance Systemic Change."

In responding to Notices of Invitation to Apply for grants under the TQP Program in recent years, grant recipients relied on these priorities in crafting their applications, and the Department relied on these priorities in making competitive selections as to who would receive grant funds. *See* 89 Fed. Reg. 23573-80 (April 4, 2024) (identifying the following competitive preferences for the FY 2024 TQP grants: Increasing Educator Diversity; Supporting a Diverse Educator Workforce and Professional Growth To Strengthen Student Learning; Meeting Student Social, Emotional, and Academic Needs; and Promoting Equity in Student Access to Educational Resources and Opportunities); 87 Fed. Reg. 10906-12 (Feb. 25, 2022) (same for FY 2022).

### 2.    The Supporting Effective Educator Development Grant Program

Congress established the SEED grant program "to increase the number of highly effective educators by supporting the implementation of Evidence-Based practices that prepare, develop, or enhance the skills of educators."[10] SEED grants must be initially awarded for a period of up to three years, but may be renewed for an additional two-year period. 20 U.S.C. § 6672(b).

---

[10] *See* Ex. 21, *Supporting Effective Educator Development Grant Program*, Dep't of Educ., https://tinyurl.com/33u9fcnj (last visited Mar. 6, 2025). The Court may take judicial notice of this government agency publication and its contents. *See supra* note 4.

When Congress established SEED, it mandated that the Secretary award grants to eligible entities such as institutions of higher education and national nonprofit entities for the purposes of providing teacher professional development; nontraditional teacher preparation; and "certification routes or pathways to serve in traditionally underserved local educational agencies," among other purposes. 20 U.S.C. § 6672(a). Congress also required the Secretary to ensure that awarded grants are, to the extent practicable, distributed among eligible entities that serve geographically diverse areas, including urban, suburban, and rural areas. 20 U.S.C. § 6672(b)(3).

In issuing a Notice Inviting Applications for the SEED Program for Fiscal Year 2022, the Department selected competitive preference criteria from the same priorities described above, *supra* p. 6, and published in the Federal Register. *See* 87 Fed. Reg. 19487 (April 4, 2022).[11]

### C. Plaintiff States' Implementation of, and Reliance on, the Federal Teacher Pipeline Programs

Pursuant to Congress' authority and mandates, the Department has invited applications for both the TQP and SEED programs throughout the years. Prior to the grant terminations, there were at least forty TQP and SEED recipients in Plaintiff States. The TQP and SEED grant recipients in Plaintiff States have used grant funds consistent with the authorizing statute's purposes; the Department's statements regarding the nature and purpose of the federal award, including as set out by the Department's Notice Inviting Applications and any priorities stated therein; and their grant application submitted to the Department. *See* Exs. 1-18.

For example, the University of Massachusetts Amherst (UMass Amherst) received a TQP grant in 2023 for approximately $2.3 million to create a sustainable program to train paraeducators

---

[11] For FY 2022, the Department relied on the following competitive preference priorities in awarding SEED grants: "Increasing Educator Diversity," "Promoting Equity in Student Access to Educational Resources and Opportunities," and "Meeting Student Social, Emotional, and Academic Needs." 87 Fed. Reg. 19487-89.

to become fully licensed early childhood educators in two high-need districts, Holyoke and Springfield, which have struggled to recruit and retain high-quality, licensed teachers. Ex. 1 ¶¶ 8-9. In Holyoke, for example, one-third of early childhood teaching staff are currently unlicensed and on waivers. Ex. 1 ¶¶ 23-24. The purpose of the program was to create a sustainable pipeline of teachers by creating more affordable and accessible online courses and building an advising and mentorship infrastructure to support paraeducators. Ex. 1 ¶ 8. By the end of the five-year term, the goal was to train and license 35 new early childhood educators in these two high-need districts and to establish and expand the Para-to-Teacher Program (PtT) for Early Childhood Education (ECE) as a source of licensed early childhood educators in other districts statewide. Ex. 1 ¶¶ 13, 22.

As another example, California State University, Chico (CSU) received a SEED grant in 2022 in the amount of approximately $13.3 million over a three-year period to create a teacher pipeline program whose purpose was to address a chronic and acute shortage of qualified or experienced teachers within a 38,000-mile rural region of northeastern California. Ex. 5 ¶¶ 8-9. The program would attract, train, and support high quality teachers for several partnering high-need Local Educational Agencies (LEAs) and high-poverty schools. Ex. 5 ¶ 8. Based on its "grow your own" approach and philosophy, the program was also designed to help students in high-need rural community school districts to become teachers in their districts. *Id.*

And in New Jersey, Montclair State University (Montclair) in 2009 created an urban teacher residency program, which was funded by two TQP grants for the periods 2009-2014 and 2014-2020. Ex. 10 ¶ 6. The program was an innovative, initial certification, teacher apprenticeship program through which participants pursued a Master's degree and teacher certification in either Early Childhood/Special Education or Mathematics or Science from Montclair, while embedded in schools and classrooms of Newark Public Schools. *Id.* Based on the success of the residency

program, Montclair applied for a 2020 TQP grant to expand its program and received a total award of approximately $3.7 million. Ex. 10 ¶¶ 8, 10. Montclair was using its 2020 TQP funds to recruit and prepare high-quality teachers for two local schools districts—Newark Board of Education and Orange Public Schools—in high-need subject areas such as math, science, and special education. Ex. 10 ¶ 8. Thus far, through the two TQP projects, Montclair had recruited and trained 140 highly qualified educators to serve in urban school districts in great need of teachers. Ex. 10 ¶ 26.

## II.    DEFENDANTS' TERMINATION OF THE FEDERAL TEACHER PIPELINE PROGRAMS

### A.    President Trump's Anti-Equity Executive Orders

Beginning on Inauguration Day, President Trump issued a series of executive orders seeking to terminate equity-related efforts—such as initiatives relating to Diversity, Equity, and Inclusion (DEI) and Diversity, Equity, Inclusion, and Accessibility (DEIA)—with respect to federal grants, including by imposing conditions on, or wholly terminating, federal funding. *See* Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ("Ending Radical and Wasteful Government DEI Programs and Preferencing"); Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"); Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025) ("Ending Radical Indoctrination in K-12 Schooling"). These Executive Orders directed agencies, including the Secretary, to eliminate federal funding for programs that target "diversity" and "equity" or promote "illegal DEI" or "diversity, equity, inclusion, and accessibility (DEIA)" principles. 90 Fed. Reg. 8339-41; 90 Fed. Reg. 8633-36; 90 Fed. Reg. 8853-57. The Executive Orders, however, fail to define any of these key terms.

### B.    Department of Education Directive Implementing the Executive Orders

Soon after, on February 5, 2025, the Department's Acting Secretary Denise Carter issued an internal directive, entitled "Eliminating Discrimination and Fraud in Department Grant Awards"

(Department Directive).[12] The Directive sought to implement the Executive Orders by instructing personnel to review all new and ongoing grants and notices for funding opportunities to ensure they "do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives." *Id.* The Department Directive also provided that grants "deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirement in the relevant award, agreement, or other instrument. *See* 2 C.F.R. § 200.340(a)(4)–341." *Id.* The Department did not publish the Department Directive; instead, it was reported about on a social media app. *Id.*

### C. Department of Education Teacher Pipeline Program Grant Terminations

Two days later, starting on February 7, 2025, the Department began sending boilerplate letters to TQP and SEED grant recipients—customized only for the address, grant award number, and termination date—with the title "RE: Grant Award Termination" (Termination Letter).[13] The Termination Letter informed recipients that their grants had been terminated and provided that:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

---

[12] Ex. 20, Prem Thakkar (@premthakker.bsky.social), Bluesky (Feb. 5, 2025, 2:08 p.m.), https://tinyurl.com/k6vc642n.

[13] A representative Termination Letter is attached to the Complaint as Attachment A.

> The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. § 200.340(a)(4); see also 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [grant award number] in its entirety effective [date of letter].

The Termination Letter did not offer any evidence that the grant-funded programs were engaging in any of the prohibited activities listed above. The Termination Letter simply recited multiple nonspecific potential reasons for termination, without saying which—if any—purportedly applied.

The Termination Letter states: "[i]f you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice." However, the Department failed to articulate procedures for processing any objections and challenges, and did not provide for interim relief while the Department processed objections. In any event, the Department's failure to provide *any* individualized facts or explanation in the termination letters prevents grantees from even knowing what information they would need to submit to respond to the Termination Letters.[14]

The Department also distributed to most grant recipients a revised Grant Award Notification (GAN) modifying the budget period for the current fiscal year to end in February 2025 on the same date as the Termination Letter or the GAN was received (Termination GAN).[15] Like the

---

[14] Nonetheless, some recipients in Plaintiff States endeavored to file objections to the terminations requesting immediate abeyance of the termination decision and/or reinstatement of the grant awards while the objection is considered, but none have received a response as of the date of filing, and the Termination Letter provides no timeframe by which the Department will review or respond to any objection. *See, e.g.*, Ex. 10, Ex. F.

[15] A representative Termination GAN is attached to the Complaint as Attachment B.

Termination Letter, the Termination GAN stated that "[t]he grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253." The Termination GAN appears to modify the authorized funding to a prorated amount for the current fiscal year. For at least one recipient, the Termination GAN is the only notice they received indicating that their award has been terminated. Ex. 16 ¶ 18.

One TQP recipient who initially had not received either a Termination Letter or Termination GAN inquired as to whether their grant was still in effect and was told by a Department official via email that "[a]ll the grants have been terminated," "[a] new GAN email was sent out to everyone, some have not received the letter," and "[a]ll the accounts in G6 [the Department's grant management system] are closed." Ex. 13 ¶ 18 and Ex. C.

### D.    Impact of Grant Terminations on Schools, Students, and Plaintiff States

The Department's termination of all previously-awarded TQP and SEED grants is causing irreparable harm to Plaintiff States and will continue to do so if a TRO is not issued. These programs are essential for building a pipeline of licensed, qualified teachers in Plaintiff States. For example, the UMass Amherst received nearly $2.3 million to create a high quality, affordable, and accessible program for current paraeducators to become licensed educators in two high-need school districts. Ex. 1 ¶¶ 9, 25. The abrupt termination of these funds means this program must now cease support for currently enrolled paraeducators, for instance by eliminating the funds to cover the cost of substitute teachers so paraeducators could remain employed while fulfilling their student teaching requirement. Ex. 1 ¶ 21. The elimination of this support imperils the paraeducators' ability to complete the requirements to become licensed teachers. *Id.* Further, the program will not be able to continue or expand to include additional paraeducators and additional districts in dire need of licensed early childhood educators. Ex. 1 ¶¶ 23-24.

As another example, in New Jersey, Montclair used its $3,692,315 TQP grant to facilitate its Urban Teacher Residency and create a pipeline of highly qualified teachers in high-need subject areas such as math, science, and special education for two local, hard-to-staff, urban school districts. Ex. 10 ¶ 8. The impact of the TQP grant termination will be immediately felt: without a replacement for TQP funding, Montclair will be unable to sustain the program. *Id.* ¶¶ 26. Similar effects will be felt across all Plaintiff States. Compl. ¶¶ 141-161; Exs. 1-18.

## ARGUMENT

### I.   PLAINTIFF STATES HAVE STANDING TO ASSERT THEIR CLAIMS.

Plaintiff States have standing to challenge the termination of previously-awarded grants because they will suffer an "injury in fact" that is "fairly traceable" to the termination and "may be redressed by" a judicial order enjoining its implementation. *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "Monetary harms are obviously concrete" for Article III standing purposes. *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023) (internal citations omitted) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). And Plaintiff States' recipient Institutions of Higher Education (IHEs) and (for some states, including California) LEAs are public instrumentalities of the Plaintiff States, which have standing to bring suit on their behalf. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2365-68 (2023); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 588, 590 (6th Cir. 2024) ("[F]or 70 years a state has been able to assert Article III standing via injuries to a state university—the state's 'agency in the educational field.'" (citing *Arkansas v. Texas*, 346 U.S. 368, 371 (1953))). Thus, Plaintiff States' IHEs and LEAs

"los[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019).

The on-the-ground impacts from this loss in federal funding reinforce that concrete harm. Through the teacher pipeline grants, Plaintiff States' recipient IHEs and LEAs were set to receive tens of millions of dollars to create and operate programs to address the nationwide teacher shortage. *See* Ex. 1 ¶¶ 9, 14; Ex. 2 ¶¶ 10, 14; Ex. 3 ¶¶ 14, 29; Ex. 4 ¶¶ 9, 16; Ex. 5 ¶¶ 10, 22; Ex. 6 ¶ 11; Ex. 7 ¶¶ 10, 13; Ex. 8 ¶¶ 9, 12; Ex. 9 ¶¶ 12, 15; Ex. 10 ¶¶ 10, 22; Ex. 11 ¶¶ 8, 13; Ex. 12 ¶¶ 8, 19; Ex. 13 ¶¶ 10, 19; Ex. 14 ¶¶ 8, 14; Ex. 15 ¶¶ 7, 11; Ex. 16 ¶¶ 7, 11; Ex. 17 ¶¶ 11, 14, 35, 39. Put simply: without the federal funds at issue,[16] Plaintiff States stand to lose grants worth hundreds of millions of dollars designated for the preparation of thousands of qualified teachers to staff positions in hard-to-fill subjects and in urban and rural school districts. Compl. ¶¶ 16, 144.

Moreover, these grant recipients do not have ready access to alternative sources of funds to replace the funds provided by the TQP and SEED grants. Plaintiff States are not in a position to make up the losses, particularly given the abrupt and immediate nature of the terminations. Ex. 1 ¶¶ 20-22; Ex. 2 ¶ 28; Ex. 3 ¶¶ 21, 35-36; Ex. 4 ¶ 18; Ex. 5 ¶ 22; Ex. 6 ¶ 19; Ex. 7 ¶ 19; Ex. 8 ¶ 18; Ex. 10 ¶¶ 22-23, 26; Ex. 17 ¶ 47; Ex. 18 ¶ 17. As a result, grant recipients face an imminent inability to pay employees and will have to lay off employees who staffed these teacher preparation programs, and teachers who are currently enrolled in the programs will not be able to receive stipends to pay for their tuition and living expenses, resulting in their inability to complete their studies or teacher residencies. Ex. 1 ¶ 22; Ex. 2 ¶ 28; Ex. 3 ¶¶ 22, 36; Ex. 4 ¶ 20; Ex. 5 ¶ 24; Ex. 6

---

[16] Plaintiff States' recipient IHEs and LEAs, as public institutions, do not have ready access to other sources of funds that could replace the millions in lost federal funding. Compl. ¶ 148. The teacher pipeline grants all provide for several one-year budget periods, and Plaintiff States' recipient IHEs and LEAs relied on that schedule to ensure funding for the entirety of their programs and had no ability to plan for any funding termination. Compl. ¶ 146.

¶ 14; Ex. 7 ¶¶ 19-20; Ex. 8 ¶¶ 18-19; Ex. 10 ¶¶ 23-24; Ex. 12 ¶ 18; Ex. 14 ¶ 19, 22; Ex. 15 ¶ 17; Ex. 17 ¶ 50.

As to traceability and redressability, Defendants are the sole cause of this financial harm—there is no other party to whom these injuries can be traced, and the relief requested by Plaintiff States will prevent Defendants from financially gutting Plaintiffs States' teacher pipeline programs. *See In re Evenflo Co., Inc., Marketing, Sales Practices and Prods. Liab. Litig.*, 54 F.4th 28, 34 (1st Cir. 2022) ("Traceability 'requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm.' And redressability requires the plaintiff to 'show that a favorable resolution of her claim would likely redress the professed injury.'" (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 71-72 (1st Cir. 2012)). These requirements of standing are therefore easily satisfied.

## II.    PLAINTIFF STATES HAVE ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiff States have a strong likelihood of success on the merits. The Department's termination of all previously-awarded grants under the TQP and SEED programs constitutes final agency action, which violates the Administrative Procedure Act (APA) because it is arbitrary and capricious, violates the Department's own regulations, and is contrary to law.

### A.    The Department's Termination of the Teacher Pipeline Grants Constitutes Final Agency Action.

Plaintiff States properly bring this challenge to the Department's blanket termination of all previously-awarded grants under the TQP and SEED programs because those terminations constitute final agency action subject to the APA. Final agency actions "mark the consummation of the agency's decisionmaking process" and are those "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted). The terminations here clearly meet both prongs. The

Termination Letter and Termination GAN "mark[] the consummation" of the Department's decisionmaking process because they announce the agency's decision to terminate, with immediate effect, each award. *See* Termination Letter (Doc. No. 1-1); Termination GAN (Doc. No. 1-2). And the terminations have clear legal consequences: the immediate loss of funding in the middle of a program year. Ex. 1 ¶¶ 20-21; Ex. 2 ¶ 28; Ex. 3 ¶¶ 21-22, 35; Ex. 4 ¶ 18; Ex. 5 ¶ 26; Ex. 6 ¶ 16; Ex. 7 ¶¶ 19-20; Ex. 8 ¶ 18; Ex. 10 ¶¶ 22-24.

## B.    The Department's Termination of the Teacher Pipeline Grants Is Arbitrary and Capricious.

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted). That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785. Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

Here, Plaintiff States will likely prevail on their claim that the Department's termination of all previously-awarded TQP and SEED grants is arbitrary and capricious, for at least five independently sufficient reasons.

*First*, the Department has not reasonably explained its actions. The Termination Letter, which includes a standardized and boilerplate explanation that was sent to nearly all recipients of the TQP and SEED grant awards, purports to set forth the Department's rationale for its actions. However, the Termination Letter does not identify the factual basis for the Department's

determination that the grant is "inconsistent with, and no longer effectuates, Department priorities." Instead, the Termination Letter lists several vague and theoretical bases for the termination—without identifying which, if any, of these hypothetical reasons purportedly justify the grant terminations. As the Termination Letter asserts, the terminated grants fund programs that "promote or take part in DEI initiatives," *or* "other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic," *or* "violate either the letter or purpose of Federal civil rights law," *or* "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education," *or* "are not free from fraud, abuse, or duplication," *or* "otherwise fail to serve the best interests of the United States." Termination Letter (Doc. No. 1-1 at 1). Grant award recipients—and, for that matter, reviewing courts—are left to guess which of these several reasons may justify the Department's determination. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."). These are not "reasonably explained" determinations. *Prometheus Radio*, 592 U.S. at 423.

*Second*, the Department has not engaged in reasoned consideration of any individual recipient's project before terminating their grant. As discussed above, although the partnerships funded by TQP and SEED all generally work to develop the nation's pipeline of K-12 teachers and school leaders, each grant funds varying activities to achieve varying priorities, consistent with Congress's purposes in authorizing the TQP and SEED Programs. *See supra* pp. 7-9. The Department did not consider these differences before hastily issuing the Termination Letter and/or Termination GAN to *all* TQP and SEED grant recipients in Plaintiff States. Thus, any suggestion that the Department made a reasoned and individualized decision is simply "incongruent with what

the record reveals about the agency's . . . decisionmaking process." *Dep't of Commerce*, 588 U.S. at 785; s*ee also Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018) (federal agency seeking to terminate federal grants must "undertake the kind of reasoned analysis of potential causes [for the termination] that the APA and its own regulations require.").

*Third*, the Department has "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. In enacting TQP and SEED, Congress sought to fund teacher preparation programs that, among other things, increased the pipeline of teachers from underrepresented populations, to serve in underserved schools, and that reflect the communities in which they serve. *See* 20 U.S.C. § 1022a(d)(5)(A), (f)(1)(F), (e)(2)(A); 20 U.S.C. § 6672(a)(1). In addition, TQP and SEED authorize funding for programs that prepare teachers to provide instruction to diverse populations, including students with disabilities and those who have limited English proficiency. 20 U.S.C. §§ 1022e, 6672(a)(2). The SEED Program also specifically prohibits officers or employees of the Federal Government from conditioning the receipt of federal grants upon a "school's adoption or implementation of specific instructional content, academic standards and assessments, curricula, or program of instruction developed and implemented to meet the requirements of this chapter." 20 U.S.C. § 7906a(b). Thus, the TQP and SEED statutes include purposes, requirements, and priorities with explicit diversity, equity, and inclusion goals.

As noted above, the Department has not reasonably explained its actions, but the DEI-related rhetoric in the Termination Letter and the context in which it was issued—mere days after the Department Directive called for the defunding of DEI practices inconsistent with "the Department policy objectives," *supra* p. 10—strongly suggest the Department's motivation. To the extent that the Department considered any grant recipient's program to be "DEI" or an objectionable "equity-

related grant" because it sought to carry out the activities cited above, the Department relied on improper factors, as this rationale is inconsistent with the plain language of the statutes creating the TQP and SEED grant programs. Indeed, Congress intended these activities to be bases to *award* TQP and SEED grants, not *terminate* them.

*Fourth*, the grant terminations were arbitrary and capricious insofar as they relied on "Department priorities" that are contrary to the priorities the Department had established through notice-and-comment rulemaking and used in awarding the TQP and SEED grants at issue here. 20 U.S.C. § 1232(d); 34 C.F.R. § 75.105(b)(2). Here, the Department has previously undergone notice-and-comment rulemaking to establish priorities for discretionary grants under both the prior Trump administration in 2020[17] and the Biden administration in 2021. *Supra* pp. 4-7. Pursuant to these Department priorities, grant recipients were awarded their TQP and SEED grants based on the Department's judgment that their programs fulfilled the priorities set forth in the statutes themselves and the Department's final priorities for discretionary grant programs. The Department's attempt to reverse its own judgment based on new, unspecified "agency priorities" is arbitrary and capricious and an abuse of discretion.

*Finally*, the Department failed to consider the significant reliance interests at stake. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted); *see*

---

[17] *See* 85 Fed. Reg. 29691 (May 18, 2020) (inviting applicants to apply for the TQP grant program and identifying competitive preference priorities with reference to priorities previously published by the Department in the Federal Register); 84 Fed. Reg. 65300 (Nov. 27, 2019) (articulating final priority after notice-and-comment rulemaking for discretionary grants, "Spurring Investment in Qualified Opportunity Zones."); 85 Fed. Reg. 13640 (March 9, 2020) (publishing final priorities after notice-and-comment rulemaking for discretionary grants).

*also Nat'l Council of Nonprofits v. Office of Mgmt. and Budget*, No. 25-239 (LLA), 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (concluding that a freeze on federal funds implicates reliance interests that "are all too real"). Here, grant recipients include public universities, colleges, community colleges, K-12 schools, nonprofits, and community organizations in Plaintiff States that rely on critical federal funds to support their work. In designing projects and applying for grants, these organizations rely on the statutory and Department priorities discussed above. The projects take significant planning and collaboration, including regarding staffing decisions and in some cases direct financial aid to students. This work is built around the expectation of continuity for at least the full funded year, if not also throughout the full grant period, especially where the Department had provided grant recipients no prior indication that funding may be at risk. *See, e.g.*, 20 U.S.C. §§ 1022b(a)(1) ("A grant awarded under this part [TQP] shall be awarded for a period of five years."), 1022a(e)(2)(C) (TQP-funded teacher residency programs "shall provide a one-year living stipend or salary to teaching residents" during the program), 1022c(a) & (c) (TQP partnerships must develop evaluation plan with strong and measurable performance objectives, and the Secretary may, after the end of the third year, determine whether to cancel a grant due to inadequate progress), 6672(b) (SEED grants "shall be for a period" of up to three years and may be renewed for an additional two-year period). Thus, the Department's decision to pull the rug out from under the recipients failed to consider where it would leave them when it did.

In sum, the Department has not explained its actions, has not engaged in reasoned decision making, relied on improper factors, and failed to consider significant reliance interests. The Department's actions are thus arbitrary and capricious. 5 U.S.C. § 706(2)(A).

**C.    The Department's Termination of the Teacher Pipeline Grants Violates the Department's Own Regulations and Is Therefore Contrary to Law.**

The Department's termination of all previously-awarded TQP and SEED grants is contrary to law, violating 5 U.S.C. § 706(2)(A), because the Department's own regulations do not authorize the Department to terminate a grant except, in relevant part, pursuant to the clear and unambiguous terms and conditions of the award, and only to the extent authorized by law, as discussed below.

When a federal agency promulgates "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954). "It is an abecedarian principle of administrative law that agencies must comply with their own regulations." *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015). An agency's action may be set aside pursuant to the APA if the action violates the agency's own procedures, particularly if that error prejudices the interest of a person before the agency. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004); *see also Town of Weymouth, Massachusetts v. Massachusetts Dep't of Env't Prot.*, 961 F.3d 34, 47 (1st Cir.), *on reh'g*, 973 F.3d 143 (1st Cir. 2020) ("[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" (quoting *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014))).

The Department has adopted the OMB's Uniform Guidance for Federal Financial Assistance (Uniform Guidance).[18] Under the revised Uniform Guidance, a federal agency may terminate a grant award "pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

_____

[18] The Uniform Guidance was last revised on April 22, 2024, and those revisions went into effect on October 1, 2024. *See* 2 C.F.R. §§ 200.339–343 (2024), 2 C.F.R. § 3474.1; 89 Fed. Reg. 30046, 30136-30208 (Apr. 22, 2024).

2 C.F.R. § 200.340(a)(4). Concurrent guidance explains that the federal award "*may* include a term and condition allowing termination by the Federal agency" for changed department priorities, but termination is authorized only "*[p]rovided that* the language is included in the terms and condition of the award." 89 Fed. Reg. at 30089 (emphasis added). Furthermore, before terminating, the federal agency must "clearly and unambiguously specify all termination provisions in the terms and conditions of the federal award." 2 C.F.R. § 200.340(b); *see also* 89 Fed. Reg. 30089 (underscoring the need for agencies "to clearly and unambiguously communicate termination conditions in the terms and conditions of the award"). Thus, to terminate an award under 2 C.F.R. § 200.340(a)(4), the federal agency's bases for termination must have been set out—clearly and unambiguously—in the award's terms and conditions.

Consequently, 2 C.F.R. § 200.340(a)(4) cannot justify the Department's termination of all previously-awarded TQP and SEED grants, and the Department's reliance on section 200.340(a)(4) as a basis for termination lacks merit.[19] The terms and conditions of the TQP and SEED awards do not authorize or even mention termination on any of the vague grounds that the Department includes in its list of potential grounds for termination. For example, the FY 2025 Grant Award Notification (GAN) for the TQP Program, issued in October 2024, sets forth various terms and conditions in Block 10, none of which address termination, and incorporates several attachments listed in Block 8, only two of which address termination: (1) GAN Attachment/Enclosure 5, entitled "Frequently Asked Questions on Cash Management," summarizes the Department's authority to terminate under 2 C.F.R. § 200.339 if the recipient

---

[19] There should be no question that the Department "terminated" the federal grant awards, as that term is used under 2 C.F.R. part 200. *See* 2 C.F.R. § 200.1 ("Termination means the action a Federal agency . . . takes to discontinue a federal award, in whole or in part, at any time before the planned end date of the period of performance.").

"materially fails to comply with any term of an award"; and (2) GAN Attachment 8, entitled "Trafficking in Persons," describes the Department's authority to terminate for a recipient's violation of human trafficking laws. *See, e.g.*, Ex. 3, Ex. B. Nowhere do the grant terms and conditions permit termination on the grounds that the award is "inconsistent with, and no longer effectuates, Department priorities." The FY 2025 GAN for the SEED Program is in all material respects identical. *See, e.g.*, Ex. 15, Ex. A. The terms and conditions of the TQP and SEED awards are the same in all material respects across all relevant years. *See, e.g.*, Ex. 3, Ex. A; Ex. 11, Ex. A; Ex. 15, Ex. A. And the Department has not claimed, or supplied evidence showing, that any grantee has materially failed to comply with an award's terms or conditions, or engaged in human trafficking.

In sum, the terms and conditions of the TQP and SEED grant awards do not permit termination on the grounds of changed department priorities—and certainly do not do so "clearly and unambiguously," as 2 C.F.R. § 200.340(b) requires. Thus, the Department's termination of previously-awarded TQP and SEED grants for no longer effectuating department priorities was not done "pursuant to the terms and conditions of the federal award," 2 C.F.R. § 200.340(a)(4), and therefore violates the very regulations the Department cites. Furthermore, as discussed *supra* pp. 18-20, to the extent the Department's new "priorities" contravene the statutory purposes articulated by Congress, a termination on that basis is not "authorized by law." *Id.* The terminations violate the "familiar rule of administrative law that an agency must abide by its own regulations," *Fort Stewart Sch. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 654 (1990), and must be set aside.[20]

---

[20] The Termination Letter also vaguely asserts termination "pursuant to, among other authorities, 2 C.F.R. § 200.339–43, 34 C.F.R. § 75.253," none of which apply here. Section 75.253 addresses continuation of awards from one budget period to the next, but not terminations made during a budget year like those at issue here. 34 C.F.R. § 75.253. Section 200.339 authorizes

### III.    PLAINTIFF STATES WILL BE IRREPARABLY HARMED ABSENT A TEMPORARY RESTRAINING ORDER.

The Department's termination of all previously-awarded TQP and SEED grants has irreparably harmed, and will continue to harm, Plaintiff States. Preliminary relief is necessary to avoid such harm and protect the equities and public interest. *See, e.g.*, *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (asking if challengers would suffer "irreparable harm" because injuries "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy").

Absent relief from this Court, Plaintiff States, as well as their IHEs and public schools, have suffered, and will continue to suffer, immediate and irreparable harm: the irredeemable loss of federal funding. *See, e.g., Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 363 (D.N.H. 2024) (citing *Tex. Child.'s Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (where the public defendant is protected from damages claims, unrecoverable funding may constitute irreparable injury)). Even recoverable costs, "may constitute irreparable harm . . . where the loss threatens the very existence" of an organization (here, the teacher pipeline programs in Plaintiff States). *Packard Elevator v. I.C.C.*, 782 F. 2d 112, 115 (8th Cir. 1986); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-cv-333-ABA, 2025 WL 53764, at *27 (D. Md. Feb. 21, 2025). Disruptions to programs and partnerships as a result of the terminations existentially threaten Plaintiff States' teacher preparation programs, and ultimately, will result in fewer qualified teachers and worse student outcomes.

---

termination due to noncompliance "with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the federal award." 2 C.F.R. § 200.339. As noted, the Termination Letter does not assert the recipients' noncompliance, and even if it did, the Department failed to explain why the recipients' noncompliance cannot be remedied by imposing specific conditions, a determination a federal agency must make before terminating on these grounds. 2 C.F.R. §§ 200.339(c), 200.208(c).

Further, the abrupt termination of the TQP and SEED programs has caused—and will continue to cause—operational burdens for Plaintiff States' institutions. *See City & Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (recognizing "burdens on . . . ongoing operations" for public entities constitute irreparable harm); *Tennessee v. Dep't of .Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (same). These swift and inexplicable terminations have resulted in chaos and confusion across Plaintiff States' institutions, particularly for recipients who found out their grants were terminated the very day the termination became effective. *See, e.g.,* Ex. 12 ¶¶ 16-18; Ex. 14 ¶ 16; Ex. 18 ¶ 13. Programmatic planning occurs years in advance, especially for eligible partnerships with several participating districts and schools. The sudden and unexpected nature of the terminations—in the middle of the academic year and budget cycle—has upended months, if not years, of the work of IHEs focused on educator preparation. Plaintiff States have to immediately assess the impact of the loss of funding on their budgets for staff, coursework, partner organizations, school districts, and student populations; communicate programmatic changes to all identified and affected parties; and redesign projects when possible or determine whether to end entire projects—and they have to do all of this with urgency, because funding has been shut off without any notice. Ex. 1 ¶¶ 20-22; Ex. 2 ¶¶ 27-28; Ex. 3 ¶ 22; Ex. 4 ¶¶ 18, 20; Ex. 5 ¶¶ 23-26; Ex. 6 ¶ 19; Ex. 7 ¶¶ 19-20; Ex. 8 ¶¶ 18-20; Ex. 10 ¶¶ 17, 23, 24; Ex. 11 ¶ 22; Ex. 12 ¶ 18; Ex. 18 ¶ 17.

For example, California State University, Los Angeles (Cal State LA) has received TQP funds since 2023 to implement a teacher residency program focused on placing teachers with partnering high-need urban school districts and for high-need subjects, such as special education and bilingual education. Ex. 3 ¶ 8. The immediate termination of the grant will directly impact the current cohort of 26 teacher residents, who will lose mentoring, training, and other support, and

the next cohort of 50 residents, who will lose financial support and the chance to participate in classroom teaching. Ex. 3 ¶ 22. Without these supports—which Cal State LA has no other funding source to cover—residents will not be required to commit to teach in high-need districts after obtaining their credential, thereby exacerbating existing teacher shortages in those districts and schools. *Id.*

Further, these grant terminations have severely disrupted the already vulnerable teacher pipeline in Plaintiff States. The TQP and SEED grants were designed to combat the vast teacher shortages experienced nationally through educator recruitment and retention efforts. *See supra* pp. 4-7. Now, with the infrastructure around the existing teacher pipeline effectively eliminated by the grant terminations, Plaintiff States will have to expend State resources to assess the current impacts of these programmatic losses and scramble to find other ways to identify, recruit, train, and place new teachers. Ex. 1 ¶¶ 21-22; Ex. 3 ¶ 22; Ex. 4 ¶ 22; Ex. 5 ¶¶ 23-24, 26; Ex. 6 ¶ 19; Ex. 7 ¶ 20; Ex. 8 ¶¶ 18-19, 21; Ex. 10 ¶¶ 23-24; Ex. 12 ¶ 18; Ex. 14 ¶ 19,22; Ex. 15 ¶ 20; Ex. 18 ¶ 17.

Public universities and K-12 schools entitled to receive these funds are not able to account for the financial and operational disruptions they are experiencing. Many were required to stop all related work immediately upon the grant termination. *See, e.g.*, Ex. 9 ¶ 21; Ex. 17 ¶ 21. And Plaintiff States anticipate, if funding is not restored, that projects will not only be forced to cut administrative, instructional, and contracted employees (such as external evaluators) but also cease stipends and all other services for teacher residents. *See, e.g.*, Ex. 3 ¶ 26; Ex. 8 ¶ 18; Ex. 10 ¶ 21.

Some Plaintiff States' institutions will have to shutter entire programs, causing reputational harm to Plaintiff States' institutions more broadly and likely having a devastating impact on the community. *See, e.g.*, Ex. 1 ¶ 22; Ex. 4 ¶ 18; *see Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 386 F. Supp. 3d 89, 95 (D. Mass. 2019) ("reputational harm can constitute irreparable

injuries" for the purpose of preliminary injunction). Some of these projects have spent years building relationships, finding exceptional staff, and recruiting qualified candidates: if they cease operations as a result of these terminations, they cannot simply un-flip the switch if or when federal funding is restored. *See, e.g.*, Ex. 5 ¶ 26; Ex. 6 ¶ 19. Relationships with local districts have been disrupted, and it will be harder to attract applicants to participate in the projects going forward.

For example, The College of New Jersey (TCNJ) has received TQP funds since 2023 for an urban residency program focused on preparing paraprofessionals to earn a master's degree and become classroom teachers. Ex. 9 ¶¶ 9, 12. The program relies on TCNJ's long-standing partnerships with several urban school districts. Ex. 9 ¶ 10. Because of the termination of grant funds, TCNJ immediately cancelled the program and informed partnering school districts, who can no longer rely on the sustained relationships and pipeline of educators. Ex. 9 ¶¶ 19-24.

Thus, as a result of these abrupt terminations, the teacher shortage experienced acutely in each of the Plaintiff States will be exacerbated. TQP and SEED Program teachers are recruited specifically to serve in hard-to-staff positions. The disruptions faced by Plaintiff States' teacher residency programs will result in thousands of teachers who are no longer going to enter the educator workforce and work in high needs schools this school year, all because of the termination of these previously-awarded grants. Ex. 1 ¶ 22; Ex. 3 ¶ 22; Ex. 4 ¶ 20; Ex. 5 ¶ 26; Ex. 6 ¶ 19; Ex. 7 ¶ 20; Ex. 8 ¶ 19; Ex. 9 ¶¶ 24, 26; Ex 17 ¶¶ 50-51; Ex. 18 ¶17. Students in Plaintiff States, especially students that require high quality instruction in hard-to-fill subject areas such as special education and ESL, are less likely to have highly qualified teachers. *See, e.g.,* Ex. 2 ¶ 31; Ex. 3 ¶¶ 36, 38. Hard-to-staff schools, such as those in rural and urban regions, are also less likely to be able to attract and retain qualified teachers. *See, e.g.*, Ex. 7 ¶ 6; Ex. 9 ¶ 24. Now, even more individuals will be dissuaded from entering the teaching profession, and the children whose educations are

disrupted as a result cannot get this time back. The harm to Plaintiff States' students from losing

these qualified teachers will reverberate for years to come. *See, e.g.*, Ex. 1 ¶¶ 8, 21; Ex. 10 ¶ 29.

## IV. THE PUBLIC INTEREST AND THE BALANCE OF EQUITIES STRONGLY FAVOR ENTRY OF A TEMPORARY RESTRAINING ORDER.

The equities and public interest also compel preliminary relief. *See, e.g., Does 1-6 v. Mills*,

16 F.4th 20, 37 (1st Cir. 2021) (noting the balance of equities and the public interest "merge when

the [g]overnment is the opposing party" (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009))).

As an initial matter, Plaintiff States have established a likelihood of success on the merits

and irreparable harm to the IHEs and communities they serve. *See supra* pp. 24-29. The "extremely

high likelihood of success on the merits" here shows that preliminary relief "would serve the public

interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Further, "the public has an important interest in making sure government agencies follow

the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323,

343 (D. Mass. 2005); *see also League of Women Voters*, 838 F.3d at 12 (same). And courts

routinely observe that "there is generally no public interest in the perpetuation of unlawful agency

action." *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018)

(quoting *League of Women Voters*, 838 F.3d at 12). Here, Plaintiff States have shown that the

Department's effective elimination of the TQP and SEED programs violated the APA in myriad

ways. *See supra* pp. 15-24. There is a strong public interest in restraining the Department's

unlawful actions and requiring it to comply with basic statutory and procedural requirements. *See,*

*e.g., Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Maine 2022). Put simply,

the public has an important interest in federal agencies playing by the rules.

Plaintiff States also have a substantial interest in the successful operation of their education

systems. *See, e.g., Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) ("[E]ducation is perhaps the

most important function of state and local governments[.]"); *see also Plyler v. Doe*, 457 U.S. 202, 221 (1982) ("We have recognized the public schools as a most vital civic institution for the preservation of a democratic system of government." (cleaned up)). Plaintiff States, specifically, and the public generally suffer significant harm when the Executive terminates swaths of federal funding without any notice or opportunity to account for the loss. Plaintiff States have detailed the devastating consequences of the grant terminations, and the many ways that the terminations will impair the functioning of public and higher education in their States. *See supra* pp. 25-29. Plaintiff States' IHEs do not have access to the tens of millions of dollars necessary to continue to support the teacher training, licensing, and mentoring supports to keep these programs operational. Ex. 1 ¶ 22; Ex. 2 ¶ 28; Ex. 3 ¶¶ 21-22; Ex. 4 ¶¶ 18, 20; Ex. 5 ¶¶ 23-24; Ex. 6 ¶ 19; Ex. 7 ¶¶ 19-20; Ex. 8 ¶ 18; Ex. 10 ¶¶ 24, 29; Ex. 11 ¶¶ 8, 26; Ex. 12 ¶ 18; Ex. 13 ¶ 22; Ex. 14 ¶ 22.

On the other side of the ledger, the federal government faces no "harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see also Planned Parenthood of N.Y.C., Inc.*, 337 F. Supp. 3d at 343. Because the terminations are unlawful, Defendants have no cognizable interest in their enforcement.

The public interest and the equities clearly favor Plaintiff States. A temporary restraining order is necessary to protect a vital source of funding for essential government functions.

## V. PLAINTIFF STATES ARE ENTITLED TO PRELIMINARY RELIEF IN THE FORM REQUESTED.

The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v.*

*Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27(2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

Given the immediate and irreparable harm to Plaintiff States, we respectfully request the court vacate and set aside Defendants' unlawful termination of all previously-awarded TQP and SEED grants and enter declaratory relief regarding the termination. Plaintiff States further request preliminary injunctive restoring recipients of TQP and SEED grants within Plaintiff States to the pre-existing status quo prior to the termination under previously-awarded TQP or SEED grants and barring Defendants from implementing, giving effect to, maintaining, or reinstating under a different name the termination of any previously-awarded TQP or SEED grants.

Plaintiff States are harmed not only by the dissolution and termination of the teacher preparation grants run by their IHEs in partnership with public schools, but also by the termination of grants by *any* entity running such program in Plaintiff States. Ex. 13 ¶¶ 24-26. While injunctions should be "no more burdensome to the defendant than necessary to provide complete relief to plaintiffs," *Madsen v. Women's Health Crt, Inc*. 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)), under the circumstances here, curtailing funding to non-state recipients also increases Plaintiff States' costs by requiring state IHEs to fill the gaps or abandon efforts altogether. *Cf. Califano*, 442 U.S. at 702 ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.").

## CONCLUSION

For these reasons, Plaintiff States respectfully request a temporary restraining order as this case proceeds or immediate preliminary relief.

**ROB BONTA**
Attorney General
State of California

By: */s/ Alexis Piazza*
Laura L. Faer*
*Supervising Deputy Attorney General*
Alexis Piazza*
Heidi Joya*
Garrett Lindsey*
*Deputy Attorneys General*
Maureen Onyeagbako*
*Supervising Deputy Attorney General*
1515 Clay St.
Oakland, CA 94612
(510) 879-3304
Laura.Faer@doj.ca.gov
Alexis.Piazza@doj.ca.gov
Heidi.Joya@doj.ca.gov
Garrett.Lindsey@doj.ca.gov
Maureen.Onyeagbako@doj.ca.gov


**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

By: */s/ Amanda I. Morejón*
Amanda I. Morejón (BBO #696737)
Jessica L. Palmer*
Lauren E. Van Driesen*
Elizabeth R. Walsh*
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Amanda.Morejon@law.njoag.gov
Jessica.Palmer@law.njoag.gov
Lauren.VanDriesen@law.njoag.gov
Elizabeth.Walsh@law.njoag.gov


**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

By: */s/ Adelaide Pagano*
Megan Barriger (BBO #687707)
*Senior Trial Counsel*
Adelaide Pagano (BBO #690518)
*Assistant Attorney General*
Yael Shavit (BBO #695333)
*Chief, Consumer Protection Division*
Chris Pappavaselio (BBO #713519)
Matthew Lindberg (BBO #633630)
*Assistant Attorneys General*
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2038
megan.barriger@mass.gov
adelaide.pagano@mass.gov
yael.shavit@mass.gov
chris.pappavaselio2@mass.gov


**PHILIP J. WEISER**
Attorney General
State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Darren Kinkead*
Darren Kinkead*
*Public Interest Counsel*
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov


**LETITIA JAMES**
Attorney General
State of New York

By: */s/ Sandra Park*
Sandra Park*
*Civil Rights Bureau Chief*
Monica Hanna*
Rabia Muqaddam*
*Special Counsels*
Alex Finkelstein*
Wil Handley*
Kathryn Meyer*
*Assistant Attorneys General*
28 Liberty Street
New York, New York 10005
(212) 416-8250
sandra.park@ag.ny.gov

**ANTHONY G. BROWN**
Attorney General
State of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson*
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
VWilliamson@oag.state.md.us


**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

By: */s/ Aaron J. Bibb*
Aaron J. Bibb*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
bibbaj@doj.state.wi.us

*Pending pro hac vice applications to be filed.*

## <u>CERTIFICATE OF SERVICE</u>

I, Adelaide Pagano, certify that on March 6, 2025, I provided a copy of the forgoing document to individuals at the U.S. Department of Justice by electronic mail:

Alex Haas
Co-Director, Federal Programs Branch
alex.haas@usdoj.gov

Diane Kelleher
Co-Director, Federal Programs Branch
diane.kelleher@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

/s/ Adelaide Pagano
Adelaide Pagano (BBO #690518)
*Assistant Attorney General*