# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF NEW YORK; and STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, in her official capacity as former Acting Secretary of Education and current acting Chief Operating Officer, Federal Student Aid; LINDA MCMAHON, in her official capacity as Secretary of Education, <br><br> Defendants. | Civil Action No. 25-10548-MJJ |

## MEMORANDUM AND ORDER ON PLAINTIFF STATES' MOTION FOR TEMPORARY RESTRAINING ORDER

March 10, 2025

JOUN, D.J.

On March 6, 2025, the states of California, Massachusetts, New Jersey, Colorado, Illinois, Maryland, New York, and Wisconsin (collectively, "Plaintiff States") filed suit against defendants Secretary of Education Linda McMahon and former Acting Secretary of Education Denise Carter, in their official capacities, and the United States Department of Education ("Department"; collectively, "Defendants"). Plaintiff States allege that, starting on February 7, 2025, the Department arbitrarily terminated all grants previously awarded under the Teacher

Quality Partnership ("TQP") Program and the Supporting Effective Educator Development

("SEED") Grant Program in violation of the Administrative Procedures Act ("APA").[1]

Plaintiff States filed a Motion for Temporary Restraining Order, [Doc. No. 2], and a

hearing was held this afternoon at 2:30 P.M. Upon consideration of Plaintiff States' briefs and

supporting evidence, the parties' oral argument, and for the reasons explained below, I GRANT

Plaintiff States' Motion and enter a temporary restraining order ("TRO") against Defendants

pursuant to the terms outlined at the end of this Order.

## I.    DISTRICT COURT JURISDICTION

Defendants argue the waiver of sovereign immunity in the APA, 5 U.S.C § 702, does not

extend to actions of contract which are within the exclusive jurisdiction of the Court of Federal

Claims under the Tucker Act, 28 U.S.C. § 1491. Plaintiff States disagree, arguing waiver of

sovereign immunity allows for suit in this Court.

Very recently, another session in this District examined this precise issue in a

substantially similar case to this one. *Massachusetts v. Nat'l Institutes of Health,* No. 25-cv-

10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025). In that case, in a thoughtful analysis, Judge

Angel Kelley determined that the "essence" of the action was not contractual in nature since the

source of the plaintiffs' rights was in federal statute and regulations and because the relief was

injunctive in nature. *See id.* at *8. I agree with, and adopt, Judge Kelley's reasoning and

conclusion. Here, similarly, Plaintiff States seek equitable relief in the form of reinstatement of

the TQP and SEED grants. Plaintiff States also seek to enjoin Defendants from implementing,

giving effect to, maintaining, or reinstating under a different name the termination of any

---

[1] The parties do not dispute that the termination of SEED and TQP grants constituted final agency action.

previously awarded TQP and SEED grants. In other words, Plaintiff States seek to preserve the previous status quo to alleviate corresponding harm; they are not alleging claims for past pecuniary harms. Plaintiff States have also sufficiently shown that the dispute does not hinge on the terms of a contract between the parties, but rather "federal statute and regulations put in place by Congress and the [Department]." *See id.* at *6. This Court retains jurisdiction.[2]

## II.    TEMPORARY RESTRAINING ORDER

The standard for issuing a TRO—an "extraordinary and drastic remedy"—is "the same as for a preliminary injunction." *Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) (cleaned up). Plaintiff States must show that weighing the following four interests favors granting a TRO:

> (i) the likelihood that the movant will succeed on the merits; (ii) the possibility that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of relevant hardships as between the parties; and (iv) the effect of the court's ruling on the public interest.

*Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009).

### A.  Likelihood of Success

I begin with the likelihood of success on the merits, which is considered the most important of the four elements and the "sine qua non" of the calculus. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). Plaintiff States allege that Defendants committed substantive violations of the APA by taking an agency action that is (1) arbitrary and capricious and an abuse of discretion, and (2) not in accordance with law. Based on the evidence before me now, I find that Plaintiff States are likely to succeed on the merits of their claims.

---

[2] For purposes of the TRO, Plaintiff States have established their recipient institutions of higher education and local educational agencies are public instrumentalities of Plaintiff States, which have standing to bring suit on their behalf.

The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (cleaned up); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (cleaned up)). That "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

The record reflects that there was no individualized analysis of any of the programs; rather, it appears that <u>all</u> TQP and SEED grants were simply terminated. See Doc. 8-13 at 60. And all the programs received the same standardized form letter notifying them of the grant terminations ("Termination Letter"), which states as follows:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. . . . In addition to complying

with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

[Doc. No. 1-1 at 2].

I see no reasoned explanation articulated for the Department's action here. First, the Termination Letter lists several theoretical bases for the grant terminations—stating the grants fund programs that, for example, "promote or take part in DEI initiatives" *or* "are not free from fraud, abuse, or duplication" *or* "otherwise fail to serve the best interests of the United States"— but fails to identify which of these bases applies here. This does not reach the level of a reasoned explanation; indeed it amounts to no explanation at all. Second, even accepting any one of these bases as justification for the agency action, such as discrimination related to DEI initiatives, the Termination Letter is arbitrary and capricious because its statements are only conclusory. "[C]onclusory statements will not do; an agency's statement must be one of *reasoning.*" *Amerijet*, 753 F.3d at 1350 (cleaned up); *see also Nat'l Institutes of Health*, 2025 WL 702163, at *18 ("[The agency's] proffered 'reasons' fail to grapple with the relevant factors or pertinent aspects of the problem and fails to demonstrate a rational connection between the facts and choice that was made."). There is no indication that the Department "examine[d] the relevant data," *Motor Vehicle Mfrs.*, 463 U.S. at 29; to the contrary, the record reflects a lack of the individualized reasoning and analysis required. To the extent that Defendants claim that it is sufficient explanation for the Department to baldly assert that the grants "no longer effectuate[]"

Department policies," such an assertion cannot stand. In the absence of any reasoning, rationale, or justification for the termination of the grants, the Department's action is arbitrary and capricious.

The Department's failure to provide a reasoned explanation is "even more egregious in light of the drastic change" from the existing policies under which the grant awards had been authorized. *Nat'l Institutes of Health*, 2025 WL 702163, at *18. "Although a change in policy does not result in a heightened standard of review, if an agency's 'new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests' an agency's failure to consider such factors 'would be arbitrary or capricious.'" *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). In such cases, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). As described, the Termination Letter failed to provide any reasoned explanation, let alone one that considered the facts and circumstances underlying the prior policy.

For these reasons, Plaintiff States are likely to succeed in their claims that the Department's action in terminating the grants is arbitrary and capricious.[3]

### B. Irreparable Harm

Plaintiff States have adequately shown that they would be irreparably harmed if temporary relief were not granted. An "irreparable injury" for the purposes of preliminary relief is "an injury that cannot adequately be compensated for either by a later-issued permanent

---

[3] This suffices for purpose of the present TRO and I need not, at this time, reach the argument in Count II that there exists a separate ground for a substantive violation of the APA, i.e., an action not in accordance with the law.

injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies. The two are flip sides of the same coin: if money damages will fully alleviate harm, then the harm cannot be said to be irreparable." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989). Here, there is ample evidence that the Department's termination of all previously awarded TQP and SEED grants has already harmed, and will continue to harm, the programs and employees of those programs that rely on these grants. *See* [Doc. No. 8; Doc. Nos. 8-1 to 8-21].

The termination of funding for a program at the California State University with the objective of training and developing "highly qualified community-centered teachers who could staff and support high-need or high-poverty urban K-12 schools and students, particularly with regard in the areas of special education," has resulted in the loss of mentoring, training, and vital support for 26 students, and the loss of financial stipends for about 50 incoming students who need these stipends to participate in classroom teaching. [Doc. No. 8-3 at ¶¶ 7, 16, 22]. In New Jersey, The College of New Jersey was forced to cancel the remainder of its urban teacher residency program due to the loss of its TQP grant. [Doc. No. 8-9 at ¶ 21]. Here in Massachusetts, where Boston Public Schools had relied on their TQP grant to support their teacher pipeline programming designed to address the need and shortage of multilingual educators, [Doc. No. 8-2 at ¶ 8], the abrupt termination of this grant has resulted in the loss of three-full time employees who were being funded by the grant. [*Id.* at ¶ 28]. Thus, it is apparent that the harms which have already resulted, and which will continue to result, from the grant terminations are irreparable.

Moreover, I agree with Plaintiff States that a later-issued permanent injunction or damages remedy cannot compensate for such loss of federal funding. [*See* Doc. No. 7 at 24]. Plaintiff States have sufficiently established that the loss of this funding "threatens the very existence" of the teacher pipeline programs implemented by Plaintiff States, and there is no traditional remedy that can compensate Plaintiff States for the disruptions and discord resulting from the abrupt terminations of these grants. *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986); *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (unrecoverable funds can constitute irreparable harm). The record shows how the terminations have "upended months, if not years" of work required to implement programs that rely on these grants, and how terminations have impacted "budgets for staff, coursework, partner organizations, school districts, and student populations" and existing projects or projects already in progress. [Doc. No. 7 at 25]; *see, e.g.*, [Doc. No. 8-1 at ¶¶ 20-22 (loss of grant hindered a program at University of Massachusetts Amherst that was one and a half years into a five-year project with significant deliverables already scheduled); [Doc. No. 8-12 at ¶ 18 (grant termination interrupted recruitment and retention activities)].

For these reasons, Plaintiff States have established irreparable harm. *See K–Mart,* 875 F.2d at 915 ("District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief") (cleaned up).

### C.  Balance of Hardships/Effect on Public Interest

Finally, upon consideration of the last two factors, the balance of the equities weighs heavily in favor of granting Plaintiff States' TRO, and a TRO would serve the public interest.[4]

---

[4] The last two factors "merge when the Government is the party opposing the [TRO]." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The record shows that if I were to deny the TRO, dozens of programs upon which public schools, public universities, students, teachers, and faculty rely will be gutted. On the other hand, if I were to grant the TRO, as another court has put it, Defendants "merely would have to disburse funds that Congress has appropriated to the States and others." *New York v. Trump*, 25-cv-39, 2025 WL 357368, at *4 (D.R.I. Jan. 31, 2025) (cleaned up). I find that, "absent such an order, there is a substantial risk that the States and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding." *Id.* Further, "[t]he fact that [Plaintiff States] have shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest." *Id.* Accordingly, the last two factors weigh in favor of granting Plaintiff States' TRO.

## III.    CONCLUSION

For the reasons stated above, Plaintiff States' Motion for Temporary Restraining Order, [Doc. No. 2], is <u>GRANTED</u>. It is therefore <u>ORDERED</u> that, until further order is issued by this Court:

1.    Defendants shall immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded TQP or SEED grants for recipients in Plaintiff States;

2.    Defendants are temporarily enjoined from implementing, giving effect to, maintaining, or reinstating under a different name the termination of any previously awarded TQP or SEED grants for recipients in Plaintiff States, including but not limited to through the Termination Letter, Termination GAN, and any other agency actions implementing such terminations, such as suspension or withholding of any funds approved and obligated for the grants;

3.      Defendants are temporarily enjoined from terminating any individual TQP and SEED grant for recipients in Plaintiff States, except to the extent the final agency action is consistent with the Congressional authorization and appropriations, relevant federal statute, including the requirements of the APA, the requirements of the relevant implementing regulations, the grant terms and conditions, and this Court's Order;

4.      Within 24 hours of entry of this Order, Defendants shall provide notice of the TRO to their employees and anyone acting in concert with them, and to all TQP and SEED grantees in Plaintiff States;

5.      Defendants shall file a status report with the Court, within 24 hours of entry of this Order, confirming their compliance with the Court's TRO;

6.      This TRO shall become effective immediately upon entry by this Court. The TRO shall remain in effect for 14 days; and

7.      By March 11, 2025 at 5 P.M., the parties shall jointly propose a briefing schedule regarding Plaintiff States' request for preliminary injunction.


SO ORDERED.

                                        /s/ Myong J. Joun
                                        United States District Judge