## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF NEW YORK; and STATE OF WISCONSIN,<br><br>      Plaintiffs,<br><br>          v.<br><br>U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, in her official capacity as former Acting Secretary of Education and current acting Chief Operating Officer, Federal Student Aid; LINDA MCMAHON, in her official capacity as Secretary of Education,<br><br>      Defendants. | Case No. 1:25-cv-10548 |

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFF STATES' OPPOSITION TO DEFENDANTS' EMERGENCY MOTION TO STAY</u>

# TABLE OF CONTENTS

**Page**

Introduction.................................................................................................... 1

Argument ....................................................................................................... 2

    A.    A Stay Is Not Warranted Because This Court Correctly Found That
Plaintiffs Were Likely to Succeed on Their Claim That Defendants
Failed to Provide the Required Reasoned Explanation and Failed to
Consider Reliance Interests, in Violation of the APA. ............................ 4

        1.    The Department Relies on Impermissible Post-Hoc
Rationalizations in Seeking a Stay of the TRO. ........................... 8

        2.    Contrary to the Department's Assertions, the TRO Was
Properly Granted as This Is Not an Unreviewable Matter of
Agency Discretion. ....................................................................... 9

        3.    The TRO Was Properly Granted Because the Tucker Act
Does Not Divest This Court of Jurisdiction............................... 12

        4.    Remand Is Not Appropriate at This Early Stage. ....................... 15

    B.    The Court Correctly Found That the Balance of Equities Heavily
Favors Plaintiff States, and Thus, a Stay of the TRO Is Not
Warranted.............................................................................................. 16

Conclusion ................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Almeida-Leon v. WM Cap. Mgmt., Inc.*,
   No. 20-2089, 2024 WL 2904077 (1st Cir. June 10, 2024)................................................. 3

*Alpharma, Inc. v. Leavitt*,
   460 F.3d 1 (D.C. Cir. 2006) ........................................................................................... 6

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   No. CV 25-239 (LLA), 2025 WL 597959 (D.D.C. Feb. 25, 2025) ................................ 19

*Am. Fed'n of Gov't Emps., Local 2924 v. Fed. Labor Relations Auth.*,
   470 F.3d 375 (D.C. Cir. 2006) ......................................................................................... 9

*Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014) ....................................................................................... 5

*Ark. Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*,
   527 F. Supp. 3d 40 (D. Mass. 2021). .............................................................................. 3

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988). ..................................................................................................... 14

*Calvary Chapel of Bangor v. Mills*,
   984 F.3d 21 (1st Cir. 2020). ............................................................................................ 3

*Castellini v. Lappin*,
   365 F. Supp. 2d 197 (D. Mass. 2005) ............................................................................ 12

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
   38 F.4th 1099 (D.C. Cir. 2022) ...................................................................................... 14

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019) ................................................................................................. 9, 10

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020). ........................................................................................................... 6

*Does 1-3 v. Mills*,
   39 F.4th 20 (1st Cir. 2022) .............................................................................................. 2

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Healthy Teen Network v. Azar,*
  322 F. Supp. 3d 647 (D. Md. 2018) ............................................................... 10

*Int'l Assoc. of Machinists and Aerospace Workers v. E. Airlines,*
  925 F.2d 6 (1st Cir. 1991). ............................................................................ 19

*Katz v. Cisneros,*
  16 F.3d 1204 (Fed. Cir. 1994) ................................................................. 13, 15

*King County v. Azar,*
  320 F. Supp. 3d 1167 (W.D. Wash. 2018) .......................................... 10, 11, 12

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ................................................................................ 10, 12

*Massachusetts v. Nat'l Insts. of Health,*
  No. 25-CV-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025). ...... 6, 9, 12, 14

*Megapulse, Inc. v. Lewis,*
  672 F.2d 959 (D.C. Cir. 1982). ........................................................ 12, 13, 14

*Milk Train, Inc. v. Veneman,*
  310 F.3d 747 (D.C. Cir. 2002) ....................................................................... 10

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983). ................................................................................ 5, 7, 8

*Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump,*
  No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) ........................... 19

*Office of Personnel Mgmt. v. Am. Fed'n of Gov't Employees, AFL-CIO,*
  473 U.S. 1301 (1985) ....................................................................................... 4

*Padula v. Webster,*
  822 F.2d 97 (D.C. Cir. 1987). ....................................................................... 11

*Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs.,*
  328 F. Supp. 3d 1133 (E.D. Wash. 2018) ............................................... 10, 12

*Pol'y & Res., LLC v. U.S. Dep't of Health & Human Servs.,*
  313 F. Supp. 3d 62 (D.D.C. 2018) ......................................................... 10, 11

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Republic Maximal LLC v. Romulus Cap. Partners II, LLC,*
   2024 WL 4519812 (D. Mass. Oct. 17, 2024) ................................................... 2

*Societe Generale de Surveillance, S.A. v. Raytheon Eur. Mgmt. & Sys. Co.,*
   643 F.2d 863 (1st Cir. 1981) ........................................................................ 3

*Union of Concerned Scientists v. Wheeler,*
   954 F.3d 11 (1st Cir. 2020) ......................................................................... 11

*Williams v. Zbaraz,*
   442 U.S. 1309 (1979) ................................................................................... 2

*Winter v. Nat. Resources Defense Council, Inc.,*
   555 U.S. 7 (2008). ....................................................................................... 15

**Statutes**

20 U.S.C. § 1022 ............................................................................................... 8

20 U.S.C. § 1022e ............................................................................................. 8

20 U.S.C. § 6672 ............................................................................................... 8

28 U.S.C. § 1331 ............................................................................................. 12

5 U.S.C. § 701 .................................................................................................. 9

5 U.S.C. § 705 ................................................................................................. 15

**Regulations**

2 C.F.R. § 200.340 ....................................................................................... 9, 11

2 C.F.R. § 200.346 ........................................................................................... 18

2 C.F.R. § 3474.1 ............................................................................................ 11

# INTRODUCTION

In its Emergency Motion for Stay Pending Appeal ("Motion"), the Department now insists that its decision to terminate virtually every previously awarded grant under two Congressionally authorized teacher pipeline programs is not subject to review under the Administrative Procedure Act (APA) or the very regulations the Department itself purports to rely on as its source of authority. Doc. No. 55. Instead, it incorrectly characterizes this case as one about money and delayed payments. But this case is not a contract dispute about monies owed. This case, at its core, is about the Executive Branch's lack of authority to unilaterally withhold previously awarded funds, without any explanation and in contravention of statutes and regulations.

This Court correctly concluded that Plaintiff States are likely to prevail on the merits. There is nothing in Defendants' motion that would change this conclusion and even more reasons provided by Defendants to support the Court's decision.

Defendants' termination of all previously awarded grants under the Teacher Quality Partnership (TQP) Program and the Supporting Effective Educator Development (SEED) Program failed to provide the required reasoned explanation and improperly disregarded the significant reliance interests at stake here. The Department's evolving position in this Motion on its own priorities is an impermissible post-hoc rationalization of the terminations, its actions are not an unreviewable matter of agency discretion, and the Court has jurisdiction. The Court properly considered the myriad irreparable harms that would result if the grants remained terminated and the teacher pipeline programs they fund to address the nation's severe teacher shortage were forced to close. Doc. No. 41 at 6-9. The temporary restraining order ("TRO") was correctly decided.

The TRO's purpose is to preserve the status quo while this matter is expeditiously litigated, to avoid programs in Plaintiff States being irremediably shuttered. The Court set an accelerated

briefing schedule for the preliminary injunction, with briefing complete on March 21, 2025, and a hearing one week later, on March 28.[1] Doc. No. 52. Defendants nonetheless seek a stay for the purpose of seeking an appeal.  But the Court's provisional order is not appealable. Moreover, there is no support for Defendants' claim that grant recipients will draw down all remaining grant funds; indeed, grant recipients are subject to federal regulations as well as payment rules incorporated in their grant awards.

## ARGUMENT

Defendants are not entitled to the "extraordinary" remedy, *Williams v. Zbaraz*, 442 U.S. 1309, 1311 (1979), of a stay pending appeal of the TRO entered by the Court on March 9, 2025. A stay pending appeal is appropriate only if "the stay applicant has made a strong showing" that (1) its appeal will "likely . . . succeed on the merits"; (2) it "will be irreparably injured absent a stay"; (3) "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) the stay would be in "the public interest." *Does 1-3 v. Mills*, 39 F.4th 20, 24 (1st Cir. 2022) (quoting *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 44 (1st Cir. 2021)); *see Republic Maximal LLC v. Romulus Cap. Partners II, LLC*, 2024 WL 4519812, at *5 (D. Mass. Oct. 17, 2024) (same factors apply for district court); *see also Ark. Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*, 527 F. Supp. 3d 40, 58 (D. Mass. 2021).  "The

---

[1] Defendants' counsel also acknowledged at the hearing that "obviously, the Court has jurisdiction to enter [a TRO] without notice even and so the government greatly appreciates the Court's courtesy with respect to today's hearing." Tr. at 16:6-8.  Counsel also acknowledged that he was "prepared to talk about the likelihood of success on the merits to the extent the Court is considering that factor with respect to entering a TRO" but that he would want more time to brief a preliminary injunction. *Id.* at 37:23-38:6. In sum, there was nothing improper about the Court crediting Plaintiff States' sworn declarations regarding the exigency of the situation and issuing temporary relief before receiving a brief from Defendants. The Court heard argument from Defendants, which counsel himself indicated he was "prepared" to argue. *Id.* Defendants' change of course in this Motion to now make the wholly unsupported argument that Plaintiff States are trying to shield the district court's order from appellate review should be dismissed outright.

party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009).

As a threshold matter, Defendants' putative appeal from the TRO is improper, and there is therefore no basis to enter a stay pending appeal. "[T]he grant of a TRO generally is not appealable." *Almeida-Leon v. WM Cap. Mgmt., Inc.*, No. 20-2089, 2024 WL 2904077, at *4 (1st Cir. June 10, 2024); *accord Calvary Chapel of Bangor v. Mills*, 984 F.3d 21, 26-27 (1st Cir. 2020). Although there is an exception to that rule where a TRO is "an injunction masquerading as a TRO," *Almeida-Leon*, 2024 WL 2904077, at *4, that is not the case here. Rather, this Court entered a TRO days ago—on March 10, 2025—and promptly entered an expedited briefing schedule on Plaintiff States' motion for preliminary injunction. That schedule assures that the motion will be fully briefed by March 21, 2025, with a hearing scheduled for March 28, 2025. Doc. No. 52.

The record thus establishes that the TRO is a "temporary and short" order imposed while a request for preliminary relief is briefed, and not in any way "an injunction masquerading as a TRO." *Almeida-Leon*, 2024 WL 2904077, at *4. And the TRO's purpose is to maintain the status quo while this matter is expeditiously litigated, not to impose durable relief in the form of an injunction. As the First Circuit has explained, a TRO entered under such circumstances, in compliance with Rule 65(b)(2) and entered to permit the court to resolve a pending motion for a preliminary injunction, is not appealable. *See Almeida-Leon*, 2024 WL 2904077, at *5 (finding no appellate jurisdiction over such a TRO); *compare, e.g., Societe Generale de Surveillance, S.A. v. Raytheon Eur. Mgmt. & Sys. Co.*, 643 F.2d 863, 865 n.2 (1st Cir.1981) (finding appellate jurisdiction in appeal from TRO in place "for more than a year"). Because the First Circuit lacks jurisdiction over defendants' putative appeal, there is no basis for a stay of this Court's order pending appeal. *Cf., e.g., Office of Personnel Mgmt. v. Am. Fed'n of Gov't Employees, AFL-CIO,*

473 U.S. 1301, 1306 (1985) (Burger, C.J., in chambers) ("[S]ince the Court of Appeals was without jurisdiction over the appeal from the District Court's order denying the temporary restraining order, the motions panel was necessarily without authority to grant such a stay.").

Even if Defendants' Motion were not jurisdictionally flawed, it must also be denied because Defendants cannot meet the standard for securing a stay pending appeal.

**A.    A Stay Is Not Warranted Because This Court Correctly Found That Plaintiffs Were Likely to Succeed on Their Claim That Defendants Failed to Provide the Required Reasoned Explanation and Failed to Consider Reliance Interests, in Violation of the APA.**

First, Defendants insist that their termination of 104 of 109 TQP and SEED grants by means of identical form letters is not in fact a categorial determination, and therefore, the Court's TRO was granted in error. *See* Doc. No. 55-1 at 4 ¶ 27; Doc. No. 55 at 3-4. As an initial matter, it is absurd to suggest that the fact that the Department allegedly preserved less than five percent of grants, while offering identical form Termination Letters to the remaining 104 grants, renders the Department's mass cancelation of grants *not* a categorial determination.[2]

In any event, the Department concedes that it utilized a single form Termination Letter to terminate all of the TQP and SEED grants at issue, and the existence of an alleged 5 remaining grants (with unnamed grantees) has no bearing on the lawfulness of the Department's reliance on a Termination Letter to effectuate a mass termination that was devoid of any reasoned explanation. *See* Doc. No. 56 (Oglesby Decl.) at ¶¶ 22-25; Doc. No. 55 at 6-7 (noting that Department "used a

---

[2] Indeed, the Department effectively concedes that the terminations amounted to a categorical determination. *See* Doc. No. 55 at 6-7; Emergency Mot. for Stay Pending Appeal and Immediate Admin. Stay, *California v. Department of Education*, No. 25-1244 (1st Cir.), Mar. 12, 2025, at 16 ("[T]he Department identified grants with a common characteristic (funding DEI) and terminated the grants on that basis."). And a Department official informed a Plaintiff State recipient via email on February 21, 2025 that "[a]ll the grants have been terminated," "[a] new GAN email was sent out to everyone, some have not received the letter," and "[a]ll the accounts in G6 [the Department's grant management system] are closed." Doc. No. 8-13 at ¶ 18 and Ex. C.

template response to communicate its position" at the time).[3] As this Court correctly found, the Termination Letter's use of the disjunctive to list "several theoretical bases for the grant terminations . . . does not reach the level of a reasoned explanation; indeed it amounts to no explanation at all." Doc. No. 41 at 5. The APA requires that an agency "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Department's actions fail that standard.

In its Motion, the Department now shares for the first time that "[a]ll of the grants it identified for termination shared a common characteristic, so the Department appropriately used a common response" which was "efficient and sensible" under the circumstances. Doc. No. 55 at 6-7.[4] This ignores the Department's failure to articulate in the Termination Letter what this purported "common characteristic" is, much less explain *how* these grants are "not in the best interests of the United States," which is the reason the Department now claims in its Motion is the "common" problem with all terminated TQP and SEED grants. *Id.* These conclusory explanations now relied on by the Department in its Motion are also insufficient under the APA. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("Restating a rule from which an exception is sought explains nothing about *why* the agency denied the exception; it begs the question.") (emphasis in original); *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 11 (D.C. Cir. 2006) (holding that FDA "flatly

---

[3] Defendants argue that the APA does not require an individualized as opposed to a categorical policy choice about what projects the government will fund. Setting aside that question, the APA plainly *does* require a reasoned explanation, and here, the Department offered no reasoned explanation for its decision on *either* a grant-by-grant or program-wide basis. Indeed, the Department's Termination Letter failed to provide grant recipients with *any* explanation at all.

[4] Defendants claim that the grants were terminated on the basis of a shared "common characteristic," but that flatly contradicts the Termination Letters themselves, which list, in the disjunctive, several other potential reasons for termination.

declare[d] that 'the agency had a clear rationale for its determination that 100 grams/ton would be the optimally effective dose for controlling necrotic enteritis.' The problem is that the letter offers no hint of what that 'clear rationale' might have been. Accordingly, we are unable to determine whether it was reasonable."). Nor should the Court credit Defendants' self-serving claims that they engaged in individualized decision-making, where the actual contemporaneous rationale, a disjunctive list of "several theoretical bases for the grant terminations" provided by the Department, belies any notion of individualized decision-making.

The Department also failed to consider the impact of its abrupt decision and reliance on its prior determination that these recipients were worthy of grant funds. As the Supreme Court has explained, where an agency is "not writing on a blank slate" it must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). In *Massachusetts v. National Institutes of Health*, the court found that the NIH's failure to consider similar reliance interests violated the APA, noting grant recipients' reliance on anticipated grant funding in "formulat[ing] their operating budgets" and planning their "staffing needs." No. 25-CV-10338, 2025 WL 702163, at *19 (D. Mass. Mar. 5, 2025). The court also credited reliance interests beyond those of institutions that received the funding, including the interests of "students who will no longer be admitted to those institutions" and "to the local communities that will suffer from the loss of community-based programming." *Id*. The same is true here: the Department has failed to consider the interests of would-be teachers who are currently enrolled in grant recipients' teacher training and pipeline programs and who have arranged their lives around the expectation

that these programs and their stipends would continue.[5] This Court correctly noted the importance of these reliance interests, *see* Doc. No. 41 at 6, and Defendants have effectively conceded that they were not considered in their decision-making process. *See* Doc. No. 56 at ¶¶ 7, 18-20 (describing process of reviewing grants, which includes no consideration of reliance interests or the impact of termination).[6] The Department's apparent desire to terminate millions of dollars in grant funds in an "efficient" and expedient manner does not give it license to ignore the devastating real-world impacts of its actions.

Finally, as the District Court noted, "[a]n agency action is arbitrary and capricious if the agency has 'relied on factors which Congress has not intended it to consider[.]'" Doc. No. 41 at 4 (citing *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43). Here, the Department did just that. In its Motion, the Department abandons any pretense that these terminations were related to anything other than an administration policy disfavoring *lawful* diversity, equity, and inclusion initiatives. Doc. No. 55 at 7. This reasoning is patently arbitrary and capricious in view of the fact that the

---

[5] Doc. No. 8-4 at ¶ 20 ("The financial assistance provided to teacher candidates is essential. It enables teacher candidates to complete a demanding year-long clinical preparation program which, among other things, requires them to teach four days a week in a high-needs or high-poverty K-6 school while taking classes one day a week and in the evenings (leaving no time for employment to support themselves in a teacher preparation program). Without the financial assistance provided through the TQP grant, the 15 teacher candidates whom CSE expects to participate in the Program will not be able to enroll and participate in the Program. Similarly, without a financial stipend, many future potential teacher candidates will not be able to enroll in the BEST Program, thereby further exacerbating the teacher shortage in our rural region.").

[6] Defendants now, for the first time, include new and different reasons for the terminations that are not included in the Termination Letters at all, including that the grants shared a "common characteristic," such as material associated with "anti-racism" and "social justice" that was deemed "objectionable." *See* Doc. 55 at 3, 6. These new reasons are inconsistent with what defense counsel argued in court just two days earlier, namely that the termination of these grants was based on the Department's view that grant recipients' programs violate federal anti-discrimination law. Tr. at 46-47. These shifting explanations of the reason for the terminations is further evidence of the arbitrary and capricious nature of the agency's action.

statutes authorizing these grants make clear that Congress intended and even *required* grant recipients to advance those aims. *See* 20 U.S.C. § 1022e(b) (requiring grant recipients to assure that "general education teachers receive training in providing instruction to ***diverse populations***, including children with disabilities, limited English proficient students, and children from low-income families") (emphasis added); 20 U.S.C. § 6672(a)(1) (expressing a purpose that grant recipients should provide teachers, principals, and school leaders "from nontraditional preparation and certification routes or pathways to serve in traditionally underserved" schools); 20 U.S.C. § 1022 ("The purposes of this part are to ... recruit highly qualified individuals, ***including minorities*** and individuals from other occupations, into the teaching force.") (emphasis added). Defendants fail to address this argument in their Motion at all, and this provides a separate and independently sufficient basis to deny the stay motion.

Defendants remaining arguments fail to show any likelihood of success on appeal.

1. **The Department Relies on Impermissible Post-Hoc Rationalizations in Seeking a Stay of the TRO.**

As a threshold issue, when a new administration changes its overall priorities, it must provide a reasoned explanation that considers all the aspects of the problem or reasons for the change. *State Farm*, 463 U.S. at 43 (requiring agency "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"). The Department conceded as much. Tr. at 45. It has not done so here, and in fact, the Department effectively agreed that it had not actually changed its priorities, only its determination of whether previously awarded grants violated, for example, federal antidiscrimination laws. Tr. at 46. Defendants now walk back that position, focusing instead on "objectionable materials associated with DEI," such as "anti-racism" and "cultural responsiveness," and dropping any pretense that the focus only on "unlawful" DEI was even a consideration. Doc. No. 55 at 3. The Department's effort now, in its

8

Motion, Doc. No. 55 at 7, to change course and argue that there are new Department priorities—ones distinct from what they argued to this Court earlier this week—only further underscores that it has not provided the required reasoned explanation. *See, e.g.*, *State Farm*, 463 U.S. at 49–50 ("The short—and sufficient—answer to petitioners' submission is that the courts may not accept appellate counsel's post hoc rationalizations for agency action."); *Nat'l Insts. of Health*, 2025 WL 702163, at *21 (same); *see also Am. Fed'n of Gov't Emps., Local 2924 v. Fed. Labor Relations Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006) (court may find agency decision to be arbitrary and capricious if action is the product of illogical reasoning); *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 934 (D.C. Cir. 2008) (same with respect to inconsistent reasoning).

Setting that aside, the regulations simply do not permit an agency to terminate existing grants based on new priorities mid-stream. *See* Doc. No. 7 at 21-23; Tr. at 28-30. Defendants' view of 2 C.F.R. § 200.340, which governs when the Department may terminate a grant for failure to effectuate agency priorities, misreads that provision. But regardless, the Court's order focused on a separate, independent basis to support the TRO, *see* Doc. No. 41 at 6 n.3, and Defendants' disagreement with Plaintiff States' contrary to law claim not yet decided by this Court provides no basis to stay the TRO.

### 2. Contrary to the Department's Assertions, the TRO Was Properly Granted as This Is Not an Unreviewable Matter of Agency Discretion.

Defendants are not likely to succeed on their argument that the Department's decision to terminate the TQP and SEED grants at issue is not subject to APA reasoned decision-making requirements. To start, the APA "embodies a 'basic presumption of judicial review,'" *Dep't of Commerce v. New York*, 588 U.S. 752, 771 (2019), that is overcome only if (1) a statute "preclude[s] judicial review" or (2) "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court, however, has "quite narrowly" read the "§ 701(a)(2)

exception for action committed to agency discretion . . . , restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *New York*, 588 U.S. at 772 (quoting *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)).

Defendants point to *Lincoln v. Vigil* to suggest that narrow exception to judicial review applies here. Doc. No. 55 at 4-6; 508 U.S. 182 (1993). There, the Supreme Court held that the Indian Health Service's decision to re-allocate funds that Congress appropriated "for the benefit, care, and assistance of the Indians," was unreviewable as committed to agency discretion. *Lincoln*, 508 U.S. at 184-85. That is because "an agency's allocation of funds from a lump-sum appropriation requires a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* at 193. Nevertheless, the *Lincoln* court noted that "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes," and disputes about the applicability of such restrictions are judicially reviewable. *Id.*

Applying *Lincoln*, courts have frequently reviewed grant award decisions where Congress, or the implementing agency, have cabined the agency's "discretionary funding determinations." *See Pol'y & Res., LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (finding a grant termination reviewable under the APA and arbitrary and capricious on the merits); *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 328 F. Supp. 3d 1133, 1145-49 (E.D. Wash. 2018) (same); *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647 (D. Md. 2018) (same); *King County v. Azar*, 320 F. Supp. 3d 1167, 1175 (W.D. Wash. 2018) (same); *see also Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002) (agency allocation of funds reviewable where Congress determined that moneys were to be used for "economic losses incurred during 1999"). Thus, the relevant question for determining

reviewability here is whether a statute, regulation, or other binding policy "provide[s] meaningful standards for a court to employ when reviewing agency decisions under the APA." *Pol'y & Res., LLC*, 313 F. Supp. 3d at 76; *see also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 20 (1st Cir. 2020) (EPA decision was subject to judicial review where "sufficient standards exist[ed] for meaningful review of the decision-making process at issue"); *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987). Notably, "the fact that the statute leaves a great deal of discretion to the agency," does not "make actions pursuant to it unreviewable." *Union of Concerned Scientists*, 954 F.3d at 19.

Here, the Department's termination decision is governed by meaningful standards that this Court can employ. The Department has adopted OMB's Uniform Guidance for Federal Financial Assistance (Uniform Guidance), which provides enumerated grounds on which an agency may terminate a grant award. *See* 2 C.F.R. § 200.340(a); 2 C.F.R. § 3474.1. In other words, the Uniform Guidance provides a meaningful standard for the court to employ in reviewing the termination decision at issue here. The district court's decision in *Policy & Research* provides a useful example on this point. There, HHS argued that its decision to shorten the program period for Teen Pregnancy Prevention Program (TPP) grants by two years was unreviewable. 313 F. Supp. 3d at 76. Then-Judge Ketanji Brown Jackson found that HHS's termination of the TPP grants was subject to judicial review because "HHS's regulations expressly address—and limit—the agency's discretion to 'terminate' monetary awards" such that there were meaningful standards to apply to the agency's decision. *Id.* at 76-77 (termination of grant awards "without explanation and in contravention of the regulations was an arbitrary and capricious act"); *see also King County*, 320 F. Supp. 3d at 1175 ("HHS regulations provide a clear standard against which the Court may judge" the termination of TPP grants).

11

Defendants' attempt to characterize the TQP and SEED terminations as a decision to allocate funding among grant recipients similarly fails. *See also id.* at 1176 (mid-performance period grant termination was not "an allocation decision between various grant options"). The funds have already been allocated to the TQP and SEED recipients, and Defendants offer no support for the idea that an agency can re-allocate such funds, Doc. No. 55 at 4, nor did it conduct any "complicated balancing of . . . factors . . . particularly within [its] expertise," *Lincoln*, 508 U.S. at 193. Accordingly, the termination decision is subject to judicial review under the APA.[7]

### 3. The TRO Was Properly Granted Because the Tucker Act Does Not Divest This Court of Jurisdiction.

The Court correctly determined that the Tucker Act has no application here. *See* Doc. No. 41 at 2-3. District courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Tucker Act does not eliminate that jurisdiction. Plaintiffs allege unlawful agency action, not breach of contract, and those claims belong in Article III courts. *See, e.g.*, *Nat'l Insts. of Health*, 2025 WL 702163, at *4-8. In assessing whether the Tucker Act impliedly precludes jurisdiction, courts consider "both . . . the source of the rights upon which the plaintiff bases its claims, and . . . the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

---

[7] Moreover, even if Defendants could invoke *Lincoln* in some effort to support a decision not to fund new grants, the decision does not support the notion that the Department can simply stop funding grants that were already entered into in a manner inconsistent with the terms of the award or applicable regulatory requirements. *See, e.g.*, *Planned Parenthood of Greater Wash. & N. Idaho*, 328 F. Supp. 3d at 1145-47 (rejecting argument that HHS's decision not to issue future continuing awards is unreviewable as it is "committed to agency discretion" because *Lincoln* (applying § 701(a)(2)) is narrow and finding that HHS arbitrarily and capriciously terminated program where program was successful, and agency's "justification" was that decision was in best interest of government because of policy concerns with program); *Castellini v. Lappin*, 365 F. Supp. 2d 197, 200-05 (D. Mass. 2005) (*Lincoln* did not render BOP decision to terminate boot camp program unreviewable where program was enabled by Congress and established through notice and comment regulations).

First, with respect to the source of rights, Plaintiff States base their claims on federal regulations, the statutes authorizing these grant programs, and on the APA—not on the grants themselves. The fact that a Court may have to consider the language of a contract as part of its regulatory or statutory analysis does *not* convert the claim to one whose "essence" is a contract claim. *Megapulse, Inc.*, 672 F.2d at 969–70 ("[W]e do not accept the Government's argument that the mere existence of such contract-related issues must convert this action to one based on the contract. This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds."); *Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994) (holding that case was "not a contract case," as "[Plaintiff] does not seek declaratory relief in the performance of a contract, but seeks judicial interpretation of a federal regulation," and the fact that the "challenged regulations are tracked in the language of the contract between [the parties]" is not controlling). !

Defendant insists that the on-point decision in *National Institutes of Health* is inapplicable because it "dealt with the lawfulness of agency guidance and sought to vacate it" whereas "Plaintiffs here challenge a series of individual grant terminations." Doc. No. 55 at 6 (emphasis omitted). *National Institutes of Health* involved a decision to slash the rate of reimbursement for indirect costs in violation of statute and regulation, impacting numerous grant awards. Here, the Department made a decision to categorically terminate grant funding for what it perceived to be all DEI-related projects, in violation of governing regulations and statutory purposes clearly embracing diversity, equity, and inclusion. Thus, as in *National Institutes of Health*, the Department has engaged in an unlawful agency action that affects many grant awards. Like in *National Institutes of Health*, the fact that the unlawful agency action here implicates the payment

of funds subject to grant awards does not alter the source of the rights at stake, which are statutory and regulatory, not contractual.!

Second, "the type of relief sought (or appropriate)" here differs from the relief available in a Tucker Act action. *Megapulse*, 672 F.2d at 968; *see also Nat'l Insts. of Health*, 2025 WL 702163, at *5.[8] Plaintiffs seek neither a money judgment nor specific performance of a contract. Instead, they seek declaratory and injunctive relief returning the parties to the pre-existing status quo prior to the termination under all previously awarded TQP or SEED grants for recipients in Plaintiff States.

The relief sought by Plaintiff States is classic APA relief; courts frequently set aside agency actions, which may then result in the payment of money, but such claims are not compensatory damages for a broken contract. The Supreme Court has made clear this type of suit may proceed in district court, because it "is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory [and regulatory] mandate itself." *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988). The fact that an injunction—or a judgment setting aside agency action—may later cause the government to make payments does not strip this Court of jurisdiction. *See Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1108 (D.C. Cir. 2022) ("[E]ven if the plaintiff filed the complaint with an eye to future monetary awards, a district court with otherwise appropriate

---

[8] Defendants attempt to distinguish *National Institutes of Health* by arguing that "although they cast their claim for relief in equitable terms, at base what Plaintiffs demand is access to money." Doc. No. 55 at 6. But *National Institutes of Health*, like this case, involved the federal government's unlawful action and equitable relief to place the funding recipients in the status quo ante, prior to the unlawful agency action. That it might require the agency to pay funds does not convert the claim into one for money damages.

jurisdiction may hear the claim and grant the proper equitable relief.") (quotation omitted); *Katz*, 16 F.3d at 1208 ("That a payment of money may flow from a decision that HUD has erroneously interpreted or applied its regulation does not change the nature of the case."). In sum, this Court retains jurisdiction because the source of the rights at issue and the relief sought demonstrate that the "essence" of the case does not sound in contract.

### 4. Remand Is Not Appropriate at This Early Stage.

Defendants' argument that the Court "should have remanded to the agency for additional consideration" misunderstands the posture of the case and the scope of the order. Doc. No. 55 at 7. The Court's TRO (and the preliminary injunctive relief Plaintiffs are seeking) is merely an interim measure until the parties can litigate the merits of the case to a final judgment. *See, e.g.*, 5 U.S.C. § 705 ("reviewing court . . . may issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings."). At the merits stage, the Court will decide whether the grounds for the agency action are inadequate and what the proper remedy will be. The traditional remedy following judicial review of administrative action may well include an order preventing reliance on the flawed agency action or a remand to the agency, but that sort of final relief at the conclusion of a case does not strip a court of its equitable authority to grant temporary provisional relief while it considers the merits of the administrative claim. *See Winter v. Nat. Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). Defendants do not get to remand this case at the beginning to shore up their decision with respect to these grants for further litigation.[9]

---

[9] Nor would it be practical to do, especially given the numerous additional grounds on which Plaintiff States assert the Department's action was unlawful and which have not yet been addressed by the Court.

**B.     The Court Correctly Found That the Balance of Equities Heavily Favors Plaintiff States, and Thus, a Stay of the TRO Is Not Warranted.**

This Court correctly found that "the balance of the equities weighs heavily in favor of granting Plaintiff States' TRO." Doc. No. 41 at 8. If grant recipients had not been restored to the pre-termination status quo, projects would continue to have to make difficult decisions, such as laying off staff, closing applications to prospective candidates, and shuttering programs upon which public schools, universities, students, teachers, and faculty rely. *See, e.g.*, Tr. at 8-13, Doc. No. 8-2 at ¶ 28, Doc. No. 8-3 at ¶ 26; Doc. No. 8-7 at ¶¶ 19, 20, Doc. No. 8-9 at ¶ 21, Doc. No. 8-10 at ¶¶ 21, 24, 29, Doc. No. 8-11 at ¶¶ 8. 26, Doc. No. 8-12 at ¶ 18; Doc. No. 8-15 at ¶ 20, Doc. No. 8-16 at ¶¶ 19-21; *see also* Doc. No. 41 at 7-9 (crediting that record).  Once those programs are dissolved, the lights cannot so easily be turned back on. Tr. at 8; Doc. No. 8-9 at ¶ 21; Doc. No. 41 at 7. As this Court correctly found, the Department's termination of all previously awarded TQP and SEED grants has already harmed, and will continue to harm, the programs that rely on those grants. Doc. No. 41 at 7. And a later-issued injunction or monetary damages could not compensate for the loss of federal funding where the very existence of the programs themselves is in jeopardy. *Id.*

Defendants contend that Plaintiff States' harms are undercut because plaintiffs purportedly "waited approximately a month before bothering to sue," in an effort, according to Defendants, to deliberately manufacture an emergency. That argument ignores reality. The Department itself pulled the rug out from under grant recipients with *no notice* whatsoever, creating the need for the emergency relief this Court properly granted. And it was the Department's own flagrant incompetence in rolling out the termination of virtually all previously awarded TQP and SEED

grants that prevented Plaintiff States' from filing sooner.[10] Under these circumstances, investigating the facts about the Department's disordered and chaotic termination of these grants, across dozens of projects in eight different states understandably took time. Plaintiff States should not be further prejudiced by Defendants' haphazard termination process by now having the delay that *Defendants caused* held against them. Contrary to Defendants' contentions, the equities favor Plaintiff States.

Moreover, the Department asserts, without any factual or legal support, that if the TRO remains in place, grant recipients will draw down all remaining grant funds as quickly as possible and that the Department will have no opportunity to recover these funds if they prevail. ECF No. 55 at 7. To be clear, Defendants' concerns are unfounded. Grantees may not simply draw down millions of dollars of funds from the Department with abandon; grant recipients must comply with all applicable federal regulations as well as the payment rules incorporated into their grant award. *See, e.g.,* Doc. No. 8-10 at Ex. C (noting that 2 CFR Part 200, as adopted at 2 CFR 3474, has been incorporated into the TQP grant agreement). Indeed, the Department itself referenced several

---

[10] The chaotic rollout of this sudden wave of terminations came without any advance warning. Grant recipients received these termination letters on a rolling basis, with some not receiving the letters until days after first getting a grant award notification terminating their grants. Doc. No. 8-3 at ¶ 18-19; Doc. No. 8-10 at ¶¶ 16-17. This created considerable confusion about the Department's actions. Additionally, at least one grant recipient had to reach out to their contact at the Department to clarify whether their grant was in fact cancelled because they had received no communication, *see* Doc. No. 8-13 at ¶ 18; Doc. No. 8-13 at Ex. C, and at least one other grant recipient *still* has not received a copy of the Termination Letter. Doc. No. 8-16 at ¶ 18. Further, some grant recipients sought to reach out to the Department to see if the Department would hold the termination in abeyance pending reconsideration but received only prolonged silence from the Department in response. *See, e.g.,* Doc. No. 8-4 at ¶ 25; Doc. No. 8-5 at ¶ 27; Doc. No. 8-14 at ¶ 23; Doc. No. 8-17 at ¶ 26.

restrictions governing the withdrawal of funds in the notice it sent to grantees pursuant to this Court's TRO Order.[11]

Many grantees submit annual performance and data verification sheets. *See, e.g.*, Doc. No. 8-10 at ¶ 14, Doc. No. 8-20 at 15. Department personnel are also in frequent contact with grant recipients for the purpose of monitoring grant compliance. For example, the University of Buffalo participated in quarterly monitoring calls with a SEED program officer, where UB reported on, among other things, project activities, expenditures, and expected drawdowns. *See* Doc. No. 8-20 at ¶ 15; *see also* Doc. No. 8-1 at ¶ 19 ("Throughout the planning and implementation stages of this teacher residency, we have consistently received the approval and support of our TQP grant officer."). UB's most recent monitoring call with its program officer took place on January 27th—just two weeks prior to grant termination—and the Department did not raise any concerns about project progress or other issues. *See* Doc. No. 8-20 at ¶ 16. Additionally, many grant recipients received successive or continuation awards, with no suggestion of wrongdoing by the Department. *See, e.g.*, Doc. No. 8-10 at ¶¶ 6-7, 10. After years of compliance under the awards and frequent touch points with the Department, *see, e.g.*, Doc. No. 8-10 at ¶¶ 9, 12, there is no support for the notion that grant recipients in Plaintiff States will now engage in fraud.

There are also myriad ways under existing law that the Department can recover any funding that is later found to be incorrectly dispersed. In fact, the Uniform Guidelines, which the Department itself contends govern this dispute, explicitly provides for such recovery. 2 C.F.R. § 200.346 ("Any Federal funds paid to the recipient or subrecipient in excess of the amount that the recipient or subrecipient is determined to be entitled to under the Federal award constitute a debt to the Federal Government."). Defendants' fear that it will never recover improperly disbursed

---

[11] This Notice is attached as Exhibit 1 to the Declaration of Adelaide Pagano.

funds, incorrectly assumes that Plaintiff States' recipients would act unlawfully and misunderstands governing laws. On the other hand, if the stay is granted, many grant programs will be harmed to the point of ruin. Doc. No. 41 at 8 ("[A] later-issued permanent injunction or damages remedy [here] cannot compensate for such loss of federal funding.").

Finally, the Court did not err in declining to impose a bond requirement. As an initial matter, there is "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." *Int'l Assoc. of Machinists and Aerospace Workers v. E. Airlines*, 925 F.2d 6, 9 (1st Cir. 1991). And, just as in *National Association of Diversity Officers in Higher Education v. Trump*, in this context, requiring a bond "would essentially forestall Plaintiffs' access to judicial review." No. 1:25-CV-00333-ABA, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025); *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (recognizing that, in this context, requiring a bond would "hold Plaintiffs hostage" for the harm resulting from Defendants' actions in unlawfully withholding previously committed funds).

## CONCLUSION

For these reasons, Plaintiff States respectfully request that the Court deny Defendants' Motion for a Stay Pending Appeal.

**ROB BONTA**
Attorney General
State of California

By: */s/ Alexis Piazza*
Laura L. Faer*
*Supervising Deputy Attorney General*
Alexis Piazza*
Heidi Joya*
Garrett Lindsey*
*Deputy Attorneys General*
Maureen Onyeagbako*
*Supervising Deputy Attorney General*
1515 Clay St.
Oakland, CA 94612
(510) 879-3304
Laura.Faer@doj.ca.gov
Alexis.Piazza@doj.ca.gov
Heidi.Joya@doj.ca.gov
Garrett.Lindsey@doj.ca.gov
Maureen.Onyeagbako@doj.ca.gov


**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

By: */s/ Amanda I. Morejón*
Amanda I. Morejón (BBO #696737)
Jessica L. Palmer*
Lauren E. Van Driesen*
Elizabeth R. Walsh*
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Amanda.Morejon@law.njoag.gov
Jessica.Palmer@law.njoag.gov
Lauren.VanDriesen@law.njoag.gov
Elizabeth.Walsh@law.njoag.gov


**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

By: */s/ Adelaide Pagano*
Megan Barriger (BBO #687707)
*Senior Trial Counsel*
Adelaide Pagano (BBO #690518)
*Assistant Attorney General*
Yael Shavit (BBO #695333)
*Chief, Consumer Protection Division*
Chris Pappavaselio (BBO #713519)
Matthew Lindberg (BBO #633630)
*Assistant Attorneys General*
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2038
megan.barriger@mass.gov
adelaide.pagano@mass.gov
yael.shavit@mass.gov
chris.pappavaselio2@mass.gov


**PHILIP J. WEISER**
Attorney General
State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

**KWAME RAOUL**
Attorney General
State of Illinois


By: */s/ Darren Kinkead*
Darren Kinkead*
*Public Interest Counsel*
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov


**LETITIA JAMES**
Attorney General
State of New York


By: */s/ Sandra Park*
Sandra Park*
*Civil Rights Bureau Chief*
Monica Hanna*
Rabia Muqaddam*
*Special Counsels*
Alex Finkelstein*
Wil Handley*
Kathryn Meyer*
*Assistant Attorneys General*
28 Liberty Street
New York, New York 10005
(212) 416-8250
sandra.park@ag.ny.gov


**ANTHONY G. BROWN**
Attorney General
State of Maryland


By: */s/ Virginia A. Williamson*
Virginia A. Williamson†
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
VWilliamson@oag.state.md.us


**JOSHUA L. KAUL**
Attorney General
State of Wisconsin


By: */s/ Aaron J. Bibb*
Aaron J. Bibb*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
bibbaj@doj.state.wi.us


*admitted *pro hac vice*
†motion for admission *pro hac vice* forthcoming

## <u>CERTIFICATE OF SERVICE</u>

Counsel for Plaintiff States certify that they have submitted the foregoing document with the clerk of court of the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff States hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).


<u>/s/ Adelaide Pagano</u>
Adelaide Pagano (BBO #690518)
*Assistant Attorney General*


Dated:  March 13, 2025