UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | |
| Plaintiffs, | Civil Action No. 25-10548-MJJ |
| v. | **Leave to File Excess Pages Granted on March 17, 2025** |
| U.S. DEPARTMENT OF EDUCATION, et al., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

The States of California, Colorado, Illinois, Maryland, Massachusetts, New Jersey, New York, and Wisconsin seek to compel the Department of Education to reinstate and make available millions of dollars in grants for programs that openly conflict with the Department's legitimate policy priorities.  Indeed, Plaintiffs seek to force the Department to fund these programs—against its will and considered judgment—during this litigation, without first proving their novel claims.  Although the Court may issue preliminary injunctive relief in rare and drastic circumstances, it cannot do so where, as here, Plaintiffs have not met their heavy burden of establishing that they are likely to succeed.  Plaintiffs have also failed to demonstrate that, if the Court denies their extraordinary request, they will suffer any immediate harm apart from a delay in payment—a classic form of *reparable* injury.  By contrast, interim relief will inflict irremediable harm on the federal government by forcing it to support activities that it does not want to, with funds that it likely cannot recoup should Defendants ultimately win this case.

As a threshold matter, this Court does not have jurisdiction to review—let alone countermand—an agency's discretionary decision on how to allocate funds.  Nor does the Court have jurisdiction over claims seeking to compel the payment of money allegedly due under a contract, which is exactly what Plaintiffs seek here.  And, even if the Court could review the Department's termination decisions under the reasoned-decisionmaking requirements of the Administrative Procedure Act (APA), those decisions easily pass muster under arbitrary-and-capricious review.  The Court's tentative decision last week concluded otherwise only by accepting the false premise that the Department had abolished these grant programs wholesale.  In fact, the Department made specific determinations whether to terminate *individual* grants, and then reasonably and transparently explained those decisions.

Nonetheless, Plaintiffs demand a restart to this funding *now* even though every dollar of the money that they seek would remain available to them *later* should they ultimately prove their entitlement to the funds.  They do so without concrete evidence that their own governments could not absorb the costs of the programs in the interim.  They do not suggest that their educational institutions will cease operating without these program-specific funds.  And they know full well that, if the Court enters preliminary relief requiring Defendants to release funds pursuant to the terminated grants, the Department will likely be unable to recover those funds once disbursed. Once the money is released it will be spent.  And it will be spent on activities that the Secretary of Education has deemed at war with her policy priorities—thus inflicting an antidemocratic harm on the Executive Branch and the public.  Defendants—not Plaintiffs—will suffer significant harm that cannot be undone at the conclusion of the case.

Rather than take the extraordinary step of issuing a preliminary injunction and essentially commandeering federal funds, the Court should chart a more cautious path—keep the funds with the Department for now and allow this case to proceed in the normal course.  For these reasons and those explained below, the Court should deny Plaintiffs' motion.

## II.    BACKGROUND

### A.  Legal Background

This case involves two grant programs implemented by the Department of Education pursuant to broad grants of authority by Congress.  The first, known as the Teacher Quality Partnership ("TQP") Program, provides that "the Secretary is authorized to award grants, on a competitive basis, to eligible partnerships, to enable the eligible partnerships to carry out" certain activities, including "a program for the preparation of teachers," "a teaching residency program," and "a leadership development program."  20 U.S.C. § 1022a(a), (c).  The second, known as the

Supporting Effective Educator Development ("SEED") Program, generally directs the Secretary to "award grants, on a competitive basis, to eligible entities for" five specified "purposes," such as "providing evidence-based professional development activities" and "making freely available services and learning opportunity to local education agencies."  20 U.S.C. § 6672(a).

### B.  Factual Background

After inviting applications for TQP and SEED grants, the Department selected certain grantees (including recipients in Plaintiff States) and made funding available to them.  Grantees may draw down these funds over the course of the fiscal year.  Doc. No. 55-1 at 5.

On February 5, 2025, the Acting Secretary issued a Directive on Department Grant Priorities, which contemplated an internal review to ensure that grants do not fund "discriminatory practices—including in the form of [diversity, equity, and inclusion ('DEI')]—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication."  *Id.* at 2.  In a multi-step process involving seven personnel over the course of a week, the Department reviewed each TQP and SEED grant individually and decided, after consulting each grant document and available information about the program, to terminate 104 grants.  *Id.* at 2-4.  Five grants remained in place.  *Id.* at 4.

For each terminated grant, the Department issued a letter stating that the funded programs "promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic;" "violate either the letter or purpose of Federal civil rights law;" "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education;" "are not free from fraud, abuse, or duplication;" or "otherwise fail to serve the best interests of the United States."  *Id.*  Citing both

"the termination provisions in" the grants and the Department's authority under "2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253," the letters terminated the recipients' grants. *Id.*

### C. Procedural History

On March 6, 2025, approximately one month after the Department issued the termination letters, Plaintiffs filed this lawsuit challenging the grant terminations. Doc. No. 1. The same day, Plaintiffs moved for a temporary restraining order seeking emergency relief on behalf of all TQP and SEED grant recipients in their States. Doc. No. 2. The next day, the Court scheduled a hearing on Plaintiffs' motion for the following business day and directed Plaintiffs to notify Defendants of the hearing. Doc. No. 20. The Court did not invite briefing from Defendants, but held a two-hour hearing and then issued an order later that day—granting Plaintiffs' requested emergency relief. Doc. No. 41. Subsequently, on March 12, 2025, the Court converted Plaintiffs' motion for a temporary restraining order into a motion for a preliminary injunction. Doc. No. 52. It also adopted Plaintiffs' proposed schedule for briefing that motion and set Defendants' deadline to oppose the preliminary injunction motion as March 17, 2025. *Id.*

## III.  LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The moving party "bears the burden of satisfying each of these four elements," using evidence to support its contentions. *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 225 (D. Mass. 2020). But, even then, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24; *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound

discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

## IV.    ARGUMENT

### A.  The Court lacks jurisdiction to issue preliminary injunctive relief.

"[T]his Court must decide whether it has jurisdiction over the subject matter of the dispute before it may proceed any further." *Griffith v. Bowen*, 678 F. Supp. 942, 944 (D. Mass. 1988). As a general rule, the federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). To sue a federal agency, a plaintiff must therefore identify an express waiver in the text of a federal law and show that its claim falls within the waiver's scope. *See FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text"). Here, Plaintiffs seek to rely on the APA, which includes a limited waiver of sovereign immunity for claims "seeking relief other than money damages." 5 U.S.C. § 702. That limited waiver does not, however, extend to this action for two independent reasons.

#### 1.  The Court lacks jurisdiction to review the Department's discretionary decisions regarding how to allocate funds.

*First*, the APA does not permit judicial review of "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Court therefore lacks jurisdiction because the Department's decisions here—which concerned how best to re-allocate funds to align with its policy objectives—were quintessential decisions committed to agency discretion by law.

In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decisionmaking standards. *See id.* at 185-88. The Court explained that the

"allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

Indeed, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193. "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.*

The TQP and SEED grant programs here confer significant discretion in determining how best to allocate appropriated funds across applicants. The statute governing TQP grants provides simply that "the Secretary is authorized to award grants, on a competitive basis, to eligible partnerships, to enable the eligible partnerships to carry out" certain specified activities. 20 U.S.C. § 1022a(a), (c). Similarly, the SEED grant statute generally directs the Secretary to "award grants, on a competitive basis, to eligible entities for" five specified "purposes," such as "providing evidence-based professional development activities" and "making freely available services and learning opportunity to local educational agencies." 20 U.S.C. § 6672(a). Neither statute constrains the Secretary's discretion to determine how best to allocate the funding for each program among many different potential grant recipients. Accordingly, the Department's

decisions in this context are discretionary decisions regarding how to allocate funds, not subject to arbitrary-and-capricious review under the APA.

Plaintiffs resist this conclusion in two ways. They first contend that the Department did not have *discretion* (or, at least, sufficient discretion) to re-allocate these funds. *See* Doc. No. 62 at 16. But they do not contend that Congress restricted the Department's discretion regarding TQP and SEED grants in any way. Rather, Plaintiffs claim that a single regulation—2 C.F.R. § 200.340(a)(4)—sufficiently constrains the Department's discretion to terminate grants such that *Lincoln* should not apply. *See* Doc. No. 62 at 16. But, if anything, this regulation reinforces, rather than restricts, the Department's discretion—making clear that the agency may cancel a grant if it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

Plaintiffs also argue that the Department did not actually *allocate* funds, but rather terminated them altogether. They insist that "[t]he funds have already been allocated to the TQP and SEED recipients." Doc. No. 62 at 17. But this assertion does not answer the question whether the Court may review the Department's decision to *re*-allocate those funds. The effect of terminating the specific grants at issue here is to enable the Department to award the remaining funds to *other* grant recipients and eligible applicants. That is, by definition, a decision to re-allocate funds.

## 2. The Court lacks jurisdiction to compel Defendants to pay money allegedly owed under the grant agreements.

*Second*, when a party seeks to access funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is typically suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). Under First Circuit precedent,

the Tucker Act vests exclusive jurisdiction over a case in the Court of Federal Claims where the plaintiffs are effectively seeking damages for breach of contract. *See, e.g.*, *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1987); *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978). And, under these circumstances, courts have routinely held that "grant agreements [are] contracts when the standard conditions for a contract are satisfied." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1360-62 (Fed. Cir. 2004) (treating a "Program Participation Agreement" and related grants under the Higher Education Act as a contract).

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also, e.g.*, *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017) (applying *Megapulse* test); *Califano*, 571 F.2d at 63 (evaluating whether "the essence of the action is in contract").

Here, the sole source of the rights that—if vindicated—could conceivably result in the forced payment of funds from Defendants to Plaintiffs are the grant agreements.  Plaintiffs claim that grantees are entitled to funds under certain grant instruments, and they allege (among other things) that "the terms and conditions of the TQP and SEED grant awards do not authorize termination on the grounds" cited by the Department.  Doc. No. 1 at 5; *see also, e.g.*, *id.* at 50-51. That central contention is essentially a contract dispute—*i.e.*, whether these grants were properly cancelled.  To be sure, Plaintiffs also invoke the APA, but their APA theory is simply that the Department failed to abide by the grant terms.  If that were sufficient to circumvent the Tucker Act, every breach-of-contract plaintiff could do so.

As for remedies, Plaintiffs ask the Court to "restore recipients in Plaintiff States to the pre-existing status quo prior to the termination[s]." Doc. No. 1 at 52. In these circumstances, that amounts to an injunction requiring the payment of money owed under a contract. But "an injunction to compel the payment of money past due under a contract" is an action at law—not equity. *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).

At bottom, the grants themselves—not any statute or regulation—give rise to any obligation to pay. And Plaintiffs' claim that the grants were improperly terminated boils down to an argument that the government violated the terms of the grant (including regulatory provisions incorporated into the instruments as such terms). "Stripped of its equitable flair," Plaintiffs' "requested relief seeks one thing": Plaintiffs "want[] the Court to order the Government to stop withholding the money due under" the grants—the "classic contractual remedy of specific performance." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 1:25-cv-465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) (quotation omitted). However, "[f]ederal courts do not have the power to order specific performance by the United States of its alleged contractual obligations." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989). As the First Circuit has explained, the APA's waiver of sovereign immunity for claims seeking relief other than money damages does not extend to "specific performance for breach of contract." *Id.* Thus, regardless of whether Plaintiffs seek to compel Defendants to pay money allegedly owed under the grants or seek to compel Defendants to abide by the terms of the grants, this Court lacks jurisdiction.

### B.  Plaintiffs have failed to establish a likelihood of success on the merits.

Even apart from the jurisdictional obstacles, Plaintiffs cannot obtain a preliminary injunction because they have not shown a likelihood of success on the merits. As the Court has often recognized, "proving likelihood of success on the merits is the '*sine qua non*' of a preliminary

injunction." *Akebia*, 443 F. Supp. 3d at 225. "Therefore, '[i]f the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity.'" *Id.* On the merits, Plaintiffs insist that the Department's decisions were arbitrary and capricious and contrary to law. But none of their arguments succeeds.

### 1. The Department's decisions were not arbitrary and capricious.

The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary-and-capricious standard "is quite narrow: a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). At bottom, this deferential standard requires only that "agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The Department's termination decisions plainly met that standard. The terminations came after the Department conducted an individualized review pursuant to the Acting Secretary's directive to identify grants that fund DEI programs that are contrary to the Department's policy priorities. *See* Doc. No. 55-1 at 2. The Department confirmed that specific grants in fact funded such programs and terminated those grants on that basis. *See id.* at 2-4. Particularly in the context of discretionary grants, where the Secretary unquestionably enjoys wide latitude to determine how best to implement the program, that decision-making process was both reasonable and reasonably explained. *Cf. Kreis v. Secretary of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989) ("the question whether a particular action is arbitrary or capricious must turn on the extent to which the relevant statute, or other source of law, constrains agency action").

Plaintiffs primarily contend that the Department's actions were arbitrary and capricious because it did not "engage[] in reasoned consideration of any individual recipient's project before terminating their grant." Doc. No. 7 at 26. Again and again, Plaintiffs insist that the Department terminated "*all* previously-awarded TQP and SEED grants" in one blanket and unthinking move. *Id.* at 25 (emphasis added); *see also* Doc. No. 62 at 6 (referring to "Defendants' termination of *all* previously awarded grants" (emphasis added)). But that is a demonstrably incorrect premise. The Department reviewed each TQP and SEED grant individually and then concluded that 104 grants should be terminated and that five should be retained. Doc. No. 55-1 at 4. Plaintiffs alternatively suggest that a "mass termination" of grants amounts to the same thing as a complete shutdown of the grant programs themselves. Doc. No. 62 at 9. But most is not all. And the Department's retention of some grants conclusively refutes their repeated refrain that it simply shuttered two grant programs altogether, as against Congress's appropriations and approvals.

Plaintiffs also claim that the termination decisions were not reasonably explained because they provided the *same* explanation to each grantee, and because this explanation identified *multiple* reasons why the grants no longer aligned with the Department's priorities. Doc. No. 7 at 25-26. Yet, Plaintiffs cite no authority to suggest that it is arbitrary and capricious for an agency to provide the same explanation across multiple decisions, if (as here) those decisions are all made for the same basic reason. Indeed, if an agency's explanation for multiple decisions is the same, it would seem disingenuous to provide recipients with differing explanations for the sheer sake of variation. Here, the Department conducted an individualized review of grants and identified a subset with a common characteristic (funding discriminatory DEI) that, in its judgment, warranted termination. Given that the Department's decisions were based on this common characteristic, the Department reasonably provided a common explanation to grantees.

11

Moreover, Plaintiffs are wrong that the letters invoked multiple "vague and theoretical bases for the termination[s]." Doc. No. 7 at 26. All the bases are related variations of the same theme: that the grants "support[ed] programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that unlawfully discriminate." Doc. No. 1-1 at 2. These include, for example, that the programs in question "promote or take part in DEI initiatives" and "conflict with the Department's policy of prioritizing merit, fairness, and excellence." *Id.* Particularly in light of the Acting Secretary's directive and the individualized review described above, the termination letters provide more than enough information such that the Department's "path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974).

Plaintiffs' remaining arbitrary-and-capricious arguments fare no better. For example, they argue that the Department's termination decisions "relied on factors which Congress has not intended it to consider." Doc. No. 7 at 27. In so doing, Plaintiffs note that the statute authorizing the TQP Program provides that grant recipients shall offer "training in providing instruction to diverse populations, including children with disabilities, limited English proficient students, and children from low-income families." 20 U.S.C. § 1022e(b)(4). And they note that the statute authorizing the SEED Program states that "the Secretary shall ensure that, to the extent practicable, grants are distributed among eligible entities that will serve geographically diverse areas, including urban, suburban, and rural areas." 20 U.S.C. § 6672(b)(3). But Plaintiffs nowhere explain how the statutory purposes they identify require that the *programs themselves* incorporate the sorts of DEI activities about which the Department was concerned.

In addition, Plaintiffs suggest that the termination letters fail to explain the government's change in positions or consider their reliance interests. However, the Department's priorities in

this context are matters of policy discretion and not of "factual findings." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And all the APA requires for a policy change is that an agency "display awareness that it *is* changing position." *Id.* The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* Moreover, Plaintiffs do not explain how grantees could reasonably develop reliance interests in grant programs that may be terminated at any time at the agency's policy discretion. And even if they could, it remains unclear how the Court could conclude that the Department did not adequately account for reliance interests based on the termination letters themselves, without reference to an administrative record.

## 2. The Department's decisions were not contrary to law.

Again, the APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). Here, Plaintiffs claim that the Department's termination decisions were "not in accordance with law" because, in their view, those decisions failed to comply with one provision of the OMB's Uniform Guidance for Federal Financial Assistance (Uniform Guidance). *See* Doc. No. 7 at 30. Specifically, Plaintiffs claim that the termination decisions failed to comply with 2 C.F.R. § 200.340(a)(4), which provides that a "[f]ederal award may be terminated in part or its entirety" by the federal agency "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." Therefore, according to Plaintiffs, the Department may only terminate grants

"for changed department priorities" if such language was previously set out "in the award's terms and conditions." Doc. No. 7 at 31.

As an initial matter, however, this version of the Uniform Guidance did not govern the Department's terminations of the grants at issue. The relevant version was instead the Uniform Guidance applicable *at the time* that these grants were awarded. *See Bennett v. New Jersey,* 470 U.S. 632, 638 (1985) ("obligations generally should be determined by reference to the law in effect when the grants were made"). And that version of the Uniform Guidance provided that a "Federal award may be terminated in whole or in part" by the agency "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities"—without reference to the terms and conditions of the award. 2 C.F.R. § 200.340(a)(2) (2020).

Even if the Court were to look to the version of the Uniform Guidance cited by Plaintiffs, they still are not likely to succeed. According to Plaintiffs, "[n]owhere do the grant terms and conditions" at issue here "permit termination on the grounds that the award is inconsistent with, and no longer effectuates, Department priorities." Doc. No. 7 at 32. That assertion, however, is simply incorrect. As the Department has explained, "[t]he invitations for all of these grants, which were published in the Federal Register, are considered part of the 'terms and conditions' of the Department's grant awards." Doc. No. 55-1 at 2. And those invitations expressly stated—thereby putting recipients on notice—that the Department could "[t]erminat[e] agreements in whole or in part to the greatest extent authorized by law if an award no longer effectuates the program goals or agency priorities (2 CFR 200.340)." *Id.*

Not only that, but as Plaintiffs acknowledge, this termination authority was also expressly incorporated into the Grant Award Notifications themselves. *See* Doc. No. 8-10 at 37 ("THE FOLLOWING ITEMS ARE INCORPORATED IN THE GRANT AGREEMENT . . . 2 CFR

PART 200 AS ADOPTED AT 2 CFR 3474"); Doc. No. 62 at 22 (acknowledging that "2 CFR

Part 200, as adopted at 2 CFR 3474, has been incorporated into the TQP grant agreement"). Thus,

even if the Court could in theory set aside a grant termination decision for failure to follow 2 C.F.R.

§ 200.340(a)(4), it would have no basis to do so here.

**C. Plaintiffs have failed to establish irreparable harm.**

To start, "[p]reliminary injunctions are generally granted under the theory that there is an

urgent need for speedy action to protect the plaintiffs' rights." *Akebia*, 443 F. Supp. 3d at 231

(citation omitted). Accordingly, a plaintiff's "[d]elay in seeking enforcement of those rights . . .

tends to indicate at least a reduced need for such drastic, speedy action." *Id.* Yet, as Plaintiffs

admit, the Department sent termination letters to the affected grant recipients over the course of a

few days beginning on February 7, 2025. Doc. No 1 at 3. These letters unequivocally stated that

"the United States Department of Education is terminating your federal award," and clearly

specified the effective date of termination. Doc. No. 1-1 at 2. Nonetheless, Plaintiffs waited nearly

a month before seeking preliminary relief to reverse those terminations. Doc. No. 2. During that

time, several grant recipients identified alternative sources of funding to continue offering their

affected programs uninterrupted. *See, e.g.*, Doc. No. 8-10 at 9; Doc. No. 8-18 at 10. And even if

some recipients have not secured alternative sources of funding, that would not warrant granting

sweeping preliminary relief to every grant recipient in the Plaintiff States. In all events, the point

remains that Plaintiffs' own conduct undercuts their claimed need for immediate relief.

In response, Plaintiffs have claimed that the Department "creat[ed] the need for the

emergency relief" by terminating grants "with *no notice* whatsoever." Doc. No. 62 at 21.

Respectfully, that misses the point. The question is not whether grantees received advance

warning of the termination decisions. It is whether they sought relief promptly *after* receiving

notice, in a manner consistent with their claimed need for immediate emergency relief. Waiting a month to sort things out—without conferring with Defendants before filing—tends to undermine any demand for immediate and drastic court-ordered relief.

Plaintiffs also claim that they did not act quickly because of the allegedly "chaotic" and "confus[ing]" way in which the termination decisions were issued. Doc. No. 62 at 22. But that explanation cannot be squared with their overarching complaint that grant recipients received the same notification letter providing the same reasons explaining that their grants had been terminated. *See* Doc. No. 1 at 3. While these notifications were surely disappointing to the recipients, they were by all accounts clear and consistent—not chaotic and confusing. *See* Doc. No. 1-1 at 2 ("the United States Department of Education is terminating your federal award").

Separate and apart from the delay, "[p]laintiffs seeking injunctive relief must make a 'clear showing' that substantial and immediate irreparable harm is 'likely' in the absence of an injunction." *Akebia*, 443 F. Supp. 3d at 230 (citation omitted). Plaintiffs claim that they will suffer irreparable harm by virtue of "the irredeemable loss of federal funding." Doc. No. 7 at 33. But they have not shown or even sought to explain how the loss of this funding would become "irredeemable" absent a preliminary injunction. To the contrary, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also, e.g.*, *Akebia*, 443 F. Supp. 3d at 230 ("economic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction" (citation and alteration omitted)); *Seafreeze Shoreside, Inc v. United States Dep't of Interior*, No. 1:22-cv-11091-IT, 2023 WL 3660689, at *7 (D. Mass. May 25, 2023) ("Plaintiffs have not demonstrated 'irreparable harm,' but at most, economic loss").

Plaintiffs appear to concede as much, but then argue that incurring "costs" may nonetheless "'constitute irreparable harm . . . where the loss threatens the very existence' of an organization." Doc. No. 7 at 33 (citation omitted). This Court has also recognized that, in rare circumstances, "economic losses may be sufficient" to establish irreparable harm where "the loss threatens the very existence of the movant's business." *Akebia*, 443 F. Supp. 3d at 230; *see also Kenworth of Bos., Inc. v. Paccar Fin. Corp.*, 735 F.2d 622, 625 (1st Cir. 1984) ("business closure can constitute irreparable harm"). The problem for Plaintiffs is that they do not claim such an existential threat. Indeed, they do not claim that the loss in federal funding will threaten the ability of a single grant recipient to continue as a going concern. What's more, the declarations that Plaintiffs submitted either fail to state whether steps were taken to secure interim sources of funding, or do not set forth any evidence to substantiate their conclusory assertions that no interim sources of funding exist.

Plaintiffs argue that the loss in federal funding threatens the existence of *certain programs* offered by the grant recipients. *See* Doc. No. 7 at 33. But there is an obvious and critical difference between (i) economic loss that prevents an institution from continuing to fund certain courses or fellowships during the pendency of a litigation and (ii) economic loss that threatens to shut an institution down. The two cases that Plaintiffs cite confirm the point. In *Packard Elevator v. ICC*, the court found that "petitioners' allegations of irreparable harm [were] speculative and unsubstantiated," while observing that "monetary loss may constitute irreparable harm only where the loss threatens the very existence of the [petitioner]'s business." 782 F.2d 112, 115 (8th Cir. 1986). And, in *National Association of Diversity Officers in Higher Educ. v. Trump*, the court found that the asserted economic loss was "severe enough to threaten Plaintiffs' existence." 2025 WL 573764, at *27 (D. Md. Feb. 21, 2025), *stay pending appeal granted*, No. 25-1189 (4th Cir.

March 14, 2025).  Neither court found irreparable harm based on economic loss resulting in the inability to continue offering a subset of services or programming.

Plaintiffs' attempt to characterize their harm as anything other than economic also fails. They assert that they will not be able to provide mentoring, training, housing, and other support for the individuals enrolled in their programs.  *See* Doc. No. 7 at 34-36.  But their purported inability to do so results solely from the loss of funding.  Defendants have not taken any actions— other than withholding money—that impede Plaintiffs' ability to carry on with these programs. The only thing that Defendants have done is stop footing the bill.  That is an economic loss. Otherwise, one could always convert the relevant harm for purposes of a preliminary injunction from (i) an economic loss to (ii) the inability to do things that cost money—thus swallowing the general rule that "economic loss alone does not usually rise to the level of irreparable harm." *Akebia*, 443 F. Supp. 3d at 230.

Finally, it is worth observing that even if Plaintiffs were correct that the terminations did not comport with the APA, vindicating that right would involve *remanding to the agency for further consideration or explanation*.  If that is the final relief Plaintiffs would theoretically be entitled to, it makes no sense to grant the broader relief of *reinstating the grants* in this preliminary posture.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) ("bedrock principles of administrative law preclude us from declaring definitively that the Secretary's decision was arbitrary and capricious without first affording her an opportunity to articulate, if possible, a better explanation").

### D. The balance of equities and public interest weigh against preliminary injunctive relief.

Nor have Plaintiffs shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555 U.S. at 32. Traditionally, a court first determines whether the movant's likely harm "will outweigh the harm which granting the injunction would inflict on [the defendant]." *7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (D. Mass. 2014). And then it considers whether "[t]he public interest weighs in favor of granting" the preliminary injunction. *Id.* at 285. But where, as here, the government is the defendant, these factors simply "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the balance of the equities and public interest tip decisively in Defendants' favor. If the status quo is preserved and the money is held by Defendants during the pendency of the case, the grantees can still obtain and use it (every dollar of it) at the end of the case. But the opposite is not true—if the grantees are given access now, and draw down the funds throughout the litigation, Defendants will be left with no meaningful recourse even if they prevail. Defendants will bear all the risk if the Court enters a preliminary injunction, whereas Plaintiffs will bear none if it denies one. In short, the equities clearly favor Defendants.

"Once funds leave the Department and go to grantees, the Department has limited ability to recover those disbursed funds." Doc. No. 55-1 at 5. These risks are exacerbated because no grantee has "promised to return withdrawn funds should its grant termination be reinstated." *Id.* Plaintiffs observe that any requests for advance payments by States and other recipients "must be limited to the minimum amounts needed and be timed with actual, immediate cash requirements." 2 C.F.R. § 200.305(b)(1); 31 C.F.R. § 205.11(b). But those regulations do not speak to the Department's ability to *recover* those payments; they do not speak to the *irreparable* nature of the harm that it will suffer if the Court allows those payments to flow throughout the case. The

operation of those regulations would affect only *how much* of the grant funds will be irrecoverably spent. Balancing the equities naturally requires comparing the relative harms that each party would suffer from an adverse ruling at this stage. And there is no serious doubt that Defendants will incur at least *some* irreparable harm if the Court enters a preliminary injunction, whereas Plaintiffs will incur no harm that cannot be remedied later if it does not.

Plaintiffs also contend that "the Department can recover any funding that is later found to be incorrectly dispersed," Doc. No. 62 at 23, but elide the fact that they would of course dispute that funds released pursuant to a Court-ordered injunction were "incorrectly dispersed." In any event, the sole regulation that Plaintiffs cite does not guard against the irreparable nature of the harm that Defendants would suffer. Plaintiffs point to 2 C.F.R. § 200.346, which provides that "[a]ny Federal funds paid to the recipient or subrecipient in excess of the amount that the recipient or subrecipient is determined to be entitled to under the Federal award constitute a debt to the Federal Government." This regulation therefore concerns only the government's ability to potentially recover payments that *exceed* a recipient's net award—which is not the case here.

Remarkably, Plaintiffs deny that Defendants would suffer *any* harm from a preliminary injunction. Plaintiffs summarily assert that "the federal government faces no harm from an injunction that merely ends an unlawful practice or reads a statute as required." Doc. No. 7 at 38 (citing *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)). But, for one thing, the case that Plaintiffs cite dealt with whether to preliminarily enjoin an allegedly unlawful immigration detention practice—not whether the forced payment of *unrecoverable funds* constitutes irreparable harm. For another, Plaintiffs' analysis incorrectly merges—entirely—the likelihood-of-success and balancing-of-the-equities factors. On their view, a defendant who is likely to lose on the merits deserves to lose, and therefore suffers no harm from a preliminary injunction.

In last week's order, the Court correctly did not adopt that circular analysis. The Court instead concluded that, if it entered preliminary injunctive relief, "Defendants 'merely would have to disburse funds that Congress has appropriated to the States and others.'" Doc. No. 41 at 9 (citation omitted). The Court's tentative determination, however, similarly failed to appreciate the full scope of the harm that the government will suffer. Indeed, the Court's assertion that the government would suffer no harm because it was only spending money Congress appropriated ignores the harm inflicted on the Department's prerogative *to allocate* those funds.

The relevant harm is not merely the forced expenditure of (unrecoverable) money during the pendency of this litigation. It is also the forced expenditure of money in support of causes that the Secretary has deemed inconsistent with her policy objectives. Put another way, it is not just the loss of money, but also the loss of control. Control that has been vested by statute in the Secretary, who in turn answers to the President and thus the public at large. Forcing the government to financially support causes at odds with its own policies inflicts a distinct and irremediable harm on the public that goes beyond the expenditure of appropriated funds.

### E.  Plaintiffs' requested relief is vastly overbroad.

If the Court were inclined to grant a preliminary injunction, it should clarify and narrow—rather than simply extend—the terms of its March 10, 2025 order. Plaintiffs succeeded in obtaining preliminary relief on behalf all grant recipients within their borders, including non-plaintiffs, presumably on the basis that the loss of funding to non-plaintiff recipients might later cause harm to the Plaintiff States' ability to hire certified teachers and provide their citizens with quality educations. Speculative and indirect injuries such as those, however, are insufficient to establish Article III standing, and are not the sort of harm required to support an injunction.

True, non-plaintiff recipients might have incurred monetary harms by virtue of the loss of funding to their programs. But those are not the *Plaintiffs'* monetary harms. *See CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) ("the issuance of a preliminary injunction requires a showing of irreparable harm *to the movant* rather than to one or more third parties"). Moreover, a State's choice to expend its own funds on a program that the federal government does not wish to fund is not a cognizable injury; it is federalism. And Plaintiffs' fears about a lack of qualified teachers reflects only "hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). Accordingly, the Court should—at a minimum—limit any relief to grant recipients that are themselves instrumentalities of the Plaintiff States. And it should clarify that the Department may continue to subject draw down requests to its normal checks and procedures.

### F. If the Court issues a preliminary injunction, it should require Plaintiffs to provide security.

Finally, if the Court issues a preliminary injunction, it should require Plaintiffs to post a bond. Rule 65(c) provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The circumstances here warrant requiring Plaintiffs to provide security in an amount that could compensate Defendants for the losses caused by a preliminary injunction (in the event that Defendants are found to have been wrongfully enjoined). Plaintiffs are eight well-resourced States purportedly seeking to set aside individual decisions to terminate discretionary grant awards. And, if the Court's order requires Defendants to "restore recipients in Plaintiff States to the pre-existing status quo prior to the termination[s]," Doc. No. 1 at 52, there is no dispute that Defendants will incur significant monetary losses during the litigation.

## V.    CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.


Respectfully submitted,

LEAH B. FOLEY
United States Attorney


Dated:  March 17, 2025          By:    /s/ Michael L. Fitzgerald
                                       MICHAEL L. FITZGERALD
                                       Assistant United States Attorney
                                       U.S. Attorney's Office
                                       1 Courthouse Way, Ste. 9200
                                       Boston, MA 02210
                                       (617) 748-3266
                                       michael.fitzgerald2@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.


                                       /s/ Michael L. Fitzgerald
                                       MICHAEL L. FITZGERALD
                                       Assistant U.S. Attorney


Dated:  March 17, 2025