# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF NEW YORK; and STATE OF WISCONSIN, | |
| Plaintiffs, | Case No. 1:25-cv-10548 |
| v. | **Leave to File Excess Pages Granted on March 17, 2025** |
| U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, in her official capacity as former Acting Secretary of Education and current acting Chief Operating Officer, Federal Student Aid; LINDA MCMAHON, in her official capacity as Secretary of Education, | |
| Defendants. | |

## REPLY IN SUPPORT OF PLAINTIFF STATES' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

Argument ............................................................................................................. 1

    I.      Plaintiffs Are Likely to Succeed on the Merits......................................... 1

          A.     The Termination of the Grants Is Arbitrary and Capricious.......... 1

          B.     The Termination of the Grants Is Contrary to Law. ...................... 5

          C.     The Termination Is Not an Unreviewable Matter of Agency
                  Discretion................................................................................... 8

    II.     This Court Has Jurisdiction. ................................................................ 10

    III.    Plaintiffs Have Shown Irreparable Harm.................................................. 11

    IV.    The Balance of Equities Heavily Favors Plaintiffs................................. 14

    V.     The Requested Relief Is Appropriate....................................................... 14

Conclusion ......................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Akebia Therapeutics, Inc. v. Azar,*
   443 F. Supp. 3d 219 (D. Mass.) ..................................................................... 12

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon,*
   No. 1:25-CV-00702-JRR, 2025 WL 833917 (D. Md. Mar. 17, 2025) ................. 2, 8, 12

*Am. Sci. & Eng'g, Inc. v. Califano,*
   571 F.2d 58 (1st Cir. 1978) ........................................................................... 11

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988). ...................................................................................... 11

*Burgos v. Milton,*
   709 F.2d 1 (1st Cir. 1983) .............................................................................. 11

*Butt v. State of California,*
   4 Cal. 4th 668 (1992) ..................................................................................... 15

*Cal. v. Dep't of Educ.,*
   No. 25-1244, slip op (1st Cir. Mar. 21, 2025) ............................................... 9, 10

*Califano v. Yamasaki,*
   442 U.S. 682 (1979). ...................................................................................... 15

*Campaign for Fiscal Equity, Inc. v. State,*
   86 N.Y.2d 307 (1995). ................................................................................... 15

*City & Cnty. of S.F. v. USCIS,*
   408 F. Supp. 3d 1057 (N.D. Cal. 2019) ........................................................ 12

*Climate United Fund v. Citibank N.A.,*
   2025 WL 842360 (D.D.C. Mar. 18, 2025); .................................................... 11

*CMM Cable Rep., Inc. v. Ocean Coast Properties,*
   48 F.3d 618 (1st Cir. 1995) ........................................................................... 15

*Coggeshall Dev. Corp. v. Diamond,*
   884 F.2d 1 (1st Cir. 1989) .............................................................................. 11

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ................................................................................ 2, 9, 18

*DHS v. Regents of the Univ. of Cal.,*
   591 U.S. 1 (2020). ........................................................................................... 4

*Dist. Hosp. Partners, L.P. v. Burwell,*
   786 F.3d 46 (D.C. Cir. 2015). ........................................................................ 5

# TABLE OF AUTHORITIES
## (continued)

Page

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ........................................................................................... 5

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
381 F. Supp. 3d 1127 (D. Alaska 2019) ............................................................. 3

*Hall v. City of Taft*,
47 Cal.2d 177 (1956) ........................................................................................ 15

*Healthy Teen Network v. Azar*,
322 F. Supp. 3d 647 (D. Md. 2018) ................................................................. 10

*In re Colonial Mortg. Bankers Corp.*,
324 F.3d 12 (1st Cir. 2003). ............................................................................. 15

*Jette v. United of Omaha Life Ins. Co.*,
18 F.4th 18 (1st Cir. 2021). ............................................................................... 6

*Katz v. Cisneros*,
16 F.3d 1204 (Fed. Cir. 1994) .......................................................................... 10

*King County v. Azar*,
320 F. Supp. 3d 1167 (W.D. Wash. 2018). ...................................................... 10

*K-Mart Corp. v. Oriental Plaza, Inc.*,
875 F.2d 907 (1st Cir. 1989). ........................................................................... 12

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016). ............................................................................ 14

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................................................................... 9

*Luokung Tech. Corp. v. Dep't of Def.*,
538 F. Supp. 3d 174 (D.D.C. 2021) ................................................................. 13

*Massachusetts v. Nat'l Insts. of Health*,
25-CV-10338, 2025 WL 702163 (D. Mass. 2025) ........................... 2, 10, 11, 14

*McDuffy v. Sec'y of Exec. Off. of Educ.*,
415 Mass. 545 (1993) ....................................................................................... 15

*Mediplex of Massachusetts, Inc. v. Shalala*,
39 F. Supp. 2d 88 (D. Mass. 1999). ................................................................. 12

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982). ........................................................................ 10

*Melone v. Coit*,
100 F.4th 21 (1st Cir. 2024). .............................................................................. 5

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................................ 2, 3

*Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*,
   554 F.3d 1290 (10th Cir. 2009) ......................................................................... 11

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017). ......................................................................... 10

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS*,
   328 F. Supp. 3d 1133 (E.D. Wash. 2018) ......................................................... 7, 9

*Policy & Research LLC v. HHS*,
   313 F. Supp. 3d 62 (D.D.C. 2018) ..................................................................... 9

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
   397 F.3d 56 (1st Cir. 2005). ............................................................................. 12

*Rosario-Urdaz v. Rivera-Hernandez*,
   350 F.3d 219 (1st Cir. 2003). ........................................................................... 13

*Ross-Simons v. Baccarat*,
   102 F.3d 12 (1st Cir. 1996). ............................................................................. 13

*Smith v. Heckler*,
   707 F.2d 1284 (11th Cir. 1983)......................................................................... 5

*Tennessee v. Dep't of Educ.*,
   104 F.4th 577 (6th Cir. 2024)........................................................................... 12

*Tootle v. Sec'y of the Navy*,
   446 F.3d 167 (D.C. Cir. 2006). ......................................................................... 11

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
   No. 1:25-CV-00465, 2025 WL 763738 (D.D.C. March 17, 2025)................................ 11

*Union of Concerned Scientists v. Wheeler*,
   954 F.3d 11 (1st Cir. 2020). ............................................................................. 9

*Venetian Casino Resort, L.L.C. v. EEOC*,
   530 F.3d 925 (D.C. Cir. 2008) ......................................................................... 3

*Victim Rts. L. Ctr. v. Cardona*,
   No. CIV 20-11104, 2021 WL 3516475 (D. Mass. Aug. 10, 2021)................................ 15

**Statutes**

20 U.S.C. § 1022b.......................................................................................... 4, 9

20 U.S.C. § 1022e........................................................................................... 4

# TABLE OF AUTHORITIES
## (continued)

**Page**

20 U.S.C. § 1232 ........................................................................................................... 3, 8, 9

20 U.S.C. § 6672 ................................................................................................................. 4, 9

20 U.S.C. §1022a ................................................................................................................... 4

5 U.S.C. § 701 ....................................................................................................................... 8

Cal. Educ. Code § 42238 ..................................................................................................... 15

Mass. Gen. L. ch. 70 ........................................................................................................... 15

N.Y. Educ. L. § 3601 ........................................................................................................... 15

**Regulations**

2 C.F.R. § 200.211 (2020) ..................................................................................................... 6

2 C.F.R. § 200.340 ............................................................................................... 1, 5, 6, 9

2 C.F.R. § 200.340 (2020) ................................................................................................. 5, 6

2 C.F.R. § 200.344 ............................................................................................................... 14

2 C.F.R. § 200.410 ............................................................................................................... 14

2 C.F.R. § 3474.1 ............................................................................................................... 5, 9

34 C.F.R. § 75.105 ............................................................................................................. 3, 8

85 Fed. Reg. 49506 (Aug. 13, 2020) ..................................................................................... 6

89 Fed. Reg. 30046 (Apr. 22, 2024) ..................................................................................... 6

89 Fed. Reg. 23573 (Apr. 4, 2024) ....................................................................................... 7

**Other Authorities**

Jessica Souza, *What is Social and Emotional Learning?* (Feb. 4, 2025),
    https://childmind.org/article/what-is-social-and-emotional-learning ................................ 4

Plaintiffs are likely to succeed on the merits of their claims that Defendants' abrupt termination of virtually all previously-awarded TQP and SEED grants violated the APA, necessitating preliminary relief. The Education Department's ("ED") action is arbitrary and capricious because, among other reasons, it provided only vague and conclusory reasons for termination devoid of any facts or analysis, acted contrary to the language and purpose of the grants' authorizing statutes, and failed to account for the impact on grant recipients or their reliance interests. The terminations also violate 2 C.F.R. § 200.340, the very regulation ED invokes. That regulation covers termination for failure to effectuate *existing* agency priorities; it does not permit ED to adopt new priorities on a whim and cancel ongoing grants midstream, nor does it permit termination on grounds not "clearly and unambiguously" set forth in the grant award. Absent this relief, Plaintiffs, their institutions of higher education, public schools, and students will suffer irreparable harm, including the demise of teacher preparation programs and school district partnerships, lay-offs, and loss of thousands of teachers to mitigate severe teaching shortages.

## ARGUMENT

### I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

#### A.    The Termination of the Grants Is Arbitrary and Capricious.

Defendants suggest that their mass termination of TQP and SEED grants, by means of identical form letters, is both reasonable and reasonably explained because ED individually reviewed the grants and purportedly preserved 5 out of 109 grants. *See* Doc. No. 69 at 11. But ED's alleged continuation of unidentified projects does not show a reasoned or individualized decision.[1]

Defendants argue that the grants were terminated on the basis of a "common characteristic

---

[1] To the contrary, Plaintiffs are aware of one potentially surviving grant, Ex. 24 at 2, which proposed to "focus on culturally responsive practices," Ex. 25 at 1, and thus included the same "objectionable" DEI-related conduct for which ED now says virtually all awards were terminated, Doc. No. 55-1 at ¶ 9, as discussed *infra* Section I.A; *see also* Doc. No. 8-13, Ex. C (ED official: "[a]ll the accounts ... are closed" and "[a]ll the grants ... have been terminated").

1

(funding discriminatory DEI)," and thus it was appropriate to send identical termination letters to each recipient. Doc. No. 69 at 11. This argument is unavailing. *First*, the APA requires a "rational connection between the facts found and the choice made." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019). Here, the Termination Letter contains *no* factual findings, much less a rational connection between any facts and the conclusion that grant recipients have the "common characteristic" of "discriminatory DEI." *See Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 1:25-CV-00702-JRR, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025) ("*AACTE*") (finding "Termination Letters fail[ed] to provide Grant Recipients any workable, sensible, or meaningful reason or basis for the termination[.]"), *recons. den.*, 2025 WL 863319 (Mar. 19, 2025). *Second*, the notion that the grants were terminated on the basis of a "common characteristic" is contradicted by the Termination Letters themselves, which list, in the disjunctive, several other potential reasons. Defendants' assertion that "[a]ll the bases are related variations of the same theme: ... [DEI] initiatives or any other initiatives that unlawfully discriminate," Doc. No. 69 at 12, is patently false. For example, the letter lists "fraud, abuse, or duplication" as a potential ground for termination, which has nothing to do with DEI. Doc. 1-1 at 1. And neither failing to "prioritiz[e] merit, fairness, and excellence in education" nor "fail[ing] to serve the best interests of the United States" clearly relates to DEI or unlawful discrimination. *Third*, ED's explanation that the grants were terminated based on a "common characteristic" is an impermissible post hoc rationalization. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 49-50 (1983); *Massachusetts v. Nat'l Insts. of Health*, 25-CV-10338, 2025 WL 702163, *21 (D. Mass. 2025) ("*NIH*").

Moreover, although Defense counsel now assert for the first time that grant recipients engage

in "*discriminatory* DEI" (Doc. No. 69 at 11),[2] the Oglesby Declaration tells a different story. Oglesby states that grants were "flagged as funding DEI contrary to the Secretary's directive," which facially encompasses *any* form of DEI, including unquestionably lawful endeavors. Doc. No. 55-1 at ¶ 11; Doc. No. 8-20. The declaration demonstrates that ED engaged in nothing more than a search for key words they dislike, *e.g.*, "social justice" and "anti-racism." Doc. No. 55-1 at ¶ 6. Defendants argue their decision is one "of policy discretion and not of 'factual findings,'" Doc. No. 69 at 12-13, but even if the Court accepted this notion, Defendants ignore that any change in policy requires them to "articulate 'good reasons' for the new policy." *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1138 (D. Alaska 2019) (articulating four-part test for changing policy). Where, as here, ED previously found that these grant projects met the priorities established by a notice-and-comment process, 20 U.S.C. § 1232; 34 C.F.R. § 75.105, it must articulate why it now believes the projects engage in "unlawful" DEI. *Friends of Alaska*, 381 F. Supp. 3d at 1140-1141.

Plaintiffs are also likely to succeed on their other arbitrary-and-capricious arguments. An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Insofar as ED's blanket terminations are based on a policy disfavoring *lawful* DEI initiatives, ED based its decision on criteria that conflict with the statutes authorizing the TQP and SEED programs, which require instruction in teaching "diverse" students in "underserved" schools, and meeting students' "social, emotional, and

---

[2] Counsel stated previously at the TRO hearing that ED had not changed priorities but had changed its view of whether previously-awarded grants violated federal antidiscrimination laws. *See* Mar. 10, 2025 Tr. at 46. Then, in a filing last week, ED alleged that the target was "objectionable material associated with DEI." *See* Doc. No. 55 at 3; *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 934-935 (D.C. Cir. 2008) (court may find agency decision to be arbitrary and capricious if action is product of inconsistent reasoning).

physical development." 20 U.S.C. §§ 1022e(b), 6672(a)(1), 1022a(d). ED insists that Plaintiffs have not explained "how the statutory purposes they identify require that the programs themselves incorporate the sorts of DEI activities about which [ED] was concerned." Doc. No. 69 at 12. But to what "DEI activities" is ED referring? The Termination Letter identifies none. Oglesby cites to concepts like "social justice" and "social and emotional learning,"[3] and fails to explain how or why these activities are objectionable. Doc. No. 55-1 at ¶¶ 9, 14-15.[4] ED's actions are contrary to the express language and intent of the authorizing statutes.

Additionally, Defendants concede that they did not consider grant recipients' reliance interests in their decision-making. *See* Doc. No. 55-1 at ¶¶ 7, 18-20. Where an agency is "not writing on a blank slate" it must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). Defendants assert that grantees cannot reasonably rely on grants "that may be terminated at any time at the agency's policy discretion," Doc No. 69 at 13, but as explained *infra* Section I.B, these grants *cannot* be terminated in the agency's discretion. Further, the statutes authorizing these grants expressly contemplate multi-year awards, and ED provided such awards to Plaintiffs. 20 U.S.C. §§ 1022b(a)(1), 6672(b)(1)-(2).

---

[3] Social and emotional learning (SEL) includes "managing difficult emotions, making responsible decisions, handling stress, setting goals, and building healthy relationships." *See* Jessica Souza, *What is Social and Emotional Learning?* (Feb. 4, 2025), https://childmind.org/article/what-is-social-and-emotional-learning. The TQP statute ***requires*** that early childhood educators receive training in techniques to improve children's social and emotional development. 20 U.S.C. § 1022a(d). That ED apparently flagged some grant projects for providing instruction in SEL, in furtherance of the statutory *requirements*, is plainly arbitrary and capricious.

[4] ED insists that the court cannot "conclude that the Department did not adequately account for reliance interests ... without reference to an administrative record." Doc. No. 69 at 13. To the extent ED relies on the declaration to explain its action, it is not part of the administrative record, *see* 5 U.S.C. § 706, is a post hoc rationalization, and Plaintiffs preserve their right to depose this witness.

Defendants' failure to account for Plaintiffs' reasonable reliance was arbitrary and capricious.[5]

### B.    The Termination of the Grants Is Contrary to Law.

Termination here is permitted only "pursuant to the terms and conditions of the award," 2 C.F.R. § 200.340(a)(4) (2024), which must specify—clearly and unambiguously—any basis for termination. Doc. No. 7 at 21-23. ED cited this regulation in both the Termination Letters and Grant Award Notices (GANs) as the only legal basis for termination. *See* Doc. No. 1-1, 1-2. Astonishingly, ED now cites a different provision, 2 C.F.R. § 200.340(a)(2) (2020),[6] which it argues is materially different. Doc. No. 69 at 14. This argument fails.

*First*, the Court cannot consider this new legal basis for the termination. "It is a bedrock principle of administrative law" that a reviewing court "may consider only the agency's explanation given at the time the relevant decision was made, as opposed to its post hoc rationale." *Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024). Even if the Court could consider it, ED's citation in the Termination Letter to a legal standard different than the one it now says applies is self-defeating. An agency's "[f]ailure to apply the correct legal standard or to provide [a] court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Smith v. Heckler*, 707 F.2d 1284, 1285 (11th Cir. 1983).

*Second*, even if the 2020 Uniform Guidance applied, ED would still be limited to

---

[5] Defendants incorrectly contend that the Court should "remand[] to the agency for additional consideration." Doc. No. 69 at 18. Neither of the cases ED cites involved remand to an agency at the preliminary injunction stage. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015). The preliminary injunctive relief Plaintiffs seek is an interim measure until the parties litigate the merits to a final judgment. *See, e.g.*, 5 U.S.C. § 705. The Court can address the propriety of remand at the merits stage; such potential final relief does not affect a court's ability to grant provisional relief.

[6] These regulations appear in OMB's Uniform Guidance for federal awards, 2 C.F.R. Part 200, which the Department adopted, 2 C.F.R. § 3474.1, and which OMB updated in 2020 and 2024. Defendants cited subpart (a)(4) in the Termination Letter and GAN, but in the 2020 version of the Uniform Guidance, (a)(4) concerns unrelated terminations *by the grant recipient*, not the agency.

termination on grounds that appear clearly and unambiguously in the award's terms and conditions. The 2020 Uniform Guidance revised 2 C.F.R. § 200.211 to require a federal agency to "make recipients aware, in a clear and unambiguous manner" of "the termination provisions" set forth in § 200.340. *See* 2 C.F.R. § 200.211 (2020); 85 Fed. Reg. 49506, 49507 (Aug. 13, 2020) (2020 Preamble).[7] The 2020 Uniform Guidance also revised 2 C.F.R. § 200.340(b) to require a federal agency, when terminating a federal grant, to "clearly and unambiguously specify termination provisions applicable to each Federal award." *See* 2 C.F.R. § 200.340(b) (2020). Taken together, these provisions make clear that agencies may only terminate grants under limited circumstances *and* must clearly and unambiguously set forth those circumstances in the GAN.[8]

The 2024 Uniform Guidance's clarifying revisions confirm this reading. The 2024 Uniform Guidance combined two provisions from the 2020 Uniform Guidance—former-section 200.340(a)(2), permitting termination "if an award no longer effectuates the program goals or agency priorities," and former-section 200.340(a)(5), permitting termination "pursuant to termination provisions included in the Federal award"—because one encompassed the other. *See* 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024). Thus, the 2024 Uniform Guidance was intended to clarify what was already true of the 2020 Uniform Guidance—namely, that a federal agency may terminate a federal grant only pursuant to the terms and conditions of the award.

The GANs here include terms and conditions setting forth just two grounds for

---

[7] OMB's contemporaneous preamble to its final rule warrants significant deference. *See Jette v. United of Omaha Life Ins. Co.*, 18 F.4th 18, 30-32 (1st Cir. 2021).

[8] Any argument that the GAN's reference to "2 C.F.R. part 200" sufficiently establishes its termination authority is circular. The 2020 and 2024 regulations both permit termination only pursuant to the terms and conditions of the award, and so the terms and conditions of the award must do more than incorporate those regulations. Moreover, a passing reference to 2 C.F.R. Part 200—which covers *all* aspects of grant administration—cannot possibly satisfy the requirement that the agency clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award. 2 C.F.R. §§ 200.340(b), § 200.211 (2020).

termination—material noncompliance and engaging in human trafficking. Doc. No. 7 at 22-23.
ED's termination on some other basis was, accordingly, not done "pursuant to the terms and
conditions of the award," regardless of whether the 2020 or 2024 version applies.[9] And
notwithstanding Defendants' assertion to the contrary, it is in fact the GAN that sets the terms and
conditions of the award, not the Notice Inviting Applications (NIA). *See, e.g.*, *Planned Parenthood
of Greater Wash. & N. Idaho v. HHS*, 328 F. Supp. 3d 1133, 1140 (E.D. Wash. 2018) (reviewing
terms and conditions in funding announcement, agency's internal grant policy statement, and
federal award notice, and explaining that award notices "are controlling"). The NIAs and GANs
here confirm that point in their text, *e.g.*, 89 Fed. Reg. 23573, 23590-23591 (Apr. 4, 2024) (NIA
stating that GAN will include applicable regulations and conditions); Doc. No. 8-3 at Ex. E (terms
and conditions), and Defendants point to no legal authority to the contrary. Doc. No. 69 at 14.[10]

*Third*, even if the award terms and conditions permitted termination for "no longer
effectuat[ing] … agency priorities," the Uniform Guidance requires more than an award being
merely "inconsistent with" those priorities. The 2020 Preamble specifically addresses how to
construe the "no longer effectuates" language. Responding to concerns "that the proposed
language will provide Federal agencies too much leverage to arbitrarily terminate awards without
sufficient cause," OMB emphasized that "agencies are not able to terminate grants arbitrarily." 85
Fed. Reg. 49509. Rather, "[t]he intent of this change is to ensure that Federal awarding agencies

---

[9] Other federal agencies have included terms and conditions expressly permitting award
termination for "no longer effectuat[ing]" program goals or agency priorities. *See, e.g.*, *U.S. Conf.
of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465, Doc. No. 5-4 at *80-81 (D.D.C.
2025), attached hereto as Ex. 22. ED has not done that here.

[10] Even if TQP and SEED award notices *did* incorporate the NIAs in their terms and conditions,
they do not authorize termination on the ground that an award "no longer effectuates … agency
priorities." *See e.g.*, 89 Fed. Reg. 23590-23591, 23588. The NIA's "Application Review
Information" section explains how ED will select among applications; it does not purport to
establish the terms and conditions of the award. *See id.* at 23589-23590.

prioritize ongoing support to Federal awards that meet program goals." *Id.* at 49508. OMB was focused on "enhanced results-oriented accountability for grants" and sought to reallocate federal grant managers' "time to analyze data to improve results." *Id.* Thus, the revised language contemplates evidence-based grantmaking that holds recipients accountable for meeting *established* agency priorities—not terminations based on *new* priorities. *See id.* at 49507-08; *cf.* Doc No. 55 at 7 (citing "the Department's new priorities going forward").[11]

In sum, even if the Court were to credit ED's newly asserted legal basis for its decision, the 2020 and 2024 Uniform Guidance both require clear and unambiguous award terms and conditions setting forth any asserted basis for termination, and the TQP and SEED awards do not permit termination for failing to effectuate agency priorities. Furthermore, the "no longer effectuates the program goals or agency priorities" language does not permit termination mid-stream on the basis of new, previously unannounced priorities. For any of these reasons, ED's termination here is not in accordance with law and violates the APA.

### C.    The Termination Is Not an Unreviewable Matter of Agency Discretion.

ED's decision to terminate the TQP and SEED grants is reviewable. The APA embodies a basic presumption of judicial review that is overcome only if (1) a statute "preclude[s] judicial review" or (2) "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a). This exception is "narrowly" applied and restricted only "to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *New York*, 588 U.S. at 772; *Union of Concerned Scientists v.*

---

[11] That ED undertook notice-and-comment rulemaking pursuant to 20 U.S.C. § 1232(d) and 34 C.F.R. § 75.105(b) to establish the priorities that grant recipients relied on further underscores the arbitrary and unlawful nature of ED's position: that it can change priorities at any time, with no advance notice, and terminate grants mid-program year on this basis. *See* Doc. No. 7 at 19; *see also AACTE*, 2025 WL 833917, at *18-20.

*Wheeler*, 954 F.3d 11, 20 (1st Cir. 2020).

Defendants point solely to *Lincoln v. Vigil*, 508 U.S. 182 (1993), to suggest that the narrow exception to judicial review applies here. Doc. No. 69 at 5-7. But *Lincoln* forecloses judicial review only (1) "where the relevant statute is drawn so a court would have no meaningful standard against which to judge the agency's exercise of discretion," and (2) where the agency action requires the balancing of factors that are "peculiarly" within the agency's expertise. *Planned Parenthood*, 328 F. Supp. 3d at 1145 (quoting *Lincoln*, 508 U.S. at 191).

*Lincoln* does not preclude judicial review here because ED's termination decision is governed by meaningful standards. Specifically, ED's decision to terminate is governed by 2 C.F.R. § 200.340(a), as adopted by the Department, 2 C.F.R. § 3474.1, which sets forth grounds for termination (and which does not permit termination mid-performance based on the agency's shifting "priorities," *see supra* Section I.B), as well as 20 U.S.C. § 1232(d), which does not permit changing agency "priorities" in this manner absent notice-and-comment rulemaking. And the TQP and SEED grant statutes themselves require establishment of competitive grants for these programs with specific purposes and timeframes. 20 U.S.C. §§ 1022b(a)(1), 6672(b)(1)-(2). These regulatory and statutory limits cabin ED's discretion as to when it can terminate existing grants. *See Cal. v. Dep't of Educ.*, No. 25-1244, slip op. at 9-10 (1st Cir. Mar. 21, 2025); *Policy & Research LLC v. HHS*, 313 F. Supp. 3d 62, 76-77 (D.D.C. 2018) (opinion of K.B. Jackson, J.) (agency's decision to shorten grant program period was reviewable under APA because applicable "regulations expressly address—and limit—the agency's discretion to 'terminate' monetary awards" such that there were meaningful standards to apply to agency's decision); *see also Planned Parenthood*, 328 F. Supp. 3d at 1145-49; *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647 (D. Md. 2018); *King County v. Azar*, 320 F. Supp. 3d 1167, 1175 (W.D. Wash. 2018).

Defendants' attempt to characterize the TQP and SEED terminations as a decision to re-allocate funding among grant recipients misunderstands Plaintiffs' claims. The dispute does not concern how funds are allocated between grant recipients or applicants, but whether ED violated the APA by terminating previously-awarded TQP and SEED grants. *Cf. King County*, 320 F. Supp. 3d at 1176 (mid-performance period grant termination was not "an allocation decision between various grant options"). The termination decision is subject to judicial review.

## II.    THIS COURT HAS JURISDICTION.

The Tucker Act does not apply here; Plaintiffs allege unlawful agency action, not breach of contract. *See, e.g.*, *NIH*, 2025 WL 702163, *4-8. Courts consider both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Plaintiffs base their claims on federal regulations, the statutes authorizing these grant programs, and the APA—not on the grants themselves. The fact that a court has to consider the language of a contract as part of its regulatory or statutory analysis does *not* convert the claim to one whose "essence" is a contract claim. *Id.* at 969–70; *Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994); *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017). Defendants insist that Plaintiffs' "APA theory is simply that the Department failed to abide by the grant terms," Doc. No. 69 at 8; this deliberately misreads the nature of Plaintiffs' claims. Plaintiffs' theory is that ED failed to abide by its own regulations, the language and purpose of the grants' authorizing statutes, and the APA's prohibition on arbitrary-and-capricious decision-making. *See supra* Sections I.A-B. As the First Circuit recognized, "if [ED] breached any contract, it did so by violating the APA." *Dep't of Educ.*, slip op. at 6-7.

Moreover, Plaintiffs seek classic APA relief: setting aside an agency decision. Courts frequently set aside agency actions, the result of which is the payment of money by one party to another, but such claims are not money damages for a broken contract and may proceed in district

court. *See, e.g.*, *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988). The fact that an injunction, or a judgment setting aside agency action, may later cause the government to make payments does not strip this Court of jurisdiction. *See Climate United Fund v. Citibank N.A.*, 2025 WL 842360, at *6 (D.D.C. Mar. 18, 2025); *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1298 (10th Cir. 2009).[12]

That the relief sought here is prospective and not seeking to substitute relief for past due sums is also significant. *NIH*, 2025 WL 702163, at *7 ("A hallmark of such equitable actions is the existence of prospective relief in ongoing relationships"); *Bowen*, 487 U.S. at 880 (noting Federal Claims Court cannot grant equitable relief and "it cannot be assumed categorically that a naked money judgment against the United States will always be an adequate substitute for prospective relief."). Instead, Plaintiffs' "claim [is] primarily designed not to enable a claim for past pecuniary harm, but to preserve an ongoing relationship," demonstrating an objective of equitable, not monetary, relief. *Normandy Apartments, Ltd.*, 554 F.3d at 1297.

## III.    PLAINTIFFS HAVE SHOWN IRREPARABLE HARM.

"District courts have broad discretion to evaluate the irreparability of alleged harm[.]" *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989). Here, preliminary relief is

---

[12] The cases cited by Defendants seek money damages for a past wrong, *see, e.g., Burgos v. Milton*, 709 F.2d 1, 2 (1st Cir. 1983) (return of purchase price where government violated bargain by not delivering valid deed), *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir. 1978) ("enforcement of the [domestic license] agreements or monetary damages"), or were expressly premised on the contract rather than any independently unlawful action by the government, *see e.g.*, *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 4 (1st Cir. 1989) ("*contractual* easement rights"). Further, to the extent the statutes and regulation on which Plaintiffs' claims are based are not "money-mandating," it is not clear the Court of Federal Claims would even have jurisdiction over them. *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). Insofar as the court in *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465, 2025 WL 763738, at *1 (D.D.C. March 17, 2025), held otherwise, it erred because plaintiffs there did not premise their claims on money-mandating statutes and regulations.

necessary because a later-issued permanent injunction or damages remedy cannot compensate for the loss of federal funding. Doc. No. 7 at 24; *see Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).

Without a preliminary injunction maintaining the status quo ante, Plaintiffs' educator preparation programs will be immediately forced to wind down and, in many cases, completely shutter. Doc. No. 8-9, ¶ 21; Doc. No. 8-17, ¶ 21. "When 'the loss threatens the very existence of the movant's business,'" such loss may establish irreparable harm. *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 230 (D. Mass.), *aff'd*, 976 F.3d 86 (1st Cir. 2020); *see also AACTE*, 2025 WL 833917, at *22-23 (plaintiffs irreparably harmed because termination of TQP and SEED grants "threaten[ed]" teacher pipeline programs' "very existence"). Defendants argue annihilation of these programs is not enough, the universities themselves must be imperiled. Doc. No. 69 at 17. Not so. In *Mediplex of Massachusetts, Inc. v. Shalala*, for example, the likely closure of a facility would "[n]onetheless" constitute irreparable harm to an organization with a "multi-billion dollar" grandparent company if it "could wipe out" the subsidiary. 39 F. Supp. 2d 88, 99-100 (D. Mass. 1999). The danger of "wiping out" Plaintiffs' programs warrants a preliminary injunction.

The abrupt funding loss has been coupled with administrative upheaval at Plaintiffs' institutions; that is also irreparable harm. *See City & Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (recognizing "burdens" on "ongoing operations" as irreparable harm); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (same). The terminations have "upended months, if not years," of work necessary to implement the grant programs, impacting "budgets for staff, coursework, partner organizations, school districts, and student populations." Doc. No. 7 at 25; *see also, e.g.*, Doc No. 8-1, ¶¶ 20-22; Doc. No. 8-12, ¶ 18.

The terminations also result in deep harms to the teacher pipeline writ large, via lost staff,

mentor teachers, students, and future educators. Doc. No. 7 at 26. "[L]oss of talent and the inability to 'recruit and retain employees to build—or even maintain—'" Plaintiffs' programs also "constitutes irreparable harm." *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 193 (D.D.C. 2021) (citations omitted). Without relief, the programs, instructional and programmatic staff, and current and future teaching students will all be gone; end-of-case damages will not suffice. *Rosario-Urdaz v. Rivera-Hernandez,* 350 F.3d 219, 222 (1st Cir. 2003).

Plaintiffs' institutions also face reputational harm, which is itself irreparable. Doc. No. 7 at 26-27; *Ross-Simons v. Baccarat*, 102 F.3d 12, 20 (1st Cir. 1996). The years spent cultivating programming, partnerships, and recruitment will be irrevocably disrupted by the terminations, *see, e.g.*, Doc. No. 8-5, ¶ 26; Doc. No. 8-6, ¶ 19, making it harder to attract future applicants.

Defendants make much ado about delay, erroneously asserting that the terminations were "clear and consistent" and that Plaintiffs did not attempt to contact ED before filing. Doc. No. 69 at 17. Not so. Some grantees did not receive Termination Letters until days after receiving notice of termination, one still has not received a Termination Letter, and yet another only learned of the termination on February 21 because they asked ED to confirm the rumor. Doc. No. 8-3, ¶ 18-19; Doc. No. 8-10, ¶¶ 16-17; Doc. No. 8-16, ¶ 18; Doc. No. 8-13, ¶ 18, Ex. C. Grant recipients wrote to ED requesting immediate termination rescission or abeyance pending reconsideration and for a quick response to avoid irreparable harm and still have received no response.[13] Defendants should not benefit from the chaos and confusion they caused. And, in any event, this motion has been fully briefed within a month of the terminations, and Defendants point to no case finding such a

---

[13] *See, e.g.*, Doc. No. 8-4, ¶ 25; Doc. No. 8-5, ¶ 27; Doc. No. 8-14, ¶ 23; Doc. No. 8-17, ¶ 26. Defendants also erroneously assert that "several grant recipients identified alternative sources of funding." Doc. No. 69 at 16. But Defendants' citations to Doc. No. 8-10 at 9 and Doc. No. 8-18 at 10 discuss grant proposal scoring and funding committed to UW-Madison, not alternative sources.

short timeframe as a cause for denial.

## IV.    THE BALANCE OF EQUITIES HEAVILY FAVORS PLAINTIFFS.

The balance of the equities and public interest weigh heavily in favor of Plaintiffs. Defendants assert, with no factual or legal support, that if the Plaintiffs are granted relief, grant recipients will rapidly draw down all remaining funds, and ED will have no opportunity to recover these funds if they prevail. Doc. No. 69 at 20. This Court has already correctly recognized "Defendants are not at risk of financial loss given that there is a mechanism for recouping allocated funds." Doc. No. 66 at 2 (referring to 2 C.F.R. § 200.346). And Defendants misread the law to say the government can only recover payments that *exceed* a recipient's net award, Doc. No. 69 at 20, but it is also applicable to unallowable or unauthorized costs. *See* 2 C.F.R. §§ 200.344, 200.410.

ED also asserts harm based on "forced" expenditure of money in support of causes inconsistent with the Secretary's policy priorities. Doc. No. 69 at 21. But the grant terminations violated the APA and therefore were contrary to the public interest. *See NIH*, 2025 WL 702163, at *32; *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). On the other hand, Plaintiffs have shown that absent a preliminary injunction, they will suffer irreparable harm that cannot be remedied by a later-issued permanent injunction or damages. *See supra* Section III. The balance of equities thus favors a preliminary injunction.

## V.    THE REQUESTED RELIEF IS APPROPRIATE.

This Court's TRO suspends the termination of TQP or SEED grants for "recipients in" the "Plaintiff States." Doc. No. 41 at 9. Defendants argue that relief should be limited to "instrumentalities of the Plaintiffs", Doc. No. 69 at 22, but "[t]he normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *NIH*, 2025 WL 702163, at *34; *see also Victim Rts. L. Ctr. v. Cardona*, No. CIV 20-11104, 2021 WL 3516475, at *1 (D. Mass. Aug. 10, 2021). Further, without a pool of TQP- or SEED-

trained educators, Plaintiffs would need to expend public funds to fill the gaps or suffer the harms caused by a diminished pool of qualified teachers in their public schools.[14] This is not a speculative and indirect injury. Termination of funding to non-plaintiff recipients located within Plaintiffs *directly harms* the States. For example, elimination of the grant awarded to DePaul University, a private university working to place 800 teachers in high-need Chicago public schools, will directly harm Illinois's ability to provide a high-quality public education.[15] And, in California, elimination of private university Alder Graduate School's grants to prepare teachers serving public schools is expected to cause $2.1 million in lost funding for partner public school systems,[16] causing direct harm to schools that are "agencies of the state." *Hall v. City of Taft*, 47 Cal.2d 177, 181 (1956). As such, *CMM Cable Rep., Inc. v. Ocean Coast Properties*, 48 F.3d 618, 622 (1st Cir. 1995), which found that only third parties were harmed, is inapposite. The relief requested is tailored and "no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

The Court should also decline Defendants' request to impose a bond for the reasons set forth in its order denying Defendants' Emergency Motion to Stay. *See* Doc. No. 66 at 2.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction.

---

[14] For example, California, Massachusetts, and New York all have constitutional duties to provide for education and would need to step in when there are insufficient teachers to provide education in their public schools. *See Butt v. State of California*, 4 Cal. 4th 668, 685 (1992); *McDuffy v. Sec'y of Exec. Off. of Educ.*, 415 Mass. 545, 621 (1993); *Campaign for Fiscal Equity, Inc. v. State*, 86 N.Y.2d 307, 316 (1995). These States already use state funds to augment the budgets of its schools. *See* Cal. Educ. Code § 42238 et seq.; Mass. Gen. L. ch. 70; N.Y. Educ. L. § 3601 et seq.

[15] Doc. No. 8-13, ¶ 24; *see also* Ill. Const. Art. X, § 1 (providing that the "State shall provide for an efficient system of high quality public educational institutions and services").

[16] Ex. 23, ¶¶ 4-5, 6, 16. The Court may take judicial notice of this declaration filed in the *AACTE* matter. *See In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15-16 (1st Cir. 2003).

**ROB BONTA**
Attorney General
State of California

By: */s/ Alexis Piazza*
Laura L. Faer*
*Supervising Deputy Attorney General*
Alexis Piazza*
Heidi Joya*
Garrett Lindsey*
Dennis Ojogho*
*Deputy Attorneys General*
Michael L. Newman*
*Senior Assistant Attorney General*
1515 Clay St.
Oakland, CA 94612
(510) 879-3304
Laura.Faer@doj.ca.gov
Alexis.Piazza@doj.ca.gov
Heidi.Joya@doj.ca.gov
Michael.Newman@doj.ca.gov
Garrett.Lindsey@doj.ca.gov
Dennis.Ojogho@doj.ca.gov

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

By: */s/ Adelaide Pagano*
Megan Barriger (BBO #687707)
*Senior Trial Counsel*
Adelaide Pagano (BBO #690518)
*Assistant Attorney General*
Yael Shavit (BBO #695333)
*Chief, Consumer Protection Division*
Chris Pappavaselio (BBO #713519)
Matthew Lindberg (BBO #633630)
*Assistant Attorneys General*
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2038
megan.barriger@mass.gov
adelaide.pagano@mass.gov
yael.shavit@mass.gov
chris.pappavaselio2@mass.gov

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

By: */s/ Amanda I. Morejón*
Amanda I. Morejón (BBO #696737)
Jessica L. Palmer*
Lauren E. Van Driesen*
Elizabeth R. Walsh*
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Amanda.Morejon@law.njoag.gov
Jessica.Palmer@law.njoag.gov
Lauren.VanDriesen@law.njoag.gov
Elizabeth.Walsh@law.njoag.gov

**PHILIP J. WEISER**
Attorney General
State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

16

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Darren Kinkead*
Darren Kinkead*
*Public Interest Counsel*
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov

**LETITIA JAMES**
Attorney General
State of New York

By: */s/ Sandra Park*
Sandra Park*
*Civil Rights Bureau Chief*
Monica Hanna*
Rabia Muqaddam*
*Special Counsels*
Alex Finkelstein*
Wil Handley*
Kathryn Meyer*
*Assistant Attorneys General*
28 Liberty Street
New York, New York 10005
(212) 416-8250
sandra.park@ag.ny.gov

*admitted *pro hac vice*
†motion for admission *pro hac vice* forthcoming

**ANTHONY G. BROWN**
Attorney General
State of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson†
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
VWilliamson@oag.state.md.us

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

By: */s/ Aaron J. Bibb*
Aaron J. Bibb*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
bibbaj@doj.state.wi.us

## <u>CERTIFICATE OF SERVICE</u>

Counsel for Plaintiff States certify that they have submitted the foregoing document with the clerk of court of the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff States hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).


<u>/s/ Adelaide Pagano</u>
Adelaide Pagano (BBO #690518)
*Assistant Attorney General*

Dated:  March 21, 2025

18