**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF NEW YORK; and STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, in her official capacity as former Acting Secretary of Education; LINDA MCMAHON, in her official capacity as Secretary of Education, <br><br> Defendants. | Case No. 1:25-cv-10548 |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Since his inauguration, President Trump has issued a barrage of executive orders prohibiting federal agencies from supporting any initiatives with a perceived nexus to subjects he opposes, including "diversity, equity, and inclusion" or "DEI." In furtherance of these executive orders, on February 5, 2025, Defendants issued a directive entitled "Eliminating Discrimination and Fraud in Department Grant Awards" aimed in part at terminating previously awarded grants with any perceived relationship to the blacklisted topic of "DEI."

2.      The Department Directive instructs United States Department of Education (Department) personnel to review all new and ongoing grants and all notices of funding opportunities and eliminate them if they run afoul of any one of five different prohibitions, which include "DEI" that is contrary to "the Department's policy objectives."

3.      Two days after the Directive was issued, beginning on February 7, 2025, and extending over many days, the Department unlawfully terminated two critical grant programs that Congress authorized to address nationwide teacher shortages and improve teacher quality by educating, placing, and supporting new teachers in hard-to-staff schools, especially in rural and other underserved communities, and in hard-to-staff subjects, such as math and special education.

4.      The terminations effectively eliminated two programs—the Teacher Quality Partnership (TQP) and Supporting Effective Educator Development (SEED)—that Congress established and funded to address these critical K-12 teacher shortages and development needs.

5.      The Department Directive as implemented with respect to the TQP and SEED programs, and the subsequent termination of the TQP and SEED programs and of all or nearly all previously-awarded TQP and SEED grants to carry out the Directive (hereinafter, "February Actions"), contravene Congress's own objectives as set forth in the statutes authorizing the TQP

and SEED grant programs—diversity, equity, and inclusion objectives Congress expressly directed grantees to carry out, which include assisting "traditionally underserved" local education agencies, 20 U.S.C. § 6672(a), ensuring "general education teachers receive training in providing instruction to diverse populations, including children with disabilities, limited English proficient students, and children from low-income families," 20 U.S.C. § 1022e(b), and "recruit[ing] highly qualified individuals, including minorities and individuals from other occupations, into the teaching force." *Id.* at § 1022.

6.      The termination of these previously-awarded and obligated grants was effectuated through a common form letter ("Termination Letter"), which claimed the grant at issue was no longer consistent with Department priorities. Although the Termination Letter itself makes reference to "programs that promote or take part in DEI initiatives," it also lists multiple other vague and unsupported Department "priorities" or potential predicates in the disjunctive without actually identifying which, if any, of the listed reasons applies, and the Termination Letter contains no facts explaining how or why any particular grant fails to conform to these priorities. In fact, the Termination Letter is devoid of *any facts* specific to the grant recipients.

7.      The February Actions, separately or in combination, constitute final agency action under the APA and are unlawful.

8.      Through this lawsuit, the States of California, Massachusetts, New Jersey, Colorado, Illinois, Maryland, New York, and Wisconsin (collectively, "Plaintiff States" or "States"), bring this action against Defendants Secretary of Education Linda McMahon and former Acting Secretary of Education Denise Carter, in their official capacities, and the United States Department of Education, to declare unlawful and vacate and set aside the Defendants' February Actions, which unilaterally ended these critical, previously awarded grants for Plaintiff States.

9.      As described further below, States have been struggling for years with a nationwide teacher shortage crisis. Congress authorized grants under the TQP and SEED programs to address this issue.

10.      Specifically, in 2008, Congress established the TQP Program, authorizing the Secretary of Education (Secretary) to award grants for the purpose of recruiting and training highly qualified and diverse teachers, especially for hard-to-staff subject areas and localities, and improving student achievement. 20 U.S.C. §§ 1022, 1022a, 1022h. In 2015, Congress also mandated the Secretary to award grants under the SEED Program for the purpose of providing teachers, principals, or other school leaders to serve in traditionally underserved local educational agencies and providing them with evidence-based professional enhancement activities. 20 U.S.C. § 6672.

11.      Pursuant to grants awarded by the Department under these programs, Plaintiff States, their institutions of higher education, local educational agencies, and other State recipients have established partnerships for teacher placements in rural and urban school districts, developed curricula and mentorship programs, and provided financial assistance to support thousands of teachers-in-training to graduate from teaching colleges and fill positions in schools with teaching shortages.

12.      The unlawful agency actions at issue here have resulted in immediate and irreparable harm to Plaintiff States, their schools and students, and their residents. The February Actions effectively terminate these programs in Plaintiff States (and nationwide), and have and will continue to immediately disrupt teacher workforce pipelines, increase reliance on underqualified educators, and destabilize local school systems.

13.    Without these programs, impacted rural and urban schools will have to resort to hiring long-term substitutes, teachers with emergency credentials, and unlicensed teachers on waivers. This will harm the quality of instruction and can lead to increased numbers of students falling short of national standards.

14.    The Department's February Actions violate the Administrative Procedure Act ("APA") in multiple ways.

15.    First, the February Actions are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), because Defendants failed to provide a transparent, internally consistent, and reasonable explanation for the termination of the TQP and SEED grants; failed to engage in a reasoned consideration of any individual grant recipient's program (*see e.g.*, 85 Fed. Reg. 49509 (grant terminations cannot be arbitrary); 2 C.F.R. § 200.341(a) (requiring written notice of any termination, which must "include the reason for termination"); improperly relied on factors Congress has not intended it to consider, as demonstrated by the stated purposes of the TQP and SEED statutes (*see e.g.*, 20 U.S.C. §§ 6672(a),1022e(b), 1022a(d)(1)(A)(ii)); did not consider the reliance interests of the various parties; did not acknowledge, much less provide good reasons for its apparent change in agency policy "priorities"; and failed to consider the impact of grant terminations on teacher training programs, teacher shortages, and Plaintiff States' public schools and students, amongst others.

16.    Second, the February Actions are arbitrary and capricious and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A), because the authority on which Defendants rely does not authorize termination on the independent grounds of previously unannounced "Department priorities."

5

17.     Instead, the General Education Provisions Act ("GEPA"), 20 U.S.C. § 1232(d), and the Department's own regulations, 34 C.F.R. § 75.105(b), require notice and comment rulemaking to change priorities with respect to the award of new TQP and SEED grants. The OMB Uniform Guidance, 2 C.F.R. § 200.340(a)(4), which the Department has adopted and cites as authority for terminating the grants, authorizes the termination of a federal grant award "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4); 2 C.F.R. § 3474.1 (adopting Uniform Guidance for Department grantmaking). It is arbitrary and capricious and inconsistent with or contrary to law under the APA for the Department to use this regulatory provision—which only allows for termination based on a failure to effectuate the goals set by Congress and priorities established through the GEPA notice and comment rulemaking process—to announce new "priorities" on a whim with respect to existing obligated grants and terminate them in the middle of a program year. In sum, the  February Actions are arbitrary and capricious and not in accordance with law because they contravene 20 USC § 1232(d), 34 C.F.R. § 75.105(b), and 2 C.F.R. § 200.340(a)(4).

18.     Third,  the TQP and SEED statutes expressly require that grant recipients (1) will train educators on teaching in "traditionally underserved" schools, on improving students' "social, emotional, and physical development," "providing instruction to diverse populations, including children with disabilities, limited English proficient students, and children from low-income families," and (2) will "recruit highly qualified individuals, including minorities and individuals from other occupations, into the teaching force." 20 U.S.C. §§ 1022e(b)(4), 6672(a)(1), 1022a(d)(1)(A)(ii), 1022.[1] And GEPA requires that the Secretary  "require" all grant applicants to

---

[1] *See also e.g.,* § 1022a(d)(5) (encouraging TQP grantees to "recrui[t] into the teaching profession . . . individuals from under[-]represented populations," "former military personnel," and "individuals to teach in rural communities"); § 6672(b)(3) (requiring the Department to ensure that

describe steps that they will take to ensure "equitable access" and "overcome barriers to equitable participation" in grant projects. 20 U.S.C. § 1228a(b). As such, to the extent the Department terminated the grants for funding the diversity, equity, or inclusion related programs that the statutes expressly require, that action is both not "authorized by law" and arbitrary and capricious under the APA to the extent Defendants reasons for terminating are inconsistent with Congress' express directives and statutory objectives.

19.     Fourth, the Department's February Actions are contrary to law and arbitrary and capricious, because in carrying out the hasty implementation of the Department Directive, none of Plaintiff States' grant recipients received any pre-termination notice or any opportunity to be heard, much less a chance to cure in violation of 2 C.F.R. §§ 200.339, 200.208(c) (permitting grant termination only after an agency "determines that noncompliance cannot be remedied by imposing specific conditions," such as by requiring technical or management assistance).

20.     Fifth, the February Actions contravene the Spending Clause by retroactively imposing new, ambiguous, and unrelated conditions on these federal grant recipients mid-stream. *See* U.S. Const. Art. I, § 8, cl. 1; *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981).

21.     Finally, Defendants do not have either constitutional or Congressional authority to eliminate the TQP and SEED grant programs and, as such, their actions are inconsistent with the Constitution's Separation of Powers mandates, U.S. Const. art. I, § 1, and are *ultra vires*. The Executive has no constitutional power or authority to unilaterally withhold funds in a manner that is inconsistent with the authority and direction provided to it by Congress.

---

SEED grants are, to the extent practicable, "distributed among eligible entities that will serve geographically diverse areas, including urban, suburban, and rural areas").

22.     Plaintiff States accordingly ask that the February Actions be declared unlawful and be vacated and set aside, and that Defendants be enjoined from implementing, maintaining, or reinstating the February Actions for recipients in Plaintiff States.

23.     Without an order declaring unlawful and setting aside the February Actions and an injunction against Defendants, Plaintiff States, their higher education and public school systems, along with the teachers-in-training and the public school students they serve, will suffer and continue to suffer irreparable harm from the abrupt termination of federal grants and the resulting: (1) loss of thousands of teachers prepared to fill teaching positions in hard-to-staff subject areas and in urban and rural school districts; (2) total cancellation of long-standing and successful teacher-residency and pipeline programs; (3) elimination of federal financial assistance for incoming aspiring teachers; (4) end of supported mentorship for new teachers at hard-to-staff and disadvantaged schools; (5) firing of full-time and part-time staff at universities running the programs; and (6) jeopardization of missions to ensure an educated citizenry and provide quality education to all students. These and other harms are ones that a monetary damages award cannot remedy.

## JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 2202 (injunctive relief), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

25.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action involves an agency of the United States as a defendant and arises under the laws of the United States, including Section 10 of the APA, 5 U.S.C. §§ 700 *et seq.*; Part A of Title II of the Higher Education Act (HEA), 20 U.S.C. §§ 1022 *et. seq.*; and Subpart 4 of Part B of Title II of the Elementary and

Secondary Education Act (ESEA), as amended by the Every Student Succeeds Act (ESSA), 20 U.S.C. § 6672.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Massachusetts.

**PARTIES**

**A. Plaintiff States**

27.     The State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California, who is the chief law enforcement officer of California and authorized to sue on the State's behalf, including its public universities and schools and its residents.

28.     The Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Andrea Joy Campbell, the Attorney General of Massachusetts, who is the chief law officer of Massachusetts and authorized to pursue this action.

29.     The State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Matthew Platkin, the Attorney General of New Jersey, who is the chief law enforcement officer of New Jersey and authorized to sue on the State's behalf, including its public universities and schools and its residents.

30.     The State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney

General is authorized to represent the State's interests, including the interests of its public universities, school districts, and residents.

31.     The State of New York is a sovereign state in the United States of America. New York is represented by Letitia James, the Attorney General of New York, who is the chief law enforcement officer of New York and authorized to sue on the State's behalf, including its public universities and schools and its residents.

32.     The State of Colorado is a sovereign state in the United States of America. Colorado is represented by and through its Attorney General Phil Weiser. The Attorney General acts as the chief legal representative of the state, and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

33.     The State of Maryland is a sovereign state in the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents and Maryland's public institutions. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

34.     The State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized under Wis. Stat. § 165.25(1m) to pursue this action on behalf of the State of Wisconsin.

35.     Plaintiff States, which all accept federal funding, are home to approximately 15,187,696 students attending tens of thousands of public elementary, secondary and

postsecondary schools.[2]

## B. Defendants

36.    Defendant the United States Department of Education is a cabinet agency within the executive branch of the United States government. 20 U.S.C. § 3411.

37.    Defendant Denise Carter was the Acting Secretary of the United States Department of Education and that agency's highest ranking official at the time of the termination. She was charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 20 U.S.C. § 3412.

38.    Defendant Linda McMahon is the Secretary of the United States Department of Education and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 20 U.S.C. § 3412.

## FACTUAL BACKGROUND

## A. National Teacher Shortage

39.    There is a nationwide shortage of well-prepared, high-quality K-12 public school teachers, resulting in crowded classrooms, cancelled classes, and underserved students. "The number of college students studying to become teachers is less than half what it was 50 years ago."[3] The number of people completing traditional teacher preparation programs has dropped by

---

[2]  Nat'l Ctr. for Educ. Stat., *Digest of Education Statistics*, tbl. 203.20 (2024), https://tinyurl.com/cu6dyuww.

[3]  Mary Ellen Flannery, *Missing: Future Teachers in Colleges of Education*, neaToday (Mar. 29, 2022), https://tinyurl.com/5n74smvx.

35 percent in the last ten years alone.[4] U.S. colleges are awarding fewer undergraduate degrees in education, and more teachers are leaving the profession.[5]

40.     Schools across the country struggle to find state-certified teachers. In 2024, more than 400,000 teaching positions in the U.S.—representing about one in eight of all teaching positions nationwide—were vacant or were filled by uncertified teachers.[6] According to the National Center for Education Statistics (NCES), 74% of public schools in the United States reported that they had difficulty filling teacher vacancies.[7]

41.     The difficulty of finding certified teachers is exacerbated by the turnover in existing personnel. The American Federation of Teachers reports that nearly 300,000 teachers leave the profession each year, with two-thirds of them leaving before retirement age.[8] That turnover rate is nearly double that of other occupations, including engineers, nurses, and lawyers.[9] Similarly, the Bureau of Labor Statistics projects a 1% decline in kindergarten and elementary school teachers *each year* between 2003 and 2033.[10]

42.     The problem is especially acute in certain subject areas. According to NCES, the percentages of teaching vacancies filled with fully certified teachers was only 83% for math, 81%

---

[4] *Id.*

[5] *Id.*

[6] Learning Policy Institute, *State Teacher Shortages 2024 Update* 1 (August 2024), https://tinyurl.com/58phtwf4.

[7] Nat'l Ctr. For Educ. Statistics, Press Release, Most U.S. public elementary and secondary schools faced hiring challenges for the start of the 2024–25 academic year (Oct. 17, 2024), https://tinyurl.com/ha6prwap.

[8] Amer. Federation of Teachers, *Here Today, Gone Tomorrow? What America Must Do to Attract and Retain the Educators and School Staff Our Students Need* 7 (July 2022), https://tinyurl.com/u6amp8yh.

[9] *Id.*

[10] Bureau of Labor Statistics, *Kindergarten & Elementary School Teachers* (last modified April 18, 2025), https://tinyurl.com/2wtn5225.

for biology or life science, 77% for special education, and 75% for English as a second language or bilingual education.[11] That means that for some of these high-need subject areas, nearly one in four public school teaching vacancies were unfilled before the start of this current school year.

43.    Public schools within Plaintiff States experience these shortages firsthand. For example, according to the Learning Policy Institute, the estimated number of teachers not fully certified for their teaching assignments exceeded 32,200 in California (2022-23), 5,200 in Massachusetts (2023-24), and 2,800 in New Jersey (2022-23).[12]

44.    A primary cause for the teacher shortage is a limited pool of qualified candidates. Based on a nationwide sample survey of 4,000 K-12 public schools, the top two challenges schools reported experiencing in trying to fill teaching vacancies with fully certified teachers entering the 2024–25 school year were (1) an overall lack of qualified candidates (64%); and (2) too few candidates applying (53%).[13]

45.    When schools are unable to hire qualified teachers, students suffer. Teacher shortages can result in larger class sizes, cancelled courses, or classes staffed with teachers less able to teach a subject. Teacher shortages may also result in significant learning disruption, as classes are staffed with temporary or substitute teachers, negatively affecting student achievement.

**B. Federal Support of Teaching Programs**

46.    Congress has recognized the importance of improving the quantity and quality of teachers nationwide by establishing federal grant programs to train, place, and support teachers. Two of these programs are the TQP and SEED grant programs.

---

[11] Nat'l Ctr. For Educ. Statistics, *supra* note 7.

[12] Learning Policy Institute, *supra* note 6, at 4, 10, 12.

[13] Nat'l Center for Educ. Statistics, *School Pulse Panel: Surveying high-priority, education-related topics*, https://tinyurl.com/yc2rewfk (last visited May 31, 2025); Nat'l Ctr. For Educ. Statistics, *supra* note 7.

47.    The Secretary is required to establish the specific priorities that are included in the application for each competitive federal grant program, including the TQP and SEED grant programs. 34 C.F.R. § 75.105(b)(1); *see also* 20 U.S.C. § 1232(d) (although the APA generally exempts grants from the rulemaking process, *see* 5 U.S.C. § 553, GEPA removes that exemption for the Department, with exceptions that do not apply here). To establish specific priorities, the Department must first publish the priorities in a notice in the Federal Register. *See* 34 C.F.R. § 75.105.

48.    In public notice for comments regarding new "proposed priorities" for future grantmaking published in the Federal Register on May 21, 2025, the Department acknowledged that all prior grantmaking "priorities," including the ones set by the Department through the prior notice and comment process for the TQP and SEED programs, "remain in effect for notices inviting applications (NIAs) published before the [Department] finalizes the proposed priorities in this document." Proposed Priorities and Definitions—Secretary's Supplemental Priorities and Definitions on Evidence-Based Literacy, Education Choice, and Returning Education to the States, 90 Fed. Reg. 21710 (May 21, 2025).

49.    Put another way, the priorities for the TQP and SEED grant programs are those that were set by Congress in the programs' authorizing statutes (*e.g.*, 20 U.S.C. §§ 1022e(b)(4), 6672(a)(1), 1022a(d)(1)(A)(ii), 1022), and those that were established through notice-and-comment rulemaking required by GEPA and the Department's own regulations, 20 U.S.C. § 1232(d), 34 C.F.R. § 75.105(b), and in place at the time the grants were awarded. *See* Final Priorities and Definitions—Secretary's Supplemental Priorities and Definitions for Discretionary Grants Programs, 86 Fed. Reg. 70612 (Dec. 10, 2021).

### i. Teacher Quality Partnership Program

50.     Congress established the TQP Program in 2008 under Part A of Title II of the Higher Education Act, as amended by the Higher Education Opportunity Act Pub. L. No. 110-315, 122 Stat. 3078, 3133–59 (2008), to (1) "improve student achievement"; (2) "improve the quality of prospective and new teachers by improving their preparation and enhancing professional development activities"; (3) "hold teacher preparation programs at institutions of higher education accountable for preparing teachers who meet applicable state certification and licensure requirements"; and (4) "recruit highly qualified individuals, including minorities and individuals from other occupations, into the teaching force." 20 U.S.C. § 1022.

51.     To implement the TQP Program, Congress authorized the Secretary to award grants, on a competitive basis, to "eligible partnerships"—which must include a high-need local educational agency and a partner institution of higher education—to carry out programs for teacher preparation, teacher residency, and school leader preparation. 20 U.S.C. §§ 1021(6), 1022a(a), 1022a(c)(1), 1022h. Congress also required the Secretary to determine, based on a peer review process, which applications shall receive funding and the amounts of the grants. 20 U.S.C. § 1022b(b)(3).

52.     Eligible partnerships that are awarded TQP grants to carry out teacher preparation programs must, among other things, implement various reforms relating to teacher preparation; implement a high-quality clinical education program; create an induction program for new teachers; and implement effective mechanisms to recruit qualified individuals to become teachers who meet all applicable certification and licensure requirements. 20 U.S.C. § 1022a(d).

53.     Teacher recruitment may include an emphasis on recruiting individuals from underrepresented populations, individuals who can teach in rural and urban communities and teacher shortage areas, such as mathematics, special education, science, and limited English

proficiency, and mid-career professionals from other occupations, former military personnel, and recent college graduates with a record of academic distinction. 20 U.S.C. § 1022a(d)(5).

54.     Eligible partnerships that are awarded TQP grants to carry out teacher residency programs must implement a teacher residency program that prepares teachers to serve in high-need schools, subjects, and areas, including by implementing rigorous graduate-level course work, teaching residency cohorts, teacher mentoring, and professional development. 20 U.S.C. § 1022a(e). Eligible partnerships must implement selection criteria for teaching residents based on strong content knowledge or record of accomplishments, strong verbal and written communication skills, or other attributes linked to effective teaching, and must provide a one-year living stipend or salary to teaching residents. *Id.*

55.     Many teacher residency programs that are awarded TQP grants employ a structured residency model in which new teachers work alongside experienced mentor teachers to gain hands-on experience. This significantly enhances teacher retention rates and ensures that educators remain in the profession beyond the crucial first five years.

56.     Eligible partnerships that are awarded TQP grants to carry out teacher residency programs must also develop admissions goals and priorities aligned with the hiring objectives of partnering local educational agencies (LEAs), which may include consideration of applicants who reflect the communities in which they will teach and individuals from underrepresented populations in the teaching profession. 20 U.S.C. § 1022a(e)(2)(A)(vi).

57.     In creating the TQP Program, Congress placed particular emphasis on addressing the national teacher shortage. The law requires all institutions of higher education that conduct a traditional teacher preparation program or alternative route to certification or licensure and that enroll students receiving federal financial aid—and not only TQP recipients—to set annual

quantifiable goals for the recruitment of prospective teachers "trained in teacher shortage areas" such as "mathematics, science, special education, and instruction of limited English proficient students." 20 U.S.C. § 1022e(a).

58.     Such institutions must ensure "general education teachers receive training in providing instruction to diverse populations," including students with disabilities and those who have limited English proficiency and children from low-income families. 20 U.S.C. § 1022e(b). And they must train educators on improving students' "social, emotional, and physical development." *Id.* at § 1022a(d)(1)(A)(ii).

59.     Congress designed TQP to support effective and ongoing teacher preparation and teacher residency programs. Grants awarded under TQP "shall be awarded for a period of five years." 20 U.S.C. § 1022b(a). Eligible partnerships must develop an evaluation plan with strong and measurable performance objectives. 20 U.S.C. § 1022c(a). For eligible partnerships not making substantial progress along those measures "by the end of the third year," Congress authorized the Secretary to cancel the grant. 20 U.S.C. § 1022c(c). According to the Department's current website detailing the TQP Program, the program has been funded steadily since Fiscal Year 2014.

### ii.  Supporting Effective Educator Development Grant Program

60.     SEED started in 2011 as a part of the Improving Teacher Quality State Grants program, contained at Subpart 1 of Part A of Title II of the Elementary and Secondary Education Act (ESEA). The Every Student Succeeds Act of 2015, Pub. L. No. 114-95, 129 Stat. 1801, 1948–49, formally enacted the SEED Program under Subpart 4 of Part B of Title II of the ESEA, "to

increase the number of highly effective educators by supporting the implementation of Evidence-Based practices that prepare, develop, or enhance the skills of educators." 20 U.S.C. § 6672.[14]

61.    To implement the SEED Program, Congress mandated that the Secretary shall award grants to eligible entities, such as institutions of higher education, national nonprofit entities, and the Bureau of Indian Education, for the purpose of providing teacher professional development and nontraditional teacher preparation and certification pathways to serve in traditionally underserved local educational agencies, amongst other purposes. 20 U.S.C. § 6672(a), (f).

62.    The Secretary must also ensure that awarded grants are, to the extent practicable, "distributed among eligible entities that will serve geographically diverse areas, including urban, suburban, and rural areas." 20 U.S.C. § 6672(b)(3).

63.    Similar to TQP, Congress designed the SEED Program to support effective and ongoing teacher development programs. Grants under SEED shall be awarded initially for a period of not more than three years, and the Secretary may renew a grant for an additional two-year period. 20 U.S.C. § 6672(b)(1)-(2).

64.    Further, Congress has prohibited officers or employees of the Federal Government from conditioning the receipt of federal grants upon a "State, local educational agency, or school's adoption or implementation of specific instructional content, academic standards and assessments, curricula, or program of instruction developed and implemented to meet the requirements of this chapter." 20 U.S.C. § 7906a(b).

---

[14] *See Supporting Effective Educator Development Grant Program*, Dep't of Educ., https://tinyurl.com/33u9fcnj (last visited May 31, 2025).

65.     According to the Department's webpage on the SEED Program, the program has been funded steadily since Fiscal Year 2011.[15]

### iii.  Department of Education Priorities Applicable to the TQP and SEED Grants

66.     The Department previously established priorities for discretionary grants under the prior Trump administration in 2019 and 2020 by undergoing the required notice-and-comment rulemaking process.[16] More recently, the Department published final annual priorities for the TQP and SEED Programs and several other grant programs on July 9, 2021. *See* Final Priorities-Effective Educator Development Division, 86 Fed. Reg. 36217 (July 9, 2021). These priorities consisted of, "Supporting Educators and Their Professional Growth" and "Increasing Educator Diversity." *Id.* at 36218-19. The Department supplemented those priorities on December 10, 2021, by publishing the Secretary's Supplemental Priorities for all discretionary grants. *See* 86 Fed. Reg. 70612. These final supplemental priorities consisted of: (1) "Addressing the Impact of COVID-19 on Students, Educators, and Faculty," (2) "Promoting Equity in Student Access to Educational Resources and Opportunities," (3) "Supporting a Diverse Educator Workforce and Professional Growth To Strengthen Student Learning," (4) "Meeting Student Social, Emotional, and Academic Needs," (5) "Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success," and (6) "Strengthening Cross-Agency Coordination and Community Engagement To Advance Systemic Change." *Id.* at 70636-39.

---

[15] *See Funding & Legislation*, *Supporting Effective Educator Development Program*, Dep't of Educ., https://tinyurl.com/mpbcpdmp (last visited May 31, 2025).

[16] *See* Administrative Priorities for Discretionary Grant Programs, 85 Fed. Reg. 13640 (Mar. 9, 2020); Final Priority for Discretionary Grants, 84 Fed. Reg. 65300 (Nov. 27, 2019).

67.    These final priorities, all published in the Federal Register after notice and comment, are the priorities that were utilized by the Department in awarding the TQP and SEED grants at issue here.[17]

### iv.    TQP and SEED Grant Programs in Plaintiff States

68.    Across the eight Plaintiff States, various organizations were operating more than forty active TQP and SEED programs with total grant awards exceeding $250 million. These programs would have supported thousands of teachers and tens of thousands of students in the States.

69.    For example, in the Commonwealth of Massachusetts, the University of Massachusetts Amherst (UMass Amherst) received a TQP grant in 2023 for approximately $2.3 million to create a sustainable program to train paraeducators to become fully licensed early childhood educators in two high-need districts, Holyoke and Springfield, which have struggled to recruit and retain high-quality, licensed teachers. In Holyoke, one-third of early childhood teaching staff are currently unlicensed and on waivers, and in Springfield, 325 teachers across the district are currently teaching on waivers or emergency licensure.

70.    The purpose of UMass Amherst's TQP program was to create a sustainable pipeline of future teachers by creating more affordable and accessible online courses and building an advising and mentorship infrastructure to support paraeducators in the program. By the end of the

---

[17] *See* 89 Fed. Reg. 23537 (Apr. 4, 2024); 87 Fed. Reg. 10906 (Feb. 25, 2022); 85 Fed. Reg. 29691 (May 18, 2020) (Notices of Invitation to Apply for TQP grants from the last five years, describing Department priorities used in evaluating the competitive grants by reference to the statute and the Department's priorities, as published in the Federal Register). *See* 90 Fed Reg. 5845 (Jan. 17, 2025); 87 Fed. Reg. 19487 (Apr. 4, 2022) (Notices of Invitation to Apply for SEED grants from the last two funding rounds, describing Department priorities used in evaluating the competitive grants by reference to the statute and the Department's priorities, as published in the Federal Register).

five-year term, the goal was to train and license 35 new early childhood educators in these two high-need districts and to establish and expand the Para-to-Teacher Program (PtT) for Early Childhood Education (ECE) as a source of future licensed early childhood educators in other districts throughout the Commonwealth.

71.    Additionally, the University of Massachusetts Boston was in the final stages of formalizing an agreement to become a subgrant recipient of a second TQP grant awarded to Boston Public Schools in 2023 for approximately $5.9 million to train bilingual educators. Boston Public Schools has a high number of students who speak a wide range of native languages, including Spanish, Vietnamese, Haitian Creole, Chinese, Arabic, Portuguese, and Cape Verdean Creole. More teachers are needed in the workforce who are able to conduct evaluative testing in students' native languages and analyze the performance of bilingual students.

72.    The Bilingual Inclusive Education Teacher Residency (BIE Teacher Residency) funded by the 2023 TQP grant was intended to create a teacher residency program that would allow educators to earn a Masters in Special Education with licensure in Moderate Disabilities and Bilingual Education Endorsement, thereby meeting the needs of the Commonwealth's largest public-school district and its high number of English Language Learners.

73.    In California, the California State University (CSU) and University of California (UC) together received eight now-terminated TQP and SEED grants across their multiple campuses, together valued at about $56 million. The grant-funded programs would have trained thousands of teachers across California, commonly focused on serving high-need rural and urban school districts.

74.    For example, in 2024, Cal Poly Corporation—a nonprofit corporation affiliated with CSU's Cal Poly, San Luis Obispo campus—received approximately $4.7 million over a five-

year grant for the Cal Poly INSPIRE: Innovative Support and Preparation of Inclusive and Resilient Educators (INSPIRE) program. The purpose of INSPIRE was to address a critical teacher shortage in important fields, including special education. The program focused on recruiting and training a skilled workforce of teachers for students Pre-Kindergarten through 12th Grade and supported teachers in high-need districts through mentoring, community building, and professional development to aid in teacher retention. The program's partner school districts served students in high-need and high-poverty areas.

75.    INSPIRE was designed to develop a high-quality teacher force by training 775 prospective educators through reformed clinical experience and coursework; support workforce retention through a comprehensive induction program benefiting 225 new teachers and school leaders; expand professional development for 200 in-service teachers to refine their skills and advance in their careers; and issue micro-credentials to 150 educators, giving them specialized qualifications to fill high-demand roles in education.

76.    Chico State Enterprises (CSE)—a nonprofit corporation affiliated with CSU, Chico (Chico State), also received a TQP grant in 2024 in the amount of approximately $8.5 million to establish the BEST Teacher Residency Program (BEST Program), whose objective was to address chronic teacher shortages in high-need K-12 districts, particularly in rural communities by, amongst other things, improving teacher retention rates, improving instructional effectiveness, and supporting the efforts of local districts in addressing teacher shortages.

77.    The BEST Program included partnerships with several high-need or high-poverty public schools and was designed to address teacher shortages by requiring candidates to teach full-time in a high-need or high-poverty school as part of the program, while working closely with a mentor teacher and meeting residency requirements. Over the five-year term, CSE would recruit,

prepare, and support a minimum of 60 teacher residents to serve in underserved, high-need rural districts in California.

78.    CSE also received a SEED grant in 2022 in the amount of approximately $13.3 million over a three-year period to create the Northern California Growing Responsive, Equitable, Adaptable and Transformative (NorCal GREAT) Teachers Pipeline Program. The purpose of NorCal GREAT was to address a chronic and acute shortage of qualified or experienced teachers within a 38,000-mile rural region of northeastern California. The program would include partnerships with several high-need LEAs and high-poverty schools, and would recruit, train, and support high quality teachers for those LEAs and schools. Based on its "grow your own" approach and philosophy, NorCal GREAT was also designed to assist and enable local students in high-need rural community school districts to become teachers and remain in those local districts as teachers and educators.

79.    The University of California, Los Angeles (UCLA) also received a TQP grant in 2023 in the amount of approximately $8 million for a five-year period to establish the UCLA Cultivating Excellence program. The Cultivating Excellence program was preparing new and aspiring middle school teachers and leaders to serve students more effectively in school districts across Los Angeles County with scarce institutional resources, high poverty rates, and a high rate of teachers with substandard credentials. The TQP grant funds also supported a number of persons involved in these initiatives, including 14 middle school residents, 30 middle school professional leaders, 17 mentor teachers, 10 current principal leadership institute students, 8 community college fellows, and 2 community college liaisons.

80.     In  New Jersey, two public universities—Montclair State University (Montclair) and The College of New Jersey—were among TQP grant recipients implementing robust teaching certification pipeline programs for hard-to-staff positions.

81.     In 2009, Montclair created the Newark-Montclair Urban Teacher Residency (Urban Teacher Residency), which was funded by two TQP grants for the periods 2009-2014 and 2014-2020. The Urban Teacher Residency was an innovative, initial certification, teacher apprenticeship program through which participants pursued a Master of Arts in Teaching with teacher certification in either Early Childhood/Special Education or Mathematics or Science from Montclair, while embedded in schools and classrooms of Newark Public Schools. Based on the success of the program, Montclair applied for a 2020 TQP grant to expand its Urban Teacher Residency and received a total award of approximately $3.7 million.

82.     Montclair was using its 2020 TQP grant to recruit and prepare high-quality teachers for two local schools districts—Newark Public Schools and Orange Public Schools—in high-need subject-areas such as math, science, and special education. Thus far, through the two TQP projects, Montclair had recruited and trained 140 highly qualified educators to serve in urban school districts, filling hard-to-staff positions.

83.     The College of New Jersey's TQP grant supported the College's Residents for Innovation in Urban Schools & Student Empowerment (RISE) Program. The RISE Program is an urban teacher residency program that aims to recruit, prepare and retain teachers in high-need urban schools. The program also provides a pathway for paraprofessionals or those with a bachelor's degree in other subject areas to earn a master's and enter the teaching profession. The RISE Program was in the process of training the first cohort of five educators who are currently in

the classroom in their local partnership school fulltime. These educators were scheduled to graduate in Spring 2025 and hoped to enter their own classrooms this coming fall.

84.    The College of New Jersey's TQP program planned to train five more educators in its next cohort in continued partnership with high-need school districts in the community surrounding the college. To combat the teacher shortage crisis experienced in New Jersey and nationwide, The College of New Jersey was also utilizing the TQP grant to build "grow your own" programs through the creation of "Future Teacher Clubs" in partner high schools, which would in turn create a sustainable pipeline of future teachers, allowing students from the community to return as educators.

85.    In New York, the Department awarded a TQP grant to the Research Foundation of the City University of New York (RF CUNY), a nonprofit education corporation associated with City University of New York (CUNY), and a TQP grant and a SEED grant to the Research Foundation of the State University of New York (RF SUNY), a nonprofit education corporation associated with State University of New York (SUNY). Together, those grants were set to train hundreds of certified teachers to fill vacancies in the State's public-school system and maintain teachers in high-need content areas for high-need schools. The programs funded by the SUNY and CUNY grants were expected to train around 750 highly credentialed educational professionals who would serve high-need communities in the State. The total funding allocated to the CUNY and SUNY grants amounts in relevant part to approximately $16.1 million.

86.    RF CUNY was awarded a five-year TQP grant in 2024 on behalf of CUNY's Lehman College. This TQP grant was projected to recruit 60 teacher candidates and 60 leadership fellows, the vast majority of whom were expected to go on to earn various specialized credentials and certifications in early childhood education, elementary education, and secondary special

education. These candidates were expected to occupy permanent positions in the State's public-school system.

87.    RF SUNY, on behalf of SUNY's University at Buffalo (SUNY Buffalo), was awarded a five-year TQP grant in 2023. This grant was directed to expand its highly successful 16-month teacher residency program to high-need areas on the outskirts of the City of Buffalo. This program was set to generate 60 residents, and eight school leaders, as well as in-service learning for another 60 educators, across four cohorts.

88.    And RF SUNY's SEED grant, also received on behalf of SUNY Buffalo, which was awarded in 2022, sought to expand Buffalo's teacher residency program to high-need areas surrounding the City of Buffalo. The program had thus far recruited 60 residents, more than 100 prospective mentor teachers, and hosted 250 total participants in teacher-leadership professional learning. The overall goals of this program were to: recruit, prepare, support, and retain educators in high-need districts through a community-focused residency program; recruit, develop, and support high-quality mentor teachers and induction specialists in residency pattern schools by implementing evidence-based coaching and induction support models; and increase the capacity of residents, early-career teachers, mentor teachers, and teacher-leaders.

89.    In Illinois, before the recent terminations, there were three active TQP grants benefitting communities in Illinois. Grant recipients included public school districts serving Chicago, Bedford Park, Bridgeview, Broadview, Maywood, Melrose Park, and Summit. These school districts were using TQP grant funds to develop teacher pipelines in partnership with universities like Chicago State University (CSU), Northeastern Illinois University, and the University of Illinois Chicago.

90.      CSU was a subawardee of a five-year TQP grant awarded to Cook County School District 104 (District 104). The purpose of District 104's TQP grant was to create a teacher preparation partnership known as the Teacher Education Alliance Model (TEAM). TEAM is an integrated, comprehensive system of recruiting, preparation, induction, and on-going mentoring of a diverse pool of participants in an innovative teacher preparation program that will prepare 300 apprentice teachers to become multi-subject or single subject certified teachers employed in the high-need schools of District 104 and Maywood–Melrose Park–Broadview School District 89 (District 89), where teacher attrition is high and student achievement is low. CSU uses its TQP subaward of approximately $929,000 to support the TEAM program in a variety of ways, including by designing courses and providing advising and professional development workshops for TEAM participants.

91.      Chicago Public Schools (CPS) was awarded a five-year TQP grant of approximately $3 million to launch its Pre-Service Teaching Equity Project (P-STEP), which aims to better recruit, prepare, develop and retain a strong teacher workforce. P-STEP allows CPS to support an additional 300 student teachers each year and is grounded in research showing that high-quality experiences for student teachers result in reliable pipelines for recruiting and retaining full-time educators. CPS used its TQP grant funds to support CPS employees who make P-STEP possible by, among other things, developing the program's curriculum and analyzing data to refine the program's strategies. And the results demonstrate that P-STEP is an exemplary model for how targeted investments in teacher preparation and placement can yield substantial benefits for students and communities. Since the program began in 2022, 65 percent of P-STEP participants are currently employed by CPS as full-time teachers, including 81 percent of participants who completed the program in the most recent semester.

92.     CPS also benefits from a separate TQP grant awarded to DePaul University that expands on a collaborative residency model with an established track record of successfully developing new teachers for CPS. This program has a goal of recruiting and placing 800 people who are changing careers on a clear and well-defined pathway for becoming highly qualified, context-ready teachers in schools serving predominantly low-income students in high-needs neighborhoods of Chicago. The residency program provides intensive university study and clinical training that prepares the majority of participants to effectively staff high priority instructional areas and instructional areas with high turnover.

93.     In Wisconsin, the University of Wisconsin-Madison received a five-year TQP grant for approximately $3.3 million in 2023 to create a teacher residency program to train highly qualified special education teachers in the Milwaukee Public Schools. Milwaukee Public Schools, the largest public-school district in Wisconsin, suffers from a critical shortage of qualified special education teachers, with 71 positions currently vacant well into the school year and many more filled by teachers who are not fully licensed in special education.

94.     . The program was intended to train 36 special education teachers chosen through a rigorous recruitment and selection process, pairing these teachers with experienced mentors and providing them with extensive graduate coursework in special education along with a year of field experience. Each of these teachers would then have been committed to work in Milwaukee Public Schools for at least three years. At the time of the grant's termination, the first cohort of 10 individuals was serving as teacher residents in Milwaukee Public Schools and taking graduate coursework. Eight more individuals had already been accepted into the second cohort, with more candidates in process.

95.    In Colorado, the University of Colorado Denver (CU Denver) received a five-year $6.5 million TQP grant for its highly successful Next Generation of Teacher Preparation (NxtGEN) program, which focuses on recruiting and preparing new teachers from rural communities to stay and teach within their communities. Colorado rural communities are facing substantial teacher shortages: according to the Colorado Department of Education, nearly three quarters of the over 1,400 open positions in small rural school districts could not be filled by a fully qualified teacher. The NxtGEN program was created to meet this serious need and was developed as a partnership between CU Denver, four rural community colleges, and 57 rural school districts. The grant was intended to fund the preparation of 146 newly minted teachers for these rural school districts as well as important professional development support for many other teachers in these rural communities. Through this program, 19 new teachers have already received their bachelor's degrees and are now teaching in rural schools.

### C.    Federal Grant Award Terms and Conditions

96.    Beginning in the summer of 2024, TQP and SEED grant recipients received Grant Award Notifications (GAN) from the Department's grant management system for Fiscal Year 2025, beginning on October 1, 2024. For many TQP and SEED grant recipients, this GAN confirmed funding for the coming year as part of their ongoing, multi-year grant award. For others, this GAN confirmed funding for the first year of a multi-year grant award. Indeed, different grant programs are at different stages in the process, with some having just started and others approaching the end of their five-year term.

97.     GANs are an official notification relating to a grant award. Per the Department, "[t]he GAN is the official document that states the terms, conditions, and amount of an award, and is signed by the official who is authorized to obligate funds on behalf of ED."[18]

98.     The Department has adopted the Office of Management Budget (OMB) Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance) through its own regulations, including the Uniform Guidance's Remedies for Noncompliance, 2 C.F.R. §§ 200.339–343. *See* 2 C.F.R. § 3474.1. The Uniform Guidance was last revised on April 22, 2024, effective October 1, 2024. Guidance for Federal Assistance, 89 Fed. Reg. 30046 (Apr. 22, 2024).

99.     The Uniform Guidance provides several procedural safeguards that protect the interests of grant recipients from ambiguous, vague, or shifting requirements, including before the termination of any award. For instance, the Uniform Guidance includes a requirement that grant terminations for a failure to "effectuate[] the program goals or agency priorities" be "pursuant to the terms and conditions of the federal award" and only "to the extent authorized by law." 2 C.F.R. § 200.340(a)(4).

100.    The Uniform Guidance, consistent with the Spending Clause, additionally requires that a Federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the federal award." 2 C.F.R. § 200.340(b); *see also* 89 Fed. Reg. at 30089 (underscoring the need for agencies "to clearly and unambiguously communicate termination conditions in the terms and conditions of the award").

---

[18] Dep't of Educ., *Grantmaking at ED — Answers to Your Questions About the Discretionary Grants Process* 29 (2024), https://tinyurl.com/ycycf85x [hereinafter *Grantmaking at ED*].

101.    Grant recipients are further protected from sudden terminations by the Department's policy, and the policy of the Uniform Guidance, to first provide assistance to noncompliant grants before implementing suspension or termination. "If, in the course of monitoring, ED's staff identify areas of weakness or noncompliance, discover that the grantee is not making substantial progress, or have suggestions for how the grantee might better achieve the program objectives, [ED personnel] will provide technical assistance to help bring the project back on track. Unresolved monitoring findings can result in such actions as additional grant terms and conditions, recovery of funds, a decision to not award a continuation grant, or the termination of a grant."[19]

102.    The framework of the Uniform Guidance at 2 C.F.R. § 200.339 echoes this policy, providing that the Department may suspend or terminate a grant award in part or in its entirety only after the agency "determines that noncompliance cannot be remedied by imposing specific conditions," such as, "[r]equiring additional project monitoring," requiring the recipient obtain technical or management assistance, and "[e]stablishing additional prior approvals." 2 C.F.R. §§ 200.339, 200.208(c).

103.    For FY2025, TQP and SEED grant recipients who would later have their grants terminated were consistently submitting reports, program evaluations, and other compliance documents to the Department. The grantees consistently met with their Department project officers and were consistently told their projects were in compliance.

---

[19] *Grantmaking at ED*, *supra* note 18, at 37.

104.    For instance, many of the TQP and SEED recipients in Plaintiff States have received multiple TQP and SEED awards,[20] demonstrating the institutions' abilities to consistently deliver results, meet compliance requirements, and successfully execute the fully funded grants with the diligence required to achieve its goals and serve Plaintiff States' communities.

105.    Finally, if the Department is unable to bring a grant-funded program into compliance and a grant is terminated, the Uniform Guidance provides the recipient with a fair opportunity to object by requiring that the Department "must provide written notice of termination to the recipient," that "include[s] the reason for termination," and that the Department "maintain written procedures for processing objections, hearings, and appeals." 2 C.F.R. §§ 200.341(a), 200.342; *see also* 85 Fed. Reg. 49509 (OMB stating that "agencies are not able to terminate grants arbitrarily").

106.    On information and belief, the Department published written federal grant termination appeal procedures for the first time on February 7, 2025, the same day as the Department's first TQP and SEED grant terminations at issue here. Although the document provides that a recipient must submit an objection within 30 days, it does not disclose how the Department will process any objections or appeals and whether or how any hearings will be held.[21]

107.    The terms and conditions set forth in the GANs of TQP and SEED grant recipients across all relevant years state that the Uniform Guidance, 2 C.F.R. part 200, apply as applicable.

---

[20] For example, in New York, CUNY has received at least two prior TQP grants in addition to its 2024 TQP grant. In New Jersey, Montclair also received two prior TQP grants in addition to its 2020 TQP.

[21] Dep't of Educ., *Grant Termination Appeal Procedures* (Feb. 2025), https://tinyurl.com/3xpr6rvy.

### D.    Executive Orders to Terminate Equity-Related Federal Grants

108.    In the first days of the new federal administration, President Trump issued a series of executive orders broadly seeking to end all efforts related to "equity"—such as any initiatives relating to Diversity, Equity, and Inclusion (DEI) or Diversity, Equity, Inclusion, and Accessibility (DEIA)—including with respect to any federal grants.

109.    On January 20, 2025, President Trump issued Executive Order No. 14151 "Ending Radical and Wasteful Government DEI Programs and Preferencing," 90 Fed. Reg. 8339 (Jan. 29, 2025). The Executive Order instructs the directors of OMB and the Office of Personnel Management and the Attorney General to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." *Id.* at § 2. The Order also requires each federal agency head to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts" within 60 days. *Id.* at § 2(b)(i).

110.    The next day, on January 21, 2025, President Trump issued Executive Order No. 14173 "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8633 (Jan. 31, 2025). The Executive Order requires the Director of OMB, with the assistance of the Attorney General, to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *Id.* at § 3(c). The Executive Order also instructs federal agencies to include in every contract or grant award terms requiring contractual counterparties or grant

recipients "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* at § 3(b)(iv)(B).

111.    On January 29, 2025, President Trump issued Executive Order No. 14190 "Ending Radical Indoctrination in K-12 Schooling," 90 Fed. Reg. 8853 (Feb. 3, 2025). The Executive Order requires the Secretary of Education, Secretary of Defense, and Secretary of Health and Human Services, in consultation with the Attorney General, to develop, within 90 days, a plan for "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology." *Id.* at § 3(a)(i).

112.    These executive orders fail to define some of the key terms they include, such as "equity-related," "programs promoting DEI," "illegal DEI," and "DEIA principles."

113.    These Executive Orders and the actions taken by the Department in their wake have given rise to extensive litigation. For instance, on February 14, 2025, the Department issued a Dear Colleague Letter (DCL) on Title VI of the Civil Rights Act that purported to "clarify and reaffirm the nondiscrimination obligations of schools" that receive federal funding. The DCL stated that schools have "advanced discriminatory policies and practices ... under the banner of 'diversity, equity, and inclusion' ('DEI'), smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline."[22] Two weeks later, the Department issued a document titled, Frequently Asked Questions About Racial Preferences and Stereotypes Under

---

[22] Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ., to Colleagues (Feb. 14, 2025) at *3 ("DCL"), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

Title VI of the Civil Rights Act ("FAQ"),[23] which again decried the dangers of DEI and asserted that schools "have sought to veil discriminatory policies with terms like 'social-emotional learning' or 'culturally responsive' teaching." *Id.* at 6. Various district courts have granted preliminary injunctions to enjoin enforcement of the Department's DCL and FAQ, undertaken in furtherance of the Executive Orders, based on the likelihood that these actions are unlawful. *See, e.g.*, *Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*, No. 25-CV-1120 (DLF), 2025 WL 1196212, at *7 (D.D.C. Apr. 24, 2025) (preliminarily enjoining enforcement of the DCL's certification requirement based on likelihood of success on constitutional vagueness claim); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160, at *32 (D.N.H. Apr. 24, 2025) (preliminarily enjoining enforcement of the DCL ); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. CV SAG-25-628, 2025 WL 1191844, at *24 (D. Md. Apr. 24, 2025) (staying enforcement of the DCL under the Administrative Procedure Act pending final resolution based the plaintiffs' showing of a likelihood of success on the merits of their APA claim).

### E.    Department Directive to Implement Executive Orders

114.    The Department quickly implemented the administration's anti-DEI executive orders with respect to federal grants when, on February 5, 2025, then-Acting Secretary Denise Carter issued an internal directive, entitled "Eliminating Discrimination and Fraud in Department Grant Awards" ("Department Directive").

115.    The Department Directive explains that "[i]t remains a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States,"

---

[23] U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf ("FAQ").

which includes "ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." The Department Directive stated that such "practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education."

116.    The Department Directive also noted that "[i]n addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States."

117.    The Department Directive instructs Department personnel to review all new and ongoing grants and all notices of funding opportunities to ensure they "do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication."

118.    Citing to 2 C.F.R. § 200.340(a)(4) as a basis for authority to terminate new and ongoing federal awards, the Department Directive provides that grants "deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements in the relevant award, agreement, or other instrument."

119.    The Department Directive requires all Department personnel, including personnel within the Office of Elementary and Secondary Education, to implement the directive.

120.    The Department Directive was reported about on social media app Bluesky.[24] The Department did not publish or circulate the Department Directive to federal grant recipients before terminating their grant awards.

121.    The Department moved quickly to implement the Department Directive. On February 10, 2025, according to an announcement from the Department of Government Efficiency, which itself has been the subject of litigation concerning its authority to perform certain similar governmental functions, the Department terminated "29 DEI training grants totaling $101 [million]."[25]

122.    On February 17, 2025, the Department issued another announcement of over $600 million in cuts to grants "[u]sed to train teachers and education agencies on divisive ideologies . . such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism; 'anti-racism.'"[26]

### F. Department Termination of TQP and SEED Grants

123.    Following issuance of the Department Directive, Defendants took immediate steps to implement it with respect to the TQP and SEED programs. Within two days of the Department Directive, on February 7, 2025 or earlier, TQP and SEED grant recipients began to receive boilerplate, uniform termination letters from the Department with the title "RE: Grant Award Termination" (Termination Letter). A true and correct copy of a representative Termination Letter is attached as Attachment A.

---

[24] Prem Thakkar (@premthakker.bsky.social), Bluesky (Feb. 5, 2025, 2:08 p.m.), https://tinyurl.com/k6vc642n.

[25] Dep't of Gov't Efficiency (@DOGE), X (Feb. 10, 2025 7:13 p.m.), https://tinyurl.com/mv9dxw9k.

[26] Dep't of Educ., Press Release, U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants (Feb. 17, 2025), https://tinyurl.com/yrwmjr6w.

124.    The Termination Letter, which was distributed to nearly all TQP and SEED grant recipients, states, in relevant part:

> This letter provides notice that the United States Department of Education is terminating your federal award, [grant award number]. See 2 C.F.R. § 200.340-43; see also 34 C.F.R. § 75.253.
>
> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. § 200.340(a)(4); see also 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [grant award number] in its entirety effective [date of letter].

125.    The Termination Letter uses a template form, customized only for the addressee, grant award number, and termination date. The Termination Letter sent to TQP and SEED grant recipients is substantively identical, despite being issued to a wide variety of programs operating under two distinct grant programs.

126.    While the copy of the Termination Letter sent to many recipients does not have authorship metadata, metadata remaining in some copies of the Termination Letters indicate that

the letter was authored by a "Morgan, Brooks." Brooks Morgan does not appear to be staff at the Department of Education; rather, The New York Times has reported that a Brooks Morgan from the Department of Government Efficiency has been detailed to the Department of Education.[27]

127.    The Termination Letter cites to no source of authority that would permit the wholesale elimination of grant programs established by Congress.

128.    The Termination Letter recites a number of nonspecific explanations as potential reasons for the grant termination, without actually identifying which, if any, of those reasons purportedly justify termination of the specific grants at issue. These potential reasons for the grant terminations are all lifted directly from the language of the Department Directive.

129.    The Termination Letter does not identify any evidence that the identified grant award engaged in any of the activities listed as potential causes for termination.

130.    The Termination Letter does not describe any specific aspect of the identified grant award that was found to be objectionable, let alone unlawful.

131.    The Termination Letter cites 2 C.F.R. § 200.340(a)(4) for the purported authority that a grant may be terminated on the grounds that the award is "inconsistent with, and no longer effectuates, Department priorities."

132.    The Department also distributed a revised GAN to most grant recipients. The dates referenced in Block 6 of the revised GAN were altered such that the Budget Period now reflected an end date that was the same date the revised GAN was received (Termination GAN). A true and correct copy of a representative Termination GAN is attached as Attachment B. Thus, the

---

[27] Dana Goldstein and Zach Montague, *Musk Staff Propose Bigger Role for A.I. in Education Department*, N.Y. Times, Feb. 13, 2025, at https://nyti.ms/4iiRrMm.

Termination GAN received by one recipient on February 12, 2025, now included the following dates in Block 6: "10/01/2024 – 02/12/2025".

133.    The Termination GAN states as follows:

(1)    THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2)    The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a) (4); see also 34 C.F.R. 75.253.

134.    The statute applicable to the TQP Program specifies that TQP grants "shall be awarded for a period of five years." 20 U.S.C. § 1022b(a)(1). Further, the notice of applications for the awards describes the grant project period as 60 months. Applications for New Awards; Teacher Quality Partnership Grant Program, 87 Fed. Reg. 10906, 10918 (Feb. 25, 2022). The statute does not authorize the termination of a grant awarded under the TQP Program without regard to whether a given grant is meeting its objectives and where it is in its five-year life cycle. *See* 20 U.S.C. § 1022b.

135.    The statute governing the SEED grant program states that grants awarded by the Department "shall be for a period of not more than 3 years." 20 U.S.C. § 6672(b)(1). Further, the notice of application for the awards describe the grant project period as up to 36 months. Applications for New Awards; Supporting Effective Educator Development Program, 87 Fed. Reg. 19487, 19492 (April 4, 2022).

136.    Further, 2 C.F.R. § 200.340(a)(4) does not authorize termination of a grant based on failure to effectuate new, previously unannounced agency priorities.

137.    Plaintiff States are unaware of any instance before the Department Directive in which the Department had terminated a previously-awarded federal grant for no longer effectuating agency priorities pursuant to 2 C.F.R. § 200.340.

138.    The Department established final annual priorities for the TQP and SEED grants in December 2021.[28] These priorities, which were utilized by the Department in awarding the TQP and SEED grants[29], include things like "Supporting Educators and Their Professional Growth"; "Increasing Educator Diversity"; "Promoting Equity in Student Access to Educational Resources and Opportunities"; and "Meeting Student Social, Emotional, and Academic Needs." 86 Fed. Reg. 36217-19 (July 9, 2021); 86 Fed. Reg. 70612-70641 (Dec. 10, 2021). These priorities remain in effect until the Department completes the notice-and-comment process for any  new priorities, which, in any event, would only be in effect for new Department grantmaking, not for previously awarded grants. *See* 90 Fed. Reg. 21710.

139.    The Termination Letter also cites 34 C.F.R. § 75.253 for authority to terminate a previously-awarded grant. This regulation is irrelevant. This federal regulation does not relate to midyear grant terminations, but rather, discusses the process by which a grantee "receive[s] a continuation award from [the Department] for a budget period after the first budget period of an approved multiyear project." 34 C.F.R. § 75.253(a).

140.    The Termination Letter also cites 2 C.F.R. § 200.339 for authority to terminate a previously-awarded grant. This regulation is also irrelevant. This federal regulation applies to terminations for noncompliance with "the U.S. Constitution, Federal statutes, regulations, or terms

---

[28] On May 21, 2025, the Department published "Proposed Priorities and Definitions-Secretary's Supplemental Priorities and Definitions on Evidence-Based Literacy, Education Choice, and Returning Education to the States," and began accepting comments for the newly proposed Department priorities. 90 Fed. Reg. 21710.

[29] *See supra* ¶¶ 66, 67.

and conditions of the federal award," which the Termination Letter does not assert. 2 C.F.R. §
200.339. This regulation also requires the federal agency to "determine[] that noncompliance
cannot be remedied by imposing specific conditions," a determination the Termination Letter does
not make or explain. *Id.*

141.    At the time of receiving their Termination Letter in February 2025, all TQP and
SEED grant award recipients had already received an initial or continuance award, effective
October 1, 2024, and were midway into the fiscal year of their current project.

142.    At least one grant recipient received a Termination GAN but no Termination Letter.
As noted above, the Termination GAN provides even less information than the Termination Letter
regarding the Department's reasons and asserted authority for the termination of the grant. In
addition, the Termination GAN provides no notice about any rights related to the termination.

143.    One TQP recipient who did not initially receive either a Termination Letter or
Termination GAN inquired as to whether their grant was still in effect and was told by a
Department official via email that "[a]ll the grants have been terminated," "[a] new GAN email
was sent out to everyone, some have not received the letter," and "[a]ll the accounts in G6 [the
Department's grant management system] are closed."

144.    In total, the Department terminated all or nearly all of the over-100 previously
awarded TQP and SEED grants.

145.    The Administrative Record demonstrates the Department's complete failure to
conduct individualized determinations of any grant program prior to termination. Objection Letters

146.    The Termination Letter states "[i]f you wish to object to or challenge this
termination decision, you must submit information and documentation supporting your position in
writing within 30 calendar days of the date of this termination notice." Some TQP and SEED grant

recipients from Plaintiff States have filed an objection with the Department to the termination, requesting that the Department immediately hold in abeyance any action—including withholding of funds—pending appeal of the termination and/or immediately rescind the termination. The objections requested a response from the Department prior to the date of this lawsuit's original filing as to whether the termination is rescinded or will be held in abeyance—including withholding of funds—pending appeal of the termination.

147.     None of the TQP and SEED grant recipients in Plaintiff States who filed objections received a response or resolution from the Department prior to the filing of the First Amended Complaint.

### G.     Harm to Plaintiff States

148.     Plaintiff States and their public schools have been, and will continue to be, irreparably harmed by the Department's February Actions.

149.     The TQP grant model encourages recipients—including public institutions of higher learning and school districts—to work in partnership with high-need school districts, schools, early childhood education programs, and nonprofit educational organizations. Funded partnerships work together to recruit, train, place, and support teachers, especially for hard-to-staff subject areas and geographies, ultimately developing a critical talent pipeline for public schools in the region and state.

150.     SEED grant recipients may similarly work in partnership with institutions of higher learning, school districts, national teacher preparation nonprofits, and the Bureau of Indian Education. Funded entities serve geographically diverse areas and provide teacher professional development and nontraditional teacher preparation and certification pathways to serve in high-need school districts, at no cost to the K-12 students who may benefit.

151.    In total, immediately prior to the Department's February Actions, there were at least 40 TQP and SEED grant recipients operating in Plaintiff States.

152.    Defendants' February Actions have irreparably harmed Plaintiff States through their public institutions, including public universities as well as public school districts and public schools, that received funding as TQP and SEED grant recipients or subrecipients. The public institutions of Plaintiff States have faced and will continue to face abrupt shortfalls to their current year budgets collectively exceeding tens of millions of dollars, which cannot be replaced. These shortfalls have forced institutions to reduce or lay off program staff. Absent federal funding, Plaintiff States do not have the financial wherewithal or staffing to keep the TQP and SEED programs running.

153.    Defendants' February Actions have irreparably harmed Plaintiff States by disrupting teacher workforce pipelines, as Plaintiff States have lost and will continue to face the loss of critical programs that are directed to teacher recruitment, teacher residencies, teacher training, and school leadership training, and would have trained and mentored thousands of teachers and affected hundreds of thousands of students. The February Actions thus increase reliance on underqualified educators and destabilize local school systems.

154.    Defendants' February Actions have irreparably harmed Plaintiff States by damaging long-term institutional relationships upon which the TQP and SEED grant programs relied. Programmatic planning at universities and public schools occurs years in advance, especially for the establishment and execution of partnerships between universities and participating districts and schools. The February Actions have upended and will continue disrupted months, if not years, of the work of public institutions of higher learning focused on educator preparation.

155.    Defendants' February Actions have irreparably harmed Plaintiff States by causing immediate chaos and confusion. The sudden and unexpected nature of the February Actions—in the middle of the academic year and budget cycle—forced Plaintiff States to immediately assess the impact on their budgets for staff, coursework, partner organizations, school districts, and student populations; communicate programmatic changes to all identified and affected parties; and redesign programs when possible or determine whether to end entire programs. And, Plaintiff States had to do all of this with urgency, because the programs were terminated without any notice.

156.    Defendants' February Actions have irreparably harmed Plaintiff States by causing reputational harm to Plaintiff States' public institutions. Participating students have shared that the termination of grant funds has caused them to lose trust not only in their respective programs, but in the teaching profession as well. The February Actions have made and will continue to make it harder for Plaintiff States to attract applicants to participate in the programs going forward.

157.    Defendants' February Actions have irreparably harmed Plaintiff States by hindering Plaintiff States' organizational missions to support K-12 student education.

158.    The TQP and SEED grants were designed to combat the vast teacher shortages experienced nationally through educator recruitment and retention efforts. Now, with much of the infrastructure around the existing teacher pipeline effectively eliminated by the Defendants' February Actions, Plaintiff States (through their institutions of higher education, districts, and schools) have been, and will continue to be, forced—as a result of the harms described above—to expend State resources to assess the current impacts of these programmatic losses.

159.    Plaintiff States have been unable to identify a way to maintain their full TQP and SEED programs for the coming school year and, by August, the vast majority of programs will shutter. Some may be able to maintain the programs for the first semester of 2025, but after that,

they too will have to close. Others had to shutdown immediately because there was no way – mid-year – to replace what had been relied on from the Federal government for the continuity of these programs.

160.    Examples from the experiences of Plaintiff States and their public schools clearly demonstrate the immediate harm they have faced and will continue to face due to Defendants' February Actions, as discussed below.

161.    In Massachusetts, since 2023, UMass Amherst's TQP grant award was used to increase the pipeline of early childhood educators, especially for two high-need districts impacted by teacher shortages and in State receivership due to low student performance. The sudden termination of UMass Amherst's grant caused confusion, especially among the program's current cohort of nineteen paraeducators who were training to become licensed early childhood educators. Paraeducators in the first cohort who were scheduled to do their student teaching practicum this fall were going to be relieved of their duties so they could focus on completing the program, and grant funds would be used to hire temporary replacements while they were student teaching.  Due to the loss of grant funds to hire replacement paraeducators, the program's participants must now continue to work full-time as paraeducators and complete their practicum on top of their full-time work. Many of these paraeducators already work multiple jobs to make ends meet and cannot accommodate their student teaching on top of working multiple jobs.  Several have already withdrawn from the program.

162.    In California, California State University, Los Angeles (Cal State LA) was awarded a TQP grant in 2023 to implement a teacher residency program focused on placing teachers with partnering high-need urban school districts and for high-need subjects, such as special education, secondary Science, Technology, Engineering and Mathematics (STEM) education, and bilingual

education. The immediate termination of the grant directly impacted the current cohort of 26 teacher residents, who lost mentoring, training, and other support, such as hiring assistance and ongoing coaching. The termination will also directly impact the incoming cohort of residents, who will lose financial support and the chance to participate in classroom teaching. As a result of this loss of financial support, 10 students in the incoming cohort of residents have already withdrawn from the program, leaving only 28 and far short of the anticipated 50. Without these supports— which Cal State LA has no other funding source to cover—residents will not be required to commit to teach in high-need districts after obtaining their credential, thereby exacerbating existing teacher shortages in those districts and schools.

163. In New Jersey, The College of New Jersey (TCNJ) was awarded a five-year TQP grant in 2023 to implement an urban residency program focused on recruiting, preparing, and retaining teachers in high needs urban schools, including creating a pathway for paraprofessionals to earn a master's degree and become classroom teachers. The program relies on the TCNJ's partnerships with several urban school districts. Because of the immediate termination of grant funds, TCNJ has cancelled the program and informed partnering school districts, who can no longer rely on the sustained relationships and pipeline of educators.

164. In Wisconsin, the University of Wisconsin-Madison was awarded a TQP grant in 2023 to implement a teacher residency program to train 36 special-education teachers for Milwaukee Public Schools, a district with a critical shortage of special education teachers. As a result of the immediate termination of the grant, the program is proceeding only in a limited capacity for the current and incoming cohorts of students. But the University has no funding for, and has been forced to stop providing, paid summer internships for teacher trainees, induction supports and mentoring for new teachers following graduation, and transportation costs for teacher

trainees to attend required in-person classes, and has to drastically curtail program coordinator support for teacher trainees and teachers. Moreover, given the grant termination and continued uncertainty, the University has done no recruitment for the third and final cohorts of students.

165.    In Illinois, the loss of a TQP grant award directly impacts Chicago State University's ability to sustain academic support functions for apprentice teachers in high-need schools in suburban Cook County. Some of the university's faculty members will not be paid, it will not be able to hire an additional employee to support the program, and it may not be able to purchase educational teaching materials necessary for a planned summer institute for apprentice teachers focusing on reading and literacy skills. The loss of TQP funds also has undermined the ability of the Chicago Public Schools (CPS) to sustain the successes of its teacher pipeline program. CPS employees and cooperating teachers in high-needs schools have proven crucial to achieving a remarkable 81 percent retention rate in the most recent semester. Because CPS was using TQP funds to pay their salaries and provide them stipends, the sudden loss of those funds jeopardized the entire program. Although CPS scrambled to develop and analyze various alternatives—a daunting task because the district already facing major fiscal challenges—it was ultimately unable to identify other funding sources. As a result, CPS terminated its program.

166.    In New York, RF CUNY designed a residency program that focused on training teachers for placement in the Bronx using its 2024 TQP grant. This program, administered through CUNY's Lehman College, was committed to serving the educational needs of a highly diverse and low-income borough of New York City. This residency program was also dedicated to training educators to meet the educational needs of disabled students. The termination of funding for the TQP grant has caused RF CUNY to completely shut down the program. No work is ongoing, and all staff have been removed from the project. RF CUNY and CUNY Lehman College have been

unable to identify any alternative funding for the teacher training program. Thus, instead of achieving the goals of training highly-qualified educators for New York's understaffed public schools, RF CUNY will no longer be able to implement a program created to address the needs of the most vulnerable children and families in a region where dedicated specialized educators are most needed.

167.    Likewise in New York, SUNY Buffalo's teacher training program supported by RF SUNY's TQP and SEED grants has been shut down because of the termination of federal funding. All of the program's staff members who were paid exclusively by the grants have been terminated. Trainees who had anticipated graduating in September 2025 are finishing their coursework over the summer without additional support, and the program has not accepted any new students.

168.    In Colorado, the termination of CU Denver's TQP grant is expected to result in the loss of 50 new qualified teachers for rural Colorado school districts. The loss of funding will result in 21 jobs lost or reduced and will cause the loss of service to the many students participating in the program as well as new teachers who have been receiving professional development support. Similarly, CU Denver's NxtGEN program for recruiting and training teachers for rural communities relies on a partnership with four rural community colleges and 57 rural school districts. The termination of funding will cause the dissolution of this partnership and substantial harm to the school districts. One school district has already reported that it expects to need to rely on long-term substitutes because it will be unable to recruit and retain fully qualified teachers without this program. Other districts will likely face similar immediate impacts.

169.    Plaintiff States are also harmed by the termination of TQP and SEED grants awarded to private recipients in Plaintiff States. For example, elimination of the TQP grant awarded to DePaul University, a private university working to place 800 teachers in high-need

Chicago public schools, will directly harm Illinois's ability to provide a high-quality public education. Similarly, elimination of two TQP grants issued to Alder Graduate School, a private university working to prepare new teachers for high-need school districts principally in Southern California, will directly harm California's ability to provide a high-quality public education public education.

170.    The harm to Plaintiff States' students from losing these qualified teachers, due to the termination of previously awarded grants, will reverberate for years to come.

## CAUSES OF ACTION

### COUNT I

**Substantive Violation of the Administrative Procedure Act**

**Agency Action That Is Arbitrary and Capricious and an Abuse of Discretion**

**5 U.S.C. § 706(2)(A)**

171.    Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

172.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

173.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). That "reasoned explanation requirement of administrative law . . . is meant

to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce* v. *New York*, 588 U.S. 752, 785 (2019).

174. Defendants' February Actions constitute final agency action under the APA. The Termination Letter directly quotes from the Directive issued days prior and provides that the "Department hereby terminates grant No. [] in its entirety effective 2/[]/25," resulting in the immediate termination of the recipients' grant funding and marking the culmination of the Department's decisionmaking. The Department Directive, as effectuated through the Termination Letter, along with any Termination GAN, contains the totality of the Department's stated explanation for the termination of the previously-awarded TQP and SEED grants.

175. Regulations governing the process for grant terminations prohibit Defendants from engaging in arbitrary and capricious terminations. *See e.g.*, 2 C.F.R.§ 200.341(a) (requiring written notice of any termination, which must "include the reason for termination"); 85 Fed. Reg. 49509 (grant terminations cannot be arbitrary).

176. Defendants' actions are arbitrary and capricious because Defendants used the fiction of individual grant termination determinations, in the form of an identical and unsupported Termination Letter and Termination GAN, to undertake the undisclosed purpose of terminating two congressionally authorized grant programs.

177. Defendants' actions are arbitrary and capricious because the Department did not provide a transparent and reasonable explanation for the termination of the grants. The Termination Letter lists a number of nonspecific reasons the Department argues it *could* use to form the basis for terminating the grants, but the Termination Letter does not actually specify which, if any, of

these reasons apply to the grants at issue. Indeed, the Termination Letter fails to provide any explanations specific to any terminated grant.

178.    The Termination Letter and Termination GAN offer no connection between the facts relating to the individual grants being terminated and the termination decision.

179.    Defendants' actions are arbitrary and capricious because Defendants failed to take into consideration the impact that terminating teacher training program grants would have on Plaintiff States, their public schools, and the students they serve.

180.    Defendants' actions are arbitrary and capricious because Defendants failed to take into consideration the reliance interests of Plaintiff States, including but not limited to their educational institutions, teachers in training, and local school district partners who had taken steps in reliance upon receiving support through the grant-funded programs.

181.    Defendants' actions are arbitrary and capricious to the extent that the Department is relying on Department priorities that are contrary to the priorities the Department established through required notice-and-comment rulemaking via publication in the Federal Register. *See* 20 U.S.C. § 1232; 34 C.F.R. § 75.105.

182.    To the extent the Department is relying on the explanation that the terminations effectuate a new Departmental priority to eliminate funding of DEI programs, the Defendants fail to define or identify what such programs entail and provide no explanation of how any particular grant is allegedly inconsistent with this priority.

183.    Furthermore, to the extent the Department is relying on the explanation that the terminations effectuate a new Departmental priority to eliminate funding of DEI and equity-related programs, it is arbitrary and capricious and an abuse of discretion to rely on a priority that is contrary to the purpose and language of the underlying TQP and SEED statutes and GEPA, which

expressly require initiatives that promote diversity among the teaching workforce and equity among the student population and support for students from diverse backgrounds and with diverse learning needs. 20 U.S.C. §§ 1022e(b)(4), 6672(a)(1), 1022a(d)(1)(A)(ii), 1228a(b).

184.    Furthermore, to the extent the Department is relying on a new interpretation of existing anti-discrimination laws to conclude that grant recipients' projects or any form of "DEI" is discriminatory and unlawful, the Defendants' actions are arbitrary and capricious because their boilerplate letters do not acknowledge—let alone provide "good reasons for"—any official change in agency policy "priorities." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009).

185.    Similarly, to the extent the Department is relying on the explanation that the terminated grants conflict with the Department's policy of prioritizing "merit, fairness, and excellence in education," the Department has never published a regulation describing or defining this policy priority as required by 20 U.S.C. § 1232(d), nor have Defendants explained how any particular grant is allegedly inconsistent with  this priority.

186.    And Defendants never informed any TQP or SEED grant recipient in Plaintiff States of any noncompliance and never offered technical assistance or even an opportunity to address any issue, as required by the Uniform Guidance and the Department's documents provided for grant recipients, 2 C.F.R. §§ 200.339; 200.208, prior to the immediate termination of the grant.[30]

187.    Federal grant award recipients of the terminated grants in Plaintiff States were harmed by the terminations.

188.    Plaintiff States are entitled to vacatur of Defendants' final agency actions pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, declaratory relief under

---

[30] *Grantmaking at ED*, *supra* note 18, at 36-37.

28 U.S.C. § 2201 and 5 U.S.C. § 706 that Defendants' actions were arbitrary and capricious and/or

an abuse of discretion in violation of the APA, and a permanent injunction preventing Defendants

from implementing, maintaining, or reinstating the February Actions

## COUNT II

### Substantive Violation of the Administrative Procedure Act

### Agency Action Not in Accordance With Law (2 C.F.R. § 200.340)

### 5 U.S.C. § 706(2)(A)

189.    Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint

as if set forth herein.

190.    Defendants include "agenc[ies]" under the APA, 5 U.S.C. § 551(1), and

Defendants' February Actions are final agency actions subject to the APA.

191.    The APA requires that a court "hold unlawful and set aside agency action, findings,

and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

192.    When a federal agency has promulgated "[r]egulations with the force and effect of

law," those regulations "supplement the bare bones" of federal statutes. *See United States ex rel.*

*Accardi v. Shaughnessy*, 347 U.S. 260, 265, 268 (1954). "An agency has the duty to follow its own

federal regulations," and "[f]ailure to follow applicable regulations can lead to reversal of an

agency order." *Nelson v. Immig. and Naturalization Serv.*, 232 F.3d 258, 262 (1st Cir. 2000). An

agency's action may be set aside pursuant to the APA if the action violates the agency's own

procedures, particularly if that error prejudices the interest of a person before the agency. *See*

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–47 (6th Cir. 2004).

193.    Defendants' February Actions are not in accordance with law because Defendants

are not authorized by applicable federal statutes and regulations to terminate federal grant awards

on the grounds asserted in the Department Directive and Termination Letter. Nor are Defendants authorized to shutter congressionally mandated grant programs under the guise of individual grant terminations.

194.    Defendants rely on 2 C.F.R. § 200.340(a)(4), which only authorizes termination "pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

195.    2 C.F.R. § 200.340(a)(4) (2024) and/or 2 C.F.R. § 200.340(a)(2) (2020)[31] do not independently permit or authorize such termination nor do they permit an agency to shutter congressionally mandated grant programs based on agency priorities identified after the time of the Federal award.

196.    Here, Defendants underwent notice and comment rulemaking to establish priorities, pursuant to GEPA, 20 U.S.C. § 1232(d) and Defendants' own regulation, 34 C.F.R. § 75.105(b). Plaintiff States' institutions relied upon these published priorities in crafting their grant applications and accepting their grant awards. However, in furtherance of the Department Directive, the Termination Letter sets forth new priorities without undergoing notice and comment rulemaking and purports to terminate previously-awarded TQP and SEED grants based on their failure to effectuate these new priorities.

---

[31] Defendants have cited to an earlier version of the OMB Uniform Guidance from 2020 in their briefing. This is not the regulation relied on by the Defendants in the Department Directive or the Termination Letter; however, neither version of the regulation permits Defendants' February Actions.

197.    Accordingly, to the extent they apply at all, Defendants lacked the authority under 2 C.F.R. § 200.340(a)(4) (2024) and/or 2 C.F.R. § 200.340(a)(2) (2020) to carry out the February Actions and have violated GEPA and their own regulations.

198.    To the extent the Department is relying on the explanation that the terminations effectuate a new Departmental priority under the Department Directive to eliminate funding of DEI and equity-related programs, Defendants' actions are also inconsistent with law because they rely on a priority that is contrary to the purpose and language of the underlying TQP and SEED statutes and GEPA, all of which expressly require initiatives that promote diversity among the teaching workforce and equity among the student population and support for students from diverse backgrounds and with diverse learning needs. 20 U.S.C. §§ 1022e(b)(4), 6672(a)(1), 1022a(d)(1)(A)(ii), 1228a.

199.    Federal grant award recipients of the terminated grants in Plaintiff States were prejudiced by these final agency actions.

200.    Plaintiff States are entitled to vacatur of Defendants' final agency actions pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, declaratory relief under 28 U.S.C. § 2201 and 5 U.S.C. § 706 that Defendants acted contrary to law in terminating all or nearly all of the previously-awarded grants under the TQP and SEED programs in violation of the APA, and a permanent injunction preventing Defendants from implementing, maintaining, or reinstating the February Actions for recipients in Plaintiff States.

## COUNT III

### Declaratory Judgment

201.    Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

202.    An actual and substantial controversy exists between Plaintiff States and Defendants about whether 2 C.F.R. § 200.340(a)(4) (2024) and/or 2 C.F.R. § 200.340(a)(2) (2020) permit Defendants to terminate awarded grants or congressionally authorized grant programs under the guise of individual grant terminations on the grounds that the Department identified "agency priorities" after the award of the grant which it contends the grant does not effectuate.

203.    This action is presently justiciable because Defendants have asserted: (a) that § 200.340 permits the Department of Education, as a matter of law, to terminate awarded grants on the grounds that the Department's "agency priorities" have changed since the award of the grant – in some cases in a manner that directly contradicts the previously published priorities that were utilized in awarding the grants and Congress's objectives as set forth in the statutes authorizing the TQP and SEED grant programs; and (b) that this interpretation of § 200.340 permits Defendants to terminate previously-awarded TQP and SEED grants on the grounds that they no longer "effectuate agency priorities."

204.    Plaintiff States assert that, to the extent they apply at all, while 2 C.F.R. § 200.340(a)(4) (2024) and/or 2 C.F.R. § 200.340(a)(2) (2020) only permit the termination of a federal award if the award no longer effectuates agency priorities identified as of the time of the federal award; these provisions do not independently permit or authorize such termination based on agency priorities identified or promulgated after the time of the Federal award.

205.    Declaratory relief will clarify the rights and obligations of the parties and, therefore, pursuant to 28 U.S.C. § 2201, is appropriate to resolve this controversy.

## COUNT IV

## Substantive Violation of the Spending Clause

## U.S. Constitution, article I, section 8, clause 1

206.    Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

207.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

208.    The Spending Clause of the U.S. Constitution, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

209.    The Spending Clause requires States to have fair notice of the conditions that apply to the disbursement of funds to them. *See Pennhurst*, 451 U.S. at 17, 25; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012). The funding conditions must be set out "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). And the federal statute must be viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal statutory] funds and the obligations that go with those funds." *Id.*

210.    Defendants' February Actions have altered the conditions upon which grants were obligated and disbursed to Plaintiff States, contrary to Congressional authority. Defendants' February Actions amount to a retroactive and ambiguous condition on TQP and SEED funding, prohibiting recipients from engaging in any work perceived to be related to "DEI."

211.    Defendants' February Actions further amount to a new and retroactive condition on TQP and SEED funding, as Defendants now assert authority to unilaterally terminate a federal grant on grounds not authorized by Congress through the TQP and SEED grant authorizing statutes, GEPA, or 2 C.F.R. § 200.340. These alterations are retroactive, ambiguous, and inconsistent with the purpose of the TQP and SEED grant programs, GEPA's requirement that grant recipients address "equity," *see* 20 U.S.C. § 1228a, and the final rulemaking priorities governing the grant programs issued pursuant to GEPA and 34 C.F.R. § 75.105(b).

212.    Defendants' February Actions are also contrary to the requirement that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987). Here, Defendants' February Actions are not related to the federal interest—to, among other things, support and encourage the development of effective K-12 teachers nationwide in traditionally underserved areas, for hard-to-serve subjects, and for diverse populations—and instead are related to an objective of ending "diversity, equity, and inclusion" activities of any kind.

213.    Indeed, the effect of Defendants' February Actions is to harm teacher development pipelines across the country, including in Plaintiff States, and Congress' stated objectives for these programs.

214.    Accordingly, Plaintiff States are entitled to equitable relief to enjoin Defendants' February Actions, and to a declaration pursuant to 28 U.S.C. § 2201 declaring unconstitutional, the Department Directive as implemented with respect to the TQP and SEED programs and any action taken to enforce or implement it as to the TQP and SEED program.

## COUNT V

## Equitable *Ultra Vires* –

## Conduct Outside the Scope of Statutory Authority Conferred on the Executive

215.    Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

216.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong,* 575 U.S. at 327. Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

217.    The Department, through its officials, may exercise only the authority conferred by statute and regulations.

218.    Defendants do not have authority to eliminate the TQP and SEED programs under the guise of terminating individual grants thereunder or to terminate the grants thereunder based on a change in priorities after grants were issued in accordance with the Congressional authorizing statutes and the completed statutorily required notice and comment process to set final priorities. Defendants' February Actions without regard to the TQP and SEED authorizing statutes, GEPA, and the Department's own regulations, are contrary to law and outside of Defendants' authority.

219.    To the extent Defendants' February Actions terminated the TQP and SEED programs by placing new, retroactive, ambiguous, and unrelated conditions on the TQP and SEED grants, Defendants have encroached upon Congress's Spending authority and violated the separation of powers, and thereby acted *ultra vires*.

220.    Defendants' February Actions have caused and are causing substantial injury, including irreparable harm.

221.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Defendants' February Actions are *ultra vires* and therefore unlawful.

222.    Plaintiff States are also entitled to a permanent injunction preventing Defendants from implementing, maintaining, or reinstating the February Actions it.

## COUNT VI

### Violation of the Separation of Powers

223.    Congress possesses exclusive power to legislate. Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. art. I,§ 1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

224.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (Alexander Hamilton) & No. 51, at 350 (James Madison)).

225.    Thus "'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (alteration in original) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)).

226.    The separation of powers doctrine thus represents a central tenet of our Constitution. *See, e.g., Trump v. United States*, 603 U.S. 593, 637–38 (2024); *Seila Law LLC*, 591 U.S. at 227, and consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Consistent with these principles, the Executive's powers are limited to those specifically conferred by the Constitution and federal statutes, and do not include any undefined residual or inherent power.

227.    The Executive Branch violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution"); *see also Util. Air. Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (noting that the President "act[s] at time through agencies").

228.    No statute authorizes the Executive's actions here. Congress created and funded the TQP and SEED grant programs to recruit and train highly qualified individuals to serve as teachers in underserved schools districts and high-need subject areas. *See* 20 U.S.C. §§ 1022, 1022a, 1022h (TQP); 20 U.S.C. § 6672 (SEED). To achieve these goals, Congress required that grant recipients train educators on teaching "diverse populations" in "traditionally underserved" schools, on improving students' "social, emotional, and physical development," "providing instruction to diverse populations, including children with disabilities, limited English proficient students, and

children from low-income families," and will "recruit highly qualified individuals, including minorities and individuals from other occupations, into the teaching force." 20 U.S.C. §§ 1022, 1022e(b)(4), 1022a(d)(1)(A)(ii), 6672(a)(1), . And, GEPA further requires that any applicant for grant funding "develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a(b).

229.    The Department's February Actions purport to terminate the previously-awarded TQP and SEED grants and to shutter those programs to effectuate a new Departmental priority to eliminate funding for diversity, equity, or inclusion related programs. But, the Department has no power to substitute its priorities for the careful judgment of Congress, which expressly required consideration of diversity and equity in awarding the TQP and SEED grants.

230.    The February Actions therefore violate the separation-of-powers constraints described above. Through their actions, Defendants have overridden the careful judgment of Congress by terminating grant awards for engaging in diversity, equity, and inclusion programs as required by Congress.

231.    For the foregoing reasons, Plaintiff States are entitled to a permanent injunction barring Defendants from implementing, maintaining, or reinstating the February Actions.

232.    Plaintiff States are also entitled, pursuant to 28 U.S.C. § 2201, to a declaration that the February Actions violate the Constitution's guarantee of separation of powers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that this Court:

i.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside Defendants' February Actions on the ground they are (a) arbitrary and capricious; (b) not in accordance or consistent with law, including federal statute and governing regulations; and (c) contrary to constitutional right;

ii.   Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' February Actions are unlawful because they violates the APA and are ultra vires because they were taken outside of statutory authority;

iii.  Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' February Actions are unconstitutional because Defendants' actions violate the Spending Clause and Separation of Powers;

iv.   Permanently enjoin Defendants from implementing, maintaining, or reinstating the Defendants' February Actions for recipients in Plaintiff States;

v.    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that 2 C.F.R. § 200.340(a)(4) (2024) and/or 2 C.F.R. § 200.340(a)(2) (2020) do not independently permit or authorize termination of awarded grants based on agency priorities identified or promulgated after the time of the Federal award;

vi.   Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

vii.  Grant other such relief as this court deems appropriate, just, and proper.

Dated:  June 2, 2025                           Respectfully submitted,

**ROB BONTA**                                  **ANDREA JOY CAMPBELL**
Attorney General                               Attorney General
State of California                            Commonwealth of Massachusetts

By: */s/ Alexis Piazza*                        By: */s/ Adelaide Pagano*
Laura L. Faer*                                 Megan Barriger (BBO #687707)
*Supervising Deputy Attorney General*          *Senior Trial Counsel*
Alexis Piazza*                                 Adelaide Pagano (BBO #690518)
Heidi Joya*                                    *Assistant Attorney General*
Garrett Lindsey*                               Yael Shavit (BBO #695333)
*Deputy Attorneys General*                     *Chief, Consumer Protection Division*
Maureen Onyeagbako*                            Chris Pappavaselio (BBO #713519)
*Supervising Deputy Attorney General*          Matthew Lindberg (BBO #633630)
1515 Clay St.                                  *Assistant Attorneys General*
Oakland, CA 94612                              1 Ashburton Pl.
(510) 879-3304                                 Boston, MA 02108
Laura.Faer@doj.ca.gov                          (617) 963-2038
Alexis.Piazza@doj.ca.gov                       megan.barriger@mass.gov
Heidi.Joya@doj.ca.gov                          adelaide.pagano@mass.gov
Garrett.Lindsey@doj.ca.gov                     yael.shavit@mass.gov
Maureen.Onyeagbako@doj.ca.gov                  chris.pappavaselio2@mass.gov
                                               matthew.lindberg@mass.gov

**MATTHEW J. PLATKIN**                         **PHILIP J. WEISER**
Attorney General                               Attorney General
State of New Jersey                            State of Colorado

By: */s/ Amanda I. Morejón*                    By: */s/ David Moskowitz*
Amanda I. Morejón (BBO #696737)                David Moskowitz*
Jessica L. Palmer*                             *Deputy Solicitor General*
Lauren E. Van Driesen*                         1300 Broadway, #10
Elizabeth R. Walsh*                            Denver, CO 80203
*Deputy Attorneys General*                     (720) 508-6000
124 Halsey Street, 5th Floor                   David.Moskowitz@coag.gov
Newark, NJ 07101
(609) 696-5279
Amanda.Morejon@law.njoag.gov
Jessica.Palmer@law.njoag.gov
Lauren.VanDriesen@law.njoag.gov
Elizabeth.Walsh@law.njoag.gov

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Darren Kinkead*
Darren Kinkead*
*Public Interest Counsel*
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov

**LETITIA JAMES**
Attorney General
State of New York

By: */s/ Sandra Park*
Sandra Park*
*Civil Rights Bureau Chief*
Monica Hanna*
Rabia Muqaddam*
*Special Counsels*
Alex Finkelstein*
Wil Handley*
Kathryn Meyer*
*Assistant Attorneys General*
28 Liberty Street
New York, New York 10005
(212) 416-8250
sandra.park@ag.ny.gov


*Admitted pro hac vice

**ANTHONY G. BROWN**
Attorney General
State of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson*
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
VWilliamson@oag.state.md.us

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

By: */s/ Aaron J. Bibb*
Aaron J. Bibb*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
bibbaj@doj.state.wi.us