UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION, et al., <br><br> Defendants. | Civil Action No. 25-10548-AK <br><br> **Leave to File Excess Pages** <br> **Granted on June 16, 2025** |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**OR, IN THE ALTERNATIVE, TRANSFER TO THE COURT OF FEDERAL CLAIMS**

## I.    INTRODUCTION

The amended complaint presents the same fundamental dispute as the original one: Does the Department of Education owe money to certain organizations operated by and within the Plaintiff States? Plaintiffs say yes, alleging that the Department wrongfully rescinded grant agreements that entitled these organizations to millions of dollars in funds. Plaintiffs therefore seek an order requiring the Department to reinstate the agreements and continue performing them according to their terms. No matter how styled, this is fundamentally a lawsuit for breach of contract seeking contract remedies. District courts, however, lack jurisdiction over lawsuits that are founded upon contracts with the United States and that exceed $10,000 in value. The Tucker Act vests exclusive jurisdiction over such lawsuits in the United States Court of Federal Claims.

Plaintiffs seek, instead, to proceed in district court under the Administrative Procedure Act (APA), which provides a limited waiver of sovereign immunity for claims against the United States seeking non-monetary relief. Here, the amended complaint prays nominally for declaratory and injunctive relief. Thus, Plaintiffs reason that they may rely upon the APA—not the Tucker Act—to sue the Department and its officials in this case.

The Supreme Court, however, deemed that position unlikely to succeed. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). Reviewing this very case, the Court observed that the APA's waiver of immunity "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Id.* (citing 5 U.S.C. § 702). And it explained that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (citing 28 U.S.C. § 1491(a)(1)). The Court thus concluded that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what"

Plaintiffs request. *Id.* (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Accordingly, the Court held that this Court likely "lack[s] jurisdiction" over the case. *Id.*

Indeed, the First Circuit has long held that the APA's waiver of sovereign immunity "does not apply to claims sounding in contract because the [waiver] was not intended to undermine the Tucker Act . . . which vests the [the Court of Federal Claims] with exclusive jurisdiction over contract actions against the United States." *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983). Therefore, Plaintiffs may not use the APA "to obtain indirectly the injunctive or declaratory relief the Court of [Federal] Claims could not provide directly" under the Tucker Act. *American Science & Engineering, Inc. v. Califano*, 571 F.2d 58, 63 n.6 (1st Cir. 1978).

Nor can Plaintiffs proceed on a theory that Defendants' actions were *ultra vires*. As the Supreme Court recently explained, "ultra vires review is not available" where the plaintiff has "an alternative path to judicial review." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025). Thus, just as the Tucker Act precludes APA actions for claims that are in essence contractual, it also precludes an *ultra vires* action based on such claims.

In the end, Plaintiffs' attempt to convert this case from one about the grant agreements to one about the Constitution, federal statutes, and federal regulations fails. Their standing to bring this suit hinges on the Department's decisions to stop paying money to specific organizations. Winning would do nothing for Plaintiffs unless it required the Department to pay funds to these specific entities as opposed to other potential grantees. Yet, no individual grant recipient has a constitutional, statutory, or regulatory entitlement to the disputed funds. Their only plausible entitlement to this money comes from the grant agreements themselves. Recognizing as much does not mean that Plaintiffs lack any ability to challenge the Department's actions. It simply means that they must proceed under the Tucker Act in the Court of Federal Claims.

## II.    BACKGROUND

### A.  Legal Background

Congress granted the Department of Education broad authority to operate the two grant programs at issue here, which relate to the preparation and professional development of schoolteachers.  *First*, the Teacher Quality Partnership (TQP) program provides that "the Secretary is authorized to award grants, on a competitive basis, to eligible partnerships, to enable the eligible partnerships to carry out" certain activities, including "a program for the preparation of teachers," "a teaching residency program," and "a leadership development program."  20 U.S.C. §§ 1022a(a) and (c); *see* 20 U.S.C. § 1022a(b) (requiring applications to be submitted "to the Secretary at such time, in such manner, and accompanied by such information as the Secretary may require").  *Second*, the Supporting Effective Educator Development (SEED) program generally directs the Secretary to "award grants, on a competitive basis, to eligible entities for" five broad "purposes," such as "providing evidence-based professional development activities" or "making freely available services and learning opportunities to local educational agencies."  20 U.S.C. § 6672(a).

### B.  Factual Background

Plaintiffs are the States of California, Colorado, Illinois, Maryland, Massachusetts, New Jersey, New York, and Wisconsin.  Doc. No. 112 at 3.  According to the amended complaint, "various organizations" operating in the Plaintiff States—public and private universities as well as nonprofit entities—received TQP and SEED grants from the Department exceeding $250 million. *Id.* at 20.  For example, UMass Amherst received a five-year TQP grant in 2023 for $2.3 million, and Chico State Enterprises (a nonprofit corporation in California) received a three-year SEED grant in 2022 for $4.5 million.  *Id.* at 20, 23; Doc. No. 8-5 at 13.  These grants consisted of awards issued each fiscal year pursuant to written agreements, which included signed documents binding

3

both the grant recipient and the Department to the terms and conditions of the grant. *See* Doc. No. 112 at 29–30. Plaintiffs further allege that "[t]he Department has adopted the Office of Management Budget (OMB) Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance)," contained in Part 200 of Title 2 of the Code of Federal Regulations, *id.* at 30, and that "[t]he terms and conditions" of the relevant grant agreements applied this Uniform Guidance, *id.* at 32.

On February 5, 2025, then-Acting Secretary Denise Carter issued a directive entitled "Eliminating Discrimination and Fraud in Department Grant Awards." *Id.* at 35. This directive stated that "[i]t remains a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States." *Id.* Thus, the directive "instruct[ed] Department personnel to review all new and ongoing grants . . . to ensure they 'do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication.'" *Id.* at 36. Plaintiffs allege that the Department then "moved quickly to implement the Department Directive." *Id.* at 37. Beginning around February 7, 2025, TQP and SEED grant recipients in the Plaintiff States began to receive termination letters from the Department informing them that their awards were being terminated. *Id.*

The termination letters affirmed that "[i]t is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States," and that "this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in [DEI] initiatives or any other initiatives that unlawfully discriminate on the basis of [a protected characteristic]." *Id.* at 38. The letters explained that "[i]llegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict

with the Department's policy of prioritizing merit, fairness, and excellence in education." *Id.* And the letters stated that "it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States." *Id.*

The letters then explained that the recipient's grant provided funding for programs that "promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic"; " violate either the letter or purpose of Federal civil rights law"; "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education"; "are not free from fraud, abuse, or duplication"; "or . . . otherwise fail to serve the best interests of the United States." *Id.* Each terminated grant, the letters explained, was therefore "inconsistent with, and no longer effectuates, Department priorities." *Id.* The letters invoked the Department's regulatory authority to terminate grants that "no longer effectuate[] the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4)—a regulation that Plaintiffs concede was made applicable by "[t]he terms and conditions" of the grant agreements. Doc. No. 112 at 32, 38.

## C. Procedural History

On March 6, 2025, Plaintiffs filed this lawsuit against the Department of Education, the Secretary of Education, and the former Acting Secretary of Education. Doc. No. 1 at 8–9. The original complaint asserted two claims under the APA. *See id.* at 46–51. *First*, Plaintiffs claimed that the terminations were arbitrary and capricious because the Department did not, among other things, "provide a transparent and reasonable explanation for the termination of the grants." *Id.* at 47. *Second*, Plaintiffs claimed that the terminations were "not in accordance with law"—i.e., "2 C.F.R. § 200.340." *Id.* at 49. Plaintiffs claimed that this regulation "only authorizes termination

'pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'" *Id.* at 50. However, according to Plaintiffs, "[n]o term or condition for any TQP or SEED grant award authorize[d] termination for failure to effectuate agency priorities." *Id.*

The same day that Plaintiffs filed the complaint, they also moved for a temporary restraining order. Doc. No. 2. The Court held a hearing on March 10, 2025 and issued an order granting Plaintiffs' motion that evening. Doc. No. 41. The Court disagreed with the government's argument that this matter is a contract dispute that belongs in the Court of Federal Claims because "the source of the plaintiffs' rights [is] in federal statute and regulations and because the relief [sought is] injunctive in nature." *Id.* at 2. The Court's order required Defendants to restore the grant recipients in the Plaintiff States to their pre-termination status, enjoined Defendants from withholding grant funds from those recipients, and prohibited Defendants from terminating those grant agreements, except as "consistent with the Congressional authorization and appropriations, relevant federal statute, including the requirements of the APA, the requirements of the relevant implementing regulations, the grant terms and conditions, and this Court's order." *Id.* at 9–10.

Defendants appealed this order to the First Circuit and sought a stay pending appeal. The First Circuit denied the stay motion. *California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). In evaluating the government's jurisdictional argument, the First Circuit reasoned that Plaintiffs' framing of their case as an APA action made it cognizable under the APA, rather than the Tucker Act. *Id.* at 97. The First Circuit stated that "the States challenge the Department's actions as insufficiently explained, insufficiently reasoned, and otherwise contrary to law -- arguments derived from the [APA]," and that, therefore, their claims were properly characterized as "assertions that the Department acted in violation of federal law -- not its contracts." *Id.* The

6

First Circuit conceded that this Court's March 10 order "require[d] the Department to continue making payments that would otherwise be due but for the terminations." *Id.* at 100. But it observed that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 97 (citation omitted). Therefore, the First Circuit saw "no jurisdictional bar" to the Court's March 10 order. *Id.*

Defendants then asked the Supreme Court to vacate this Court's order. On April 4, 2025, the Supreme Court construed the application as seeking a stay pending appeal and granted the application. *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). Relevant here, the Court found that "the Government is likely to succeed in showing the District Court lack[s] jurisdiction to order the payment of money under the APA" because the APA's waiver of immunity does not apply to claims for money damages or where another statute forbids the relief which is sought. *Id.* at 968. The Court acknowledged that an APA claim "'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (citing *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)). Still, the Court found that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what" Plaintiffs request here. *Id.* (citing *Great-West*, 534 U.S. at 212). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (citing 28 U.S.C. § 1491(a)(1)).

Defendants subsequently moved to dismiss the case based on the jurisdictional argument that the Supreme Court found likely to succeed. Doc. No. 101. Defendants alternatively requested that the Court transfer the action to the Court of Federal Claims. *Id.* Rather than respond to the motion to dismiss, Plaintiffs filed the amended complaint, Doc. No. 112, which led the Court to terminate Defendants' motion to dismiss as moot, Doc. No. 114.

7

The amended complaint includes the same two APA claims set forth in the original complaint. Doc. No. 112 at 50–56. Plaintiffs continue to assert that the grant terminations were arbitrary and capricious because the Department did not, among other things, "provide a transparent and reasonable explanation for the termination of the grants." *Id.* at 50–51 (Count I). And they continue to assert that the terminations were "not in accordance with law"—namely, "2 C.F.R. § 200.340." *Id.* at 54 (Count II).

The amended complaint also adds four new claims. Plaintiffs now assert a claim for a "Declaratory Judgment" pursuant to 28 U.S.C. § 2201, alleging that "[a]n actual and substantial controversy exists" concerning the proper interpretation of 2 C.F.R. § 200.340. Doc. No. 112 at 56–57 (Count III). Plaintiffs also assert a claim under the Spending Clause, alleging that the terminations effectively imposed new, retroactive, and ambiguous conditions on federal funding, unrelated to the federal government's interest in the TQP and SEED programs. *Id.* at 58–59 (Count IV). Plaintiffs claim that Defendants lacked the legal authority to terminate the specific grants at issue as well as the TQP and SEED programs generally, and therefore acted "ultra vires." *Id.* at 60–61 (Count V). And Plaintiffs claim that Defendants violated the Constitution's separation of powers, alleging that the Executive Branch acted contrary to "the careful judgment of Congress," as embodied in the statutes authorizing the TQP and SEED programs. *Id.* at 61–63 (Count V).

Plaintiffs claim that Defendants' actions have caused them significant financial harm, resulting in "abrupt shortfalls to their current year budgets collectively exceeding tens of millions of dollars." *Id.* at 44; *see id.* ("Absent federal funding, Plaintiff States do not have the financial wherewithal or staffing to keep the TQP and SEED Programs running."). Plaintiffs further claim that the loss of this funding has forced them to "expend State resources to assess the current impacts of these programmatic losses." *Id.* at 45. And they claim that the loss of funding will

have negative downstream consequences, such as making it harder for schools to hire qualified teachers, which will in turn hinder the quality of education provided to their citizens.  *See id.*

## III.    LEGAL STANDARD

A district court should dismiss claims under Rule 12(b)(1) when it lacks subject-matter jurisdiction to decide them.  That includes where, as here, the federal government has not waived its sovereign immunity for the types of claims at issue.  *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature").  "When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor."  *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).  "A plaintiff, however, may not rest merely on unsupported conclusions or interpretations of law."  *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (citation omitted).  Moreover, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence."  *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993).

## IV.    ARGUMENT

### A.  The APA's limited waiver of sovereign immunity does not apply.

"The United States, as sovereign, is immune from suit save as it consents to be sued."  *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  To sue a federal agency and its officials, a plaintiff must therefore identify an express waiver of sovereign immunity and show that its claim falls within the waiver's scope.  *See FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text").  The Tucker Act provides a waiver of sovereign immunity by "grant[ing] the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'"  *California*, 145 S. Ct. at 968 (citing 28 U.S.C. § 1491(a)(1)); *see United States v. Mitchell*, 463 U.S. 206, 215 (1983)

9

("the Tucker Act effects a waiver of sovereign immunity"). And Plaintiffs' suit falls within that grant of jurisdiction, as it seeks to enforce alleged contractual obligations to pay money.

Yet rather than file suit in the Court of Federal Claims under the Tucker Act, Plaintiffs seek to proceed in district court under the APA. The APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief. *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). "The APA's waiver of sovereign immunity does not apply," however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *California*, 145 S. Ct. 966, 968 (citing 5 U.S.C. § 702). This carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

To that end, the First Circuit has squarely held that the APA's waiver of sovereign immunity "does not apply to claims sounding in contract because the [waiver] was not intended to undermine the Tucker Act . . . which vests the [Court of Federal Claims] with exclusive jurisdiction over contract actions against the United States." *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983).

There is no dispute that the Tucker Act grants consent to suits founded upon contracts with the United States. 28 U.S.C. § 1491(a)(1). And it has long been accepted that the Tucker Act impliedly forbids granting "specific relief," such as specific performance of a contract. *Glidden Co. v. Zdanok*, 370 U.S. 530, 557 (1962). Indeed, no court has "the power to order specific performance by the United States of its alleged contractual obligations." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989). The D.C. Circuit has observed that it "know[s] of no case in which a court has asserted jurisdiction either to grant a declaration that the United States

was in breach of its contractual obligations or to issue an injunction compelling the United States

to fulfill its contractual obligations." *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986).

Congress added the limited waiver of sovereign immunity to the APA in 1976. Pub. L. 94-

574, 90 Stat. 2721, 2721 (1976). And the legislative history to this amendment confirms that it

was not intended to undo the Tucker Act's implied prohibition on granting specific performance:

> [T]he amendment to 5 U.S.C. section 702 is not intended to permit suit in circumstances where statutes forbid or limit the relief sought . . . For example, in the [Tucker Act], Congress created a damage remedy for contract claims with jurisdiction limited to the Court of Claims except in suits for less than $10,000. *The measure is intended to foreclose specific performance of government contracts.* In the terms of the proviso, a statute granting consent to suit, *i.e.,* the Tucker Act, "impliedly forbids" relief other than the remedy provided by the Act. Thus, the partial abolition of sovereign immunity brought about by this bill *does not change existing limitations on specific relief*, if any, derived from statutes dealing with such matters as government contracts.

H.R. Rep. No. 94-1656, at 12–13 (1976) (emphasis added).

Therefore, as the First Circuit has explained, "[t]he APA cannot be used to obtain indirectly

the injunctive or declaratory relief the Court of [Federal] Claims could not provide directly."

*American Science & Engineering, Inc. v. Califano*, 571 F.2d 58, 63 n.6 (1st Cir. 1978). Put another

way, even where a plaintiff's requested relief can be characterized as "equitable" and "[does] not

constitute 'money damages,'" the APA's waiver of sovereign immunity still "does not apply to

claims sounding in contract." *Burgos*, 709 F.2d at 3.

The longstanding prohibition on ordering specific performance against the United States

derives from the separation of powers. The rule prevents the Judiciary from requiring the

Executive "to expend funds for work it no longer believes to be in the nation's interests," and

thereby "preserv[es] majoritarian policymaking." Harold J. Krent, *Reconceptualizing Sovereign

Immunity*, 45 Vand. L. Rev. 1529, 1566 (1992). "[T]o lock the government into a contract would"

impermissibly "tie its hands" when a new Administration may understandably and properly have

"different political priorities" than a previous one.  *Id.* at 1566–1567.  This case implicates precisely that concern, as the new Administration has determined that the grant agreements at issue "fail to serve the best interests of the United States."  Doc. No. 112 at 38.

Moreover, beyond this implied prohibition, Congress has expressly forbidden federal district courts from hearing contract claims against the United States exceeding $10,000 in value. *See* 28 U.S.C. § 1346(a)(2).  Thus, by statute and by virtue of the United States' sovereign immunity, if this action is founded upon a contract with the United States, this Court lacks subject-matter jurisdiction.  In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)."  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).  Here, both the source of the rights asserted and the type of relief sought confirm that Plaintiffs' lawsuit sounds in contract.

### 1.  The sources of Plaintiffs' asserted rights are the grant agreements.

The sources of Plaintiffs' purported rights to payment in this case are the grant agreements in question, which bear all the hallmarks of a contract.  *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that "many . . . federal grant programs" are "much in the nature of a contract") (citation and internal quotation marks omitted); *see also Columbus Regional Hosp v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("we have followed our predecessor court in treating federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound").  Indeed, Plaintiffs have never disputed that their TQP and SEED grant awards have the essential characteristics of contracts.  When the government implements grants by "employ[ing] contracts to set the terms of and receive commitments from

recipients," the grants are properly treated as contracts for purposes of jurisdiction in the Court of Federal Claims. *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

The sole source of the rights that could result in the reinstatement and continued performance of the grant agreements are, of course, *the grant agreements*. Plaintiffs' entire lawsuit rests on their claim that specific organizations in their States are entitled to funds under the grant agreements. Plaintiffs thus seek relief requiring the Department to unwind these terminations and preventing it from terminating the agreements moving forward. Plaintiffs would have no claim at all without having alleged a breach of the grant agreements by the government.

Plaintiffs have identified four other potential sources of their asserted rights, but none of them provides a right to the reinstatement and continued performance of the grant agreements.

*First*, Plaintiffs have pointed to the APA. But the APA "does not declare self-actualizing substantive rights," rather, it "merely provide[s] a vehicle for enforcing rights which are declared elsewhere." *American Waterways Operators v. United States Coast Guard*, 613 F. Supp. 3d 475, 486 (D. Mass. 2020) (citing *Perales v. Casillas*, 903 F.2d 1043, 1050 n.4 (5th Cir. 1990)); *see also, e.g.*, *Furlong v. Shalala*, 156 F.3d 384, 394 (2d Cir. 1998) ("The APA is merely a procedural vehicle for review of agency action; it does not confer a substantive right to be free from arbitrary agency action."); *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 753 (9th Cir. 1991) ("Section 702 does not create substantive rights."). Therefore, Plaintiffs "cannot manufacture an APA claim by asking the court to declare that" the cessation of payments in this case "was an arbitrary or capricious act." *Diaz*, 2020 WL 9437887, at *2.

To conclude otherwise would allow any Tucker Act claim to be converted into an APA claim simply by arguing that the agency's reasons for allegedly breaching a contract were arbitrary and capricious. "It is hard to conceive of a claim falling no matter how squarely within the Tucker

13

Act which could not be urged to involve as well agency error subject to review under the APA." *Megapulse*, 672 F.2d at 967 n.34 (brackets and citation omitted); *see United States Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 165 (D.D.C. 2025) ("Sure, the Conference seeks to set aside agency action. But the agency action that it asks the Court to reverse is the Government's decision to cease a financial relationship with the Conference."). Thus, where "the essence of the action is in contract," the "plaintiff cannot 'by the mystique of a different form of complaint' make it otherwise." *American Science*, 571 F.2d at 63 (citation omitted).

Although flawed and abrogated in relevant part by the Supreme Court's decision in this case, the First Circuit's decision denying a stay pending appeal helps illustrate the point. There, the First Circuit reasoned that "if the Department breached any contract, it did so by violating the APA," and that, "if the Department did not violate the APA, then it breached no contract." *California v. U.S. Dep't of Education*, 132 F.4th 92, 97 (1st Cir. 2025). Thus, under the First Circuit's own reasoning, Plaintiffs' lawsuit is not "based on truly independent legal grounds." *Megapulse*, 672 F.2d at 970. Instead, it is one "sounding genuinely in contract." *Id.* at 969. Put another way, disagreement over whether the Department has "acted arbitrarily" cannot "be resolved without reference to the [grant agreements]." *American Science*, 571 F.2d at 61. Therefore "exclusive jurisdiction [lies] in the Court of [Federal] Claims." *Id.*

*Second*, Plaintiffs claim that the terminations were "not in accordance with law"—namely, "2 C.F.R. § 200.340." Doc. No. 112 at 54. Plaintiffs claim that this regulation "only authorizes termination 'pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'" *Id.* at 55 (citing § 200.340(a)(4)). However, according to Plaintiffs, the terms and conditions of the grant awards did not authorize the Department to terminate in these circumstances. *See id.*

14

Defendants contend that the terms and conditions of the grant awards *did* authorize termination in these circumstances. Therefore, "[t]he question presented by the complaint could be phrased as whether the [grant agreements] forbid[] termination under these conditions." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). Because compliance with 2 C.F.R. § 200.340 turns on compliance with the grant agreements, any supposed rights under the regulation do not "exist independently" of the grant agreements. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).

Moreover, even if one construed 2 C.F.R. § 200.340 to impose procedural requirements on the government separate and apart from the terms of the grant agreements, that still would not alter the essentially contractual nature of this action. That is because, even if 2 C.F.R. § 200.340 "impose[d] procedural requirements on the government having some impact on the [grant agreements]," the regulation "in no way creates the substantive right to the remedy" that Plaintiffs seek. *Spectrum Leasing*, 764 F.2d at 894. Nothing in 2 C.F.R. § 200.340 suggests that a violation would entitle grant recipients to the reinstatement of their grants and the consequent release of withheld funds. At bottom, where a plaintiff "essentially argu[es] that the government violated its bargain with [the plaintiff]," the lawsuit "clearly falls within the category of cases covered by the Tucker Act and outside the scope of section 702." *Burgos*, 709 F.2d at 3. "That the termination[s] also arguably violate[d] certain other regulations does not transform the action into one based solely on those regulations." *Ingersoll-Rand*, 780 F.2d at 78. "Nor does [Plaintiffs'] decision to" allege a regulatory violation "change the essential character of the action." *Id.*

*Third*, Plaintiffs point to certain federal statutes. They invoke the statutes authorizing the TQP and SEED programs, which identify goals and criteria for the Department's consideration in *awarding* grants. *See* Doc. No. 112 at 6. Plaintiffs also invoke the General Education Provisions

Act, which they claim requires notice-and-comment rulemaking before the Department can issue priorities governing the *award* of TQP and SEED grants. *See id.* None of these statutes, however, prevents the Department from *terminating* grant agreements—understandably, since without the ability to terminate for grantee misconduct or to reflect democratic changes in Administration priorities, one Administration could bind future Administrations to policies and priorities extending well past the term of an Administration. And none of these laws vests grant recipients with a right to the continued performance of their grant agreements. It is thus "problematic" to suggest that the source of Plaintiffs' claimed rights are these statutes as they "cannot possibly provide the relief sought." *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995).

*Fourth*, Plaintiffs cite the Constitution, alleging that Defendants' actions violated the Spending Clause and the separation of powers. *See* Doc. No. 112 at 7. But Plaintiffs have no cognizable interest in simply policing the Department's compliance with the Constitution. Their ability to bring this case depends on their claim that specific entities—the grantees operated by and in the Plaintiff States—have a legal entitlement to the disputed funds. Yet, neither the Spending Clause nor the Constitution's separation of powers remotely confers on these entities a right to federal funds. Rather, "it is the operative grant agreements which entitle any particular [recipient] to receive federal funds." *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025). Indeed, "no cause of action would exist" without the grant agreements. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted). That Plaintiffs' claims could not "exist[] prior to and apart from rights created under the [grant agreements]" precludes district court jurisdiction. *Spectrum Leasing*, 764 F.2d at 894.

Tellingly, the plaintiff in *American Science* similarly argued that its lawsuit was "not an action arising on a contract," but rather a dispute over "an agency action '*ultra vires*' of its

16

authority, in violation of [the agency's] regulations and due process of law." 571 F.2d at 61. The First Circuit nonetheless found it "clear" that the action was "essentially a contract dispute." *Id.* That was because "[t]he focus of the complaint" was the allegedly wrongful "abrogation" of a license agreement between the plaintiff and the Department of Health, Education and Welfare. *Id.* Although the plaintiff "invoked" federal regulations and the Constitution as bases for its action, "resolution of those claims was peripheral to the core determination of whether a breach of contract had occurred." *Id.* The plaintiff's requested relief—"enforcement of the agreements or monetary damages"—underscored the essentially contractual nature of the dispute. *Id.*

Here, too, the focus of Plaintiffs' amended complaint is the allegedly wrongful abrogation of the grant agreements between the Department and the grant recipients. And although Plaintiffs have likewise invoked the Constitution, federal statutes, and federal regulations, the core and dispositive dispute in this case turns on whether the relevant grant agreements authorized the Department to terminate those grants in these circumstances.

### 2. Plaintiffs seek contractual remedies.

The remedies that Plaintiffs request underscore the contractual nature of this dispute. The fact that Plaintiffs nominally seek declaratory and injunctive relief "does not decide the issue" of whether an action, at its core, seeks contract remedies. *Ingersoll-Rand*, 780 F.2d at 79. A plaintiff may not avoid the Tucker Act by "couch[ing] [its] claims in the language of equitable and declaratory relief," when the alleged injury "is pecuniary in nature and at bottom what [it] seeks is monetary relief based on . . . a contract." *Diaz*, 2020 WL 9437887, at *2. To determine whether an action seeks contract remedies, courts must instead look to the substance of the complaint, "irrespective of how it is packaged." *Coggeshall*, 884 F.2d at 4.

Here, Plaintiffs allege that the Department has withheld *money* due and owing to educational entities under binding grant agreements. The entire basis for their lawsuit is the loss of "tens of millions of dollars" allegedly owed pursuant to those grants. Doc. No. 112 at 44. As a result, Plaintiffs seek to compel the Department to reinstate the grant agreements and to prevent it from terminating them moving forward. *See id.* at 64. Plaintiffs surely would not dispute that, if they win this case, they will expect (indeed, demand) the Department to start paying up under the grants. Therefore, "it seems clear that the injur[ies] [Plaintiffs are] alleging [are] pecuniary in nature and at bottom what [they] seek[] is monetary relief." *Diaz*, 2020 WL 9437887, at *2. Plaintiffs' requests for declaratory and injunctive remedies do not change the essential character of this action, where those requests "are merely a means to the end of satisfying a claim for the recovery of money." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 262 (1999); *see Crowley*, 38 F.4th at 1107 ("we have cautioned plaintiffs that this court prohibits the creative drafting of complaints . . . to avoid the jurisdictional consequences of the Tucker Act" (cleaned up)).

To be sure, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds.'" *California*, 145 S. Ct. at 968 (citing *Bowen*, 487 U.S. at 910).[1] But where a plaintiff seeks "to enforce a contractual obligation to pay money," the action belongs in the Court of Federal Claims. *Id.* That is precisely

---

[1] *Bowen* is readily distinguishable from this action, which seeks an order requiring the payment of money withheld and allegedly owed under *grant agreements*. "*Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due." *Great-West*, 534 U.S. at 212. Again, "[a] claim for money due and owing under a contract is 'quintessentially an action at law.'" *Id.* at 210 (citation omitted). Thus, courts "have consistently read *Bowen* to reinforce the jurisdictional role of the Court of Federal Claims in resolving *contract disputes* outside the complex Medicaid arena." *Brighton Village Associates v. United States*, 52 F.3d 1056, 1059 n.3 (Fed. Cir. 1995) (emphasis added); *see also Coggeshall*, 884 F.2d at 5 ("*Bowen* was not an action for breach of contract").

what Plaintiffs seek to do here. "Stripped of its equitable flair, the requested relief seeks one thing: [Plaintiffs] want[] the Court to order the Government to stop withholding the money due under the [grant agreements]." *Conf. of Cath. Bishops*, 770 F. Supp. 3d at 163.

The stylistic changes that Plaintiffs made to their prayer for relief do not alter the outcome. Just as with the original complaint, the judgment that the amended complaint seeks would "in reality compel[]" the Department "to perform the subject contract[s], restrain[] it from rescinding the award of the contract[s], and require[] it to pay out money . . . in the performance of the contract[s]." *Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1225–26 (5th Cir. 1976).

*First*, Plaintiffs seek an injunction preventing Defendants "from implementing, maintaining, or reinstating" the terminations "for recipients in Plaintiff States." Doc. No. 112 at 64. An order preventing the Department from "maintaining" and "reinstating" the terminations is both literally and functionally the same thing as an order requiring the Department to *reinstate* the grant agreements and *continue performing* them. And whether phrased in direct or indirect terms, such an order "amounts to a request for specific performance." *Ingersoll-Rand*, 780 F.2d at 80.

*Second*, Plaintiffs seek judicial declarations that Defendants' actions were not authorized by 2 C.F.R. § 200.340(a)(4), violated the Constitution, and were *ultra vires*. Doc. No. 112 at 64. But, for the reasons discussed, a declaration that 2 C.F.R. § 200.340(a)(4) did not permit the Department to terminate the grants would amount to an impermissible declaratory judgment that the Department "was in breach of its contractual obligations." *Sharp*, 798 F.2d at 1524. Plaintiffs do not have standing to seek a declaration merely opining on whether Defendants' actions violated the law. "[T]o satisfy Article III standing," the requested relief must "redress the individual plaintiffs' injuries." *California v. Texas*, 593 U.S. 659, 672 (2021). And the only way that a declaratory judgment could redress the claimed injuries in this case would be if it declared the

19

rights and obligations of the parties under *the grant agreements*.  Yet, again, such a declaration would amount to an order of specific performance.  *See Ingersoll-Rand*, 780 F.2d at 80.

*Third*, Plaintiffs ask the Court to "vacate and set aside" Defendants' terminations of the TQP and SEED grants on the grounds that they were "arbitrary and capricious," "not in accordance or consistent with law," and "contrary to constitutional rights."  Doc. No. 112 at 64.  They also ask the Court to issue a declaration that the terminations were unlawful because they violate the APA. *Id.*  Yet, even if a vacatur/set aside constituted a "remedy" authorized by the APA, it would only be available if the APA applied.  Likewise, even if the Court could issue a declaration that Defendants violated the APA, that remedy would only be available if the APA applied.  Allowing Plaintiffs to proceed under the APA because they seek such remedies would be no different than allowing them to proceed under the APA merely because they have invoked the APA.

Congress chose to limit the relief available for contractual claims against the federal government to money judgments.  Plaintiffs cannot circumvent that choice.  The sources of Plaintiffs' asserted rights are the grant agreements, and the relief that they seek is contractual.  The Tucker Act thus impliedly forbids Plaintiffs from bringing suit under the APA, and the Court should dismiss this case for lack of subject-matter jurisdiction.

**B.  Plaintiffs have an adequate remedy in the Court of Federal Claims.**

The Court also lacks jurisdiction because a money judgment in the Court of Federal Claims would provide an adequate remedy for the injuries of which Plaintiffs complain.  The APA applies only where "there is no other adequate remedy in a court."  5 U.S.C. § 704.  "In other words, a claimant with an alternative adequate remedy in another court, such as the Court of Federal Claims,

cannot seek review of agency action in a district court under the APA." *Consolidated Edison Co. of New York v. U.S., Dep't of Energy*, 247 F.3d 1378, 1383 (Fed. Cir. 2001).

As the First Circuit has explained, "review by the Court of Claims [under the Tucker Act] has consistently been held to provide an adequate remedy for an alleged breach of contract by a federal agency." *American Science*, 571 F.2d at 62.  That general observation holds true here.  The crux of Plaintiffs' claims is that the Department has withheld money owed to their educational institutions under binding grant agreements, allegedly in contravention of the terms of those agreements.  Thus, a breach-of-contract award in the Court of Federal Claims awarding Plaintiffs those withheld funds would provide Plaintiffs with an adequate remedy in this case.  *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1117 (Fed. Cir. 2007) (finding that adequate relief was available in Court of Federal Claims where "[t]he relief sought was to require the Government to perform its contract obligations so that [the plaintiff] could get the money allegedly due it under [an] insurance agreement").

True, Plaintiffs could not obtain specific relief in the Court of Federal Claims directing the Department to reinstate and continue performing the grant agreements.  But *no court* could award Plaintiffs that relief.  *See Coggeshall*, 884 F.2d at 3 ("Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations.").  Therefore, the fact "[t]hat the Court of [Federal] Claims cannot provide the precise relief requested is no grounds for denying its jurisdiction over the claim." *American Science*, 571 F.2d at 62.

Finally, even if Plaintiffs sought some form of equitable relief other than specific performance, the Court of Federal Claims could grant it as relief incidental and subordinate to a money judgment.  *See* 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official

with such direction as it may deem proper and just."); *Stephanatos v. United States*, 81 Fed. Cl. 440, 445 (2008), *aff'd*, 306 F. App'x 560 (Fed. Cir. 2009) (explaining that the Court of Federal Claims may "grant equitable relief" when "it is tied and subordinate to a money judgment").

### C. Plaintiffs cannot establish jurisdiction by asserting a claim for a declaratory judgment.

Plaintiffs cannot enlarge or evade the limits of the APA's waiver of immunity by asserting a claim for a declaratory judgment "pursuant to 28 U.S.C. § 2201." Doc. No. 112 at 57. "The Declaratory Judgment Act, 28 U.S.C. § 2201, alone does not provide a court with jurisdiction." *California*, 593 U.S. at 672; *see Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) (The Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction"). Nor does it waive the federal government's sovereign immunity. *See Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228, 1230 (1st Cir. 1996) ("The government correctly argues that Progressive wrongly relies on the Declaratory Judgment Act . . . to constitute a waiver of sovereign immunity").

Moreover, Plaintiffs cannot rely on the federal-question statute, 28 U.S.C. § 1331, to establish jurisdiction over their claim under the Declaratory Judgment Act. For one thing, "[g]eneral jurisdictional statutes such as 28 U.S.C. § 1331 . . . do not waive sovereign immunity and therefore cannot be the basis for jurisdiction over a civil action against the federal government." *Berman v. United States*, 264 F.3d 16, 20 (1st Cir. 2001). For another, the Declaratory Judgment Act "creates a remedy, not a cause of action." *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007); *see Schilling v. Rogers*, 363 U.S. 666, 677 (1960) ("the availability of [declaratory relief] presupposes the existence of a judicially remediable right").

If anything, Plaintiffs' bid to "clarify the rights and obligations of the parties" highlights the contractual nature of this dispute. Doc. No. 112 at 57. Plaintiffs ask the Court to declare

whether 2 C.F.R. § 200.340(a)(4) "permit[ted]" the Department to terminate the grant awards in these circumstances. *Id.* And, as discussed, the applicability of this regulatory provision hinges entirely on the terms and conditions of the grant agreements. *See* pp. 14–15, *supra*. Thus, a declaration that 2 C.F.R. § 200.340(a)(4) did not permit the Department to terminate the grants in these circumstances would amount to an impermissible declaratory judgment that the Department "was in breach of its contractual obligations." *Sharp*, 798 F.2d at 1524.

### D. Plaintiffs cannot establish jurisdiction by asserting standalone constitutional claims.

Plaintiffs also assert two standalone constitutional claims, alleging that Defendants violated the Spending Clause (Count IV) and the Constitution's separation of powers (Count VI). Doc. No. 112 at 58–59, 61–63. But those claims do not solve their jurisdictional problem, either. Although the federal-question statute vests district courts with jurisdiction over "all civil actions arising under the Constitution," 28 U.S.C. § 1331, that statute does not "waive sovereign immunity." *Berman*, 264 F.3d at 20; *see American Science*, 571 F.2d at 63 ("As with attempts to found jurisdiction on the APA, efforts to ground it on the federal question statute have consistently been rejected by courts because the effect would be to undercut the exclusive jurisdiction of the Court of Claims."). And while the APA allows district courts to decide whether an agency's action was "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706, such a claim—of course—must fall within the scope of the APA's limited waiver of immunity.

To be sure, a claim for injunctive relief against an official for acting *ultra vires* does not require a waiver of sovereign immunity. And Plaintiffs have asserted an *ultra vires* claim, seemingly on the same basis as their standalone Spending Clause and separation-of-powers claims. *See* Doc. No. 112 at 60 ("Defendants have encroached upon Congress's Spending authority and violated the separation of powers, and thereby acted ultra vires."). But a plaintiff may invoke a

federal court's equitable jurisdiction over an *ultra vires* claim only in rare and demanding circumstances not present here.  *See* pp. 24–27, *infra*.  Otherwise, to proceed against federal officials, the plaintiff must identify an applicable waiver of sovereign immunity.  Plaintiffs have not done so.  The Court therefore lacks jurisdiction over Counts IV and VI.

In any event, Plaintiffs' asserted constitutional claims are simply statutory claims dressed up in constitutional language, and as the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Dalton v. Specter*, 511 U.S. 462, 473 (1994).  In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation of powers doctrine."  *Id*. at 471.  Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution."  *Id*. at 472.  In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority."  *Id*. (collecting cases).  The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute.  *Id*. at 473 & n.5.  Because Plaintiffs' constitutional claims focus entirely on their contentions that the Department has not acted consistent with the TQP and SEED enabling statutes, such claims are untenable under *Dalton*.

### E.  Plaintiffs cannot establish jurisdiction by asserting an *ultra vires* claim.

Finally, Plaintiffs' *ultra vires* challenge to Defendants' actions fails at the threshold because there exists an alternative procedure for judicial review.  As the Supreme Court has recently explained, "[u]ltra vires review is . . . unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for

judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) (citing *Board of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)); *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.").

Plaintiffs here have an "alternative path to judicial review" in the Court of Federal Claims. *Id.* As explained, "the [Tucker Act] statute provides . . . clear and convincing evidence that Congress intended to deny the District Court[s] jurisdiction to review" claims which are in essence contractual. *Board of Governors, FRS*, 502 U.S. at 44. Allowing a breach-of-contract claim to be reframed as an *ultra vires* action against the relevant executive official would allow plaintiffs to easily circumvent the Tucker Act's remedial limits. *See Nuclear Regul. Comm'n*, 145 S. Ct. at 1775 (explaining that *ultra vires* review is not an "easy end-run around the limitations of the Hobbs Act and other judicial-review statutes"). Thus, for all the reasons that the Tucker Act precludes APA actions for claims that are in essence contractual, the Tucker Act also precludes a non-statutory equitable *ultra vires* action based on such claims. *See Sustainability Inst.*, 2025 WL 1587100, at *2 ("it appears unlikely that Plaintiffs' ultra vires claims, which allege the Government violated the Constitution when it terminated or suspended Plaintiffs' grants, would provide a detour around the Tucker Act").

Plaintiffs' *ultra vires* claim fails for additional reasons as well. As an initial matter, Plaintiffs assert their *ultra vires* claim against *the Department*, as well as Secretary McMahon and former Acting Secretary Carter in their *official* capacities. *See* Doc. No. 112 at 11. But a plaintiff cannot assert an *ultra vires* claim "against the federal government itself or its departments," *Elgin v. U.S. Dep't of Treasury*, 641 F.3d 6, 8 (1st Cir. 2011), as the whole theory of such suits is that

they are not against the sovereign. Moreover, the fact that "the acts complained of consist of actions taken by defendants in their official capacit[ies] as agents of the United States" reinforces that "the action is in fact one against the United States." *Burgos*, 709 F.2d at 2. "The issue here, therefore, is whether the United States consented to this action in the district court." *Id.*

Moreover, Plaintiffs' requested relief would operate against the government. In deciding whether a suit properly lies against (i) a federal official acting *ultra vires* or (ii) the government itself, "[t]he general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (quotation marks and citations omitted). Here, granting Plaintiffs' requested relief would restrain the government from terminating the relevant grant awards, interfere with the public administration of the TQP and SEED grant programs, and cause the expenditure of federal funds from the public treasury. Notably, "the general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 107 (1984). Plaintiffs' requested remedies are thus "clearly aimed at [the Department] itself," not Secretary McMahon or former Acting Secretary Carter in their individual capacities. *Harper v. Rettig*, 46 F.4th 1, 6 n.9 (1st Cir. 2022); *see Coggeshall*, 884 F.2d at 4 (holding that "the real party defendant is the United States" because granting the requested relief would "direct[] the spending of federal funds").

In all events, *ultra vires* claims are "strictly limited" to the "painstakingly delineated procedural boundaries of" of the Supreme Court's decision in *Leedom v. Kyne*, 358 U.S. 184 (1958). *Nuclear Regul. Comm'n*, 145 S. Ct. at 1775–76. The *Kyne* exception applies only where an "agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific*

*prohibition*' in a statute." *Id.* at 1776 (citation omitted). Here, however, Plaintiffs concede that the Department may lawfully terminate TQP and SEED grants in certain circumstances. *See* Doc. No. 112 at 6, 30, 55. Plaintiffs agree that the Department may terminate a grant "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

Plaintiffs' disagreement with the Department's exercise of this authority therefore does not give rise to an *ultra vires* claim. *See Muirhead v. Mecham*, 427 F.3d 14, 19 (1st Cir. 2005) ("a mere claim that an official has erred in the exercise of a delegated power is not enough to bring the action out from behind the protective shield of sovereign immunity"). As the First Circuit observed in similar circumstances, "[i]t might be that after hearing, the Court of [Federal] Claims [will] determine that cancellation of the agreements . . . violated [federal] regulations." *American Science*, 571 F.2d at 62 n.4. "[H]owever, even an erroneous rescission would not amount to agency action '*ultra vires*' for the purposes of establishing the district court's jurisdiction." *Id.*

### F. In the alternative, the Court should transfer this action to the Court of Federal Claims.

28 U.S.C. § 1631 provides that when a court "finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action" to any court in which the case could have been filed. Here, there is a want of jurisdiction for all the reasons discussed. And, where "it is found that the case is one which . . . belongs in the [Court of Federal Claims]," it is in the interest of justice to transfer the action to that court. *Roman v. Velarde*, 428 F.2d 129, 133 (1st Cir. 1970); *see Burgos*, 709 F.2d at 3 ("It is evident that the transfer of this case to the Claims Court is in the interest of justice."). Therefore, if the Court does not dismiss this case for lack of jurisdiction, it should transfer the matter to the Court of Federal Claims.

## V.    CONCLUSION

The Court should dismiss this action for lack of subject-matter jurisdiction.  Alternatively, the Court should transfer this action to the Court of Federal Claims.


Respectfully submitted,

LEAH B. FOLEY
United States Attorney


Dated:  June 30, 2025              By:    */s/ Michael L. Fitzgerald*
                                         MICHAEL L. FITZGERALD
                                         Assistant United States Attorney
                                         U.S. Attorney's Office
                                         1 Courthouse Way, Ste. 9200
                                         Boston, MA 02210
                                         (617) 748-3266
                                         michael.fitzgerald2@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Michael L. Fitzgerald*
MICHAEL L. FITZGERALD
Assistant U.S. Attorney

Dated:  June 30, 2025