## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
STATE OF CALIFORNIA;                                    )
COMMONWEALTH OF                                        )
MASSACHUSETTS; STATE OF NEW                            )
JERSEY; STATE OF COLORADO;                             )
STATE OF ILLINOIS; STATE OF                            )
MARYLAND; STATE OF NEW YORK;                           )
and STATE OF WISCONSIN,                                )
                                                       )
       Plaintiffs,                                    )        Civil Action No. 25-CV-10548-AK
                                                       )
                                                       )
v.                                                     )
                                                       )
U.S. DEPARTMENT OF EDUCATION;                          )
DENISE CARTER, in her official capacity                )
as former Acting Secretary of Education;               )
LINDA MCMAHON, in her official                         )
capacity as Secretary of Education,                    )
                                                       )
       Defendants.                                    )
_____)

## MEMORANDUM AND ORDER
## ON DEFENDANTS' MOTION TO DISMISS

**ANGEL KELLEY, D.J.**

This case appears, at the outset, to concern Defendants' decision to cancel certain educational grants. As it turns out, this case extends well beyond that single dispute. Specifically, this case requires this Court to identify, untangle, and apply precedent. Faced with several Supreme Court per curiam opinions and conflicting persuasive authority, this Court grapples with a contested issue: does this case belong in this Court or the Court of Federal Claims? For the reasons explained below, this Court holds it belongs in *both*.

On March 6, 2025, the Commonwealth of Massachusetts and the States of California, New Jersey, Colorado, Illinois, Maryland, New York, and Wisconsin (collectively, "Plaintiff

States" or "States") filed suit against defendants Secretary of Education Linda McMahon and former Acting Secretary of Education Denise Carter ("Secretary Carter"), in their official capacities, and the United States Department of Education (collectively, "Department" or "Defendants").  Plaintiff States allege that, starting on February 7, 2025, the Department arbitrarily terminated grants previously awarded under the Teacher Quality Partnership ("TQP") and the Supporting Effective Educator Development ("SEED") Grant Programs in violation of the Administrative Procedures Act ("APA").

Plaintiff States filed their Amended Complaint on June 2, 2025.  Defendants moved to dismiss for of lack of jurisdiction arguing that the dispute is fundamentally a lawsuit for breach of contract seeking contract remedies, and district courts lack jurisdiction over these claims. Plaintiffs States, however, allege that their claims are classic claims under the APA and the Constitution.  Accordingly, Defendants' Motion to Dismiss is **GRANTED** in part and **DENIED** in part for lack of jurisdiction.

## I.    BACKGROUND

### A.  The Grant Programs

Across the nation, educational institutions face a shortage of well-prepared and certified teachers.  [See, e.g., Dkt. 112 at ¶ 39].  The number of people completing traditional teacher preparation programs has dropped by 35% in the last ten years and nearly 300,000 teachers leave the teaching profession each year.  [Id. at ¶¶ 39, 41].  In 2024, 74% of public schools in the United States reported difficulty filling teacher vacancies.  [Id. at ¶ 40].  Within Plaintiff States, the estimated number of teachers not fully certified for their teaching assignments exceeded 32,200 in California (2022-23), 5,200 in Massachusetts (2023-24), and 2,800 in New Jersey (2022-23).  [Id. at ¶ 43].  The issue is particularly acute in certain subject areas; for example, the

percentages of teaching vacancies filled with fully certified teachers was 83% for math, as compared to 77% for special education and 75% for English as a second language or bilingual education. [Id. at ¶ 42]. These teacher shortages can result in an array of negative consequences for students, including larger class sizes, cancelled courses, classes staffed with teachers less qualified to teach a certain subject and/or temporary teachers, and significant learning disruption. [Id. at ¶ 45].

To address this increasingly dire crisis, Congress established federal grant programs to train, place, and support teachers—including the TQP and SEED grant programs, established in 2008 and 2011, respectively. [Id. at ¶¶ 46, 50, 60]. Under the authorizing statutes for the TQP and SEED grant programs, the Secretary of the Department is instructed to "award grants, on a competitive basis, to eligible partnerships," 20 U.S.C. § 1022a(a), or "entities," id. § 6672(a), for the purposes specified by the respective statutes.

The TQP program statute provides that its purpose is to:

(1) improve student achievement;

(2) improve the quality of prospective and new teachers by improving the preparation of prospective teachers and enhancing professional development activities for new teachers;

(3) hold teacher preparation programs at institutions of higher education accountable for preparing teachers who meet the applicable State certification and licensure requirements, including any requirements for certification obtained through alternative routes to certification, or, with regard to special education teachers, the qualifications described in section 612(a)(14)(C) of the Individuals with Disabilities Education Act [20 USCS § 1412(a)(14)(C)];; and

(4) recruit highly qualified individuals, including minorities and individuals from other occupations, into the teaching force.

Id. § 1022. Under the TQP program, an eligible partnership "(1) shall use grant funds to carry out a program for the preparation of teachers . . . , a teaching residency program . . . , or a

combination of such programs; and (2) may use grant funds to carry out a leadership development program," subject to certain specified requirements.  Id. § 1022a(c).  Teacher recruitment may include an emphasis on recruiting individuals from underrepresented populations, individuals who can teach in rural and urban communities and subjects suffering from teacher shortages, mid-career professionals from other occupations, former military personnel, and recent college graduates with a record of academic distinction.  Id. § 1022a(d)(5); [Dkt. 112 at ¶ 53].  The authorizing statute instructs qualifying institutions to "provide assurances to the Secretary" that, inter alia, "general education teachers receive training in providing instruction to diverse populations" and "training provided to prospective teachers is closely linked with the needs of schools and the instructional decisions new teachers face in the classroom."  20 U.S.C. § 1022e(b).  Grants awarded under TQP "shall be awarded for a period of five years."  Id. § 1022b(a)(1).  Eligible partnerships must develop an evaluation plan with strong and measurable performance objectives.  Id. § 1022c(a).  For eligible partnerships not making substantial progress along those measures "by the end of the third year," Congress authorizes the Secretary to cancel the grant.  Id. § 1022c(c).  The TQP grant program has been funded steadily since 2014.  [Dkt. 112 at ¶ 59].

Congress enacted SEED "to increase the number of highly effective educators by supporting the implementation of evidence-based practices that prepare, develop, or enhance the skills of educators."  Funding Opportunity Description Purpose of Program: The SEED, 90 Fed. Reg. 11, 5846 (Jan. 17, 2025).  SEED provides grants for the purposes of:

> (1) providing teachers, principals, or other school leaders from nontraditional preparation and certification routes or pathways to serve in traditionally underserved local educational agencies;

(2) providing evidence-based professional development activities that address literacy, numeracy, remedial, or other needs of local educational agencies and the students the agencies serve;

(3) providing teachers, principals, or other school leaders with professional development activities that enhance or enable the provision of postsecondary coursework through dual or concurrent enrollment programs and early college high school settings across a local educational agency;

(4) making freely available services and learning opportunities to local educational agencies, through partnerships and cooperative agreements or by making the services or opportunities publicly accessible through electronic means; or

(5) providing teachers, principals, or other school leaders with evidence-based professional enhancement activities, which may include activities that lead to an advanced credential.

20 U.S.C. § 6672(a).  Congress also tasked the Secretary with ensuring that grants are distributed among entities that will serve "geographically diverse areas."  Id. § 6672(b)(3).  Grants under SEED shall be awarded initially for a period of not more than three years, and the Secretary may renew a grant for an additional two-year period.  Id. § 6672(b)(1)-(2).  The SEED grant program has been funded steadily since 2011.  [Dkt. 112 at ¶ 65].

**B.  Federal Grant Application and Award Process**

Grant recipients typically apply for awards pursuant to a Notice Inviting Application ("NIA") published in the Federal Register.  See, e.g., Applications for New Awards; Teacher Quality Partnership Grant Program, 85 Fed. Reg. 29,691 (May 18, 2020); 87 Fed. Reg. 10,906 (Feb. 25, 2022); 89 Fed. Reg. 23,573 (Apr. 4, 2024); Applications for New Awards; Supporting Effective Educator Development Program, 87 Fed. Reg. 19,487 (Apr. 4, 2022); 90 Fed. Reg. 5,845 (Jan. 17, 2025).  The various NIAs for TQP and SEED set forth Department priorities as previously established through a public notice-and-comment rule making process, including the following priorities: "improv[ing] the recruitment, outreach, preparation, support, development, and retention of a diverse educator workforce"; "[i]ncreasing [e]ducator [d]iversity";

"improv[ing] students' social, emotional, academic, and career development, with a focus on underserved students, through creating a positive, inclusive, and identity-safe climate at institutions of higher education"; and "promot[ing] educational equity and adequacy in resources and opportunity for underserved students . . . [t]hat examines the sources of inequity and inadequacy and implement responses, and that may include pedagogical practices in educator preparation programs and professional development programs that are inclusive with regard to race, ethnicity, culture, language, and disability status so that educators are better prepared to create inclusive, supportive, equitable, unbiased, and identity-safe learning environments for their students."  Applications for New Awards; Teacher Quality Partnership Grant Program, 87 Fed. Reg. 10,906 (Feb. 25, 2022); 89 Fed. Reg. 23,573 (Apr. 4, 2024).  The Department relied on those priorities in making competitive selections.  [Dkt. 112 at ¶ 67]; see, e.g., Applications for New Awards; Supporting Effective Educator Development Program, 90 Fed. Reg. 5,845 (Jan. 17, 2025).

Beginning in the summer of 2024, TQP and SEED grant recipients received Grant Award Notifications ("GANs"), which are official notifications relating to a grant award, from the Department's grant management system for Fiscal Year 2025 ("FY2025").  [Dkt. 112 at ¶¶ 96, 97].  For some grant recipients, the GANs confirmed funding for the coming year as part of their ongoing, multi-year grant award; for others, the GANs confirmed funding for the first year of a multi-year grant award.  [Id. at ¶ 96].

The terms and conditions set forth in the GANs across all applicable years incorporate the Office of Management Budget ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance"), 2 C.F.R. §200, as applicable.  [Id. at ¶¶ 98, 107].  The Department has adopted the Uniform Guidance through its

own regulations.  [Id. at ¶ 17].  In relevant part, the Uniform Guidance, effective October 1, 2025, [1] instructs that a federal agency may terminate a grant award "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  2 C.F.R. § 200.340(a)(4).  The Uniform Guidance additionally requires that "[t]he Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."  Id. § 200.340(b).  If a grant is terminated, the Uniform Guidance provides the recipient with a fair opportunity to object by requiring that the Department "must provide written notice of termination to the recipient," that "include[s] the reason for termination," and that the Department "maintain written procedures for processing objections, hearing, and appeals."  Id. §§ 200.341(a), 200.342; [Dkt. 112 at ¶ 99].

For FY2025, prior to termination, TQP and SEED grant recipients had been consistently submitting reports, program evaluations, and other compliance documents to the Department. [Id. at ¶¶ 103-04].  Department project officers consistently told these grantees that their projects were in compliance.  [Id.].  Indeed, many of the grantees had received multiple TQP and SEED awards over the years.  [Id.].

### C.  TQP and SEED Grant Programs in Plaintiff States

At the time of the grant terminations, there were more than forty TQP and SEED programs across the eight Plaintiff States, with total grant awards exceeding $250 million.  [Id. at ¶ 68].  For example, in Massachusetts, the University of Massachusetts ("UMass") Amherst received a TQP grant in 2023 for approximately $2.3 million to create a sustainable program to train paraeducators to become fully licensed early childhood educators in two high-need districts,

---

[1] The relevant Uniform Guidance language was the same in February 2025.

Holyoke and Springfield. [Id. at ¶¶ 69, 70]. The goal of the TQP program was to train and license new early childhood educators in these districts, and to establish and expand the Para-to-Teacher Program for Early Childhood Education as a source of future licensed early childhood educators in other districts. [Id. at ¶ 70]. UMass Boston was in the final stages of formalizing an agreement to become a subgrant recipient of a second TQP grant awarded to Boston Public Schools in 2023 for approximately $5.9 million to train bilingual educators. [Id. at ¶ 71]. The Bilingual Inclusive Education Teacher Residency program, funded by the 2023 TQP grant, was intended to create a teacher residency program that would allow educators to earn a master's in Special Education with licensure in Moderate Disabilities and Bilingual Education Endorsement, addressing the high number of English Language Learners in the Commonwealth's largest public-school district. [Id. at ¶ 72].

In California, the California State University and University of California received eight now-terminated TQP and SEED grants valued at about $56 million. [Id. at ¶ 73]. These programs were intended to train thousands of teachers across California for high-need rural and urban school districts. [Id. at ¶ 73]. The University of California, Los Angeles ("UCLA") received a TQP grant in 2023 in the amount of approximately $8 million to establish the UCLA Cultivating Excellence program, preparing middle school teachers, leaders, and aspiring leaders to serve students more effectively in high-need school districts across Los Angeles County. [Id. at ¶ 79].

In New Jersey, public universities of Montclair State University ("Montclair") and The College of New Jersey ("TCNJ") were using TQP grant recipients to implement teaching certification pipeline programs for hard-to-fill positions. [Id. at ¶ 80]. Montclair created the Newark-Montclair Urban Teacher Residency ("Urban Teacher Residency") in 2009, which was

funded by two TQP grants for the periods of 2009-2014 and 2014-2020.  [Id. at ¶ 81].  Montclair received another TQP grant in 2020 to expand the program and was using the grant to recruit and prepare high-quality teachers for local school districts.  [Id. at ¶ 82].  TCNJ's TQP grant supported TCNJ's Residents for Innovation in Urban Schools & Student Empowerment Program which aims to recruit, prepare, and retain teachers in high-need urban schools and provide a pathway for individuals in other subject areas to earn a master's degree and become educators. [Id. at ¶ 83].  TCNJ also was using the TQP grant to build "'grow your own' programs. . . [to] create a sustainable pipeline of future teachers" through students returning to their communities as educators.  [Id. at ¶ 84].

In New York, the Department awarded a TQP grant to the Research Foundation ("RF") of the City University of New York ("CUNY"), a nonprofit associated with CUNY, and a TQP grant and a SEED grant to the RF of the State University of New York ("SUNY"), a nonprofit associated with SUNY.  [Id. at ¶ 85].  Those grants, totaling approximately $16.1 million, are expected to train around 750 highly credentialed educational professionals to serve high-need communities in the State.  [Id.].  RF SUNY was awarded a five-year TQP grant in 2023 and a SEED grant in 2022, both intended to expand the local teacher residency program to high-need areas in and around of the City of Buffalo.  [Id. at ¶¶ 87-88].

In Illinois, before termination, three TQP grants were active and benefitting public school districts to allow them to develop teacher pipelines in partnership with universities in Illinois. [Id. at ¶ 89].  Chicago State University was a sub-awardee of a five-year TQP grant awarded to Cook County School District 104, intended to create a teacher preparation partnership known as the Teacher Education Alliance Model ("TEAM").  [Id. at ¶ 90].  TEAM recruits, prepares, and mentors a diverse pool of 300 apprentice teachers as they become certified teachers employed in

high-need local schools, and used its grant to support the TEAM program in various ways.  [Id.].

Additionally, Chicago Public Schools ("CPS") was awarded a TQP grant of approximately $3

million" for its Pre-Service Teaching Equity Project to recruit and train its teacher workforce.

[Id. at ¶ 91].  CPS also benefited from a TQP grant given to DePaul University, targeted at

recruiting and placing 800 people who are changing careers on a pathway to become qualified

teachers in schools serving low-income students in high-needs neighborhoods of Chicago.  [Id. at

¶ 92].

In Wisconsin, the University of Wisconsin-Madison received a TQP grant for around

$3.3 million in 2023 to create a teacher residency program to train special education teachers in

the Milwaukee Public Schools ("MPS").  [Id. at ¶ 93].  MPS suffers from a critical shortage of

qualified special education teachers, with approximately 71 positions currently vacant.  [Id.].  At

the time of the grant's termination, the first cohort of ten individuals was serving as teacher

residents in MPS and taking graduate coursework.  [Id. at ¶ 94].  Eight individuals had been

accepted into an additional cohort, with applications in process.  [Id.].

In Colorado, the University of Colorado Denver received a $6.5 million TQP grant for its

Next Generation of Teacher Preparation program, which focuses on recruiting and preparing new

teachers from rural communities to stay and teach within their communities.  [Id. at ¶ 95].  The

grant was meant to fund the program for 146 new rural schoolteachers.  [Id.].

### D.  Executive Orders and Department Directives Under the New Administration

In January 2025, shortly after taking office, President Donald J. Trump began issuing a

series of executive orders.  [Id. at ¶ 108].  "On January 20, 2025, President Trump issued

Executive Order No. 14151 ("No. 14151"), "Ending Radical and Wasteful Government DEI

Programs and Preferencing."  90 Fed. Reg. 8,339 (Jan. 29, 2025).  The Executive Order instructs

the directors of the OMB, assisted by the Office of Personnel Management and the Attorney General to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' ("DEIA") mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear."  [Id. (citation modified)].  No. 14151 also requires each federal agency head to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts' within [sixty] days." [Id. (citation modified)].

On January 21, 2025, President Trump issued Executive Order No. 14173 ("No. 14173"), "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." [Id. at ¶ 110 (quoting 90 Fed. Reg. 8,633 (Jan. 31, 2025))].  No. 14173 requires the Director of the OMB, with the assistance of the Attorney General, to "excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "terminate all diversity, equity, equitable decision-making, equitable deployment of financial and technical assistance, advancing equity, and like mandates, requirements, programs, or activities, as appropriate."  [Id. (citation modified) (quoting 90 Fed.  8,634 (Jan. 31, 2025))].  No. 14173 also instructs federal agencies to include in every contract or grant award terms requiring contractual counterparties or grant recipients "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."  [Id. (citation omitted)].

On January 29, 2025, President Trump issued Executive Order No. 14190 ("No. 14190"), "Ending Radical Indoctrination in K-12 Schooling."  [Id. at ¶ 111 (quoting 90 Fed. Reg. 8,853 (Feb. 3, 2025))].  No. 14190 requires the Secretary of Education, Secretary of Defense, and Secretary of Health and Human Services, in consultation with the Attorney General, to develop,

within ninety days, a plan for "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology." [Id. (quoting 90 Fed. Reg. 8,854 (Feb. 3, 2025))].

On February 5, 2025, Secretary Carter issued an internal "Directive on Department Grant Priorities," titled "Eliminating Discrimination and Fraud in Department Grant Awards." [Dkt. 8-20; see 112 at ¶ 114]. The directive begins:

> From the Supreme Court's 1954 landmark opinion in *Brown v. Board of Education* to its 2023 decision in *Students for Fair Admissions, Inc. v. Fellows of Harvard College,* education has played a central role in this Nation's fight against discrimination. It remains a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. This includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education.

[Dkt. 8-20]. Secretary Carter then instructs as follows:

> Department personnel shall conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—including the form of DEI—that are either contrary to law or the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication.

[Id.]. The directive concludes that "[g]rants deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements in the relevant award, agreement, or other instrument," and cites "2 C.F.R. § 200.340(a)(4)-341" in support. [Id.].

### E. Terminations of Grants

Beginning around February 7, 2025, TQP and SEED recipients began receiving termination letters from the Department entitled "RE: Grant Award Termination" ("Termination Letter"). [Dkt. 112 at ¶ 123]. Most TQP and SEED grant recipients received the Termination Letter. [See id. at ¶ 144; 55-1 at ¶ 27 ("The Department terminated 104 grants awarded under the TQP and SEED programs. Five grants remain in place.")]. The Termination Letter states in relevant part:

> This letter provides notice that the United States Department of Education is terminating your federal award, [grant award number]. *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.
>
> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. § 200.340(a)(4); see also 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [grant award number] in its entirety effective [date of letter].

[Dkt. 112-1]. The letter closes by noting the procedures for appeal available to the awardee. [Id.]. The terminated TQP and SEED grant recipients received substantively identical letters. [Dkt. 112 at ¶ 125]. "The Termination Letter uses a template form, customized for the addressee, grant award number, and termination date." [Id.]. The Termination Letter appears to have been authored by a staff member originally from the Department of Government Efficiency. [Id. at ¶ 126].

The Department also distributed a revised GAN ("Termination GAN") to most TQP and SEED grant recipients. [Id. at ¶ 132]. The dates were altered such that the Budget Period reflected an end date that was the same date the Termination GAN was received. [Id.]. The Termination GAN noted, "[t]he grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. § 200.340(a)(4); see also 34 C.F.R. § 75.253." [Id. at ¶ 133]. Plaintiff States' grant recipients had all already received an initial or continuance award . . . and were midway into the fiscal year of their current projects when they received the Termination Letters in February 2025. [Id. at ¶ 141]. Of the TQP and SEED grant recipients in Plaintiff States who filed objections, none received a response or resolution from the Department as of June 2, 2025. [Id. at ¶ 147].

## II.    PROCEDURAL HISTORY

This case is well-traveled. On March 6, 2025, Plaintiff States filed both a Complaint in the District of Massachusetts against Defendants alleging that Defendants' termination of grants under the TQP and SEED programs violated the APA [Dkt. 1], as well as a Motion for Temporary Restraining Order ("TRO") to restore Plaintiff States to their original status prior to the grants' termination and prevent Defendants from trying to reinstate the termination [Dkt. 2]. On March 10, 2025, District Judge Myong J. Joun entered a TRO effective until March 24,

temporarily enjoining Defendants from terminating any previously awarded TQP or SEED grants for recipients in Plaintiff States. [Dkt. 41]. Defendants appealed the TRO to the First Circuit and asked the First Circuit to stay the district court's TRO order pending its decision. [Dkt. 48]. On March 12, 2025, the district court converted the TRO to a Motion for Preliminary Injunction ("PI") and set forth a briefing schedule [Dkt. 52]; however, Defendants also filed an emergency motion in the district court to stay the court's TRO until the resolution of their First Circuit appeal [Dkt. 54; see 55]. The next day, March 13, 2025, the motion to stay was denied by the district court [Dkt. 66], followed by the First Circuit also denying the motion to stay on March 21 [Dkt. 73].

On March 24, 2025, the district court extended the TRO until its decision on the PI was made, not to exceed April 7, 2025. [Dkt. 79]. On March 26, 2025, Defendants applied to the Supreme Court for vacatur of the March 10 grant of the TRO, as extended on March 24, and an administrative stay. [See Dkt. 86-1 at 1]. On April 4, 2025, the Supreme Court granted Defendants' application because of the construability of the TRO as an "appealable preliminary injunction" [see id.] and stayed both the TRO and its extension pending the disposition of the appeal of the TRO in the First Circuit, as well as in the case of a disposition of a petition for a writ of certiorari based on the appeal to the Supreme Court [Dkt. 86]. Upon receiving the Supreme Court's decision, Plaintiff States withdrew the TRO-turned-PI motion in the district court [Dkt. 89] and it was terminated as moot by the court on April 9, 2025 [Dkt. 92]. Defendants submitted an unopposed motion to dismiss the TRO appeal in the First Circuit; on April 23, 2025, the appeal of the TRO was then voluntarily dismissed. [Dkt. 95].

On May 12, 2025, Defendants submitted a Motion to Dismiss for Lack of Jurisdiction, or, in the Alternative, to Transfer to the Court of Federal Claims [Dkt. 101], arguing that the district

court lacks subject-matter jurisdiction based on the Tucker Act and caveats within the APA that would give the Court of Federal Claims jurisdiction over this suit. [Dkt. 102]. After requesting that Defendants produce the administrative record [Dkt. 93] and receiving it pursuant to the district court's order [Dkt. 106], Plaintiff States filed their Amended Complaint on June 2, 2025 [Dkt. 112].

In the Amended Complaint, Plaintiff States maintain their initial claims regarding substantive violations of the APA, 5 U.S.C. § 706(2)(A), alleging arbitrary and capricious agency action and agency action not in accordance with 2 C.F.R. § 200.340; however, Plaintiff States also added four additional counts. The Amended Complaint additionally claims: (1) declaratory judgment is necessary to clarify the obligations and rights of the parties given the parties' disagreement about the grant termination permitted under 2 C.F.R. § 200.340(a)(2), (4) (2020 & 2024); (2) Defendants committed a substantive violation of the Spending Clause, U.S. Const. art. 1, § 8, cl. 1; (3) Defendants' actions fall outside their scope of statutory authority, *ultra vires*; and (4) Defendants violated the separation of powers doctrine based in U.S. Const. art. 1, § 1. Because of the Amended Complaint, Defendants' original Motion to Dismiss for Lack of Jurisdiction, or in the Alternative, to Transfer to the Court of Federal Claims was terminated as moot. [Dkt. 114, 115].

On June 3, 2025, this case was reassigned to this Court after Judge Joun's recusal. [Dkt. 117]. On June 30, 2025, Defendants moved to dismiss the Amended Complaint and submitted a second Motion to Dismiss for Lack of Jurisdiction or, in the Alternative, to Transfer to the Court of Federal Claims (the "Motion"). [Dkt. 128]. Plaintiff States oppose the Motion. [Dkt. 130]. It is this motion that is the subject of this Order.

## III.    LEGAL STANDARD

Federal courts are courts of limited jurisdiction, Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), and on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court must ensure it has the constitutional and statutory authority to adjudicate.  See Fafel v. Dipaola, 399 F.3d 403, 410 (1st Cir. 2005).  Since "[t]he existence of subject-matter jurisdiction 'is never presumed,'" Fafel, 399 F.3d at 410 (quoting Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998)), federal courts "have a duty to ensure that they are not called upon to adjudicate cases which in fact fall outside the jurisdiction conferred by Congress." Esquilín-Mendoza v. Don King Prods., Inc., 638 F.3d 1, 3 (1st Cir. 2011).  The party asserting federal jurisdiction is responsible for establishing that such jurisdiction exists, see Kokkonen, 511 U.S. at 377; Spielman v. Genzyme Corp., 251 F.3d 1, 4 (1st Cir. 2001), and the Court "must resolve questions pertaining to its subject-matter jurisdiction before it may address the merits of a case," Donahue v. City of Boston, 304 F.3d 110, 117 (1st Cir. 2002) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101-02 (1998)).

## IV.    DISCUSSION

It is a long-standing principle, confirmed by this Court's prior ruling, that district court jurisdiction is exclusively derived from the Constitution and federal statutes.  Massachusetts v. Nat'l Institutes of Health, 770 F. Supp. 3d 277, 291 (D. Mass. 2025) ("NIH").  Thus, before considering the merits of the case, this Court must determine whether it has subject matter jurisdiction to hear Plaintiff States' case.  If this Court finds that it lacks subject matter jurisdiction, it shall transfer the case at issue to the appropriate court "if it is in the interest of justice."  28 U.S.C. § 1631.  Defendants have contended throughout this litigation that Plaintiff States' claims lie exclusively in the United States Court of Federal Claims, pursuant to the

Tucker Act, 28 U.S.C. § 1491. Plaintiff States disagree that the Tucker Act divests this Court of jurisdiction. Instead, they argue that the Court has jurisdiction under the APA and the Constitution. Before the Court considers the parties' arguments, it sketches the legal landscape that predicates the Court's analysis.

### A.    Supreme Court Per Curiam Decisions

#### 1. What is precedent?

Alexander Hamilton said: "To avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them." THE FEDERALIST NO. 78 (Alexander Hamilton). Hamilton's remarks echo the principle of stare decisis, which is, "a foundation stone of the rule of law." Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 798 (2014). Faithfulness to vertical stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Kimble v. Marvel Ent., LLC, 576 U.S. 446, 455 (2015) (quoting Payne v. Tennessee, 501 U.S. 808, 827-828 (1991). This principle also promotes judicial economy and removes incentives to challenge settled precedents. Id. As Justice Brandeis wrote, "it is usually more important that the applicable rule of law be settled than that it be settled right." Id. (quoting Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 406 (1932) (dissenting opinion)). Therefore, the Supreme Court has recognized that "respecting *stare decisis* means sticking to some wrong decisions." Id. (citing Payne v. Tennessee, 501 U.S. 808, 827-828 (1991)). The task of discerning and applying the governing law—that is, applying the foundational stone of the rule of law—presents a challenging inquiry.

This is because not all Supreme Court writings are equal.  Emergency docket orders often are preliminary judgments from the Supreme Court without the benefit of robust briefing.  As Justice Kavanaugh has reminded lower courts, emergency stay orders "allow this Court to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do *not* have to decide the merits on the emergency docket. To reiterate: The Court's stay order is not a decision on the merits."  Merrill v. Milligan, 142 S. Ct. 879, 879 (2022); see also Lunding v. N.Y. Tax Appeals Tribunal, 522 U.S. 287, 307 (1998) ("Although we have noted that '[o]ur summary dismissals are . . . to be taken as rulings on the merits in the sense that they rejected the specific challenges presented . . . and left undisturbed the judgment appealed from,' we have also explained that they do not 'have the same precedential value . . . as does an opinion of this Court after briefing and oral argument on the merits.'" (citation omitted)).[2]  A judicial decision's reasoning, or *ratio decidendi*, helps guide lowers courts to uniform conclusions.  The *ratio decidendi* is especially instructive if there are conflicting authorities—lower courts turn to the court's reasoning to understand which authority is most binding.  As Justice Gorsuch stated, "It is usually a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases.  As this Court has repeatedly explained . . . decisions may 'settle the issues for the parties, but they are not to be read as a renunciation by this Court of doctrines previously announced in our opinions.' . . . [S]tripped from any reasoning, its judgment alone cannot be read to repudiate this Court's

---

[2] Other features can impact an order's precedential value, such as it being unsigned, not fully reasoned, or a summary dismissal.  Paul J. Watford et. al., Crafting Precedent, 131 HARV. L. REV. 543, 555 (2017) (reviewing BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT (2016)).  Additionally, concurrences and dissents are only persuasive—never binding.

repeated pre-existing teachings." <u>Ramos v. Louisiana</u>, 590 U.S. 83, 104-5 (2020)(citation

modified).

This dilemma is most clearly illustrated in this case, where the Supreme Court granted

the emergency application to stay the Temporary Restraining Order on April 4, 2025, via an

unsigned, per curiam opinion.[3]  The per curiam opinion is four paragraphs long, and the relevant

discussion on jurisdiction is half of one paragraph:

> Moreover, the District Court's "basis for issuing the order [is] strongly challenged," as the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA. *Sampson* [*v. Murray*, 415 U.S. 61,] 87, 94 S.Ct. 937[(1974)]. The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." *Ibid.* True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen v. Massachusetts*, 487 U.S. 879, 910, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

<u>Dep't of Educ. v. California</u>, 604 U.S. 650, 651 (2025) ("<u>Dep't of Ed. III</u>").  The precedential

value of <u>Dep't of Ed. III</u> has confused courts.  See <u>Massachusetts v. Kennedy</u>, 783 F. Supp. 3d

487, 498 (D. Mass. 2025) ("Whatever the Supreme Court's motivations or intentions, the <u>[Dep't

of Ed. III]</u> decision is of little assistance to the district courts in charting the intersection of the

APA and the Tucker Act."); <u>Harris Cnty. v. Kennedy</u>, 786 F. Supp. 3d 194, 216 (D.D.C. 2025)

---

[3] Chief Justice Roberts indicated he would deny the application and Justices Kagan, Jackson, and Sotomayor dissented.

("The Supreme Court's brief foray into the jurisdictional issue left many questions unanswered."); Sustainability Inst. v. Trump, No. 2:25-CV-2152-RMG, 2025 WL 1486978, at *5 (D.S.C. Apr. 29, 2025) (holding Dep't of Ed. III was "not dispositive of the jurisdictional questions" because it "was made in the context of an emergency application"); Colorado v. U.S. Dep't of Health & Hum. Servs., No. 1:25-CV-00121-MSM-LDA, 2025 WL 1426226, at *9 (D.R.I. May 16, 2025) (stating Dep't of Ed. III is in tension with another Supreme Court case "that directly controls" (internal quotations omitted)); Launch Alaska v. Dep't of the Navy, No. 3:25-CV-00141-GMS, 2025 WL 2223744, at *4 (D. Alaska Aug. 5, 2025) (stating the jurisdiction is "unresolved" after Dep't of Ed. III); Ass'n of Am. Universities v. Dep't of Energy, 789 F. Supp. 3d 118, 133 (D. Mass. 2025) (stating the court is "hesitant" to conclude that Dep't of Ed. III "requires it to cede jurisdiction to the Federal Court of claims"); Oregon Council for Humans. v. United States DOGE Serv., No. 3:25-CV-829-SI, 2025 WL 2237478, at *21 (D. Or. Aug. 6, 2025) (concluding that Dep't of Ed. III "does not provide the reasoning behind th[eir] conclusion" in order to be dispositive); Vera Inst. of Just. v. U.S. Dep't of Just., No. 25-CV-1643 (APM), 2025 WL 1865160, at *9 (D.D.C. July 7, 2025) ("The Supreme Court's sparse reasoning in [Dep't of Ed. III] has sown confusion in this jurisdiction."); Rhode Island v. Trump, 781 F. Supp. 3d 25, 40 (D.R.I. 2025) (stating "[Dep't of Ed. III]'s precedential value is limited, considering that the Supreme Court issued the decision on its emergency docket, in the context of an application for a stay pending appeal, and based on 'barebones briefing, no argument, and scarce time for reflection.'" (quoting Dep't of Ed. III at 969 (Kagan, J., dissenting))); San Francisco Unified Sch. Dist. v. AmeriCorps, 784 F. Supp. 3d 1280, 1293 (N.D. Cal. 2025) (holding that Dep't of Ed. III was not dispositive); President & Fellows of Harvard Coll. v. United States Dep't of Health & Hum. Servs., Nos. 25-CV-10910-ADB & 25-CV-11048-ADB,

2025 WL 2528380, at *12 n.9 (D. Mass. Sep. 3, 2025) (stating the court "endeavors to follow the Supreme Court's rulings" but the "recent emergency docket rulings regarding grant terminations have not been models of clarity, and have left many issues unresolved"); Urb. Sustainability Directors Network v. United States Dep't of Agric., No. CV 25-1775 (BAH), 2025 WL 2374528, at *14 (D.D.C. Aug. 14, 2025) (stating that "[m]uch confusion ensued as countless courts—in this district and others—attempted to interpret that cursory explanation" in Dep't of Ed. III).).

The confusion is warranted, given that there is another Supreme Court case, Bowen v. Massachusetts, on a similar matter that was fully briefed, benefitted from oral arguments, and resulted in a lengthy, well-reasoned opinion. 487 U.S. 879 (1988). Bowen has been the primary authority on explaining the "distinction between an action at law for damages," which provides monetary compensation, and "an equitable action for specific relief," which might nonetheless require monetary relief. Id. at 893.

Many courts that discounted Dep't of Ed. III did so because of its reliance on Bowen. Colorado, 2025 WL 1426226, at *9 ("[R]ecogniz[ing] the tension between Bowen and [Dep't of Ed. III]," the court determined that "[t]he case that directly controls, and the one that the Court must follow, is Bowen" (internal citation omitted)). Courts attempted to distinguish Bowen from Dep't of Ed. III (see section below) but were constrained as they were "trying to resolve [] issues quickly, often on an emergency basis . . . in a rapidly evolving doctrinal landscape." President & Fellows of Harvard Coll., 2025 WL 2528380, at *12 n.9. Because Dep't of Ed. III neither distinguished its holding from nor explicitly overruled Bowen, courts have continued to apply the sound precedent of Bowen. See La. Delta Serv. Corps v. Corp. for Nat'l & Cmty. Serv., No. CV 25-378-JWD-RLB, 2025 WL 1787429, at *22 (M.D. La. June 27, 2025) ("Nor did the Supreme Court's per curiam emergency stay address the merits question in [Dep't of Ed. III].

Nor, indeed, did it provide any dicta distinguishing [Dep't of Ed. III] from Bowen. Under these circumstances, the Court remains bound by the precedent set by Bowen.").

This confusion somewhat abated in August 2025. For a third time, the Supreme Court issued a per curiam that granted a stay.[4] This time, it was a partial stay in National Institutes of Health v. American Public Health Association, 145 S. Ct. 2658 (2025) ("APHA"). Pursuant to Dep't of Ed. III, the Supreme Court vacated the Government's termination of various research grants. However, this was not a full stay: the Supreme Court denied the application for a stay as to portions of the lower court's order that vacated various related internal guidance documents. The unsigned per curiam opinion was accompanied by five separate concurring opinions, with each concurrence reflecting a distinct rationale. Chief Justice Roberts and Justices Sotomayor, Kagan, and Jackson stated that if the district court had jurisdiction to vacate the directives, then it also had jurisdiction to vacate the terminations of the grants. Id. at 2662-63. This position is contrary to Justices Gorsuch, Kavanaugh, Thomas, and Alito who stated that the district court lacked jurisdiction over *any* of the claims. Id. at 2663, 2665.

---

[4] At one paragraph, the per curiam is short enough to include it all.

> The application is granted as to the District Court's judgments vacating the Government's termination of various research-related grants. See *Department of Ed.* v. *California*, 604 U. S. —— –, 145 S.Ct. 966, 221 L.Ed.2d 515 (2025) (*per curiam*). The Administrative Procedure Act's "limited waiver of [sovereign] immunity" does not provide the District Court with jurisdiction to adjudicate claims "based on" the research-related grants or to order relief designed to enforce any "'obligation to pay money'" pursuant to those grants. *Id.*, at ——, 145 S.Ct., at 968. And while the loss of money is not typically considered irreparable harm, that changes if the funds "cannot be recouped" and are thus "irrevocably expended." *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304, 131 S.Ct. 1, 177 L.Ed.2d 1040 (2010) (Scalia, J., in chambers). The Government faces such harm here. The plaintiffs do not state that they will repay grant money if the Government ultimately prevails. Moreover, the plaintiffs' contention that they lack the resources to continue their research projects without federal funding is inconsistent with the proposition that they have the resources to make the Government whole for money already spent.

Nat'l Institutes of Health v. Am. Pub. Health Ass'n, 145 S. Ct. 2658 (2025).

Situated between these two positions is Justice Barrett, who "provided the critical, and what may ultimately be the decisive, analytical perspective for assisting lower courts in their efforts to navigate an ever-evolving federal jurisprudence." Fairfax Cnty. Sch. Bd. v. McMahon, No. 1:25-CV-1432 (RDA/LRV), 2025 WL 2598622, at *4 (E.D. Va. Sep. 5, 2025). Justice Barrett writes in support of a two-track litigation that bifurcates vacatur claims (the prospective claims) in the district court while sending terminated grants (the retrospective claims) to the Court of Federal Claims. This, she states, requires the plaintiffs to proceed sequentially rather than simultaneously. APHA, 145 S. Ct. at 2662.

Like its predecessors, APHA lacked the routine *ratio decidendi* that explained why terminated grants must be separated from the challenged actions that terminated them. But, this Court "can take a hint" and accept this is law until and if the Supreme Court changes its views about the Tucker Act. Am. Council of Learned Soc'ys v. McDonald, No. 25 CIV. 3657 (CM) (BCM), 2025 WL 2097738, at *24 (S.D.N.Y. July 25, 2025). This ensures "that the applicable rule of law be settled" even if lower courts do not agree that it was settled right. Kimble, 576 U.S. at 455.

Drawing upon various Supreme Court opinions and the undisturbed Bowen precedent, this Court holds that retrospective and prospective claims must be analyzed separately. The divergent views among the justices on how to apply these categories nevertheless inform the current approach to this issue.

### 2. Distinguishing the Current Complaint from Dep't of Ed. III

This case is no stranger to judicial scrutiny. Virtually every court that has addressed a jurisdictional issue under the Tucker Act post Dep't of Ed. III has distinguished itself from this case. Some courts have pointed to the relief requested and permitted cases to remain in the

district court when the plaintiff only requests prospective, equitable relief.  Am. Council of Learned Soc'ys , 2025 WL 2097738, at *24 (stating that the "most salient factor reconciling" Dep't of Ed. III and Bowen appears to be that in Dep't of Ed. III the Court viewed the relief ordered "to be the sort of 'naked money judgment' that could and should have been issued by the Court of Federal Claims."); Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv., No. CV MJM-25-1458, 2025 WL 1865971, at *14 (D. Md. July 7, 2025) (citation modified); Maryland v. Corp. for Nat'l & Cmty. Serv., 785 F. Supp. 3d 68, 108-09 (D. Md. 2025); Thakur v. Trump, 787 F. Supp. 3d 955, 990-91 (N.D. Cal. 2025); Illinois v. Fed. Emergency Mgmt. Agency, No. 25-206 WES, 2025 WL 2716277, at *9 (D.R.I. Sep. 24, 2025).

Other cases point to the presence of constitutional claims to justify remaining in district court.  See Am. Council of Learned Soc'ys, 2025 WL 2097738, at *24-25 ("This is particularly relevant in this case where we, unlike in [Dep't of Ed. III], are faced with constitutional claims as well as APA claims based on [d]efendants' alleged violation of [p]laintiffs' constitutional rights."); Am. Bar Ass'n v. U.S. Dep't of Just., 783 F. Supp. 3d 236, 245 (D.D.C. 2025); Chi. Women in Trades v. Trump, 778 F. Supp. 3d 959, 982 (N.D. Ill. 2025).

This Court joins the consensus of courts that have addressed jurisdiction of claims that request the repayment of grant terminations from federal agencies: Dep't of Ed. III belongs in the Court of Federal Claims.  However, in this case, there is a notable change between March 2025, the original filing date, and today—an Amended Complaint.  This Court must address Defendants' Motion to Dismiss in light of this new operative complaint, which contains facts and relief unlike those described in Plaintiffs' original complaint.  In addition to APA claims, Plaintiffs also allege in their Amended Complaint that Defendants' actions violated the Spending Clause, the separation of powers, and are *ultra vires*.  While the first complaint generally

requested the Court vacate and set aside Defendants' grant termination, the Amended Complaint specifically request declaratory judgment and a vacatur of Defendant's actions.[5]  The Court holds that these changes are material and render <u>Dep't of Ed. III</u> inapplicable to this case since the Amended Complaint does not solely request the reinstatement of funds for terminated grants but also explicitly requests equitable relief to preserve prospective grants and the process to award grants.  Moreover, the Amended Complaint includes constitutional claims that were absent in the original complaint.  The Court must now determine whether the Amended Complaint's new claims vest jurisdiction with this Court.  Consistent with the framework described in <u>APHA</u>, the Court bifurcates the analysis for terminated and prospective claims.

**B.    Subject Matter Jurisdiction**

To start, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 475 (1994).  The Administrative Procedure Act provides one such waiver by permitting "a person suffering legal wrong because of any agency action" to seek "judicial review thereof."  5 U.S.C. § 702.  Congress provided a waiver under the APA for claims against the United States by persons "adversely affected . . . by agency action" if they "seek[ ] relief other than money damages."  <u>Id.</u>  However, the APA's waiver does not "extend to orders to enforce a contractual obligation to pay money."  <u>Dep't of Ed. III</u>, 604 U.S. at 651 (quoting <u>Great-West Life & Annuity Ins. v. Knudson</u>, 534 U.S. 204, 212 (2002)).  The Tucker Act confers exclusive jurisdiction in the United States Court of Federal Claims for suits involving "any express or implied contract with the United States" that is over $10,000.  28 U.S.C. § 1491.  In these cases, the Tucker Act "waives the Government's sovereign

---

[5] Although the change in requested relief is not sufficient to establish this Court's jurisdiction, <u>see</u> *infra* Section (B)(1)(b), it is also indicative of larger alterations to the complaint which do give this Court jurisdiction over some of the claims.

immunity for those actions." <u>Fisher v. United States</u>, 402 F.3d 1167, 1172 (Fed. Cir. 2005).

Claims under the Tucker Act must be "purely monetary" because the Court of Federal Claims

"has no power to grant equitable relief." <u>Bowen</u>, 487 U.S. at 910, 905 (internal quotation marks

omitted).

      As this Court has previously stated, the "jurisdictional boundary" between the Tucker Act

and the APA is well- traversed by litigants seeking relief against the federal government.  <u>NIH</u> at

292.  Courts must look to the "substance of the claim . . . to determine whether the essence of the

action is in contract." <u>Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.</u>, 778

F. Supp. 3d 440, 464 (D.R.I. Apr. 15, 2025) (quoting <u>Am. Sci. & Eng'g, Inc. v. Califano</u>, 571

F.2d 58, 63 (1st Cir. 1978)).  The inquiry encompasses two distinct aspects—the "source of the

rights upon which the plaintiff bases its claim" and "the type of relief sought (or appropriate)."

<u>Piñeiro v. United States</u>, No. 08-2402 (DRD/BJM), 2010 WL 11545698, at *5 (D.P.R. Jan. 26,

2010); <u>see also</u> <u>Village W. Assocs. v. R.I. Hous. & Mortg. Fin. Corp.</u>, 618 F. Supp. 2d 134, 138

(D.R.I. 2009).  This "rights and remedies" framework continues to guide this Court's analysis.

### 1. Terminated Claims

#### a.  Source of Rights

      First, the Court considers the source of Plaintiff States' rights for retrospective claims,

namely, the already terminated grant agreements.  Defendants contend that the source of rights

stems from the grant agreements which, according to them, bear all the essential characteristics

of a contract.  [Dkt. 129 at 13].  Plaintiffs, however, contend that this inquiry is "irrelevant" since

their claims are based on four other sources: the APA, the regulations, the statutes authorizing

TQP and SEED programs, and the Constitution.  [Dkt. 130 at 10].  Regarding the terminated

grant agreements, the Court agrees with Defendants.

A contract under the Tucker Act requires the standard contract elements: offer, acceptance, and consideration passing between the parties.  See Fincke v. United States, 675 F.2d 289, 295 (Cl. Ct. 1982); Columbus Reg'l Hosp. v. United States, 990 F.3d 1330, 1339 (Fed. Cir. 2021).  While the parties did not brief each element, Plaintiffs have challenged the existence of consideration.  However, Plaintiffs would receive funding for its programs from Defendants, who would, in turn, receive from Plaintiffs publication of Plaintiff States' research, which is likely sufficient to sustain a finding of consideration.[6]  See Thermalon Indus., Ltd. v. United States, 34 Fed. Cl. 411, 415 (1995).  Moreover, these very terminated grants were reviewed by the Supreme Court, which held that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here."  Dep't of Ed. III, 604 U.S. at 651 (citation modified).  Thus, with the standard conditions for a contract satisfied, this Court holds the grant agreements are contractual in nature.

Additionally, to determine the source of rights for the terminated grants, "the Court considers whether, among other factors, . . . the plaintiffs seek to enforce any duty imposed upon[] the government by the relevant contracts to which[] the government is a party."  Maryland, 785 F. Supp. 3d at 104 (citation modified).  Plaintiff States ask the Court to look at sources *other than the grant agreements* to enforce their rights.  However, the Court's consideration of the various other sources is peripheral to addressing Plaintiff States rights under the grant agreements.  See Am. Sci. & Eng'g, Inc. v. Califano, 571 F.2d 58, 61 (1st Cir. 1978).  It is not just a reopening of the grant agreements that must occur.  It is also the enforcement of rights—monetary damages—asserted in the grant agreements.  Accordingly, even though

---

[6] The Court takes judicial notice of the reporting grant recipients must provide to Defendants.  See DEP'T OF EDUC., *Teacher Quality Partnership (TQP) Grant Program; FY 2024 TQP Live Webinar Competition Overview* (May 3, 2024), https://www.ed.gov/sites/ed/files/2024/05/TQP-FY24-Live-Webinar.pptx.

Plaintiff States point to statutes, regulations, and the Constitution, their ultimate request is one that requires a court to look at the underlying grant agreements to enforce their rights.  See APHA, 145 S. Ct. at 2661.  Under this source of rights inquiry, the terminated grant agreements are akin to contracts.

### b.  Relief Sought

Next, the Court examines the relief sought by Plaintiff States for the terminated grant agreements.  Defendants maintain that Plaintiff States seek contractual remedies, specifically a payment of money damages owed to Plaintiff States under the terminated grant agreements.  Plaintiff States contend that they seek only to vacate an unlawful agency action.  Plaintiff States' position can be dispatched with ease.

Plaintiff States argue that "the fact that the relief sought here is prospective in nature and is not for payment of sums *past due* is significant, as the Supreme Court itself has repeatedly found."  [Dkt. 130 at 17].  Specifically, they seek relief that only involves "vacating, declaring unlawful, and enjoining Defendants' actions."  Id.  However, as the First Circuit has stated, "other courts have consistently rejected attempts to cast a contract dispute in different terms so as to subject it to the jurisdiction of the district court."  Califano, 571 F.2d at 61.  While a Court's vacatur of an agency directive may impact future (i.e., prospective) grants,[7] it does not disperse the grant money under the agreements that were already terminated by the agency's directive.

As Justice Barrett stated in her concurrence, "[v]acating the guidance does not reinstate terminated grants. If one simply flowed from the other, the District Court would have needed only to vacate the guidance itself."  APHA, 145 S. Ct. at 2661.  Plaintiff States may be asking

---

[7] But it could also not.  As Plaintiffs acknowledge, Defendants have the right to decline funding for future projects, provided they do so lawfully.  [Dkt. 130 at 20] ("If Plaintiffs prevail in this litigation, nothing would prevent Defendants from terminating TQP and SEED grants so long as they do so in accordance with law; they would simply be barred from terminating grants for the unlawful reasons challenged in this lawsuit.").

this Court to "declare unlawful" Defendants' actions to terminate the already awarded grants, but "the essence of the action [for terminated grants] is in contract, and plaintiff cannot by the mystique of a different form of complaint make it otherwise," Califano, 571 F.2d at 63 (citation modified).  No matter how Plaintiff States manufacture their relief for terminated grant agreements, they are requesting disbursement of funds.  As another court said, "a request for relief that seeks the reinstatement of the original award, like what Plaintiffs seek, amounts to a request for specific performance." Am. Ass'n of Physics Tchrs., Inc., slip op. at 9.  Accordingly, the Court finds that an injunction to correct Defendants' unlawful agency action with regard to the terminated grants is, in effect, a request for disbursement under the terminated grants.  To reiterate what the Supreme Court noted in this very case, "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" Dep't of Ed. III, 604 U.S. at 651 (quoting 5 U.S.C. § 702). Here, the Tucker Act applies as the terminated grants are "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  Accordingly, the Tucker Act vests jurisdiction away from this Court and to the Court of Federal Claims for Plaintiff States' terminated grants. Defendants' Motion to Dismiss is granted with respect to the terminated grant agreements.

## 2. Prospective Relief

However, Plaintiff States' prospective claims tell a different story.  These claims are grounded in the request "to set aside the unlawful agency action[s]."  [Dkt. 130 at 8].  This is precisely the issue examined by Bowen.  In that case, the Supreme Court concluded that "the District Court had the authority to hold unlawful and set aside agency action that it found to be not in accordance with law." Bowen, 487 U.S. at 911 (citation modified).  This is because the

Court of Federal Claims "does not have the general equitable powers of a district court to grant

prospective relief." Id. at 905.  As this Court stated in NIH:

> It is now axiomatic that there is a distinction between an action at
> law for damages, which provides monetary compensation, and an
> equitable action for specific relief, which might nonetheless require
> monetary relief. Bowen, 487 U.S. at 893, 108 S.Ct. 2722. . . A
> hallmark of such equitable actions is the existence of prospective
> relief in ongoing relationships.  Compare Bowen, 487 U.S. at 905,
> 108 S.Ct. 2722 (holding the district court had jurisdiction because
> declaratory or injunctive relief was appropriate to clarify petitioner
> state's ongoing obligations under the Medicaid plan), with Me.
> Cmty. Health Options v. United States, 590 U.S. 296, 298, 140 S.Ct.
> 1308, 206 L.Ed.2d 764 (2020) (holding that petitioners properly
> relied on the Tucker Act to sue for damages in the Court of Federal
> Claims because plaintiffs were strictly concerned with "specific
> sums already calculated, past due, and designed to compensate for
> completed labors").

770 F. Supp. 3d at 294 (citation modified).

Defendants' challenge this well-accepted principle in an ipse dixit fashion by contending

that Plaintiff States' "entire lawsuit" sounds in contract.  [Dkt. 129 at 13].  This is not true.

Plaintiff States' Amended Complaint clearly requests the Court to "vacate and set aside"

Defendants' agency directives.  [Dkt. 112 at 64].  Plaintiff States seek this "prospective,

nonmonetary relief to clarify future obligations."  Me. Cmty. Health Options, 590 U.S. at 298.

Sudden changes to a federal agency's rules "frustrate[] the notice and predictability purposes of

rulemaking, and promotes arbitrary government."  Talk Am., Inc. v. Michigan Bell Tel. Co., 564

U.S. 50, 69 (2011) (Scalia, J., concurring).  Plaintiff States' interests in "procedural regularity

and predictability" of how the Department of Education will award grants in the future is distinct

from their interest in obtaining "retrospective monetary relief sought" from the terminated grant

agreements.  New York v. Nat'l Sci. Found., No. 25 CIV. 4452 (JPC), 2025 WL 2180478, at *14

(S.D.N.Y. Aug. 1, 2025).  They seek to compel Defendants to adhere to the procedural

requirements mandated by the federal statutes and regulations.  Thus, it is clear that vacatur of the agency's actions and enjoining its prospective implementation is equitable, prospective relief that must be addressed under the APA in this Court.  See id.

This conclusion comports with the APHA per curiam, which declined to grant the application for prospective claims.  In expounding on her analysis, Justice Barrett stated:

> Plaintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court or directly in the D. C. Circuit. See, e.g., Ciox Health, LLC v. Azar, 435 F.Supp.3d 30 (DDC 2020) (challenge to HHS guidance); POET Biorefining, LLC v. EPA, 970 F.3d 392 (CADC 2020) (challenge to EPA guidance). That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim "founded ... upon" contract that only the CFC can hear. 28 U.S.C. § 1491(a)(1). So the District Court was likely correct to conclude that it had jurisdiction to entertain an APA challenge to the guidance, and it would be confusing for our disposition of this application to suggest that the CFC is the right forum for that claim.

145 S. Ct. at 2661.  Similarly, Plaintiff States seek vacatur of the Department of Education's February actions on arbitrary and capricious grounds.  As this Court previously stated, it would be legal error to construe such relief as couched pleas for monetary relief for which they never ask.  NIH at 295.  Since this Court finds that the proper source of Plaintiffs' rights is federal statute and regulations and because the relief sought is equitable in nature, this Court determines that portion of the lawsuit does not sound in contract.  See Village West Assocs., 618 F. Supp. 2d at 138.  Thus, Plaintiffs' claims cannot properly be brought under the Tucker Act in the Federal Court of Claims and this Court retains jurisdiction over the prospective claims.

### 3. Constitutional and *Ultra Vires* Claims

According to Plaintiff States, Defendants' actions violate the Spending Clause because they "altered the conditions upon which grants were obligated and disbursed to Plaintiff States, contrary to Congressional authority," [Dkt. 112 at ¶ 210], and violate the separation of powers

doctrine because Defendants substituted "its priorities for the careful judgment of Congress," [Id. at ¶ 229]. Defendants contend that Plaintiff States cannot establish jurisdiction over the standalone constitutional claims because they "are simply statutory claims dressed up in constitutional language." [Dkt. 129 at 24].

In bringing an *ultra vires* claim, Plaintiffs allege that Defendants "encroached upon Congress's Spending authority." [Dkt. 112 at ¶ 219]. Defendants contend that Plaintiffs cannot bring an *ultra vires* claim because (1) *ultra vires* claims against the individual defendants in their official capacity is essentially a suit against the Government, and (2) there is an "alternative path to judicial review" in the Court of Federal Claims under the Tucker Act. [Dkt. 129 at 25-26 (citation omitted)]. All of Defendant's arguments fail.

In contrast to Plaintiff States' other claims, their constitutional and *ultra vires* claims do not need to rely upon a statutory waiver of sovereign immunity to establish jurisdiction. Instead, Plaintiff States can rely upon the Larson-Dugan exception. Under this exception, "[t]he prohibition on suits against the United States does not apply in suits where plaintiffs sue for specific relief against federal officers, alleging either (1) that the officers have acted beyond their statutory authority or (2) that the statute conferring power upon the officers is unconstitutional." Kozera v. Spirito, 723 F.2d 1003, 1008 (1st Cir. 1983). This exception to sovereign immunity is based on the principle that such unconstitutional and *ultra vires* actions "by a federal officer [are] 'beyond the officer's powers and [are], therefore, not the conduct of the sovereign.'" Pollack v. Hogan, 703 F.3d 117, 120 (D.C. Cir. 2012) (quoting Larson v. Domestic & Foreign Com. Corp., 337 U.S. 682, 690 (1949)). Thus, Plaintiffs "would not need to show a separate statutory waiver of sovereign immunity, since sovereign immunity cannot be asserted to bar such a suit." New York v. Nat'l Sci. Found., 2025 WL 2180478, at *25.

To be clear, the Supreme Court has distinguished between a claim alleging a constitutional violation and a claim that an executive official has acted in excess of their statutory authority.  See Dalton v. Specter, 511 U.S. 462, 472 (1994).  A claim that an executive official's actions exceeded his or her statutory authority is a statutory claim is subject to judicial review, not a constitutional claim.  See Id. at 463.  In other words, unconstitutional conduct and *ultra vires* conduct are distinct claims.

Here, Plaintiff States invoke both aspects of the exception.  Plaintiffs claim that Defendants violate the Spending Clause and the separation of powers doctrine, and they act *ultra vires* by acting outside of the authority delegated to them by Congress.  For both claims, Plaintiff are alleging Defendants acted outside the bounds of their authority. When officers of the United States act beyond the limits set by statute or the Constitution, their "actions beyond those limitations are considered individuals and not sovereign actions," and challenges to those actions may be heard in district courts.  Larson, 337 U.S. at 689-90.

Additionally, these constitutional and *ultra vires* claims do not seek relief based on already terminated grant agreements.  Like the prospective claims discussed above, these claims are based on Defendants' actions to terminate the grant agreements outside the proper process. Plaintiff States' constitutional claims "do not at all depend on whether the terms of particular awards were breached."  Chavez-DeRemer, 789 F. Supp. 3d at 84 (citation omitted).  As stated above, Plaintiffs' prospective claims do not fall within the bounds of the Tucker Act.  See supra Part III(B)(2).  Thus, the Tucker Act does not offer an alternative path to review for Plaintiff States to vindicate their rights and there is no jurisdiction barrier to review their constitutional and *ultra vires* claims.  See Chavez-DeRemer, 789 F. Supp. 3d at 104.  This is not to say that

Plaintiff States will succeed on their constitutional claims. The Court has no opinion at this time on the merits of the constitutional claims.

One final note. Throughout the Motion to Dismiss, Defendants fashion several jurisdictional arguments that go to the merits of the claim. For example, the argument that Plaintiffs' *ultra vires* claim must be "'strictly limited' to the 'painstakingly delineated procedural boundaries of' the Supreme Court's decision in Leedom v. Kyne, 358 U.S. 184 (1958)" [Dkt. 129 at 264 (citation omitted)] is not a jurisdictional argument. The Court refrains from opining on whether the *ultra vires* claim—or any claim—is meritorious. Its holding today is narrowly tailored to whether it can hear Plaintiffs' claims. As the Court explained above, there is no jurisdictional barrier to hear Plaintiffs' *ultra vires* claim—or any other claim—regarding prospective relief.[8]

## V.    CONCLUSION

When all is said and done, grants to fund certain educational programs were terminated. Today's holding indicates this Court lacks any power to bring these grants back. However, Plaintiffs are not without remedy. If this Court finds Defendants' actions were unlawful under the APA and the Constitution, the grantees in Plaintiff States can file suit in the Court of Federal Claims to request their money damages under the contract. This two-track litigation framework preserves binding authority and upholds the systemic stability intended by the doctrine of stare decisis. Whether or not Plaintiffs are successful on the merits of their claims will be taken up later in this litigation. For the foregoing reasons, Defendants' Motion to Dismiss [Dkt. 128] is **GRANTED IN PART** and **DENIED IN PART**. The Court lacks jurisdiction over Plaintiff States' terminated grants. The Court retains jurisdiction over all remaining claims.

---

[8] As the Court found it properly has jurisdiction over the prospective APA claim, constitutional, and ultra claims, it need not address jurisdiction over the Declaratory Judgment Act separately.

**SO ORDERED.**

Dated: November 13, 2025                    /s/ Angel Kelley
                                            Hon. Angel Kelley
                                            United States District Judge