**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF NEW YORK; and STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> *v.* <br><br> U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, in her official capacity as former Acting Secretary of Education and current acting Chief Operating Officer, Federal Student Aid; LINDA MCMAHON, in her official capacity as Secretary of Education, <br><br> Defendants. | Case No. 1:25-cv-10548-AK <br><br> **Leave to File Excess Pages Granted on February 2, 2026** |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

Introduction.................................................................................................................................1

Factual Background .....................................................................................................................2

I.  Congress Responded To The National Teacher Shortage By Enacting And
Funding The Federal Teacher Pipeline Programs......................................................2

II.  The Department Regularly Administered The Federal Teacher Pipeline
Programs .....................................................................................................................4

III.  Defendants' Efforts To Cancel Programs That "Promote," "Take Part In,"
Or "Incorporate" Diversity, Equity, Or Inclusion.....................................................6

A.  Campaign Against "DEI" ................................................................................6

B.  The Directive And Directive Procedure ..........................................................7

C.  The February Actions Will Continue To Harm Plaintiffs ...............................9

Legal Standard ...........................................................................................................................12

Argument ...................................................................................................................................13

I.  Plaintiffs Have Standing. .........................................................................................13

II.  The February Actions Violate The Administrative Procedure Act. .........................15

A.  The February Actions Are Final Agency Action (Counts I & II).................15

B.  The February Actions Are Contrary To Law (Counts II & III)....................17

1.  The February Actions Require Review of Funding on the
Basis of Anti-"DEI" Priorities Not Authorized by Law. ................17

2.  The February Actions Require Review of Funding on the
Basis of New Priorities Not Set Through Notice and
Comment............................................................................................19

3.  The February Actions Require Review of Funding on the
Basis of New Priorities, in Violation of 2 C.F.R. § 200.340. .........21

C.  The February Actions Are Arbitrary & Capricious (Count I). .....................24

III.  The February Actions Violate The Constitution.......................................................29

A.  The February Actions Violate The Spending Clause (Count IV)..................29

B.  The February Actions Violate Separation Of Powers And Are
Ultra Vires (Counts V & VI). .......................................................................32

IV.  Plaintiffs Are Entitled To Vacatur And Declarative And Injunctive Relief..........34

A.  Plaintiffs Are Entitled To Vacatur Of The February Actions.....................34

B.  Plaintiffs Are Entitled To Declaratory Relief. ............................................34

C.  Plaintiffs Are Entitled To Permanent Injunctive Relief..............................35

1.  Plaintiffs Will Continue to Suffer Irreparable Harm. ....................36

**TABLE OF CONTENTS**
**(continued)**

**Page**

2.    The Remedies Available at Law Are Inadequate. ........................37

3.    The Balance of Hardships and Public Interest Favor
Plaintiffs. ...............................................................................39

Conclusion ........................................................................................................40

ii

**TABLE OF AUTHORITIES**

**Page**

CASES

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*
   770 F. Supp. 3d 822 (D. Md. 2025) ........................................................................20

*Am. Fed'n of Tchrs. v. U.S. Dep't of Educ.*
   796 F. Supp. 3d 66 (D. Md. 2025) ...........................................................................7

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*
   145 F.4th 39 (1st Cir. 2025) (*NIH II*)...................................................................35

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*
   791 F. Supp. 3d 119 (D. Mass. 2025) (*NIH I*) .................................................15, 16

*Amerijet Int'l, Inc. v. Pistole*
   753 F.3d 1343 (D.C. Cir. 2014)...........................................................................24, 25

*Arlington Cent. School Dist. Bd. of Educ v. Murphy*
   548 U.S. 291 (2006).................................................................................................30

*Armstrong v. Exceptional Child Ctr., Inc.*
   575 U.S. 320 (2015).............................................................................................12, 33

*Ass'n of Am. Univs. v. Dep't of Def.*
   792 F. Supp. 3d 143 (D. Mass. 2025) .......................................................................39

*Ass'n of Am. Univs. v. Nat'l Sci. Found.*
   788 F. Supp. 3d 106 (D. Mass. 2025) ...................................................................12, 36

*Associated Gen. Contractors of Mass. v. Bos. Dist. Council of Carpenters*
   642 F. Supp. 1435 (D. Mass. 1986) ..........................................................................35

*Bennett v. Spear*
   520 U.S. 154 (1997)..................................................................................................15

*Biden v. Texas*
   597 U.S. 785 (2022)..................................................................................................16

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*
   838 F.3d 42 (1st Cir. 2016).......................................................................................12

**TABLE OF AUTHORITIES**
(continued)

Page

*California v. U.S. Dep't of Educ.*
132 F.4th 92 (1st Cir. 2025) ...................................................................................................14

*Chicago Women in Trades v. Trump*
778 F. Supp. 3d 959 (N.D. Ill. 2025) .....................................................................................19

*City & Cnty. of San Francisco v. Sessions*
349 F. Supp. 3d 924 (N.D. Cal. 2018) ...................................................................................31

*City of Philadelphia v. Sessions*
280 F. Supp. 3d 579 (E.D. Pa. 2017) .....................................................................................31

*City of Providence v. Barr*
954 F.3d 23 (1st Cir. 2020) .....................................................................................................33

*City of Seattle v. Trump*
2025 WL 3041905 (W.D. Wash. Oct. 31, 2025) .......................................................................6

*Clinton v. City of New York*
524 U.S. 417 (1998) .................................................................................................................32

*Council for Opportunity in Educ. v. U.S. Dep't of Educ.*
No. 25-CV-03491 (TSC), 2026 WL 120984 (D.D.C. Jan. 16, 2026) ....................................18

*Ctr. for Biological Diversity v. Haaland*
58 F.4th 412 (9th Cir. 2023) ...................................................................................................15

*Dep't of Com. v. New York*
588 U.S. 752 (2019) ...........................................................................................13, 14, 21, 24

*Dep't of Educ. v. Brown*
600 U.S. 551 (2023) .................................................................................................................15

*Dep't of Educ. v. California*
604 U.S. 650 (2025) .................................................................................................................14

*DHS v. Regents of the Univ. of Cal.*
591 U.S. 1 (2020) ...............................................................................................................27, 28

*Doe v. R.I. Interscholastic League*
137 F.4th 34 (1st Cir. 2025) ...................................................................................................35

**TABLE OF AUTHORITIES**
(continued)

Page

*Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*
682 F.2d 12 (1st Cir. 1982).................................................................................35

*eBay Inc. v. MercExchange, L.L.C.*
547 U.S. 388 (2006)............................................................................................36

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016)............................................................................................27

*Ernst & Young v. Depositors Econ. Prot. Corp.*
45 F.3d 530 (1st Cir. 1995).................................................................................35

*FCC v. Fox Television Stations, Inc.*
556 U.S. 502 (2009)......................................................................................26, 27

*FCC v. Prometheus Radio Project*
592 U.S. 414 (2021)............................................................................................24

*Fischer v. United States*
603 U.S. 480 (2024)............................................................................................23

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*
604 U.S. 542 (2025)......................................................................................21, 26

*Gale v. First Franklin Loan Servs.*
701 F.3d 1240 (9th Cir. 2012) ............................................................................22

*Gen. Elec. Co. v. EPA*
290 F.3d 377 (D.C. Cir. 2002) ...........................................................................16

*Illinois v. Fed. Emergency Mgmt. Agency*
801 F. Supp. 3d 75 (D.R.I. 2025)........................................................................30

*In E.K. by & through Keeley v. Dep't of Def. Educ. Activity*
2025 WL 2969560 (E.D. Va. Oct. 20, 2025)..........................................................6

*In re Aiken Cnty.*
725 F.3d 255 (D.C. Cir. 2013) ...........................................................................40

*In re United Mine Workers of Am. Int'l Union*
190 F.3d 545 (D.C. Cir. 1999) ...........................................................................33

v

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Jette v. United of Omaha Life Ins. Co.*
18 F.4th 18 (1st Cir. 2021)................................................................................21

*Kingdom v. Trump*
No. 1:25-cv-00691, 2025 WL 1568238 (D.D.C. June 3, 2025) ...........................25

*Kisor v. Wilkie*
588 U.S. 558 (2019)........................................................................................24

*Larson v. Domestic & Foreign Com. Corp.*
337 U.S. 682 (1949)........................................................................................33

*Lopez v. Garriga*
917 F.2d 63 (1st Cir. 1990)..............................................................................36

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992)........................................................................................13

*Martin Luther King Jr. Cnty. v. Turner*
798 F. Supp. 3d 1224 (W.D. Wash. 2025).........................................................6

*Massachusetts Delivery Ass'n v. Coakley*
769 F.3d 11 (1st Cir. 2014)..............................................................................15

*Massachusetts v. Nat'l Institutes of Health*
770 F. Supp. 3d 277 (D. Mass. 2025) ................................................34, 39, 40

*Metro. Transp. Auth. v. Duffy*
784 F. Supp. 3d 624 (S.D.N.Y. 2025)...............................................................24

*Monsanto Co. v. Geertson Seed Farms*
561 U.S. 139 (2010)........................................................................................38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983).......................................................................12, 24, 25, 28

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*
779 F. Supp. 3d 149 (D.N.H. 2025).............................................................7, 37

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
567 U.S. 519 (2012)........................................................................................30

## TABLE OF AUTHORITIES
### (continued)

Page

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*
145 S. Ct. 2658 (2025) (*NIH III*) .................................................................14, 34, 35

*New York v. Trump*
133 F.4th 51 (1st Cir. 2025)............................................................................15

*New York v. Trump*
811 F. Supp. 3d 215 (D. Mass. 2025) .............................................................35

*New York v. U.S. Dep't of Energy*
No. 6:25-cv-01458-MTK, 2025 WL 3140578 (D. Or. 2025)...........................39

*New York v. U.S. Dep't of Health & Human Servs.*
414 F. Supp. 3d 475 (S.D.N.Y. 2019)............................................................29

*Nielsen v. Preap*
586 U.S. 392 (2019)......................................................................................22

*Nieves-Marquez v. Puerto Rico*
353 F.3d 108 (1st Cir. 2003)..........................................................................31

*Nken v. Holder*
556 U.S. 418 (2009)...............................................................................36, 39

*Pennhurst State Sch. & Hosp. v. Halderman*
451 U.S. 1 (1981)..........................................................................................30

*Penobscot Nation v. Frey*
3 F.4th 484 (1st Cir. 2021).............................................................................24

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*
793 F. Supp. 3d 19 (D.D.C. 2025)..................................................................39

*Rhode Island v. Trump*
155 F.4th 35 (1st Cir. 2025)...........................................................................37

*Rhode Island v. Trump*
810 F. Supp. 3d 283 (D.R.I. 2025).............................................................17, 32

*Ryder v. Union Pac. R.R. Co.*
945 F.3d 194 (5th Cir. 2019) .........................................................................24

## TABLE OF AUTHORITIES
### (continued)

**Page**

*San Francisco A.I.D.S. Found. v. Trump*
786 F. Supp. 3d 1184 (N.D. Cal. 2025) ...................................................................6

*San Francisco Unified Sch. Dist. v. AmeriCorps*
789 F. Supp. 3d 716 (N.D. Cal. 2025) ...............................................................19, 31

*SEC v. Chenery Corp.*
332 U.S. 194 (1947)................................................................................................25

*Seila Law LLC v. CFPB*
591 U.S. 197 (2020)................................................................................................32

*South Dakota v. Dole*
483 U.S. 203 (1987)...........................................................................................29, 30

*Students for Fair Admissions v. President & Fellows of Harvard Coll.*
600 U.S. 181 (2023) (*SFFA*)....................................................................................7

*Sullivan v. City of Springfield*
561 F.3d 7 (1st Cir. 2009).......................................................................................12

*Taylor v. Am. Chemistry Council*
576 F.3d 16 (1st Cir. 2009).....................................................................................12

*Texas v. Cardona*
743 F. Supp. 3d 824 (N.D. Tex. 2024) ...................................................................17

*Thakur v. Trump*
787 F. Supp. 3d 955 (N.D. Cal. 2025) .....................................................................6

*Trump v. United States*
603 U.S. 593 (2024)................................................................................................32

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*
578 U.S. 590 (2016)...........................................................................................15, 16

*Vanngo v. Questex, LLC*
No. 23-cv-13032, 2024 WL 6822763 (D. Mass. July 12, 2024) ............................37

*Victim Rights Law Ctr. v. U.S. Dept. of Educ.*
788 F. Supp. 3d 70 (D. Mass. 2025) ......................................................................33

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Washington v. U.S. Dep't of Educ.*
167 F.4th 1241 (9th Cir. 2026) (*Washington II*)............................................16, 19, 20

*Washington v. United States Dep't of Educ.*
813 F. Supp. 3d 1222 (W.D. Wash. 2025) (*Washington I*).....................................20

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*
778 F. Supp. 3d 440 (D.R.I. 2025)............................................................25

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952)...........................................................................32

STATUTES

5 U.S.C. § 553.................................................................................19

5 U.S.C. § 703.................................................................................34

5 U.S.C. § 706(2)..............................................................................34

5 U.S.C. § 706(2)(A)...........................................................................24

5 U.S.C. § 706(2)(A)-(C).......................................................................12

20 U.S.C. § 1022.........................................................................3, 18, 32

20 U.S.C. § 1022(4)............................................................................29

20 U.S.C. § 1022a.........................................................................18, 32

20 U.S.C. § 1022a(d)(1)(A)(ii)............................................................28, 29

20 U.S.C. § 1022h.........................................................................18, 32

20 U.S.C. § 1022b(a)............................................................................3

20 U.S.C. § 1022e(b)(4).....................................................................3, 29

20 U.S.C. § 1228a(b).............................................................11, 18, 28, 29, 33

20 U.S.C. § 1232..............................................................................19

20 U.S.C. § 1232(d).........................................................................4, 28

**TABLE OF AUTHORITIES**
(continued)

**Page**

20 U.S.C. § 1232e-4.................................................................................................20

20 U.S.C. § 6672....................................................................................................18

20 U.S.C. § 6672(a)(1)....................................................................................3, 28, 29

28 U.S.C. § 2201(a) ...............................................................................................34

31 U.S.C. § 1122....................................................................................................20

Administrative Procedure Act............................................................................ *passim*

Declaratory Judgment Act .......................................................................................34

Consolidated Appropriations Act, 2026

    Pub. L. No. 119-75, 140 Stat. 173, 296, 301-02 (2026) ...........................................4

Elementary and Secondary Education Act (ESEA)........................................................3

Every Student Succeeds Act of 2015

    Pub. L. No. 114-95, 129 Stat. 1801, 1948–49 .......................................................3

General Education Provisions Act (GEPA)............................................................ *passim*

Higher Education Opportunity Act

    Pub. L. No. 110-315, 122 Stat. 3078, 3133–59 (2008).............................................2

Pub. L. No. 113-76, 128 Stat. at 391, 396..................................................................4

Pub. L. No. 115-141, 132 Stat. at 743, 747................................................................4

Pub. L. No. 116-260, 134 Stat. at 1600, 1605............................................................4

Pub. L. No. 118-47, 138 Stat. at 683, 689.................................................................4

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article I, § 1.........................................................................................32

U.S. Const. Article I, § 8, cl. 1............................................................................29, 32

**TABLE OF AUTHORITIES**
(continued)

**Page**

U.S. Const. Article II, § 3 ...............................................................................32

**COURT RULES**

Fed. R. Civ. P. 56(a) .....................................................................................12

Fed. R. Civ. P. 56(e) .....................................................................................13

**REGULATIONS**

2 C.F.R. § 200.208(c)...................................................................................28

2 C.F.R. § 200.311 ........................................................................................22

2 C.F.R. § 200.315 ........................................................................................22

2 C.F.R. § 200.339 ........................................................................................28

2 C.F.R. § 200.340 ................................................................................. *passim*

2 C.F.R. § 200.340(a)(1)–(3) .........................................................................23

2 C.F.R. § 200.340(a)(4).................................................................8, 21, 22, 24

2 C.F.R. § 200.341 .........................................................................................8

2 C.F.R. § 200.511(b)(3)................................................................................23

34 C.F.R. § 75.105(b) ...................................................................................28

34 C.F.R. § 75.105(b)(1)..............................................................................4, 20

**OTHER AUTHORITIES**

160 Cong. Rec. at H1042, H1098, H1108. ......................................................4

164 Cong. Rec. at H2760, H2767 ...................................................................4

166 Cong. Rec. at H8692, H8699. ...................................................................4

170 Cong. Rec. at H2050, H2057 ...................................................................4

172 Cong. Rec. H1651, H1655 (daily ed. Jan. 22, 2026) .................................4

# TABLE OF AUTHORITIES
## (continued)

**Page**

78 Fed. Reg. 9,892 (Feb. 12, 2013) ...........................................................................................4

79 Fed. Reg. 30,584 (May 28, 2014) .........................................................................................4

83 Fed. Reg. 12,356 (Mar. 21, 2018) .........................................................................................4

83 Fed. Reg. 22,036 (May 11, 2018) .........................................................................................4

85 Fed. Reg. 49,506 (Aug. 13, 2020)........................................................................................23

87 Fed. Reg. 10,906 (Feb. 25, 2022) .........................................................................................4

87 Fed. Reg. 19,487 (Apr. 4, 2022) ...........................................................................................4

90 Fed. Reg. 11,411 (March 6, 2025) .........................................................................................9

90 Fed. Reg. 43,514 (Sept. 9, 2025) ........................................................................................21

Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives Celebrated in His First Term*, N.Y. Times (Feb. 14, 2025), https://tinyurl.com/27zezebu.........................................................................................26

Executive Order No. 14190, "Ending Radical Indoctrination in K-12 Schooling," 90 Fed. Reg. 8,853 (Feb. 3, 2025) ...............................................................................6

Executive Order No. 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," 90 Fed. Reg. 8,339 (Jan. 29, 2025)................................6

Executive Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8,633 (Jan. 31, 2025)...........................................6

*Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ., to Colleagues* (Feb. 14, 2025) (DCL), https://tinyurl.com/5n6f3h95 ...........................7

*No Longer*, Cambridge Dictionary, https://tinyurl.com/5n83zhxv (last visited April 13, 2026) ..............................................................................................22

*No Longer*, Merriam-Webster.com, https://tinyurl.com/44br3n6e (last visited April 13, 2026) ..............................................................................................22

Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025), https://tinyurl.com/2h8563xy ...................................7

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Supporting Effective Educator Development Grant Program*,* Dep't of Educ.,
   https://tinyurl.com/33u9fcnj (last visited Apr. 13, 2026) ...........................................................3

Tiffany S. Tan, et al, *State teacher shortages 2025 update: Teaching positions left*
   *vacant or filled by teachers without full certification*, Learning Pol'y Inst. 1
   (July 15, 2025), https://tinyurl.com/yfcyr3a4 ............................................................................2

U.S. Dep't of Educ., *Questions and Answers Regarding the Supreme Court's*
   *Decision in* Students for Fair Admissions, Inc. v. Harvard College and
   University of North Carolina (Aug. 14, 2023), https://tinyurl.com/4tz9hu8d.........................26

**INTRODUCTION**

On February 5, 2025, in furtherance of a series of anti-diversity, equity, and inclusion Executive Orders, Defendant Denise Carter issued a directive (Directive) to staff at the Department of Education (Department), prohibiting the Department from funding any "programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives." AR000139. The Directive mandated a new procedure (Directive Procedure), whereby all new and existing grants are subject to review and elimination based on previously unannounced policy objectives, including to eliminate "DEI." *Id.* Pursuant to the Directive and Directive Procedure (collectively, February Actions), Defendants immediately thereafter sent identical Termination Letters to virtually all Teacher Quality Partnership (TQP) and Supporting Effective Educator Development (SEED) grant recipients, resulting in the effective elimination of both federal grant programs within a week. The February Actions remain in effect to this day, leaving Plaintiffs, through their grantees, in an impossible position: comply with the General Education Provisions Act (GEPA) and TQP and SEED statutes—which require recipients to address diversity, equity, and inclusion—or comply with the February Actions—which prohibit addressing or even mentioning diversity, equity, or inclusion principles.

The February Actions violate the Department's own regulations, applicable law, and the Constitution. The policy objectives announced by the Directive and incorporated into the Directive Procedure were not the subject of notice-and-comment rulemaking as required by law, and are in direct conflict with GEPA and the TQP and SEED statutes. The February Actions also misconstrue Defendants' authority to eliminate funding under 2 C.F.R. § 200.340; are arbitrary and capricious several times over; violate the Spending Clause and Separation of Powers; and are *ultra vires*. For each of these reasons, Plaintiffs seek a declaratory judgment and vacatur of the Defendants' unlawful agency action and injunctive relief.

1

**FACTUAL BACKGROUND**

**I.    CONGRESS RESPONDED TO THE NATIONAL TEACHER SHORTAGE BY ENACTING AND FUNDING THE FEDERAL TEACHER PIPELINE PROGRAMS**

There is a nationwide shortage of well-prepared, high-quality teachers. Doc. No. 112 (First Amended Complaint) ¶ 39. Schools across the country struggle to find state-certified teachers. *Id.* ¶ 40; *see also id.* ¶¶ 39-41. More than 410,000 teaching positions in the U.S.—representing about one eighth of all teaching positions nationwide—were vacant or filled by uncertified teachers in 2025.[1] The teacher shortage is especially acute in specific subject areas, including math, biology or life sciences, special education, and English as a second language or bilingual education—where nearly one in four vacancies were not filled with state-certified teachers before the start of the school year. *Id.* ¶ 42. Public schools within Plaintiff States experience these shortages firsthand, as the estimated number of teachers not fully certified for their teaching assignments exceeded 32,200 in California (2022-23), 5,200 in Massachusetts (2023-24), and 2,900 in New Jersey (2023-24).[2] A primary cause for the shortage is a limited pool of qualified candidates. Based on a nationwide survey of K-12 public schools, the top two challenges schools reported in filling vacancies with fully certified teachers entering the 2024–25 school year were: (1) an overall lack of qualified candidates (64%); and (2) too few candidates applying (53%). *Id.* ¶ 44.

Recognizing the importance of improving the quantity and quality of teachers nationwide, Congress established the TQP and SEED grant programs to train, place, and support teachers. Congress established the TQP program in 2008 under Part A of Title II of the Higher Education Act, as amended by the Higher Education Opportunity Act Pub. L. No. 110-315, 122 Stat. 3078, 3133–59 (2008), to "improve the quality of prospective and new teachers by improving their

---

[1] *See* Tiffany S. Tan, et al, *State teacher shortages 2025 update: Teaching positions left vacant or filled by teachers without full certification*, Learning Pol'y Inst. 1 (July 15, 2025), https://tinyurl.com/yfcyr3a4.
[2] *See* Tan, et al., *supra* note 1 at 4, 10, 14.

Plaintiffs' Memorandum of Law ISO Motion for Summary Judgment (1:25-cv-10548-AK)

preparation and enhancing professional development activities" and to "recruit highly qualified individuals, including minorities and individuals from other occupations, into the teaching force," among other objectives. 20 U.S.C. § 1022. The statute envisions that teachers will "receive training in providing instruction to diverse populations," *id.* § 1022e(b)(4), as well as techniques "to improve . . . social, emotional, and physical development," *id.* § 1022a(d)(1)(A)(ii). The statute also permits TQP teacher-residency programs to consider choosing "applicants who reflect the communities in which they will teach as well as consideration of individuals from underrepresented populations." *Id.* § 1022a(e)(2)(A)(vi); *see also* § 1022a(d)(5) (encouraging TQP grantees to "recrui[t] into the teaching profession . . . individuals from under[-]represented populations," "former military personnel," and "individuals to teach in rural communities"). Grants awarded under TQP "shall be awarded for a period of five years." 20 U.S.C. § 1022b(a).

Three years later, in 2011, Congress established the SEED program as a part of the Improving Teacher Quality State Grants program, contained at Subpart 1 of Part A of Title II of the Elementary and Secondary Education Act (ESEA). The Every Student Succeeds Act of 2015, Pub. L. No. 114-95, 129 Stat. 1801, 1948–49, formally enacted the SEED program "to increase the number of highly effective educators by supporting the implementation of Evidence-Based practices that prepare, develop, or enhance the skills of educators."[3] Among its purposes is to "provid[e] teachers, principals, or other school leaders from nontraditional . . . pathways to serve in traditionally underserved local educational agencies." *Id.* § 6672(a)(1); *see also* § 6672(b)(3) (requiring the Department to ensure that SEED grants are, to the extent practicable, "distributed among eligible entities that will serve geographically diverse areas, including urban, suburban, and rural areas"). SEED grants must be initially awarded for not more than three years

---

[3] *See* Supporting Effective Educator Development Grant Program, Dep't of Educ., https://tinyurl.com/33u9fcnj (last visited Apr. 13, 2026).

but may be renewed for an additional two years. *Id.* § 6672(b)(1)-(2).

For over a decade, Congress regularly made appropriations intended for both the TQP and SEED programs.[4] Most recently, on February 3, 2026, Congress passed the Consolidated Appropriations Act, 2026 (FY26 Act), which *requires* the Department to expend or obligate approximately $70 million and $90 million towards TQP and SEED, respectively, by September 30, 2026. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 296, 301-02 (2026); 172 Cong. Rec. H1651, H1655 (daily ed. Jan. 22, 2026) (explanatory statement submitted by Rep. Cole).

## II. THE DEPARTMENT REGULARLY ADMINISTERED THE FEDERAL TEACHER PIPELINE PROGRAMS

Consistent with Congressional appropriations and intent, the Department regularly provided funding for the TQP and SEED programs.[5] The Department issued those awards pursuant to lawfully established priorities issued after the required notice-and-comment rulemaking process,[6] and the Plaintiffs' grantees received and implemented their awards consistent with those established priorities.[7] Specifically, on July 9, 2021, the Department published final annual

---

[4] *E.g.*, Pub. L. No. 118-47, 138 Stat. at 683, 689 (making appropriations available for SEED and TQP for FY2024); Pub. L. No. 116-260, 134 Stat. at 1600, 1605 (same for FY2021); Pub. L. No. 115-141, 132 Stat. at 743, 747 (same for FY2018); Pub. L. No. 113-76, 128 Stat. at 391, 396 (same for FY2014); 170 Cong. Rec. at H2050, H2057 (explanatory text directing funding to SEED and TQP for FY2024); 166 Cong. Rec. at H8692, H8699 (same for FY2021); 164 Cong. Rec. at H2760, H2767 (same for FY2018); 160 Cong. Rec. at H1042, H1098, H1108 (same for FY2014).

[5] *E.g.*, Applications for New Awards; SEED Program, 87 Fed. Reg. 19,487 (Apr. 4, 2022); Applications for New Awards; TQP Grant Program, 87 Fed. Reg. 10,906 (Feb. 25, 2022); Application for New Awards; TQP Grant Program, 83 Fed. Reg. 22,036 (May 11, 2018); Applications for New Awards; SEED Program, 83 Fed. Reg. 12,356 (Mar. 21, 2018); Applications for New Awards; TQP Grant Program, 79 Fed. Reg. 30,584 (May 28, 2014); Applications for New Awards; SEED Grant Program, 78 Fed. Reg. 9,892 (Feb. 12, 2013).

[6] The Secretary of Education is required to establish specific priorities that are included in the application for grant programs, such as TQP and SEED, against which grant applicants will be judged. 34 C.F.R. § 75.105(b)(1); 20 U.S.C. § 1232(d).

[7] The Department used its published priorities, established through notice-and-comment rulemaking, in awarding the TQP and SEED grants at issue here. AR000067-73, AR000088-90, AR000098-105; *see also* AR000010-12.

4

priorities for the TQP and SEED Programs, which included "Increasing Educator Diversity." AR00035. And on December 10, 2021, the Department published Supplemental Priorities for all discretionary grants, which included: "Promoting Equity in Student Access to Educational Resources [and] Opportunities," AR00044, "Supporting a Diverse Educator Workforce and Professional Growth To Strengthen Student Learning," AR00048, and "Meeting Student Social, Emotional, and Academic Needs," AR00052.[8]

Plaintiffs' grantees have implemented numerous TQP and SEED programs designed to recruit and prepare qualified teachers to serve high-needs school districts consistent with Department priorities finalized through notice-and-comment rulemaking and relying on federal funding. *See generally* Doc. No. 112 ¶¶ 68-95. These programs included—before Defendants' February Actions—initiatives focused on serving rural areas,[9] programs to improve access to qualified special education teachers and math and science teachers,[10] and programs focused on English Language Learners,[11] among others.

---

[8] A small number of the grants at issue here were awarded under the priorities established under the prior Trump administration, *see* AR000001-9, but most were awarded in response to the Notices of Application for new awards published in 2022 and 2024, applying the July and December 2021 priorities.

[9] *See, e.g.*, Doc. No. 8-11 ¶¶ 6-7, 23 (describing Colorado TQP grant program that has helped produce 19 teachers who are now teaching in rural Colorado schools, with plans to prepare 146 teachers for rural placements); Doc. No. 8-5 ¶¶ 23-24 (describing SEED grant intended to ease teacher shortage in rural Northeastern California, which was providing financial support to approximately 225 students and credential candidates).

[10] *See, e.g.*, Doc. No. 8-10 ¶¶ 6, 26 (describing TQP program to certify Early Childhood/Special Education or Math/Science teachers, which has produced 140 highly qualified STEM and special education teachers since 2009); Doc. No. 8-18 ¶¶ 5, 17 (describing grant program attempting to address critical shortages by producing 36 trained special education teachers—a position that is exceedingly hard to staff, in a district with an urgent need.)

[11] *See, e.g.*, Doc. No. 8-2 ¶¶ 3, 8 (describing TQP grant program designed to train more qualified special education teachers that are multilingual in order to better serve the district's large population of English Language Learners).

Plaintiffs' Memorandum of Law ISO Motion for Summary Judgment (1:25-cv-10548-AK)

### III. DEFENDANTS' EFFORTS TO CANCEL PROGRAMS THAT "PROMOTE," "TAKE PART IN," OR "INCORPORATE" DIVERSITY, EQUITY, OR INCLUSION

#### A. Campaign Against "DEI"

Beginning in January 2025, the Trump Administration issued a series of Executive Orders (collectively, "Anti-DEI Orders") seeking to eliminate an unspecified form of "DEI" programs, which it claims constitute illegal discrimination under federal law. Among other things, these Anti-DEI Orders directed the elimination of "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)" from all corners of the federal government[12] and required that government officials "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal . . . grants" and "terminate all 'diversity,' 'equity'. . . and like . . . programs, or activities."[13] Several courts have preliminarily enjoined enforcement of various aspects of the Anti-DEI Orders.[14]

Soon after, and in furtherance of the Anti-DEI Orders, Defendants undertook numerous actions. For example, on February 14, 2025, the Department issued a "Dear Colleague Letter" (DCL) purporting to "clarify and reaffirm the nondiscrimination obligations of schools and other entities that receive federal financial assistance" under Title VI, and "the Equal Protection Clause of the United States Constitution and other relevant authorities," in light of the Supreme Court's

---

[12] Executive Order No. 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," 90 Fed. Reg. 8,339 (Jan. 29, 2025).

[13] Executive Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8,633 (Jan. 31, 2025) (calling for the end of "dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility" (DEIA)" and "any programs promoting DEI"); *see also* Executive Order No. 14190, "Ending Radical Indoctrination in K-12 Schooling," 90 Fed. Reg. 8,853 (Feb. 3, 2025).

[14] *See, e.g.*, *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1234 (N.D. Cal. 2025); *Thakur v. Trump*, 787 F. Supp. 3d 955, 1006 (N.D. Cal. 2025); *City of Seattle v. Trump*, 2025 WL 3041905, at *12 (W.D. Wash. Oct. 31, 2025); *Martin Luther King Jr. Cnty. v. Turner*, 798 F. Supp. 3d 1224, 1255-56 (W.D. Wash. 2025); *In E.K. by & through Keeley v. Dep't of Def. Educ. Activity*, 2025 WL 2969560, at *21 (E.D. Va. Oct. 20, 2025).

Plaintiffs' Memorandum of Law ISO Motion for Summary Judgment (1:25-cv-10548-AK)

decision in *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) (*SFFA*).[15] The DCL advised that the Department considered any reliance on non-racial information as a proxy for race or use of racial preferences as illegal under *SFFA*.[16] Then, on February 27, 2025, the Department launched the "End DEI" portal, through which members of the public could report educators for "pushing critical theory, rogue sex education and divisive ideologies."[17] The DCL has since been declared unlawful and vacated, and the "End DEI" portal was preliminarily enjoined and subsequently shut down.[18]

### B.   The Directive And Directive Procedure

Against the backdrop of the administration's campaign against "DEI," on February 5, 2025, then-Acting Secretary Denise Carter issued an internal directive, entitled "Eliminating Discrimination and Fraud in Department Grant Awards." The Directive announced new priorities, including "ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that unlawfully discriminate on the basis of" protected characteristics. AR000139. To implement that new priority, the Directive prescribes the Directive Procedure, which requires "all ED personnel" to review all Department grants—including all "new grant awards," "notices of funding opportunities," and previously "issued grants"—for compliance with the Department's new objectives. *Id.* Pursuant to the Directive Procedure, personnel must ensure grants "do not fund

---

[15] *Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ., to Colleagues* (Feb. 14, 2025) at 1 (DCL), https://tinyurl.com/5n6f3h95.
    [16] *Id.* at 2; *see also Am. Fed'n of Tchrs. v. U.S. Dep't of Educ.*, 796 F. Supp. 3d 66, 117 (D. Md. 2025) (explaining that under DCL "any race-consciousness whatsoever could be defined as" DEI).
    [17] *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025), https://tinyurl.com/2h8563xy.
    [18] *See Am. Fed'n of Teachers*, 796 F. Supp. 3d at 123 (vacating DCL); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025) (enjoining the Department from implementing the "End DEI" portal).

discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives," and "ensure that all grants are free from fraud, abuse, and duplication." AR000139. And finally, "[g]rants deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements in the relevant award, agreement, or other instrument." AR000140 (citing 2 C.F.R. §§ 200.340(a)(4), 341). Within days of the issuance of the Directive, TQP and SEED grant recipients began to receive identical Termination Letters—customized only for the addressee, grant award number, and date—which mirrored the Directive's language. *See, e.g.*, AR000452-53 ("The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of [protected characteristics]").

The Department's implementation of the February Actions effectively required termination of any grant that even *mentioned* disfavored DEI principles or words, without regard to whether the grant at issue was engaged in any discriminatory or unlawful practices. Indeed, the Department's Chief of Staff, Rachel Oglesby, attested in this litigation that the Department compiled all grant applications for existing TQP and SEED grant recipients into a database "to determine whether they included *objectionable material associated with* DEI, such as cultural responsiveness, systemic privilege, racial justice, social justice, and anti-racism." Doc. No. 55-1 (Oglesby Declaration) ¶ 9 (emphasis added). The Oglesby Declaration describes several examples of the type of offending language in various TQP and SEED grant applications that were "flagged as funding DEI contrary to the Secretary's directive." *Id.* ¶¶ 11-16. Noticeably absent from the Oglesby Declaration, and the boilerplate Termination Letters sent to grantees, is any explanation as to how the flagged language in any given grant application meant that the grant program's

8

activities were alleged to be unlawful or discriminatory. *See id.*; *see also* AR000452-53 (example Termination Letter); Doc. No. 135 (Answer) ¶ 123 (admitting to using "common, template language"). Instead, the Oglesby Declaration and Defendants' Press Release, AR000141-42, indicate that the TQP and SEED programs were effectively eliminated pursuant to the February Actions because grant applications included various DEI buzz words, including "racial justice" and "cultural responsiveness."[19]

In their effort to effectively eliminate the TQP and SEED programs, Defendants did not stop at cancelling virtually every single grant awarded under the programs; they also withdrew the Notice Inviting Applications (NIA) for new grants under the SEED program, which had been issued in January 2025. They did not re-issue it or issue a new NIA for the SEED program for the remainder of FY 2025. *See* Withdrawal of Notice Inviting Applications (NIA) and Cancellation of the Competition for the Supporting Effective Educator Development (SEED) Program, 90 Fed. Reg. 11,411 (March 6, 2025).[20]

### C.    The February Actions Will Continue To Harm Plaintiffs

Defendants' abrupt elimination, pursuant to the February Actions, of almost every TQP and SEED program, in the middle of the academic year, with no prior warning, caused immediate

---

[19] The Oglesby Declaration mentions the terms: "cultural responsiveness," "systemic privilege," "racial justice," "social justice," and "anti-racism." Doc. No. 55-1 ¶ 9. The Department's press release announcing the cuts likewise states that grants were cancelled for their inclusion of words like, "Critical Race Theory," "Diversity, Equity, and Inclusion (DEI)," "social justice activism," "anti-racism," "white privilege" and "white supremacy." AR000141. The administrative record includes a printout of a third-party website, Defending Education, that purports to expose $1 billion in Department grant funding that has entrenched far-left ideologies in education. AR000118-38. While it is unclear what role that third-party website played in the Department's decision-making, even that printout contains no analysis of whether a particular program engaged in *discriminatory or unlawful* DEI.

[20] The Notice withdrawing the NIA for the SEED competition states that "[t]he Department intends to publish a new NIA for the SEED program, Assistance Listing Number 84.423A, in FY 2025." 90 Fed. Reg. at 11,412. However, no such NIA was ever published.

chaos across Plaintiffs' institutions, particularly for recipients who found out their grants had ended the very day Defendants issued their termination letters, regardless of the date received.[21] Plaintiffs, through their grantees, had to immediately assess the impact on their budgets for staff, coursework, partner organizations, school districts, and student populations; communicate programmatic changes to all identified and affected parties; and determine whether to end entire programs, some of which had been years in the making.[22]

With the passage of time, the immediate chaos and harm caused by the February Actions has given way to lasting damage. *See, e.g.*, Ex. 2 ¶¶ 4, 8; Ex. 3 ¶¶ 6, 8–10.[23] Having expended significant resources engaging in programmatic planning, years in advance, numerous grant recipients have now had to shutter their teacher preparation programs.[24] Many others had to significantly scale back their programs, cutting critical staff, services, and stipends, among other project activities.[25] Because many of the teacher residency programs have closed down, thousands

---

[21] *See, e.g.*, Doc. No. 8-3 ¶¶ 16–20; Doc. No. 8-4 ¶¶ 12–15; Doc. No. 8-5 ¶¶ 16–21; Doc. No. 8-6 ¶¶ 15–18; Doc. No. 8-8 ¶¶ 14–17; Doc. No. 8-9 ¶¶ 16–18; Doc. No. 8-12 ¶¶ 16–18; Doc. No. 8-14 ¶¶ 16–18; Doc. No. 8-18 ¶¶ 13–16.

[22] *See, e.g.*, Doc. No. 8-3 ¶ 22; Doc. No. 8-4 ¶¶ 18, 20; Doc. No. 8-5 ¶¶ 23–26; Doc. No. 8-6 ¶ 19; Doc. No. 8-8 ¶¶ 18–21; Doc. No. 8-10 ¶¶ 26–29; Doc. No. 8-11 ¶¶ 22–24; Doc. No. 8-12 ¶ 18; Doc. No. 8-18 ¶ 17.

[23] Citations to "Ex. _" refer to the exhibits of the Declaration of Adelaide Pagano. The Declaration attaches supplemental declarations from teacher preparation grant witnesses in Plaintiff States; those are attached as numbered exhibits and will be referred to herein as Exhibits 1 through 17. *See* Ex. 1 (University of Massachusetts); Ex. 2 (Boston Public Schools); Ex. 3 (California State University, Los Angeles); Ex. 4 (California State University, Chico; Ex. 5 (California State University, Chico); Ex. 6 (California Polytechnic State University, San Luis Obispo); Ex. 7 (California Polytechnic State University, San Luis Obispo); Ex. 8 (California State University); Ex. 9 (University of California, Los Angeles); Ex. 10 (The College of New Jersey); Ex. 11 (Montclair State University); Ex. 12 (University of Colorado Denver); Ex. 13 (Towson University); Ex. 14 (University of Maryland, College Park); Ex. 15 (City University of New York); Ex. 16 (State University of New York); Ex. 17 (University of Wisconsin-Madison).

[24] *See, e.g.*, Ex. 2 ¶ 4; Ex. 3 ¶ 6; Ex. 7 ¶ 5; Ex. 9 ¶ 5; Ex. 10 ¶ 5; Ex. 11 ¶ 8; Ex. 13 ¶ 5; Ex. 15 ¶ 5; Ex. 16 ¶ 5 ("The program was permanently closed.").

[25] *See, e.g.*, Ex. 2 ¶¶ 6–7; Ex. 6 ¶¶ 6–7 ("[A] small amount of discretionary funds and some small teacher stipends . . . were sufficient to support only eight third-year teachers as opposed to the approximately 200 teachers which would have been supported with the TQP grant funding."); Ex. 12 ¶ 6; Ex. 17 ¶ 5.

10

of would be teachers will no longer enter the workforce, exacerbating teacher shortages, particularly in high need subjects.[26] And Plaintiffs have been left without a critical tool to help address the shortages. Likewise, the continued existence of the Directive, which applies to all new grants going forward, has created uncertainty among Plaintiffs' institutions.[27]

Plaintiffs' institutions still need the TQP and SEED programs to address dire staff shortages.[28] But Plaintiffs are in the impossible position of determining whether to comply with federal laws like GEPA, which requires grant applicants to address "equitable access" and "barriers to equitable participation" in their grant applications, *see* 20 U.S.C. § 1228a(b), and the TQP and SEED statutes themselves, which require *inter alia* initiatives that promote diversity among the teaching workforce, equity among the student population, and support for students from diverse backgrounds and with diverse learning needs, on the one hand, and the February Actions on the other hand, which specifically single out applications that "promote or take part in" undefined "DEI." *See, e.g.*, Doc. No. 8-1 ¶ 18; AR000452. Faced with this choice, many of Plaintiffs' institutions are unsure they will receive a fair opportunity to apply for and be awarded future grants or whether to reapply for federal grants as long as the February Actions remains operative.[29]

---

[26] *See, e.g.*, Ex. 2 ¶ 9; Ex. 3 ¶ 13 ("Training for teachers, especially teachers of special needs students, has been made less or completely unavailable."); Ex. 7 ¶¶ 6-7; Ex. 9 ¶ 6; Ex. 11 ¶ 11; Ex. 13 ¶¶ 6-8; Ex. 15 ¶ 7 ("[T]he original grant was projected to recruit 120 teaching residents and leadership fellows that would have gone on to occupy permanent positions in high need areas of New York City Public Schools."); Ex. 16 ¶ 8.

[27] *See, e.g.*, Ex. 1 ¶ 7; Ex. 8 ¶ 11; Ex. 11 ¶¶ 7, 9, 14 ("The last year was extremely stressful for the university and for our student-residents in the UTR@MSU program. There was constant uncertainty over whether we could pay staff members, fear over whether we could continue to partner with our school districts, and doubt over whether students would receive their stipends and promised supports."); Ex. 14 ¶ 6; Ex. 15 ¶ 8; Ex. 17 ¶¶ 5-6.

[28] *See, e.g.*, Ex. 1 ¶ 9; Ex. 4 ¶ 7 ("Rural districts in [Butte and Tehama Counties] encounter ongoing challenges in recruiting and retaining qualified teachers because of geographic isolation, small applicant pools, and competition from larger districts."); Ex. 5 ¶¶ 6-7; Ex. 10 ¶ 6; Ex. 12 ¶ 7; Ex. 15 ¶¶ 7-8; Ex. 17 ¶ 6.

[29] *See, e.g.*, Ex. 1 ¶¶ 14–15; Ex. 3 ¶ 15; Ex. 7 ¶ 9; Ex. 11 ¶ 14; Ex. 12 ¶ 10; Ex. 16 ¶ 12; Ex. 17 ¶ 8.

## LEGAL STANDARD

Summary judgment is appropriate when there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). There is a genuine issue of fact only "where the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir. 2009) (citation modified). "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact. *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (citation modified).

As to Plaintiffs' constitutional claims, this Court has the "equitable power[]" to "enjoin unconstitutional actions by state and federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015), and summary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact.

For APA claims, a motion for summary judgment is "simply a vehicle to tee up a case for judicial review." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). The Court must set aside agency action that is arbitrary or capricious, "not in accordance with law[,]" "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A)-(C). Therefore, the court "review[s] an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious or otherwise unlawful." *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 121 (D. Mass. 2025) (citation modified). An agency action may be upheld only "on the basis articulated by the agency itself" at the time of the challenged action. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

**ARGUMENT**

**I.     PLAINTIFFS HAVE STANDING.**

To have standing, a plaintiff must "present an injury that is [1] concrete, particularized, and actual or imminent; [2] fairly traceable to the defendant's challenged behavior; and [3] likely to be redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (citation modified). At summary judgment, plaintiffs "must set forth by affidavit or other evidence 'specific facts'" to support standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)). Here, Plaintiffs have established several injuries in fact, all caused by the February Actions, and all redressable by this Court.

First, Plaintiffs, through their grantees, will likely be subject to the February Actions in the immediate future. The FY26 Act requires the Department to expend or obligate approximately $70 million and $90 million towards TQP and SEED, respectively, by the end of the fiscal year on September 30, 2026. *See supra*, p. 4. To meet that deadline, Defendants must first issue new NIAs for both programs. Plaintiffs' grantees who are interested in applying to those NIAs would, at that point, be subject again to Defendants' arbitrary and unlawful February Actions, which require ongoing review of new grant awards. AR000139.

Harms abound. Plaintiffs, through their grantees, will be put in the untenable position of having to choose between complying with GEPA and the TQP and SEED authorizing statutes—which require Plaintiffs to address equity and diversity, *see infra*, pp. 18–20, —or attempting to comply with the February Actions and avoiding even the mention of diversity, equity, and inclusion principles. Plaintiffs that do apply may be denied an award based on the Directive's mandate that "grants do not fund" projects inconsistent with the Department's shifting "policy objectives." AR000139. Plaintiffs whose applications are granted will again face the continuing threat that Defendants will arbitrarily re-review grants, including their prior applications, going

forward under the February Actions, including by searching for disfavored "DEI" terms. Thus, there exists "a substantial risk that the harm will occur." *Dep't of Com.*, 588 U.S. at 767.

Second, Plaintiffs have experienced actual harm,[30] as Defendants implemented the Directive to eliminate the federal teacher pipeline programs and virtually all TQP and SEED grants in Plaintiff States.[31] *See California v. U.S. Dep't of Educ.*, 132 F.4th 92, 100 (1st Cir. 2025) (explaining that Plaintiffs "provided detailed evidence" of harm, such as "staff layoffs, program disruptions, and the halting of stipends to currently enrolled teachers"); *cf. Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025) (per curiam) (accepting that Plaintiffs are harmed by "any wrongfully withheld funds"). That harm was clearly caused by the Directive, which requires that grants "be terminated." AR000140.

These actual and ongoing injuries can be redressed by this Court. First, prospective relief would prohibit future application of the February Actions, thus making funds available—for the first time in about a year—to support TQP and SEED projects in Plaintiff States. And as noted, Plaintiffs are interested in applying to future TQP and SEED competitions.[32] Separately, declaratory relief would resolve critical issues for Plaintiffs should they proceed to the Court of Federal Claims (CFC) for monetary relief stemming from the abrupt termination of the TQP and SEED grants at a later date, as the Supreme Court has suggested may be appropriate. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (*NIH III*) (Barrett, J.,

---

[30] *See, e.g.*, Doc. No. 8-1 ¶ 22; Doc. No. 8-4 ¶ 18; Doc. No. 8-7 ¶ 20; Doc. No. 8-9 ¶ 22; Doc. No. 8-10 ¶ 29.

[31] *See, e.g.*, AR000452–53; AR000852–53; AR001470–71; AR001765–66; AR002028–29; AR002392–93; AR002708–09; AR003057–58; AR003304–05; AR003546–47; AR003789–90; AR004031–32; AR004384–85; AR004676–77; AR004901–02; AR005218–19; AR005894–95; AR006122–23; AR006371–72; AR007037–38; AR007167–68; AR007422–23; AR008005–06; AR008511–12; AR008830–31; AR009142–43; AR009531–32; AR009779–80; AR009999–10000; AR010947–48; AR011221022; AR011771; AR011987–88; AR012193–94; AR012410–11; AR012761–62; AR013128–29; AR013361–62; AR013633–34.

[32] *See, e.g.*, Ex. 1 ¶ 14–15; Ex. 7 ¶ 9; Ex. 11 ¶ 14; Ex. 12 ¶ 10; Ex. 13 ¶ 10; Ex. 16 ¶ 12; Ex. 17 ¶ 8.

14

concurring) (calling for "[t]wo-track litigation" between the district court and CFC); *Massachusetts Delivery Ass'n v. Coakley*, 769 F.3d 11, 17 (1st Cir. 2014) (declaratory relief need only "lift a bar" to plaintiffs' complete relief to satisfy Article III). For both reasons, this Court can redress Plaintiffs' clear injury already caused by the February Actions.

Finally, Plaintiffs have standing to challenge the February Actions as they violate Plaintiffs' procedural rights, including to notice-and-comment rulemaking required by GEPA before changing the priorities or conditions for grantmaking. *See infra*, pp. 17–19. Plaintiffs maintain a "concrete interest that is affected by the deprivation" of such procedural rights, which is ongoing and affects future TQP and SEED grant awards. *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (citation modified).

## II.    THE FEBRUARY ACTIONS VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.

### A.    The February Actions Are Final Agency Action (Counts I & II).

The February Actions constitute final agency action which Plaintiffs can challenge under the APA's "generous review provisions." *See Bennett v. Spear*, 520 U.S. 154, 163 (1997) (citation modified). Only two conditions are required for finality: the challenged action "(1) marks the consummation of the agency's decisionmaking process and (2) is an action by which rights or obligations have been determined, or from which legal consequences will flow." *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (citation modified). The final agency action analysis is "pragmatic," *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016) (citation modified), and "requires focus on the practical and legal effects of the agency action, not on labels, and finality is interpreted in a pragmatic and flexible manner." *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (citation modified); *see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 791 F. Supp. 3d 119, 175–76 (D. Mass. 2025) (*NIH I*) (finding that the challenged directives were final agency action), *stay granted in part and denied in part,* 145 S. Ct.

15

2658 (2025).

The February Actions easily clear this hurdle. The Directive announced new Department priorities, including "ensuring that the Department's grants do not support programs or organizations that promote or take part in [DEI]." AR000139. To implement this new priority, Department personnel were ordered to follow the Directive Procedure and review all new, pending, and issued grant awards to "ensur[e] that Department grants do not fund discriminatory practices" that "are either contrary to law or the Department's policy objectives," and "to ensure that all grants are free from fraud, abuse, and duplication." *Id.* Personnel were directed to terminate any grants "deemed inconsistent with these priorities." AR000140. Far from "tentative or interlocutory," *Hawkes Co.*, 578 U.S. at 597, the Directive set forth the Department's final determination that any grants that "are 'contrary . . . to the Department's policy objectives'" must be terminated.

The final nature of the February Actions is reinforced by the fact that just days later, the Department began terminating grants awarded under the TQP and SEED programs *en masse*, *see supra*, p. 10 n.21; Doc. No. 135 ¶¶ 121, 123, and took other actions to terminate or cease funding for other grant awards that it claims do not meet its new priorities. *See Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1245 (9th Cir. 2026) (*Washington II*) (finding that the Directive "had binding legal effect upon grant programs" as it "mandated an across-the-board review of all new grant awards and the re-review of all issued grants in accordance with the Department's new policy objectives, resulting in the discontinuation of grants in Plaintiff States"). The swift action taken by the Department to implement the February Actions demonstrates that they were binding on Department personnel. *See Biden v. Texas*, 597 U.S. 785, 808–09 (2022); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (noting that "an agency pronouncement will be considered

16

binding" "if it either appears on its face to be binding," or "is applied by the agency in a way that indicates it is binding"). And, "legal consequences" plainly "flowed" from the Directive—grantees lost access to previously awarded funds due to the resulting grant terminations. *See Rhode Island v. Trump*, 810 F. Supp. 3d 283, 302 (D.R.I. 2025) (loss of grant funds was a "legal consequence" of agency "policy to eliminate all non-statutorily required activities and functions" (citation modified)); *Texas v. Cardona*, 743 F. Supp. 3d 824, 838, 839–47 (N.D. Tex. 2024) (guidance documents impacting "Texas educational entities that accept federal dollars" were final agency action). Because the February Actions mark the consummation of Defendants' decisionmaking process and determine the rights of Plaintiffs' grantees, the February Actions are final agency action for purposes of the APA.

### B.    The February Actions Are Contrary To Law (Counts II & III).

For at least three independent reasons, the February Actions are contrary to law.

#### 1.    The February Actions Require Review of Funding on the Basis of Anti-"DEI" Priorities Not Authorized by Law.

Defendants' February Actions are contrary to law, first, because they require termination on the basis of policy considerations—namely, a policy against funding anything related to diversity, equity, or inclusion—contrary to the TQP and SEED authorizing statutes and GEPA.

The February Actions require termination of grants relating in any way to equity. The Directive announces the Department's priority "of ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion (DEI) initiatives," and requires that Department personnel ensure grants "do not fund" DEI initiatives and terminate all grants "deemed inconsistent with" that priority. AR000139–40. The Directive does not define "DEI," but contemporaneous material—including the Executive Orders that immediately precipitated the Directive, and the DCL—construe DEI as a vague and amorphous

17

"guise" or "banner" for any equity-related programs or initiatives that the administration does not like. *See supra*, pp. 6–9.

Confirming the point, Defendants implemented the Directive Procedure by searching for awards that mentioned any words related to diversity, equity, or inclusion, and then terminating the offending awards. Defendants admit this, explaining that Defendants reviewed TQP and SEED applications to determine whether they "included objectionable material *associated with* DEI, such as cultural responsiveness, systemic privilege, racial justice, social justice, and anti-racism," and terminated all grants "that *incorporated* DEI." Doc. No. 55-1 ¶¶ 9, 20 (emphasis added). The Department's press release also confirms this, explaining that the Department terminated funding for teacher training programs that "included *inappropriate and unnecessary topics* such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism; 'anti-racism'; and instruction on white privilege and white supremacy," among others. AR000141 (emphasis added).

There is simply no way to reconcile the Directive's requirement to search-and-destroy anything relating to "DEI" with applicable law. Congress created the TQP and SEED grant programs to recruit and train highly qualified individuals to serve as teachers in underserved schools districts and high-need subject areas. *See* 20 U.S.C. §§ 1022, 1022a, 1022h, 6672. To achieve these goals, Congress required by statute that grant recipients embrace the principles of diversity, equity, and inclusion in various ways. *See supra,* pp. 2–4. Separately, GEPA's Equity Directive expressly requires that any applicant for grant funding describe in their application steps "to ensure equitable access to, and equitable participation in," the project, including "by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a(b); *see Council for Opportunity in Educ. v. U.S. Dep't of*

18

*Educ.*, No. 25-CV-03491 (TSC), 2026 WL 120984, at \*2 (D.D.C. Jan. 16, 2026) ("This requirement is commonly referred to as the GEPA Equity Directive.").

In sum, TQP and SEED expressly require initiatives that promote diversity among the teaching workforce, equity among the student population and as to schools in underserved locations, and support for students from diverse backgrounds and with diverse learning needs. *See supra,* pp. 2–4. And GEPA further requires that applications for funding address equity and ensure equitable access to, and equitable participation in, funded projects or activities. Because applicable law "bakes into its core principles of diversity, equity, [and] inclusion," *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 750 (N.D. Cal. 2025), it is difficult "to conceive of any grant" issued under the TQP or SEED programs that would *not* address equity. *Cf. Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 991 (N.D. Ill. 2025) (court "is unable to conceive of any grant issued under" the federal Women in Apprenticeship and Nontraditional Occupations Act that would not be subject to federal directive to terminate equity-related grants). Because the February Actions require termination wherever grantees do so, they are thus contrary to law.

### 2. The February Actions Require Review of Funding on the Basis of New Priorities Not Set Through Notice and Comment.

The February Actions are also contrary to law because they require termination on the basis of priorities not set through notice-and-comment rulemaking. Although the APA generally exempts grants from the rulemaking process, *see* 5 U.S.C. § 553, GEPA removes that exemption for the Department, with exceptions that do not apply here. 20 U.S.C. § 1232. Under GEPA, a "regulation" subject to notice and comment includes "[1] any generally applicable rule, regulation, guideline, interpretation, or other requirement that [2] is prescribed by the Secretary or the Department; and [3] has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program.'" *Washington II*, 167 F.4th at 1245 (quoting 20

U.S.C. § 1232(a)); *see also* 20 U.S.C. § 1232e-4.

Here, the February Actions are unquestionably "prescribed by" the Department, *see* AR000139, and announce a "generally applicable rule" to review all new and existing grants against the Department's new priorities. *See id.*; *Washington v. United States Dep't of Educ.*, 813 F. Supp. 3d 1222, 1245 (W.D. Wash. 2025) (*Washington I*) ("[T]he Directive ordered an across-the-board re-review of Department grants, including those previously awarded, and measured them against new criteria."); *see also Washington II*, 167 F.4th at 1245 (Department's generic mass discontinuation decisions "guided by generally applicable policy criteria" set by the Directive). The February Actions also have a "legally binding effect" by requiring review and termination of existing awards. *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 855 (D. Md. 2025) ("'[D]epartment priorities' are established by the Secretary or Department and grant recipients must abide them to avoid award cancellation – which is to say, they are legally binding on the federal award recipient."); *cf. Washington I*, 813 F. Supp. 3d at 1244 ("The text of the Directive confirms" it "had legally binding effect" where it "resulted in the discontinuation of grants in Plaintiff States."). The February Actions thus trigger GEPA rulemaking. *See id.* (GEPA's rulemaking applies "to rules imposed at the beginning of a grant contest" as well as "to rules imposed at any other point in time").

Allowing grant terminations based on unpublished priorities not produced through notice-and-comment would run counter to other carefully reticulated requirements that direct agencies to clearly define their program goals and funding priorities at the outset of the grant, provide public notice of these goals and priorities, and measure progress against those defined goals. *See, e.g.*, 31 U.S.C. § 1122. Department regulations require notice-and-comment rulemaking for priorities used at the start of any competitive grant competition, including for TQP and SEED. *See* 34 C.F.R.

20

§ 75.105(b)(1). The Department accordingly went through notice and comment to establish priorities for all of Plaintiffs' TQP and SEED grant awards here. *See supra*, pp. 4–6. The Department also went through this process in late 2025, finalizing priorities for future NIAs, and noted that the prior priorities "remain in effect" until the new priorities were finalized after notice and comment. [33] But critically, the Department never went through notice-and-comment to promulgate the new priorities underlying the Directive. *See* Doc. No. 135 ¶ 185.

It was required to do so. And "if a statute requires rulemaking, the affected agency must comply." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 565 (2025). For these reasons, Defendants' February Actions are contrary to law.

### 3. The February Actions Require Review of Funding on the Basis of New Priorities, in Violation of 2 C.F.R. § 200.340.

The February Actions are also contrary to 2 C.F.R. § 200.340, which in some cases permits an agency to terminate an existing grant if it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Contrary to Section 200.340, the February Actions direct the termination of grant awards based on *new* agency priorities, improperly expanding Section 200.340, which only contemplates termination using *established* agency priorities.

Starting with the plain language of Section 200.340, termination of a grant award may be permitted if the award "no longer effectuates *the* program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added); *see Jette v. United of Omaha Life Ins. Co.*, 18 F.4th 18, 26 (1st

---

[33] Since this case was filed, the Department went through the notice-and-comment process to finalize priorities for future NIAs. *See* 90 Fed. Reg. 43,514 (Sept. 9, 2025). Notably, the Department's final priorities—which relate to promoting evidence-based literacy, expanding education choice, and returning education to the States—do not address DEI. *Id.* Thus, even if Defendants were to award new TQP and SEED grants tomorrow based on the priorities they established after this case was filed, the anti-"DEI" policy embodied in the Directive would *still* not be a valid basis on which to measure grant applications because no such priority has ever been the subject of notice-and-comment rulemaking.

Cir. 2021) (Courts construe federal regulations by "applying general rules of statutory construction and starting with the plain language of the regulation."). Generally, "the" is a "function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context." *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005) (alteration in original)); *see Gale v. First Franklin Loan Servs.*, 701 F.3d 1240, 1246 (9th Cir. 2012) ("In construing a statute" or regulation, "the definite article 'the' particularizes the subject which it precedes and is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" (citation modified)). So, "the" program goals or agency priorities means not just *any* goals or priorities that agencies identify whenever they wish, but rather the *specific* goals and priorities at the time of the initial award.

The regulation also makes clear that it can only be used to terminate an award that "*no longer* effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added). The phrase "no longer" implies "once did." *See, e.g.*, *No Longer*, Merriam-Webster.com, https://tinyurl.com/44br3n6e ("used to say that something that *was once true* or possible is not now true or possible" (emphasis added)) (last visited April 13, 2026); *No Longer*, Cambridge Dictionary, https://tinyurl.com/5n83zhxv ("*in the past* but not now" (emphasis added)) (last visited April 13, 2026). Applied here, that an award "no longer effectuates" certain program goals or agency priorities means the award "once did effectuate" those goals and priorities. This straightforward reading works if the goals or priorities are fixed at the start: a grantee clearly met existing program goals or agency priorities when the agency issued the award, and the grantee must continue to meet those same goals or priorities to satisfy the regulation's language.[34] That

---

[34] This straightforward reading is also how 2 C.F.R. part 200 elsewhere uses "no longer." *See, e.g.*, 2 C.F.R. §§ 200.311 (addressing grantee's disposition of real property that "is no longer needed *for the originally authorized purpose*" (emphasis added)), 200.315 (same, for intangible (continued…)

reading is impossible, however, if the goals or priorities can be changed midstream, as Defendants claim: a grantee could never have met program goals that did not exist when the agency issued the award.[35]

The regulation's rulemaking history confirms this reading. When OMB first added the language in 2020, OMB was broadly focused on "enhanced results-oriented accountability for grants" and sought to reallocate federal grant managers' "time to analyze data to improve results." 85 Fed. Reg. 49,506 (Aug. 13, 2020). Specifically addressing 2 C.F.R. § 200.340, OMB intended the language "to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals." *Id.* at 49,507. OMB then identified two scenarios where an award would no longer do so: (1) where "*additional evidence* reveals that a specific award objective is ineffective at achieving program goals" or (2) where "*additional evidence* may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award." *Id.* at 49,507–08 (emphasis added). Like the phrase "no longer effectuates," the term "additional evidence" implies that the agency's original goals and priorities have held steady—all that has changed is that new evidence indicates the award does not serve those original goals and priorities.

Allowing terminations based on mid-award priority shifts would render superfluous the other provisions circumscribing when agencies can terminate existing grants. *See, e.g.*, 2 C.F.R. § 200.340(a)(1)–(3). In other words, there would be no need for agencies to invoke the narrow circumstances of those parallel provisions if they could simply invoke whatever priorities they wish, new or old, and terminate grants on that basis. *See, e.g.*, *Fischer v. United States*, 603 U.S.

---

property), 200.511(b)(3) (addressing audit requirements where auditee believes prior year audit findings "are no longer valid").

[35] Defendants try to avoid the regulation's "no longer effectuating" language by requiring termination of awards merely "deemed inconsistent with" agency priorities. AR000140. But 2 C.F.R. § 200.340 demands more.

480, 498 (2024) ("Although the Government's all-encompassing interpretation may be literally permissible, it defies the most plausible understanding . . . and it renders an unnerving amount of . . . text mere surplusage."). Even if federal agencies "could theoretically issue such a rule, we presume that they, no less than Congress, do not 'hide elephants in mouseholes.'" *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 203 (5th Cir. 2019); *accord Penobscot Nation v. Frey*, 3 F.4th 484, 506 (1st Cir. 2021). This Court should not "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019).

In sum, 2 C.F.R. § 200.340's language contemplates termination only where an award "no longer effectuates" *established* agency priorities.[36] Defendants' February Actions, requiring termination of grants "deemed inconsistent with" *new* agency priorities, are thus contrary to law.

### C. The February Actions Are Arbitrary & Capricious (Count I).

The APA requires courts to hold unlawful and set aside as "arbitrary and capricious" a final agency action that is not the product of "reasoned decisionmaking." *See* 5 U.S.C. § 706(2)(A); *see State Farm,* 463 U.S. at 43, 52. An agency's decision must be "reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), with the agency "set[ting] forth its reasons for decision," *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation modified). Agencies must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785. Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* at 784–85.

---

[36] And even there, termination pursuant to Section 200.340 is authorized only "pursuant to the terms and conditions of the Federal award." 2 C.F.R. § 200.340(a)(4); *see Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 670 (S.D.N.Y. 2025) (explaining that Section 200.340 "does not create a default ability" to terminate federal awards on the basis of a change of agency priorities, and rejecting federal agency's argument that Section 200.340 "requires" all federal awards to permit termination on such grounds).

24

Here, Defendants' February Actions are arbitrary and capricious in multiple ways.

First, the February Actions are not reasonably explained. It is "a fundamental requirement of administrative law . . . that an agency set forth its reasons for decision." *Amerijet*, 753 F.3d at 1350. "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Id.* (quotation marks omitted and emphasis in original). The Directive declares that the Department's grants must not support "programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that unlawfully discriminate," and it requires that "Department personnel . . . conduct an internal review of all . . . grants" to ensure that they "do not fund discriminatory practices—including in the form of DEI—that are *either* contrary to law *or* to the Department's policy objectives." AR000139 (emphasis added). But nowhere does the Directive define what it means by "DEI" or explain how such DEI initiatives might violate anti-discrimination laws, nor does it explain *how* grants will be evaluated to achieve the stated ends. The vague and conclusory nature of the Directive makes it impossible for a Court to evaluate the Defendants' decisionmaking. *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."); *State Farm*, 463 U.S. at 43 (reasoned explanation must include a "rational connection between the facts found and the choice made" (citation modified)).[37] The Termination Letters echo this same vague language.

Second, the February Actions are arbitrary and capricious because Defendants did not

---

[37] Insofar as Defendants claim the Directive was undertaken in furtherance of the President's Executive Orders, they "cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant [Executive Order]. After all, 'furthering the President's wishes cannot be a blank check' for the Agencies to do as they please." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025) (citation modified); *see also Kingdom v. Trump*, No. 1:25-cv-00691, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025).

acknowledge, much less provide good reasons for, their apparent change in agency policy "priorities." An agency changes its position when it acts inconsistently with an earlier position, performs a reversal of its former views as to the proper course, or disavows prior, inconsistent agency action. *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569–70 (2025). An agency must both "display awareness that it is changing position" and "show that there are good reasons" for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Here, the February Actions implement an agency policy priority that reinterprets existing anti-discrimination laws to conclude that an undefined category of "DEI initiatives" is discriminatory and unlawful. This policy priority is a stark departure from the positions the Department has taken in the past. Former Trump Administration Secretary of Education Betsy DeVos previously extolled the benefits of diversity, equity, and inclusion, as "key elements for success" for "building strong teams,"[38] and as recently as 2023, the Department repeatedly took the position that DEI initiatives were permissible and desirable.[39] Moreover, Plaintiffs applied for and received grants in reliance on the published priorities in effect at the time, which encouraged applicants to address diversity, equity, and inclusion. *See* Doc. No. 112 ¶ 66; *see also supra*, p. 5.[40] Under these circumstances, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 516. But as explained above, the Directive contains no explanation as to what is meant by "DEI," much less how said "DEI" could violate anti-discrimination law or how grants should be

---

[38] Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives Celebrated in His First Term*, N.Y. Times (Feb. 14, 2025), https://tinyurl.com/27zezebu.

[39] *See, e.g.*, U.S. Dep't of Educ., *Questions and Answers Regarding the Supreme Court's Decision in* Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina (Aug. 14, 2023), https://tinyurl.com/4tz9hu8d.

[40] These priorities, published through notice-and-comment rulemaking, included things like, "Promoting Equity in Student Access to Educational Resources and Opportunities," "Supporting a Diverse Educator Workforce and Professional Growth To Strengthen Student Learning," and "Meeting Student Social, Emotional, and Academic Needs." *See supra*, pp. 4–5.

reviewed for offending DEI initiatives. This failure is arbitrary and capricious.

Third, the February Actions fail to consider the harm caused by the elimination of the TQP and SEED programs and Plaintiffs' reliance on the Department's previous policy and priorities. Where an agency is "not writing on a blank slate," it must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020); *see also Fox Television Stations*, 556 U.S. at 515 (where "prior policy has engendered serious reliance interests," agency must provide "a more detailed justification" for new policy). Here, Plaintiffs applied for and received grants in reliance on the published priorities in effect at the time, which included principles of and adherence to creating programs that incorporated diversity, equity, and inclusion. *See* Doc. No. 112 ¶ 66; *see also supra*, pp. 4–5. The Directive dictates that the very priorities that Plaintiffs' projects strove to fulfill must now be counted against them. This scenario is the epitome of a change in course that requires an agency to account for Plaintiffs' reliance interests. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). But the record lacks any consideration of the February Actions' impact on Plaintiffs, their programs, the student teachers enrolled in those programs, and the students affected by the ongoing teacher shortage.[41] This failure to consider the reliance engendered by the previous, published priorities, and the harm caused by the Directive, is arbitrary and capricious.

Fourth, the February Actions are arbitrary and capricious insofar as they fail to consider less disruptive, alternative means of fulfilling the Department's goals. "[W]hen an agency rescinds

---

[41] The failure to consider harm or reliance interests is clear on the face of the Directive; however, it is further borne out by the implementation of the Directive. With no prior notice, virtually every single grant recipient under the TQP and SEED programs received an identical Termination Letter, which took *immediate* effect. The form letters did not provide any facts specific to the grant project or how it had allegedly violated the law, nor did the letters acknowledge any change in policy by the Department or acknowledge the Plaintiffs' reasonable reliance on the prior, published policies and priorities of the Department.

a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy],'" *Regents of the Univ. of Cal.*, 591 U.S. at 30, though it need not "consider all policy alternatives in reaching [its] decision." *State Farm*, 463 U.S. at 51. Indeed, federal regulations *require* the Department to afford grant recipients an opportunity to remedy any alleged issues prior to termination. *See* 2 C.F.R. §§ 200.339, 200.208(c) (permitting grant termination only after agency "determines that noncompliance cannot be remedied by imposing specific conditions," such as by requiring technical or management assistance). Here, the Department flouted the law and regulations: it did not consider whether its new anti-"DEI" policy could be furthered in a less disruptive manner—such as by providing pre-termination notice and an opportunity for grantees to address the issues identified by the Department—and there is nothing in the record showing that they considered any other means of carrying out their goals.

Fifth, the February Actions are arbitrary and capricious insofar as they require termination based on new priorities that are contrary to priorities duly established through notice-and-comment rulemaking. *See* 20 U.S.C. § 1232(d); 34 C.F.R. § 75.105(b). Indeed, it is the embodiment of arbitrariness to eliminate grant projects for violating previously unannounced and unpublished anti-"DEI" priorities that are entirely at odds with the lawfully-adopted priorities in effect when the grants were issued.

Last, the February Actions are arbitrary and capricious insofar as they require the elimination of these programs based on policy considerations that are contrary to the TQP and SEED authorizing statutes and GEPA. *See* 20 U.S.C. §§ 1022e(b)(4), 6672(a)(1), 1022a(d)(1)(A)(ii), 1228a(b). An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Here, a new Departmental priority to eliminate funding of DEI and equity-related programs is plainly *not*

28

a factor Congress intended the Department to consider in reviewing grants under the TQP and SEED programs because the statutes authorizing these grant programs expressly *require* initiatives that promote diversity among the teaching workforce[42] and equity among the student population,[43] as well as support for students from diverse backgrounds and with diverse learning needs.[44] *See generally* 20 U.S.C. §§ 1022e(b)(4), 6672(a)(1), 1022a(d)(1)(A)(ii), 1228a(b). Likewise, GEPA requires that the Secretary of Education "require" all grant applicants to describe in their grant applications the steps that they will take to ensure "equitable access" and "overcome barriers to equitable participation" in grant projects. 20 U.S.C. § 1228a(b).

## III.    THE FEBRUARY ACTIONS VIOLATE THE CONSTITUTION.

### A.    The February Actions Violate The Spending Clause (Count IV).

The Spending Clause vests the spending power in Congress alone, authorizing it to raise and spend money for the "general Welfare" of the United States. U.S. Const. Art. I, § 8, cl. 1. Incident to the spending power, "Congress may attach conditions on the receipt of federal funds," *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But this power "is of course not unlimited," *id.* at 207, and several limitations apply to Congress and to federal agencies when adopting or enforcing spending conditions. *Id.*; *see, e.g.*, *New York v. U.S. Dep't of Health & Human Servs.,* 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019).

Notably, the Spending Clause requires that any conditions imposed on funding must

---

[42] The TQP authorizing statute describes one of the purposes of the program is to "recruit highly qualified individuals, *including minorities* and individuals from other occupations, into the teaching force." 20 U.S.C. § 1022(4) (emphasis added).

[43] The SEED authorizing statue directs that among other purposes, its grant recipients should provide teachers, principals, and school leaders "from nontraditional preparation and certification routes or pathways to serve in traditionally underserved" schools. 20 U.S.C. § 6672(a)(1).

[44] The TQP authorizing statute requires grant recipients to assure that "general education teachers receive training in providing instruction to diverse populations, including children with disabilities, limited English proficient students, and children from low-income families," 20 U.S.C. § 1022e(b)(4).

be identified "unambiguously," allowing "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207–11; *accord Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *Arlington Cent. School Dist. Bd. of Educ v. Murphy*, 548 U.S. 291, 296 (2006). The Spending Clause requires that conditions be clear so that grantees considering accepting funds can understand what is required of recipients. *See Arlington*, 548 U.S. at 296 (explaining that Spending Clause ambiguity is viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the funds] and the obligations that go with those funds"); *see also Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 96 (D.R.I. 2025) (grant condition failed to "defin[e] what compliance entails," "provide[d] no meaningful standards," and was "hopelessly vague," such that "States cannot predict how DHS will interpret these vague terms, yet they risk losing billions in federal funding for any perceived violation").

Here, the February Actions alter the conditions upon which the grants were obligated and disbursed, contrary to Congressional authority and in violation of the Spending Clause. The Directive Procedure seeks to impose the Directive's vague, anti-"DEI" conditions retroactively, well-after Plaintiffs had accepted the federal funding—and in the middle of a school year and budget cycle. Congress's spending powers "do[] not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012). "Once a State has accepted federal funds, the Government may not change the conditions such that it "accomplishes a shift in kind, not merely degree." *Sebelius*, 567 U.S. at 583. And the Department cannot be permitted to accomplish what Congress itself is prohibited from doing by retroactively imposing new conditions on funds that are directly at odds with the conditions in place at the time the funds were awarded and accepted

30

by Plaintiffs' institutions. Insofar as Defendants through an internal Directive now assert the authority to unilaterally terminate grants under 2 C.F.R. § 200.340 based on changed "priorities" that were never subject to notice-and-comment rulemaking, this reinterpretation of the law itself amounts to a retroactive condition on TQP and SEED funding. *See San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 745–750 (N.D. Cal. 2025) (plaintiffs likely to succeed on Spending Clause claim where new anti-equity Directive and grant conditions were impermissibly vague).

The Spending Clause also prohibits imposing conditions "unrelated to the federal interest in particular national projects or programs" funded under the legislation. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003) (citing *Dole*, 483 U.S. at 207–08). Here, the February Actions' imposition of anti-"DEI" principles are not reasonably related to the federal interests animating the TQP and SEED programs, which seek to support and encourage the development of effective K-12 teachers nationwide in traditionally underserved areas, for hard-to-serve subjects, and for diverse populations. As in other cases where courts have found unrelated conditions on federal spending unconstitutional, this Court should likewise find that the imposition of anti-"DEI" principles on grant program projects that are intended to *support* educator diversity and increase the pool of qualified teachers, bears no relationship to the purpose of the spending. *See, e.g.*, *San Francisco Unified Sch. Dist.*, 789 F. Supp. 3d at 750–751 (finding Plaintiffs were likely to succeed on their claims that anti-equity Directive and grant conditions violated the Spending Clause because "they lack an adequate nexus to the purposes of AmeriCorps' funding program"); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 642 (E.D. Pa. 2017) ("Immigration law has nothing to do with the enforcement of local criminal laws."); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 959 (N.D. Cal. 2018), *aff'd in part, vacated in part sub nom. City & Cnty. of*

31

*San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020) ("The Byrne JAG programs that are at risk of losing funding because of the access and notice conditions do not relate to immigration enforcement.").

### B. The February Actions Violate Separation Of Powers And Are Ultra Vires (Counts V & VI).

The February Actions, as applied to the TQP and SEED programs, violate the Separation of Powers by usurping legislative authority for federal education funding. The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see Trump v. United States*, 603 U.S. 593, 637–38 (2024). Article I of the Constitution grants Congress the exclusive power of the purse, U.S. Const. art. 1, § 8, cl. 1, and the exclusive power to legislate. U.S. Const. art. I, § 1.

The Executive Branch, on the other hand, is charged with ensuring that the laws created by Congress be "faithfully executed." U.S. Const. art. II, § 3. The Executive Branch lacks authority to enact, amend, or repeal statutes, *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), or to unilaterally refuse to spend congressionally appropriated funds. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring); *see also Rhode Island v. Trump*, 810 F. Supp. 3d 283, 309–10 (D.R.I. 2025) (granting summary judgment to plaintiff states challenging unilateral dismantling of seven federal agencies, noting "[t]he Separation of Powers is a principle that is integral to our democracy").

Here, Defendants violated the Separation of Powers by substituting their priorities for the careful judgment of Congress. Congress created and funded the TQP and SEED grant programs to recruit and train highly qualified individuals to serve as teachers in underserved schools districts and high-need subject areas. *See* 20 U.S.C. §§ 1022, 1022a, 1022h (TQP); *id.* § 6672 (SEED). To achieve these goals, Congress requires that grant recipients undertake steps to diversify their

32

teaching workforce and to better support diverse student populations, including English Language Learners and students with disabilities. *See supra*, pp. 3–4. Likewise, through the GEPA Equity Directive, Congress additionally requires grant applicants to provide detailed steps they will take to "ensure equitable access to, and equitable participation in, the[ir] project" notwithstanding "barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a(b). The February Actions impose standards that run directly contrary to the standards promulgated by Congress in these statutes. The Executive cannot displace Congress's priorities for its own. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" (citation modified)). By relying on the Directive to terminate the TQP and SEED programs and usurping Congress' legislative authority, Defendants violated the Separation of Powers.

For the same reasons, the February Actions are ultra vires as they are contrary to law and outside of Defendants' authority. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949). "[U]ltra vires relief is designed to permit courts to 'reestablish the limits' on executive authority when it acts 'beyond its authority.'" *Victim Rights Law Ctr. v. U.S. Dept. of Educ.*, 788 F. Supp. 3d 70, 93 (D. Mass. 2025) (quoting *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172–73 (D.C. Cir. 2003)). Such relief is appropriate here.

IV.    **PLAINTIFFS ARE ENTITLED TO VACATUR AND DECLARATIVE AND INJUNCTIVE RELIEF.**

A.    **Plaintiffs Are Entitled To Vacatur Of The February Actions.**

The APA empowers federal courts to "hold unlawful and set aside agency action" that is arbitrary and capricious, contrary to law, or otherwise violative of the APA. 5 U.S.C. § 706(2). "The normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 329 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026); *see also NIH III*, 145 S. Ct. at 2662 n.1 (Barrett, J., concurring) ("If a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward.").

Here, for the reasons stated above, the February Actions violate the APA, and thus the "normal remedy" of vacatur is appropriate. Vacatur of the Directive and Directive Procedure is especially warranted in this case given the severity of Defendants' actions and the devastating impact on Plaintiffs' institutions of higher education, countless students, educators, and schools. *See supra*, pp. 10–12. In *Washington I*, 813 F. Supp. 3d at 1248–49, the district court vacated a similar procedure, pursuant to the same Directive at issue here, that led to the unlawful discontinuation of grants after finding "serious, fundamental errors in the Department's Directive procedure that led to unlawful discontinuation of the Grants at issue" and "that those actions caused significant disruption to Plaintiff States." This Court should do the same here.

B.    **Plaintiffs Are Entitled To Declaratory Relief.**

In addition to vacatur, the APA and Declaratory Judgment Act both empower courts to provide declaratory relief. 5 U.S.C. § 703; 28 U.S.C. § 2201(a). In considering whether declaratory relief is appropriate, courts consider whether "an actual controversy exists," and whether such relief would "serve a useful purpose in either clarifying and settling legal relations or finally ending

the controversy giving rise to the proceedings." *Associated Gen. Contractors of Mass. v. Bos. Dist. Council of Carpenters*, 642 F. Supp. 1435, 1441 (D. Mass. 1986). In the agency context, declaratory relief may "guide an agency as it decides upon its future course of conduct," and is "well within the scope of the APA." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 50–51 (1st Cir. 2025) (*NIH II*), *rev'd in part on other grounds*, *NIH III,* 145 S. Ct. 2658; *see also New York v. Trump*, 811 F. Supp. 3d 215, 244 (D. Mass. 2025).

Here, both considerations are met. First, an actual controversy exists because Plaintiffs remain at risk of Defendants' enforcing the Directive Procedure against them in the immediate future. *See supra,* pp. 13–14. Second, an Order declaring the Directive to be unlawful would end the controversy giving rise to this lawsuit by eliminating the risk that Defendants will again rely on the arbitrary and unlawful Directive to terminate future TQP and SEED awards. *See Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 16 n.1 (1st Cir. 1982) (noting that declaratory relief was proper because it would "resolve the present controversy"). In addition, declaratory relief would serve "a valuable purpose" in enabling Plaintiffs "to clarify legal rights and obligations," *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995), should they proceed to the CFC later, as the Supreme Court has suggested may be appropriate. *See NIH III*, 145 S. Ct. at 2662 (Barrett, J., concurring).

## C.   Plaintiffs Are Entitled To Permanent Injunctive Relief.

Plaintiffs seeking a permanent injunction must demonstrate "actual success on the merits," *Doe v. R.I. Interscholastic League*, 137 F.4th 34, 40 (1st Cir. 2025) (citation modified), and satisfy the traditional four-factor test governing permanent injunctive relief by showing: "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would

not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). When the government is the opposing party, the final two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting merger rule in context of a stay); *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 140, 142 (D. Mass. 2025) (applying *Nken* in permanent injunction context).

Here, as shown above, Plaintiffs are entitled to summary judgment on their claims and have demonstrated actual success on the merits. And as described below, Plaintiffs satisfy the four-factor test for granting a permanent injunction.

### 1.    Plaintiffs Will Continue to Suffer Irreparable Harm.

For the purposes of permanent injunctive relief, Plaintiffs can demonstrate irreparable harm by showing either (1) "that some past unlawful conduct has continuing impact into the future" or (2) "a likelihood of future unlawful conduct on the defendant's part." *Lopez v. Garriga*, 917 F.2d 63, 67 (1st Cir. 1990) (citation modified). Here, Plaintiffs have demonstrated both.

First, with respect to past unlawful conduct, Defendants' unlawful abrupt termination of the TQP and SEED programs pursuant to the February Actions has caused irreparable harm that continues to severely impact Plaintiffs, including: interfering with Plaintiffs' ability to plan and budget;[45] disrupting the already vulnerable teacher pipeline in Plaintiff States that the TQP and SEED grants were designed to combat;[46] causing Plaintiffs to shutter entire programs, resulting in reputational harm to Plaintiffs' institutions and likely having a devastating impact on the community;[47] and making millions of dollars in federal education funding contingent upon States

---

[45] *See, e.g.*, Ex. 1 ¶ 7; Ex. 11 ¶ 14; Ex. 17 ¶¶ 5–6.
[46] *See, e.g.*, Ex. 1 ¶ 11; Ex. 5 ¶¶ 6–7; Ex. 9 ¶ 8 ("The abrupt cancellation of this Grant hindered the ability to staff middle schools with well-prepared leaders."); Ex. 10 ¶ 6; Ex. 12 ¶ 7; Ex. 15 ¶¶ 7-8; Ex. 16 ¶¶ 8-10; Ex. 17 ¶ 6; Doc. No. 41 (Order on TRO Motion) at 8.
[47] *See, e.g.*, Ex. 2 ¶ 4; Ex. 3 ¶ 6; Ex. 7 ¶ 5; Ex. 9 ¶ 5; Ex. 10 ¶ 5 ("The sudden closure also forced us to rupture long-standing relationships with area school districts and break commitments
(continued…)

Plaintiffs' Memorandum of Law ISO Motion for Summary Judgment (1:25-cv-10548-AK)

abandoning their sovereign authority over education policy to comply with Defendants' vague and unlawful policy. *See Rhode Island v. Trump*, 155 F.4th 35, 49 (1st Cir. 2025) (finding that plaintiffs were like to suffer irreparable harm stemming from the loss of grant funding, including having to diminish or halt services, implement hiring freezes, deny payments for contracted services, and initiate layoffs); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 196 (D.N.H. 2025) ("The enabling legislation which established the [Department] expresses Congressional acknowledgment of state sovereignty in the area of education." (citation modified)).

Second and as described *supra*, pp. 13–14, with respect to future unlawful conduct, Plaintiffs have established that Defendants have not disavowed or eliminated the Directive and by its own terms it requires review as to additional TQP and SEED grant applications going forward, putting Plaintiffs in the untenable position of having to choose between complying with GEPA and the TQP and SEED statutes—which mandate they address equity in their grant applications and projects—or complying with the Directive and avoiding even the mention of DEI principles. A court order permanently enjoining Defendants' continued implementation of the Directive would likely prevent that harm. Permanent injunctive relief is thus necessary to avoid irreparable harm caused by Defendants' continued implementation of their own policy. *See Vanngo v. Questex, LLC*, No. 23-cv-13032, 2024 WL 6822763, at *2–3 (D. Mass. July 12, 2024) (granting permanent injunction where plaintiff established claim of copyright infringement and demonstrated continuing impact of unauthorized publishing of photographs).

### 2.    The Remedies Available at Law Are Inadequate.

Equitable relief is appropriate where, as here, the remedies available at law are inadequate. No damages or subsequent remedial efforts will protect Plaintiffs from the pervasive uncertainty

---

tied to the RISE project."); Ex. 11 ¶¶ 8, 12-13; Ex. 15 ¶ 5; Ex, 17 ¶¶ 5–6; Doc. No. 8-1 ¶ 22; Doc. No. 8-4 ¶ 18; Doc. No. 8-7 ¶ 20; Doc. No. 8-9 ¶ 22; Doc. No. 8-10 ¶ 29.

that Defendants' unlawful and arbitrary policy has created.[48] In the absence of permanent injunctive relief, Plaintiffs' institutions can no longer apply for future TQP and SEED grants without the substantial risk that their awards would again be subject to an arbitrary and unlawful termination pursuant to the February Actions.[49]

Nor is there an adequate remedy at law to compensate for the further disruption to students' education and development caused by the loss of thousands of teachers who are no longer going to enter the educator workforce and work in high needs schools or address the February Actions' continued threat to essential funding, personnel, and instructional support.[50] Students in Plaintiff States, especially students that require high quality instruction in hard-to-fill subject areas such as special education and ESL, are less likely to have highly qualified teachers.[51] Hard-to-staff schools, such as those in rural and urban regions, are also less likely to be able to attract and retain qualified teachers. *See, e.g.*, Doc. No. 8-7 ¶ 6; Doc. No. 8-9 ¶ 24. Now, even more individuals will be dissuaded from entering the teaching profession, and the children whose educations are disrupted as a result cannot get this time back. The harm to Plaintiffs' students from losing these qualified teachers will reverberate for years to come. Doc. No. 41 at 7–8.

The Supreme Court has cautioned that a district court should not issue an injunction that merely duplicates the effect of a vacatur. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139,

---

[48] *See, e.g.*, Ex. 1 ¶ 7; Ex. 8 ¶ 11; Ex. 11 ¶¶ 7, 9, 14; Ex. 14 ¶ 6; Ex. 15 ¶ 8; Ex. 17 ¶¶ 5–6.
[49] *See, e.g.*, Ex. 1 ¶¶ 14-15; Ex. 3 ¶ 15; Ex. 11 ¶ 14; Ex. 12 ¶ 10; Ex. 13 ¶ 10; Ex. 16 ¶ 12; Ex. 17 ¶ 8.
[50] Doc. No. 41 at 7; *see, e.g.*, Ex. 1 ¶ 11; Ex. 9 ¶ 7; Ex. 10 ¶ 6; Ex. 12 ¶ 7; Ex. 13 ¶¶ 6–8; Ex. 15 ¶¶ 7–8; Ex. 16 ¶¶ 8–9.
[51] Doc. No. 41 at 7; *see, e.g.*, Ex. 2 ¶ 9; Ex. 7 ¶ 7; Ex. 9 ¶ 6; Ex. 11 ¶ 11; Ex. 13 ¶ 6 ("As of December 2025, the State of Maryland reported 886 teacher vacancies. Many of those vacancies are in critical shortage areas such as special education and ESOL, both areas that were to be addressed in Project PRIME."); Ex. 15 ¶ 8; Ex. 16 ¶ 8; Ex. 17 ¶ 6 ("Mirroring the national trend, in Wisconsin, the shortage of special education teachers remains acute. For example, in Milwaukee Public Schools, as of March 2026, which is more than halfway through the academic year, there are still 51 open positions for special educators.").

165–66 (2010). Here, however, an injunction would have an independent and meaningful practical effect. Absent injunctive relief, Defendants could revive the Directive as applied to TQP and SEED in another form—an outcome which is particularly likely in this case given the hasty and capricious manner in which Defendants promulgated the Directive. Defendants have not disavowed their authority to reimpose the same requirements or represented that they will adhere to the Court's interpretation of the governing statutes. An injunction is therefore necessary to prevent Defendants from reissuing a substantially similar agency action. *See New York v. U.S. Dep't of Energy*, No. 6:25-cv-01458-MTK, 2025 WL 3140578, at \*17–18 (D. Or. 2025) (holding that an injunction was warranted despite vacatur of the challenged agency action); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 109–10 (D.D.C. 2025) (same).

### 3.    The Balance of Hardships and Public Interest Favor Plaintiffs.

Because an agency of the United States is the defendant, the balance of hardships and public interest merge. *See Nken*, 556 U.S. at 435. Both factors decisively favor Plaintiffs.

The balance of hardships tips sharply in favor of a permanent injunction. Absent a permanent injunction, Plaintiffs would remain subject to the likelihood that Defendants will again terminate millions of dollars of funding in a similarly arbitrary and unlawful manner. That risk would cause severe and irreparable disruption to Plaintiffs' education systems and harm countless students by destabilizing educational services and programs. By contrast, Defendants would suffer no cognizable harm from an injunction preventing the imposition of the Directive or any substantially similar policy. As courts have recognized, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 181 (D. Mass. 2025) (citation modified); *Massachusetts*, 770 F. Supp. 3d at 326–27 (same). Defendants also retain their current ability to ensure that Plaintiffs follow existing federal law as a condition of receipt of federal funding, including Title VI and the U.S. Constitution, and

39

they can set and impose lawful funding priorities through the regulatory process set forth in GEPA.

The public interest likewise favors an injunction that ensures compliance with federal law. *See Massachusetts*, 770 F. Supp. 3d at 327 (noting that "there is no public interest in upholding unlawful agency action"); *cf. In re Aiken Cnty.*, 725 F.3d 255, 267 (D.C. Cir. 2013) (explaining that "our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law").

## CONCLUSION

For the reasons herein, the Court should grant Plaintiffs' Motion for Summary Judgment in its entirety and order the requested relief described in the Proposed Order filed concurrently herewith, including vacating and setting aside Defendants' unlawful action and issuing declaratory and permanent injunctive relief.

Dated:  April 16, 2026                          Respectfully Submitted,


**ROB BONTA**                                   **ANDREA JOY CAMPBELL**
ATTORNEY GENERAL                                ATTORNEY GENERAL
STATE OF CALIFORNIA                             COMMONWEALTH OF MASSACHUSETTS


By: */s/ Alexis M. Piazza*                      By: */s/ Megan Barriger*
Alexis M. Piazza                                Megan Barriger (BBO #687707)
*Deputy Attorney General*                       *Senior Trial Counsel*
Office of the Attorney General                  Adelaide Pagano (BBO #690518)
300 South Spring Street, Suite 1702             *Assistant Attorney General*
Los Angeles, CA  90013-1230                     Yael Shavit (BBO #695333)
Michael L. Newman*                              *Chief, Consumer Protection Division*
*Senior Assistant Attorney General*             Matthew Lindberg (BBO #633630)
Laura L. Faer*                                  *Assistant Attorney General*
*Supervising Deputy Attorney General*           1 Ashburton Pl.
Alexis Piazza*                                  Boston, MA 02108
Garrett Lindsey*                                (617) 963-2038
Dennis Ojogho*                                  megan.barriger@mass.gov
*Deputy Attorneys General*                      adelaide.pagano@mass.gov
1515 Clay St.                                   yael.shavit@mass.gov
Oakland, CA 94612
(510) 879-3304
Michael.Newman@doj.ca.gov
Laura.Faer@doj.ca.gov
Alexis.Piazza@doj.ca.gov
Garrett.Lindsey@doj.ca.gov
Dennis.Ojogho@doj.ca.gov


**JENNIFER DAVENPORT**                          **PHILIP J. WEISER**
ATTORNEY GENERAL                                ATTORNEY GENERAL
STATE OF NEW JERSEY                             STATE OF COLORADO


By: */s/ Amanda I. Morejón*                     By: */s/ David Moskowitz*
Amanda I. Morejón (BBO #696737)                 David Moskowitz*
Jessica L. Palmer*                              *Deputy Solicitor General*
Lauren E. Van Driesen*                          1300 Broadway, #10
*Deputy Attorneys General*                      Denver, CO 80203
124 Halsey Street, 5th Floor                    (720) 508-6000
Newark, NJ 07101                                David.Moskowitz@coag.gov
(609) 696-5279
Amanda.Morejon@law.njoag.gov
Jessica.Palmer@law.njoag.gov
Lauren.VanDriesen@law.njoag.gov


41

**KWAME RAOUL**
ATTORNEY GENERAL
STATE OF ILLINOIS

By: */s/ Darren Kinkead*
Darren Kinkead*
*Public Interest Counsel*
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov

**LETITIA JAMES**
ATTORNEY GENERAL
STATE OF NEW YORK

By: */s/ Sandra Park*
Sandra Park*
*Civil Rights Bureau Chief*
Monica Hanna*
Rabia Muqaddam*
*Special Counsels*
Alex Finkelstein*
Wil Handley*
Kathryn Meyer*
*Assistant Attorneys General*
28 Liberty Street
New York, New York 10005
(212) 416-8250
Sandra.park@ag.ny.gov

**ANTHONY G. BROWN**
ATTORNEY GENERAL
STATE OF MARYLAND

By: */s/ Virginia A. Williamson*
Virginia A. Williamson*
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
VWilliamson@oag.state.md.us

**JOSHUA L. KAUL**
ATTORNEY GENERAL
STATE OF WISCONSIN

By: */s/ Aaron J. Bibb*
Aaron J. Bibb*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
bibbaj@doj.state.wi.us

*admitted pro hac vice*

42

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/Megan Barriger
Megan Barriger (BBO# 687707)
*Senior Trial Counsel*

Dated:  April 16, 2026

Plaintiffs' Memorandum of Law ISO Motion for Summary Judgment (1:25-cv-10548-AK)