UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, et al,

Plaintiffs,

v.

U.S. DEPARTMENT OF EDUCATION, et al,

Defendants.

Case No. 25-cv-10548-AK

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

In February 2025, the Department of Education circulated internal guidance directing its personnel to review new and existing grants to ensure that they did not fund "discriminatory practices—including in the form of DEI." AR 139. Following that review, the Department terminated several grants in accordance with this guidance—including grants previously awarded to organizations operated by and within the Plaintiff States. As a result, Plaintiffs filed this action seeking to vacate the February guidance and those terminations. This Court concluded that the Tucker Act divested it of jurisdiction over Plaintiffs' retrospective claims challenging the termination of their grants. But it found that the Tucker Act did not divest it of jurisdiction over Plaintiffs' prospective claims challenging the February guidance and its implementation moving forward. To that end, Plaintiffs now move for summary judgment, seeking to vacate, set aside, declare unlawful, and enjoin the Department's February guidance and attendant procedures.

Those claims, however, have been rendered moot now that the Department has issued different procedures superseding the February guidance. Although the Department's current guidance similarly directs program personnel to review grants to ensure that they do not fund

discriminatory activities, it does not mandate the termination of any award.  Moreover, even if this guidance was sufficiently similar to the February guidance, such that this case remained live, Plaintiffs would plainly lack standing to pursue their forward-looking claims.  The prior terminations provide no basis for prospective relief.  And it remains entirely speculative whether Plaintiffs will apply for and be awarded *future* grants—let alone whether the Department will terminate such hypothetical grants pursuant to the guidance that Plaintiffs seek to challenge.

In any event, Plaintiffs' claims fail on the merits.  Their theory of the case largely consists of a flawed syllogism—namely, that (i) the statutes authorizing the grants at issue "embrac[e] the principles of [DEI]"; (ii) the Department's guidance rejects "anything relating to 'DEI'"; therefore (iii) the Department's guidance conflicts with the governing statutes.  Doc. No. 144 at 32.  But that syllogism produces a false conclusion because it rests on overly broad and inaccurate premises.  The relevant statutes do not license (or require) grantees to engage in DEI initiatives of any kind whatsoever.  And the Department's guidance concerns discriminatory activities, *including* in the form of DEI—not anything relating to notions of diversity, equity, or inclusion.  If Plaintiffs contend that the Department's guidance violates federal law, they must identify the specific provisions of those statutes and the Department's guidance that supposedly conflict—instead of resting on what they view as some thematic tension between the two.  Plaintiffs have failed to do so.  Accordingly, for the reasons explained below, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

II.    **BACKGROUND**

   **A.  Legal Background**

Congress granted the Department broad authority to operate the two grant programs at issue here, which relate to the preparation and professional development of schoolteachers.  *First*,

the Teacher Quality Partnership (TQP) program provides that "the Secretary is authorized to award grants, on a competitive basis, to eligible partnerships, to enable the eligible partnerships to carry out" certain activities, including "a program for the preparation of teachers," "a teaching residency program," and "a leadership development program."  20 U.S.C. §§ 1022a(a) and (c); *see* 20 U.S.C. § 1022a(b) (requiring applications to be submitted "to the Secretary at such time, in such manner, and accompanied by such information as the Secretary may require").  *Second*, the Supporting Effective Educator Development (SEED) program generally directs the Secretary to "award grants, on a competitive basis, to eligible entities for" five broad "purposes," such as "providing evidence-based professional development activities" or "making freely available services and learning opportunities to local educational agencies."  20 U.S.C. § 6672(a).

### B.  Factual Background

Plaintiffs are the States of California, Colorado, Illinois, Maryland, Massachusetts, New Jersey, New York, and Wisconsin.  Doc. No. 112 at 3.  "[V]arious organizations" operating in the Plaintiff States—public and private universities as well as nonprofit entities—received TQP and SEED grants from the Department exceeding $250 million.  *Id.* at 20.  For example, UMass Amherst received a five-year TQP grant in 2023 for $2.3 million, and Chico State Enterprises (a nonprofit corporation in California) received a three-year SEED grant in 2022 for $4.5 million.  *Id.* at 20, 23; Doc. No. 8-5 at 13.  These grants consisted of awards issued each fiscal year pursuant to written agreements, which included signed documents binding both the grant recipient and the Department to the terms and conditions of the grant.  *See* Doc. No. 112 at 29–30.

On February 5, 2025, then-Acting Secretary Denise Carter issued a directive entitled "Eliminating Discrimination and Fraud in Department Grant Awards."  AR 139-140.  This directive stated that "[i]t remains a priority of the Department of Education to eliminate

3

discrimination in all forms of education throughout the United States." *Id.* at 139.  It therefore instructed Department personnel to review new and issued grants to ensure that they "do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication.'" *Id.*  It further provided that "[g]rants deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements in the relevant award, agreement, or other instrument." *Id.* at 140.

Beginning around February 7, 2025, TQP and SEED grant recipients in the Plaintiff States began to receive termination letters from the Department informing them that their awards were being terminated.  Doc. No. 112 at 37.  The termination letters affirmed that "[i]t is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States," and that "this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in [DEI] initiatives or any other initiatives that unlawfully discriminate on the basis of [a protected characteristic]." *E.g.*, AR 452.  The letters explained that "[i]llegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." *Id.*  And the letters stated that "it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States." *Id.*

The letters then explained that the recipient's grant provided funding for programs that "promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic"; " violate either the letter or purpose of Federal civil rights law"; "conflict with the Department's policy of

4

prioritizing merit, fairness, and excellence in education"; "are not free from fraud, abuse, or duplication"; "or . . . otherwise fail to serve the best interests of the United States." *Id.* Each terminated grant, the letters explained, was therefore "inconsistent with, and no longer effectuates, Department priorities." *Id.* The letters invoked the Department's regulatory authority to terminate grants that "no longer effectuate[] the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4)—a regulation that Plaintiffs concede was made applicable by "[t]he terms and conditions" of the grant agreements. Doc. No. 112 at 32, 38.

In June 2025, the Department circulated new internal guidance titled "Non-Competing Continuation Discretionary Grant Award Review Policy," which superseded the February 5 directive in full. *See* Doc. No. 155 (Decl. of M. Bessette); Doc. No. 155-1 (referred to herein as the "June Guidance"). This guidance reiterates that "[t]he Department will review all grant awards to advance the Administration's priorities of ensuring Federal funds do not support projects that: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds." Doc. No. 155-1 at 2. And, to that end, the guidance provides that "[p]rogram offices, in reviewing each discretionary grant award for [a non-competing continuation] award, shall review each grant to ensure that grant funds are not supporting any discriminatory activities." *Id.* at 3. The guidance explains that "discriminatory activities" include things such as "[e]xcluding participants based on race," "[i]ncluding participants based on race," "[e]ngaging in hiring or recruiting practices based on race," and "[u]sing racial or sex quotas for the purpose of selecting participants." *Id.*

The June Guidance further provides that "[p]rogram offices shall flag for further review any project that includes any activities" that violate the federal Constitution and antidiscrimination

laws. *Id.* And it states that "[p]rogram office leadership will then make a recommendation for continuation or non-continuation to" the Department's Office of Planning, Evaluation, and Policy Development (OPEPD). *Id.* at 4. OPEPD will then consider this recommendation and "take appropriate action, which may include non-continuation of the grant." *Id.*

## C. Procedural Background

On March 6, 2025, Plaintiffs filed this lawsuit against the Department of Education, the Secretary of Education, and the former Acting Secretary of Education. Doc. No. 1 at 8–9. Plaintiffs claimed that the Department's "termination[s]" of their "TQP and SEED grants constitute[d] final agency action" that was both (i) arbitrary and capricious and (ii) contrary to law. *Id.* at 46. They therefore sought to vacate and set aside those terminations under the APA. *Id.* at 51. Plaintiffs also sought to permanently enjoin the Department "from terminating any individual TQP and SEED grant for recipients in Plaintiff States," except as permitted by federal law and the terms of the relevant grant. *Id.* at 52. The same day that Plaintiffs filed the complaint, they also moved for a temporary restraining order, which the Court later granted. Doc. No. 2; Doc. No. 41.

Defendants appealed and the Supreme Court stayed the TRO. *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). The Supreme Court found that Defendants were "likely to succeed in showing the District Court lack[s] jurisdiction to order the payment of money under the APA." *Id.* at 968. The Court acknowledged that an APA claim "'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (citing *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)). Still, the Court found that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what" Plaintiffs requested in this case. *Id.* (citing *Great-West*, 534 U.S. at 212).

6

"Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (citing 28 U.S.C. § 1491(a)(1)).

Defendants subsequently moved to dismiss the case based on the jurisdictional argument that the Supreme Court found likely to succeed. Doc. No. 101. Defendants alternatively requested that the Court transfer the action to the Court of Federal Claims. *Id.* Rather than respond to the motion to dismiss, Plaintiffs filed the amended complaint, Doc. No. 112, which led the Court to terminate Defendants' motion to dismiss as moot, Doc. No. 114.

In their amended complaint, Plaintiffs sought to challenge the February guidance "as implemented with respect to the TQP and SEED programs"—what they referred to collectively as the "February Actions." Doc. No. 112 at 2. Plaintiffs claimed that the February guidance, "as effected through the Termination Letter[s]," constituted final agency action that was arbitrary and capricious and contrary to law. *Id.* at 51. And they claimed that the February Actions violated the Constitution and were ultra vires. *Id.* at 58-63. Plaintiffs therefore sought an order vacating and setting aside the February Actions, a declaration that the February Actions were unlawful, and an injunction permanently enjoining Defendants "from implementing, maintaining, or reinstating the [February Actions] for recipients in Plaintiff States." *Id.* at 64.

Defendants then moved to dismiss the amended complaint for lack of jurisdiction, which the Court granted in part and denied in part. Doc. No. 128; Doc. No. 133. The Court agreed that it lacked jurisdiction over Plaintiffs' "retrospective claims" challenging the *termination* of their grant agreements. Doc. No. 133 at 27-30. Even though Plaintiffs sought equitable relief—namely, a declaration that "Defendants' actions to terminate the already awarded grants" were unlawful and "an injunction to correct Defendants' [allegedly] unlawful agency action with regard to the terminated grants"—the Court concluded that such claims sounded in contract and that, therefore,

"the Tucker Act vest[ed] jurisdiction" solely in "the Court of Federal Claims." *Id.* at 30. The Court summed up by explaining that "grants to fund certain educational programs were terminated" and it "lacks any power to bring these grants back." *Id.* at 35.

That said, the Court concluded that the Tucker Act did not divest it of jurisdiction over Plaintiffs' "prospective claims" that "may impact" the Department's conduct with respect to "future" grants. *Id.* at 29-30. In the Court's view, Plaintiffs' amended complaint concerned not only the prior grant terminations but also "agency directives" moving forward—namely, then-Acting Secretary Carter's February 5 directive. *Id.* at 31. The Court reasoned that, aside from the terminated grants, Plaintiffs maintained "interests in" the "procedural regularity and predictability" with which the Department "will award grants in the future." *Id.* (citation omitted). It therefore concluded that the Tucker Act did not divest it of jurisdiction over Plaintiffs' claims seeking an order vacating the February 5 directive and "enjoining its prospective implementation." *Id.* at 32.

In so doing, the Court relied substantially on Justice Barrett's concurrence in *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025). There, the government sought to stay a district court's order vacating (i) guidance documents issued by the National Institutes of Health (NIH), as well as (ii) the agency's termination of grants pursuant to that guidance. The Supreme Court agreed to stay the district court's order "vacating the Government's termination of various research-related grants," but "otherwise denied" the application. *Id.* at 2658. Justice Barrett concurred in the partial grant of the application, explaining that, in her view, the district court "likely lacked jurisdiction to hear challenges to the grant terminations, which belong[ed] in the Court of Federal Claims," but did not lack jurisdiction over the plaintiffs' request to "vacate the guidance documents." *Id.* at 2661 (Barrett, J., concurring). Put another way, in Justice Barrett's view, "the plaintiffs' challenges to the grant terminations belong[ed] in the [Court

of Federal Claims],” while their “challenges to the guidance belong[ed] in district court.” *Id.* at 2662. Notably, however, Justice Barrett expressed no view as to whether the plaintiffs’ challenges to the agency’s guidance failed for reasons unrelated to the Tucker Act, and observed that “[i]t [was] not obvious, for instance, that NIH’s guidance is final agency action.” *Id.*

Plaintiffs then filed a motion for summary judgment seeking to vacate, set aside, declare unlawful, and enjoin the “February Actions” moving forward. Doc. No. 143; Doc. No. 143-1. Plaintiffs now define the “February Actions” as (i) the February 5 directive and (ii) the “new *procedure*” that it “mandated,” “whereby all new and existing grants are subject to review and elimination based on” what Plaintiffs contend are “previously unannounced policy objectives.” Doc. No. 144 at 15 (emphasis added). By contrast, in their amended complaint, Plaintiffs defined the “February Actions” as including (i) the February 5 directive and (ii) the “subsequent termination” of TQP and SEED grants pursuant to the directive. Doc. No. 112 at 2. In its prior order, however, the Court made clear that it lacked jurisdiction over Plaintiffs’ retrospective claims challenging the grant terminations. Doc. No. 133 at 27-30. Accordingly, to avoid any confusion, Defendants refer to the challenged agency action in this case as the February 5 directive and the procedure called for by it (the “February Guidance”)—as opposed to the “February Actions.”

## III.    STANDARD

“Judicial review of agency decisions is ‘highly deferential.’” *Mahoney v. Del Toro*, 99 F.4th 25, 34 (1st Cir. 2024) (quoting *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015)). “Under the APA, a reviewing court may set aside an agency’s decision if it is ‘arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.’” *Atieh*, 797 F.3d at 138 (citing 5 U.S.C. § 706(2)). “The APA’s arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained.” *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423

(2021).  Ultimately, "[t]his standard is quite narrow: a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" *Atieh*, 797 F.3d at 138 (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)).

Under the APA, a reviewing court may also "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  Agency action challenged under § 706(2)(B) is reviewed de novo.  *See, e.g.*, *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1110 (10th Cir. 2021) ("We review de novo any constitutional issues."); *Darden v. Peters*, 488 F.3d 277, 284 (4th Cir. 2007) ("judicial review of a claim that the agency's actions violated a claimant's constitutional rights is conducted *de novo*").

## IV.   ARGUMENT

### A.  Plaintiffs lack standing.

Plaintiffs "bear[] the burden of establishing" standing "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  They must "show (i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Moreover, Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek."  *Id.* at 431.

Plaintiffs lack standing to obtain prospective relief with respect to the February Guidance. Plaintiffs need to demonstrate standing "throughout the litigation," *Spencer v. Kemna*, 523 U.S. 1, 7 (1998), and therefore must *continue* to show that their asserted injuries "would likely be redressed by judicial relief."  *TransUnion*, 594 U.S. at 423.  They cannot do so in this case,

however, because the Department has issued new and different guidance superseding the February Guidance.  *See* Doc. No. 155.  "[W]hen one agency action supersedes another, prospective challenges to the superseded agency action generally become moot," *Anderson v. U.S. Dep't of Hous. & Urb. Dev.*, 731 F. Supp. 3d 19, 31 (D.D.C. 2024), as the court "can no longer provide [the] plaintiff with any effectual relief," *Uzuegbunam v. Preczewski*, 592 U.S. 279, 282 (2021). *See also, e.g.*, *Horizon Bank & Tr. Co. v. Massachusetts*, 391 F.3d 48, 53 (1st Cir. 2004) ("a case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party" (citing *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992)).

After all, a court cannot "rule on the legality of an agency policy that no longer exists" by virtue of having been superseded by a different one.  *Worth v. Jackson*, 451 F.3d 854, 861 (D.C. Cir. 2006).  Because the February Guidance "has no current force or effect," *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011), the Court cannot "prohibit future application of [it]."  Doc. No. 144 at 28.  Plaintiffs therefore no longer have standing to seek prospective relief enjoining, setting aside, or vacating the February Guidance, or prospective relief declaring it unlawful.  *See, e.g.*, *Audubon of Kansas, Inc. v. United States Dep't of Interior*, 67 F.4th 1093, 1103 (10th Cir. 2023) ("If the MOA has expired, then Audubon's claims based on § 706(2) are moot because the MOA is the only final agency action Audubon challenges."); *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1210 (9th Cir. 2021) ("[W]hen the environmental report at issue 'has been superseded, and the federal agencies will rely' on a new and different report 'for the near future,' the case is moot.") (citing *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1075 (9th Cir. 1995)).

Plaintiffs contend that the Court can still grant effectual relief in the form of a declaratory judgment because "declaratory relief would resolve critical issues for Plaintiffs should they

11

proceed to the Court of Federal Claims (CFC) for monetary relief stemming from the . . . termination of [their] TQP and SEED grants." Doc. No. 144 at 14. But when a party seeks a declaratory judgment "as a predicate to a damages award," it functions as *retrospective* relief. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 979 F.3d 10, 15–16 (1st Cir. 2020) (citing *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974)). And as the Court has already and correctly concluded, it lacks jurisdiction over Plaintiffs' "retrospective claims." Doc. No. 133 at 27. Insofar as Plaintiffs seek a *prospective* declaratory judgment, they lack standing for all the reasons discussed. Regardless, a prospective declaratory judgment would not bear on—much less "resolve critical issues" for—a claim for monetary relief premised on a breach of contract theory that Plaintiffs might file in the Court of Federal Claims. A breach of contract claim would be predicated on distinct showings under contract law to be resolved by a court possessing jurisdiction to do so.

Even if Plaintiffs' prospective challenges were not moot, they would still lack standing. Plaintiffs argue that they "have experienced actual harm" because "Defendants implemented the [February] Directive to eliminate the federal teacher pipeline programs and virtually all TQP and SEED grants in Plaintiff States." Doc. No. 144 at 28. To establish "standing to seek forward-looking" relief, however, Plaintiffs cannot rely on "past harm[s]," *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023), such as the termination of "TQP and SEED grants in Plaintiff States," Doc. No. 144 at 28. They instead need to demonstrate an ongoing injury or a future injury that "is sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 435. A future, "threatened injury must be certainly impending to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Assertions "of *possible* future injury," by contrast, "are not sufficient." *Id.*

Plaintiffs assert that some of the organizations in their States that received TQP or SEED grants in the past "are *interested* in applying to future TQP and SEED competitions" and that those who "do apply *may* be denied an award." Doc. No. 144 at 27 (emphasis added). The "imminence" element of standing, however, "requires more than an interest in" applying for a benefit or opportunity "at some point in the future." *Nat. Res. Def. Council, Inc. v. Wheeler*, 367 F. Supp. 3d 219, 233 (S.D.N.Y. 2019); *see, e.g.*, *Albuquerque Indian Rts. v. Lujan*, 930 F.2d 49, 56 (D.C. Cir. 1991) ("Mere 'interest,' however, is not sufficient to confer standing."); *Abadi v. City of New York*, No. 22-1560, 2023 WL 3295949, at *2 (2d Cir. May 8, 2023) (finding that plaintiff "lack[ed] standing to challenge the City's employment vaccination requirement" based on assertion that "he was interested in applying for employment with the City"). Plaintiffs' mere interest in applying for future TQP and SEED grants fails to establish they face an *imminent* risk of having their hypothetical applications denied—let alone denied based on now-superseded guidance.

Plaintiffs also assert that if they apply for a TQP or SEED grant, they "will be put in the untenable position of having to choose between complying with GEPA and the TQP and SEED authorizing statutes . . . or attempting to comply with the February Actions and avoiding even the mention of diversity, equity, and inclusion principles." Doc. No. 144 at 27. But being in such a "position" does not constitute an injury in fact. No law requires Plaintiffs to apply for a TQP or SEED grant. And if they do, the Department agrees that they must satisfy all statutory eligibility requirements to qualify for an award. Plaintiffs need not—indeed, cannot—"choose" another option. If the Department were to paradoxically *fault* an organization for complying with a statutory requirement and decline to award a grant on that basis, the applicant presumably would have standing to challenge that decision. But it remains entirely speculative that the Department will even deny one of Plaintiffs' yet-to-be-filed applications. *See Fac. v. New York Univ.*, 11 F.4th

13

68, 77 (2d Cir. 2021) ("The primary defect in all these theories is that there is uncertain future action that would need to occur before the plaintiffs could arguably suffer the harm alleged.").

In any event, Plaintiffs' speculation rests on the false premise that GEPA and the TQP and SEED statutes require grantees to do things that the February Guidance prohibited. Plaintiffs observe that teaching residency programs funded by TQP grants should provide for the "development of admissions goals and priorities" that "may include consideration of applicants who reflect the communities in which they will teach as well as consideration of individuals from underrepresented populations in the teaching profession." 20 U.S.C. § 1022a(e)(2)(A)(vi)(II). The TQP statute also provides that certain programs should promote "techniques for early childhood educators to improve children's cognitive, social, emotional, and physical development." 20 U.S.C. § 1022a(d)(1)(A)(ii). And it directs grantees to provide assurances that "general education teachers receive training in providing instruction to diverse populations, including children with disabilities, limited English proficient students, and children from low-income families." 20 U.S.C. § 1022e(b)(4). None of these provisions conflicted with the February Guidance, which has been superseded in any event. And none of them conflict with the June Guidance, either.

For instance, the June Guidance instructs program offices "to ensure that grant funds are not supporting any discriminatory activities," including by "[e]xcluding" or "[i]ncluding" participants "based on race" or "[e]ngaging in racial balancing." Doc. No. 155-1 at 3. A grantee clearly can—and should—avoid engaging in such discriminatory activities without violating the provisions of the TQP statute described above, which do not mention race at all, much less *require* grantees to consider race in structuring their TQP programs. Indeed, the statute itself contemplates that grantees may consider "applicants who reflect the communities in which they will teach" and

14

account for "underrepresented" and "diverse" populations with reference to factors such as geography and income—as opposed to factors such as race and sex.

Plaintiffs further claim that—*if* they apply, and *if* they receive an award—they "will again face the continuing threat that Defendants will arbitrarily re-review [those] grants." Doc. No. 144 at 27. But even if a Plaintiff organization applies for and receives a TQP or SEED grant, the Department's periodic *review* of that program to ensure it continues to align with agency priorities does not constitute an injury in fact. A grant recipient would suffer a cognizable harm if the Department were to terminate its award. But merely *reviewing* a grant would not suffice. *Cf. Nat'l Institutes of Health*, 145 S. Ct. at 2674 (Gorsuch, J., concurring in part and dissenting in part) ("[I]t is the prospect of getting its wrongfully terminated grant money that brings the grantee to court in the first place. That prospect is also, one presumes, the only (or at least the primary) reason the grantee has Article III standing to sue at all.").

Plaintiffs also argue that the alleged violation of their "procedural rights, including to notice-and-comment rulemaking," gives them standing. Doc. No. 144 at 29. But the only case that they cite for this proposition demonstrates the opposite. In *Dep't of Educ. v. Brown*, the Supreme Court explained that "the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.'" 600 U.S. 551, 562 (2023) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). Plaintiffs' "claim of procedural error" therefore "does not excuse the absence of an actual injury." *Barker v. Transportation Sec. Admin.*, 353 F. App'x 450, 453 (1st Cir. 2009). Moreover, insofar as Plaintiffs mean to rely on "procedural rights" beyond notice-and-comment rulemaking, their claim fails because they do not *identify* any such rights, much else explain how applying the Department's prior guidance and concomitant procedures would violate them. And,

in all events, Plaintiffs' generic contention entirely overlooks the process that recipients may utilize to appeal a grant termination—one that some TQP and SEED grantees successfully pursued following the February terminations. *See* Department of Education, *Department Grant Discontinuation and Termination Processes*, available at https://www.ed.gov/grants-and-programs/manage-your-grant/department-grant-discontinuation-and-termination-processes.

Finally, and in all events, Plaintiffs lack standing to obtain relief on behalf of *non-party* entities, operating within the Plaintiff States, that might apply for and receive TQP and/or SEED grants in the future. True, non-plaintiff recipients might incur monetary harms in the future if they apply for, receive, and then lose TQP and/or SEED funding. But those are not the *Plaintiffs'* monetary harms. Plaintiffs instead seek to recover on behalf of such entities on the theory that the future loss of (yet-to-be-awarded) grants to non-plaintiff recipients might lower the supply of highly qualified teachers in the Plaintiff States. *See* Doc. No. 144 at 50-53. Speculative and indirect injuries such as those, however, are insufficient to establish Article III standing, and are not the sort of harm required to support an injunction. *See, e.g.*, *Clapper*, 568 U.S. at 402; *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 622 (1st Cir. 1995).

**B. The Department's guidance does not constitute final agency action.**

The APA only allows for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. To qualify as "final," an agency action must satisfy "two conditions." *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177–78 (internal quotation marks

16

and citation omitted). "The issue of whether there was final agency action implicates the jurisdiction of the federal courts." *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007).

Tellingly, in the amended complaint, Plaintiffs described the relevant "final agency action" in this case as the February Guidance "*as effectuated through* the Termination Letter[s]." Doc. No. 112 at 51 (emphasis added). That makes sense, as it was the Department's *termination decisions* that determined the grant recipients' rights, and it was the *termination decisions* from which legal consequences flowed. The February Guidance was an "input[] into" those termination decisions. *Dubey v. Dep't of Homeland Sec.*, 154 F.4th 534, 537 (7th Cir. 2025). But it "did not itself terminate the funding" in this case; "those effects flowed from the termination letters issued by" the Department. *Pacito v. Trump*, 169 F.4th 895, 931 (9th Cir. 2026). Thus, "[t]he termination[s]," not the guidance, constituted "final agency action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* (citing *Bennett*, 520 U.S. at 177–78). In other words, the guidance triggered a review process, but the terminations marked the "terminal event[s]" in that process. *Salinas v. United States R.R. Ret. Bd.*, 592 U.S. 188, 195 (2021). True, if this Court had APA jurisdiction to review those terminations, it could also review the guidance on which they were based. *See* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."). But it cannot review the legality of that guidance standing alone.

In any event, the June Guidance plainly constitutes a policy statement as opposed to final agency action. "An agency policy statement does not seek to impose or elaborate or interpret a legal norm," but "merely represents an agency position with respect to how it will treat—typically enforce—the governing legal norm." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). "[A] general statement of policy" thus guides an agency's application of a standard by

17

discussing how adjudicators generally "should" approach an issue while leaving them free to exercise "individual case-by-case discretion." *Nat'l Min. Ass'n v. Sec'y of Lab.*, 589 F.3d 1368, 1372–73 (11th Cir. 2009). To be sure, a purported policy statement might qualify as a final agency action if it does not merely guide an adjudicator's exercise of discretion but instead "commands," "requires," "orders," or "dictates" a substantive result. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). But "as long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a binding norm." *Nat'l Min. Ass'n v. Sec'y of Lab.*, 589 F.3d at 1371 (citation omitted).

The June Guidance simply requires that program offices "review" grants to ensure that grant funds do not support discriminatory activities. Doc. No. 155-1 at 3. It does not, by contrast, dictate or command a substantive result—such as the continuance or non-continuance of any grant. Beyond this review, the June Guidance merely requires program offices to "flag for further review any project" that includes such discriminatory activities. *Id.* And it states that "[p]rogram office leadership will then make a *recommendation* for continuation or non-continuation," thus leaving the agency free to exercise its broad discretion and take "appropriate action" based on the individual facts of each case. *Id.* (emphasis added). The June Guidance thus constitutes a nonbinding policy statement—not final agency action subject to APA review.

### C. The Department's guidance is lawful.

#### 1. The Department's guidance does not conflict with the TQP and SEED enabling statutes or GEPA.

Even if Plaintiffs' claims were reviewable, they nonetheless fail on the merits. Plaintiffs first argue that the Department's guidance is "contrary to the TQP and SEED authorizing statutes and GEPA." Doc. No. 144 at 31. But nothing in the superseded February Guidance or the operative June Guidance conflicts with those statutes (or any other). As an initial matter, Plaintiffs

18

state that the February Guidance directed Department personnel to review grant awards to ensure that they "'do not fund' DEI initiatives." Doc. No. 144 at 31. But, in fact, this guidance directed Department personnel to ensure that its "grants do not fund *discriminatory practices*—including in the form of DEI." AR 139 (emphasis added). The June Guidance similarly directs program offices to "review each grant to ensure that grant funds are not supporting any *discriminatory activities*," such as "[u]sing racial or sex quotas for the purpose of selecting participants." Doc. No. 155-1 at 3 (emphasis added). Accordingly, contrary to Plaintiffs' assertion, the Department's guidance does not preclude grantees from considering "anything relating" to diversity and equity whatsoever. Doc. No. 144 at 32. It simply seeks to ensure that grantees do not pursue diversity and equity *through discriminatory means*—including in the form of DEI initiatives.

Where Plaintiffs do cite specific statutory provisions, they do not identify any provision that conflicts with the Department's guidance. Plaintiffs observe that the TQP statute seeks to "recruit highly qualified individuals, including minorities and individuals from other occupations, into the teaching force." 20 U.S.C. § 1022(4). But it does not require the Department or grantees to construe the term "minorities" as limited to racial minorities. Even if it did, the Department's guidance still does not conflict with § 1022(4) in any way. The June Guidance provides that grantees should not engage in "recruiting practices based on race." Doc. No. 155-1 at 3. And Plaintiffs cannot reasonably contend that § 1022(4) requires otherwise. Section 1022(4) indicates that grantees should recruit individuals based on their *qualifications*—while rightly recognizing that minorities may well be highly qualified individuals. Section 1022(4) does not, by contrast, require (or even allow) grantees to recruit individuals based on their race.[1]

---

[1] The Department's guidance does not conflict with any of the other provisions of the TQP statute that Plaintiffs cite for the reasons described above. *See* p. 14, *supra*.

19

Plaintiffs also observe that the SEED statute directs the Secretary to award grants for the purposes of, among other things, "providing teachers, principals, or other school leaders from nontraditional preparation and certification routes or pathways to serve in traditionally underserved local educational agencies."  20 U.S.C. § 6672(a)(1).  And it directs the Secretary to "ensure that, to the extent practicable, grants are distributed among eligible entities that will serve geographically diverse areas, including urban, suburban, and rural areas."  *Id.* § 6672(b)(3).  Again, nothing in the Department's guidance conflicts with those statutory directives.  If anything, those statutory provisions underscore that funded programs may address diversity (as relevant here, geographic diversity) without promoting initiatives that discriminate based on race or sex.

Finally, under GEPA, as amended by the Improving America's Schools Act of 1994, Pub. L. 103-382, 108 Stat. 3518, 3917, a grant applicant must describe "the steps" that it "proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with" the grant funds, "by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age."  20 U.S.C. § 1228a(b).  Plaintiffs argue that this provision requires grant applicants to "address equity" but that the Department's guidance contradictorily "require[s] termination wherever grantees do so."  Doc. No. 144 at 33.  The Department's guidance does not, however, prohibit grantees from addressing equity.  It seeks to ensure that grant funds do not support "discriminatory activities," such as "[i]ncluding participants based on race."  Doc. No. 155-1 at 3.  Therefore, a grantee should not attempt to address equity *by* including participants based on race.  But it would remain free to address equity in myriad ways that both comply with GEPA and satisfy the Department's guidance.

20

**2. The Department's guidance did not require notice-and-comment rulemaking.**

Plaintiffs next contend that the Department's guidance effectively constitutes a regulation that could not have been issued without notice-and-comment rulemaking. *See* Doc. No. 144 at 33-35.   Under the APA, notice-and-comment procedures apply to legislative rules, but not "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).  In determining whether an agency action constitutes a legislative rule subject to notice-and-comment procedures, courts should assess whether it "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992).

The Department's guidance constitutes at most a general statement of policy or a rule of agency procedure and practice.  It does not "require" grantees "to do anything" or "prohibit" them "from doing anything." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).  The guidance instead directs *program offices* to "review" grants to ensure that funded programs do not support "any discriminatory activities," to "flag" any such program "for further review," and to "make a recommendation for continuation or non-continuation" of the grant.  Doc. No. 155-1 at 3-4.  Plaintiffs claim that the February Guidance had a "legally binding effect" because it directed the "*termination* of existing awards" within its scope.  Doc. No. 144 at 34 (emphasis added).  But, as explained above, the February Guidance has been superseded by the June Guidance, which does not require the termination of any grant.  In any event, the February Guidance was not a legislative rule because it did not purport to supply the legal authority for terminating any grant; rather, it required review and termination "where permitted by applicable law." AR 140.  The terminations that occurred thus relied on existing legal authority—namely, 2 C.F.R. § 200.340—to do so.

Plaintiffs further observe that "Department regulations require notice-and-comment rulemaking for priorities used at the start of any competitive grant competition, including for TQP and SEED." Doc. No. 144 at 34. When the Department announces a competition for new grants, it generally proposes "priorities" for public comment and publishes the final set in the Federal Register. 34 C.F.R. § 75.105(b). Then, when deciding which applications to select, the Department may award "bonus points" to an application that meets one or more of these priorities. *Id.* § 75.105(c)(2)(i). Critically, Plaintiffs do not even contend that the Department sidestepped this requirement by giving bonus points to applications based on unannounced priorities. They merely argue that the Department *terminated* grants based on priorities that did not go through notice and comment. But the Department's obligation to publish priorities that, if met, may give applicants a leg up in the *selection* process does not impose a corresponding duty to publish all the factors that it might consider in deciding whether to *terminate* an existing grant.

### 3. The Department's guidance does not violate 2 C.F.R. § 200.340(a)(4).

Plaintiffs also claim that the Department's guidance "direct[s] the termination of grant awards based on *new* agency priorities," whereas—in their view—2 C.F.R. § 200.340(a)(4) only permits the termination of grant awards based on previously "*established* agency priorities." Doc. No. 144 at 35. But this argument fails because 2 C.F.R. § 200.340(a)(4) concerns the Department's *termination* of grant awards, yet the Department's operative guidance merely directs program offices to *review* grants and make recommendations regarding continuance or non-continuance. The June Guidance does not dictate or authorize the termination of any grant awards. It therefore by definition does not differ from or conflict with 2 C.F.R. § 200.340(a)(4).

True, the February Guidance directed the termination of "[g]rants deemed inconsistent" with the Department's priorities—namely, "ensuring that Department grants do not fund

discriminatory practices" and that "all grants are free from fraud, abuse, and duplication."  AR 139-140.  But it limited that directive to situations "permitted by applicable law," cited 2 C.F.R. § 200.340(a)(4) as the pertinent termination authority, and required any terminations to comply "with all notice and procedural requirements in the relevant award."  *Id.*  Insofar as Plaintiffs contend that the subsequent *terminations* did not actually comport with 2 C.F.R. § 200.340(a)(4), they must assert that retrospective claim in the Court of Federal Claims.  Doc. No. 133 at 30.  Even if this Court were to consider the merits of that retrospective claim, it would fail at the threshold, seeing as it turns largely on the language of the *current* version of 2 C.F.R. § 200.340—whereas the terminated grants were subject to the *prior* version.  *See* Department of Education, *Retroactive Application of the Revised Version of the Guidance for Federal Financial Assistance*, 90 Fed. Reg. 9240, 9241 (Feb. 10, 2025) (explaining that "grants issued prior to the October 1, 2024 effective date of [the current regulation] are governed by the version of the [regulation] applicable at the time of the Federal award").

Plaintiffs' argument also misconstrues the current version of 2 C.F.R. § 200.340(a)(4), which provides that a grant award "may be terminated" by the government "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  The plain meaning of the regulation itself thus makes clear that the Department may terminate a grant based on "agency priorities," and does not distinguish between (i) new and (ii) previously established ones.  As for the text, Plaintiffs assert that the word "the" indicates that the following noun "is definite or has been previously specified by context."  Doc. No. 144 (citing *Nielsen v. Preap*, 586 U.S. 392, 408 (2019)).  But even so, that would not mean that the regulation refers only to "the" old priorities of a previous administration—and not "the" new priorities of the current administration.  Plaintiffs

23

also assert that the phrase "no longer" contemplates a condition that was true in the past but has subsequently changed. *See* Doc. No. 144 at 36. But they offer no persuasive reason to conclude that the only permissible change is a change in *the grantee's operations*—as opposed to a change in *agency priorities*.

Plaintiffs contend that § 200.340(a)(4) only permits an agency to terminate a grant based on priorities that were established "when the agency issued the award." Doc. No. 144 at 36. But the express terms of subsection (a)(4) do not require a backward-looking inquiry. Notably, the *preceding* subsection—(a)(3)—*does* contain such language: it allows a grant recipient to terminate the award in part, and then allows the agency to terminate the remainder if it "determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made." 2 C.F.R. § 200.340(a)(3). That is a backward-looking inquiry, stated in the past tense, about the state of the world at the time that "the Federal award *was made*." *Id.* (emphasis added). It is thus telling that subsection (a)(4) contains no similar language. To the contrary, it is stated in the present tense—calling for a here-and-now analysis of whether the award *currently* "effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The overall structure of the regulation thus further undermines Plaintiffs' interpretation.

Plaintiffs also rely on the rulemaking history behind § 200.340(a)(4), but that history strongly supports the Department's interpretation. The previous version of the regulation provided that the government may terminate an award if it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2020). And, initially, the Office of Management and Budget (OMB) proposed removing this provision altogether. In response, "[s]everal commenters supported" doing so because "its removal would prevent agencies from terminating high-performing projects based on shifting agency priorities." OMB, Final Rule: *Guidance for Federal*

*Financial Assistance*, 89 Fed. Reg. 30,046, 30,089 (April 22, 2024). "Other commenters," however, sought to retain this provision because they wanted to keep "the ability for unilateral termination based on *changes in* program goals or *agency priorities*." *Id.* (emphasis added). Ultimately, OMB decided to preserve this language with a slight modification: the revised regulation "continues to allow Federal agencies . . . to terminate an award in the circumstances described in paragraph (a)(2) in the prior version," so long as the agency includes such language "in the terms and conditions of the award." *Id.* Put another way, so long as an agency apprises grantees of this possibility in the terms and conditions of the award itself, it may subsequently terminate the grant based on "changes in . . . agency priorities." *Id.*

### D. The Department's guidance is not arbitrary and capricious.

Plaintiffs next claim that the Department's guidance was arbitrary and capricious for several reasons, but none of their arguments has merit. *See* Doc. No. 144 at 38-43.

*First*, they contend that the Department's guidance was "not reasonably explained" because it does not "define what it means by 'DEI'," explain how "DEI initiatives might violate anti-discrimination laws," or explain how "grants will be evaluated to achieve the stated ends." Doc. No. 144 at 39. But, as an initial matter, the June Guidance does not refer to DEI—let alone demand or prohibit conduct that would require defining the term. The February Guidance did refer to DEI, but specifically DEI initiatives that "unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." AR 139. And the government has no obligation—under the APA or any other law—to counsel grantees on how to comply with anti-discrimination laws. Plaintiffs also misapprehend the level of explanatory detail required in an agency guidance document—as opposed to a termination decision. Plaintiffs might believe that the Department's *termination letters* failed to adequately explain how their grants were evaluated

25

and why they were terminated, but that does not mean that the Department's *guidance* needed to, ex ante, catalogue all the ways that a grantee's DEI initiatives might warrant termination.

It also bears emphasizing that agency guidance need not define terms like "DEI" just to avoid APA invalidation. *See Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2665–66 (2025) (Kavanaugh, J., concurring in part). That is especially true in the context of competitive grants because, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). Indeed, "[i]n the context of selective subsidies," perfect "clarity" "is not always feasible." *Id.* Regardless, whatever explanatory detail the February Guidance supposedly lacked on this score has clearly been addressed by the June Guidance, which provides several specific examples of activities that the Department considers discriminatory and that may therefore warrant non-continuation of a grant. *See* Doc. No. 155-1 at 3.

*Second*, Plaintiffs argue that the Department "did not acknowledge, much less provide good reasons for, their apparent change in agency policy 'priorities.'" Doc. No. 144 at 39-40. Under the Supreme Court's "change-in-position doctrine," "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests." *Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025) (internal quotation marks and citation omitted). "[T]he agency must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

26

The Supreme Court has assumed without deciding that "the change-in-position doctrine applies when an agency abandons a position it first articulated in a nonbinding guidance document." *Wages & White Lion Invs.*, 604 U.S. at 569 n.5. But it has "traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting." *Id.*

Either way, Plaintiffs' argument fails because they have not identified—and cannot identify—any "nonbinding guidance document" or "more formal" policy from which either the February Guidance or June Guidance departed. The February Guidance directed Department personnel to review grants to ensure that they "do not fund discriminatory practices—including in the form of DEI." AR 139. The June Guidance directs program offices to review grants "to ensure that grant funds are not supporting any discriminatory activities," such as "[e]ngaging in racial balancing" or "[u]sing racial or sex quotas for the purpose of selecting participants." Doc. No. 155-1 at 3. The Department has never expressed a policy—in a guidance document or more formal setting—licensing grantees to engage in discriminatory activities. The Supreme Court's change-in-position doctrine therefore does not apply.

*Third*, Plaintiffs argue that the Department "fail[ed] to consider the harm caused by the elimination of the TQP and SEED programs and Plaintiffs' reliance on the Department's previous policy and priorities." Doc. No. 144 at 41. But neither the February Guidance nor the June Guidance eliminated the TQP and SEED *programs*. The Department continues to administer grantees under both the TQP and SEED programs, has done so continuously throughout its application of the February and June Guidance and, in fact, recently announced competitions for both TQP and SEED FY 2026 grants in response to continued funding of the programs by Congress. *See* Dep't of Education, *Notice Announcing Teacher Quality Partnership Program Competition* (May 11, 2026); Department of Education, *Notice Announcing Supporting Effective*

*Educator Development Program Competition* (April 20, 2026).   If—by referring to "the elimination of the TQP and SEED programs"—Plaintiffs mean the elimination of *their* TQP and SEED grants, that argument constitutes a challenge to the termination of their grants and therefore must be brought in the Court of Federal Claims.  *See* Doc. No. 133 at 30.

Similarly, even if Plaintiffs had reliance interests in *the continuation of their grants*, such interests would only be affected if the Department *terminated those grants*.[2]  Plaintiffs have no "serious reliance interests" in simply avoiding the review process called for by the Department's guidance moving forward.  *Fox Television*, 556 U.S. at 515.  Nor do they have any serious reliance interests in engaging in the types of discriminatory activities that might warrant non-continuation of future grants for which they have not yet applied or been awarded.  *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 60 (2020) (Thomas, J., concurring in part and dissenting in part).

*Fourth*, Plaintiffs claim that the Department "fail[ed] to consider less disruptive, alternative means of fulfilling the Department's goals."  Doc. No. 144 at 42.  But no administrative-law principle requires an agency to consider "less disruptive, alternative means" of accomplishing its chosen policy to survive arbitrary-and-capricious review.  "The APA does not," in other words, "require agencies to tailor their regulations [or policies] as narrowly as possible to the specific concerns that generated them."  *Associated Dog Clubs of New York State, Inc. v. Vilsack*, 75 F. Supp. 3d 83, 92 (D.D.C. 2014).  As support for this argument, Plaintiffs cite the Supreme Court's

---

[2] Even if the Court could consider that type of retrospective claim, it would fail because the relevant grant agreements apprised recipients that the Department could terminate the awards if they "no longer effectuate[d] the program goals or agency priorities."  2 C.F.R. § 200.340(a)(4). And, as the Supreme Court has explained, such clear and explicit "disclaimers are surely pertinent in considering the strength of any reliance interests."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 31 (2020).

decisions in *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), and *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020), but neither case imposes a general rule requiring an agency to consider "less disruptive, alternative means" any time that it adopts a new policy.

For example, in *State Farm*, the National Highway Traffic Safety Administration rescinded a rule that required new cars to have automatic seatbelts or airbags based on its view that requiring automatic seatbelts would not produce "significant safety benefits." *Id.* at 38. But it did so "without any consideration whatsoever of an airbags-only requirement," even though the agency previously found that "airbags are an effective and cost-beneficial life-saving technology." *Id.* at 51. Moreover, the agency's rationale for rescinding the existing safety rule—namely, its view that automatic seatbelts would prove ineffective—did "not cast doubt" on the "efficacy of airbag technology" or on "the need for" this type of safety rule generally. *Id.* at 47. The Supreme Court explained that an agency need *not* "consider all policy alternatives in reaching [a] decision." *Id.* at 51. But an airbags-only requirement was no mere "policy alternative"—it was "a technological alternative" already "within the ambit of the existing standard." *Id.* The agency's failure to even *consider* an airbags-only requirement was thus arbitrary and capricious. *See id.*

Similarly, in *Regents*, the Supreme Court reviewed the Acting Secretary of Homeland Security's termination of the immigration program known as Deferred Action for Childhood Arrivals (DACA). Under DACA, certain individuals could apply for a two-year forbearance of removal, which, if granted, would render the applicant eligible for certain benefits, such as Social Security and Medicare. *Id.* at 9. In deciding to terminate DACA, the Acting Secretary explained that, in her view, the program's *provision of benefits* violated the INA. *Id.* at 24. But she did not consider whether to retain the *forbearance* aspect of the program—even though "removing

29

benefits eligibility while continuing forbearance remained squarely within [her] discretion." *Id.* at 28. The Supreme Court concluded that the Acting Secretary had "repeated the error" it identified in *State Farm*. *Id.* at 28. "Even if it is illegal for DHS to extend work authorization and other benefits to DACA recipients, that conclusion supported only 'disallow[ing]' benefits.'" *Id.* at 29 (citing *State Farm*, 463 U.S. at 47). "It did 'not cast doubt' on the legality of forbearance or upon DHS's original reasons for extending forbearance to childhood arrivals." *Id.* It was therefore arbitrary and capricious for the Acting Secretary to terminate DACA "in full 'without any consideration whatsoever' of a forbearance-only policy." *Id.*

*State Farm* and *Regents* thus describe a specific category of error: terminating an *entire* program based on a rationale that applies to only *part* of it—without even considering whether to retain aspects of the program unaffected by the termination rationale. The error present in those cases thus has no relevance here, where the Department has not terminated a prior program at all.

*Fifth*, Plaintiffs claim that the Department's actions are arbitrary and capricious because they "require termination based on new priorities that are contrary to priorities duly established through notice-and-comment rulemaking." Doc. No. 144 at 42. *Sixth*, Plaintiffs claim that the Department's actions are arbitrary and capricious "insofar as they require the elimination of these programs based on policy considerations that are contrary to the TQP and SEED authorizing statutes and GEPA." *Id.* at 42-43. But, again, the February Guidance has been superseded by the June Guidance, which does not require terminating grants—thereby rendering this argument moot. And insofar as Plaintiffs mean to argue that the Department's *termination decisions* were arbitrary and capricious, they must assert such a claim in the Court of Federal Claims. *See* Doc. No. 133 at 30. Lastly, on the merits, Plaintiffs' contentions merely repeat their contrary-to-law arguments, which fail for the reasons discussed above. *See* pp. 18-22, *supra*.

30

### E.  The Department's guidance does not violate the Constitution.

#### 1.  The Department's guidance does not violate the Spending Clause.

Plaintiffs' constitutional claims fare no better.  They first assert that the Department's actions violate the Spending Clause, which authorizes Congress to "lay and collect Taxes" to provide for the "general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  This grant of authority vests Congress with "broad power" to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022).  And, in that way, "[t]his grant gives the Federal Government considerable influence even in areas where it cannot directly regulate."  *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 537 (2012).  For instance, "in exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions," which may, in turn, "induce the States to adopt policies that the Federal Government itself could not impose."  *Id.*  To that end, Congress "has repeatedly employed the [spending] power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'"  *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citation omitted).

"The spending power is of course not unlimited," and the Supreme Court has articulated three basic "limitations" on its use.  *Id.* at 207.  First, "the exercise of the spending power must be in pursuit of 'the general welfare.'"  *Id.* (citing *Helvering v. Davis*, 301 U.S. 619, 640–41 (1937)).  Second, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation."  *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  Third, the Supreme Court has "suggested" that "conditions on federal grants

31

might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" *Id.* (citing *Massachusetts v. United States*, 435 U.S. 444, 461, (1978)).

A violation of the Spending Clause thus occurs—if at all—"when *Congress* imposes a spending or funding condition" that runs afoul of these limitations. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 162 (D.D.C. 2025) (emphasis added), *appeal filed*, No. 25-5277 (D.C. Cir. July 28, 2025); *see, e.g.*, *Bd. of Educ. for Silver Consol. Schs. v. McMahon*, 791 F. Supp. 3d 1272, 1288 (D.N.M. 2025) (citing same); *Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 212 (D.D.C. 2025) (observing that the Spending Clause "does not, on its face, purport to limit what the Executive Branch may do under Article II"). Plaintiffs, however, seek to challenge conditions that the Department has purportedly placed on TQP and SEED grant awards. Because they do not seek to challenge "Congressional action," Plaintiffs' claim under the Spending Clause "cannot" succeed. *Wilmer*, 784 F. Supp. 3d at 162.

Plaintiffs' two Spending Clause arguments fail in any event. They observe that "Congress's spending powers 'do[] not include surprising participating States with post acceptance or 'retroactive' conditions.'" Doc. No. 144 at 44 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981)). And they claim that the Department imposed "vague, anti-'DEI' conditions retroactively, well-after Plaintiffs had accepted the federal funding—and in the middle of a school year and budget cycle." Doc. No. 144 at 44. But, even if that were true, this Court lacks jurisdiction over such a retrospective claim. Moreover, Plaintiffs' asserted "past harm[s]"—namely, having their grants subjected to and terminated based on allegedly vague and retroactive conditions—cannot serve as the basis for prospective relief. *Roe*, 78 F.4th at 21. And to the extent that Plaintiffs claim that the Department's imposition of such conditions to *future*

32

grants (that they might apply for and might receive) *would* violate the Spending Clause, that contention fails because such action would not in any sense qualify as a retroactive surprise.

Plaintiffs also assert that the Department's alleged "imposition of anti-'DEI' principles are not reasonably related to the federal interests animating the TQP and SEED programs." Doc. No. 144 at 45. But, as was the case with their other claims, Plaintiffs' loose branding of the Department's actions as simply imposing "anti-DEI principles" mischaracterizes the now-superseded February Guidance, which sought to ensure that "Department grants do not fund discriminatory practices—*including* in the form of DEI." AR 139 (emphasis added).

What's more, the reasonable-relation test for Spending Clause claims marks "a rather low-threshold" requiring only that the funding condition "bear *some relationship* to the purpose of the federal spending." *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1034 (N.D. Cal. 2018) (citing *New York v. United States*, 505 U.S. 144, 167 (1992)); *see City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019) (observing that the Supreme Court "has never struck down a condition on federal grants based on this relatedness prong"). And Plaintiffs cannot reasonably contend that (i) the government's interest in ensuring that federal funds do not support discriminatory activities lacks a sufficient relationship to (ii) the purpose of TQP and SEED funding. After all, federal agencies have long required compliance with antidiscrimination laws and regulations as a condition to receiving all manner of federal funding. *See Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582, 629–30 (1983) (Marshall, J., dissenting).

Plus, it is not as though the Department has sought to enlist States in carrying out some federal policy as a condition of receiving TQP and SEED grants. It has merely sought to ensure that *those funds* do not support discriminatory activities. The Department's concern—whether

33

viewed as a "condition" or not—thus bears a direct relationship with the purpose of the federal spending at issue in that it seeks to ensure that recipients do not use those funds for *other* purposes.

### 2. The Department's guidance does not violate the separation of powers.

Plaintiffs next claim that, "[b]y relying on the [February Guidance] to terminate the TQP and SEED programs and usurping Congress' legislative authority, Defendants violated the Separation of Powers." Doc. No. 144 at 47. Yet, again, their assertion that the Department's *terminations* violated the law (here, the Constitution's separation of powers) constitutes a "retrospective claim[]" that they must bring in the Court of Federal Claims. Doc. No. 133 at 27. And, again, the Department's recent solicitation of TQP and SEED grant applications conclusively demonstrates that it has not "terminate[d] the TQP and SEED programs" writ large. *See* p. 27, *supra*. Even if Plaintiffs had standing to challenge a prospective violation of the separation of powers that the Department might commit in the imminent future, their theory still would lack merit. Plaintiffs' argument rests on the view that the Department's guidance "impose[s] standards" for termination "that run directly contrary to the standards" for awarding grants "promulgated by Congress" in the TQP and SEED statutes and GEPA. Doc. No. 144 at 47.

As the Supreme Court has explained, however, not "every action" by an Executive agency "in excess of [its] statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated, for example, if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an Executive

34

agency has "exceeded [its] statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473.

Here, Plaintiffs' "separation of powers claim turns on the allegation that the Government's actions 'directly contravene[d] Congress's directives'" in the TQP and SEED statutes and GEPA. *Sustainability Inst. v. Trump*, 165 F.4th 817, 831 (4th Cir. 2026). In other words, they assert that "because [Defendants] violated *statutes*, they also violated the Constitution." *Id.* (emphasis added). Plaintiffs' separation-of-powers claim is therefore really a "statutory one," *Dalton*, 511 U.S. at 474; *Glob. Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025) ("Here, the grantees assert a non-statutory right to vindicate separation-of-powers principles but they are foreclosed from doing so by *Dalton v. Specter*.").

### 3. The Department's guidance is not ultra vires.

Finally, Plaintiffs briefly assert that—"[f]or the same reasons" supporting their separation-of-powers claim—the Department's actions "are ultra vires as they are contrary to law and outside of Defendants' authority." Doc. No. 144 at 47. But they have not developed their ultra vires argument in any meaningful way and have therefore waived it. *See Mackey v. Town of Tewksbury*, 433 F. Supp. 3d 116, 163 (D. Mass. 2020) (explaining that movant's "failure to adequately develop" an argument "amounts to a waiver of the argument for purposes of [its] summary judgment motion"). And, regardless, an ultra vires claim presents different considerations than a separation-of-powers claim and thus cannot succeed simply "[f]or the same reasons." *See Sustainability Inst.*, 165 F.4th at 830 (explaining that "[n]onstatutory review claims alleging a constitutional violation, however, are not subject to the same restrictions" as ultra vires claims).

"Before enactment of the APA, those challenging agency action often lacked a statutory cause of action." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680 (2025). Nonetheless, in

35

certain circumstances, "courts recognized a right to equitable relief where an agency's action was ultra vires—that is, 'unauthorized by any law and . . . in violation of the rights of the individual.'" *Id.* (citation omitted). Following the enactment of the APA, however, the Supreme Court has "strictly limited nonstatutory ultra vires review to the 'painstakingly delineated procedural boundaries'" of its decision in *Leedom v. Kyne*, 358 U.S. 184 (1958). *Id.* Accordingly, ultra vires review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to *a specific prohibition*' in a statute." *Id.* (citation omitted). "Given all that," an ultra vires claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.* at 681–82 (citation omitted).

Plaintiffs have not identified any "specific prohibition" in the TQP or SEED statutes, or GEPA, that the Department has supposedly contravened. *Cf. Sustainability Inst.*, 165 F.4th at 833 ("The appropriations statutes cited by Plaintiffs appropriate funds for particular programs and goals. But none of them purport to tell the Government that it must contract specifically with Plaintiffs."). Thus, even if they had not waived this claim, it would still fail on the merits.

## V.    CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated:  June 1, 2026                    By:    */s/ Michael L. Fitzgerald*
                                               MICHAEL L. FITZGERALD
                                               Assistant United States Attorney

36

U.S. Attorney's Office
1 Courthouse Way, Ste. 9200
Boston, MA 02210
(617) 748-3266
michael.fitzgerald2@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Michael L. Fitzgerald*
MICHAEL L. FITZGERALD
Assistant U.S. Attorney