**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF NEW YORK; and STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, in her official capacity as former Acting Secretary of Education; and LINDA MCMAHON, in her official capacity as Secretary of Education,<br><br>Defendants. | Civil Action No. 25-CV-10548-AK |

**<u>MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO STRIKE, PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

**ANGEL KELLEY, D.J.**

In this lawsuit, eight States challenge a U.S. Department of Education directive that mandates the termination of federal education grants that fund diversity, equity, and inclusion ("DEI") initiatives. In February 2025, within the span of two weeks, the Department canceled over one hundred grants worth hundreds of millions of dollars under this directive. Plaintiff States bring this suit alleging that the directive is arbitrary or capricious, contrary to federal education funding statutes, and unconstitutional.

In 2008 and 2015, Congress established two educational grant programs to address the

ongoing national crisis in teacher shortages, particularly in high-need communities. Known as the Teacher Quality Partnership ("TQP") and the Supporting Effective Educator Development ("SEED") programs, these federal funding opportunities seek to expand equitable access to high-quality educators and improve student achievement. These initiatives dovetailed with an earlier federal statute, the General Education Provisions Act ("GEPA"), under which Congress required all federal educational grant applicants "to ensure equitable access to, and equitable participation in, the project . . . by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a(b). Pursuant to these statutes, the Department awarded hundreds of multi-year grants to States and their instrumentalities through these programs. But in February 2025, the Department issued an internal agency directive mandating the termination of any grant program that promotes DEI ("February 2025 Directive" or "Directive"). And within fourteen days of issuing the Directive, the Department terminated over ninety percent of existing TQP and SEED grants.

Plaintiff States—the Commonwealth of Massachusetts and the States of California, New Jersey, Colorado, Illinois, Maryland, New York, and Wisconsin—filed this action against Defendants Secretary of Education Linda McMahon and former Acting Secretary of Education Denise Carter ("Secretary Carter"), in their official capacities, and the Department of Education. Plaintiffs argue that the Department's terminations and the February 2025 Directive are arbitrary and capricious under the Administrative Procedure Act ("APA"), contrary to three federal educational funding statutes, and in violation of the Constitution.

Previously, this Court granted in part and denied in part Defendants' motion to dismiss, finding that it lacked jurisdiction under the Tucker Act to hear Plaintiff States' challenges to the

individual grant terminations. However, the Court retained jurisdiction over the claims related to the February 2025 Directive. Now on summary judgment, Plaintiff States ask the Court to vacate the Directive and provide declaratory and permanent injunctive relief. The Department cross-moves for summary judgment, arguing that Plaintiff States lack standing, that their claims are moot, and that they are otherwise not entitled to any relief.

As explained in this Order, the Court finds that Plaintiff States are entitled to summary judgment on their APA claims because the February 2025 Directive is arbitrary and capricious and contrary to law. The Court will vacate the Directive and grant the declaratory relief requested by Plaintiff States. Accordingly, Plaintiffs' Motion for Summary Judgment is **GRANTED**, and Defendants' Cross-Motion for Summary Judgment is **DENIED**. Plaintiffs' Motion to Strike is **DENIED AS MOOT**.

## I. BACKGROUND

The following facts are drawn from the Administrative Record, the admissions in Defendants' Answer, and uncontroverted facts in the summary judgment record, unless otherwise noted. See Wahlstrom v. Zurich Am. Ins. Co., No. 19-CV-12208, 2022 WL 20416909, at *3 (D. Mass. Aug. 17, 2022) (citing W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 175 (3d Cir. 2013)); Mills v. Turner, No. 15-CV-13267, 2017 WL 3670967, at *12 (D. Mass. Aug. 25, 2017).

This case arises from nationwide efforts to improve teacher training, teacher shortages, and equitable access to education. Across the United States, communities face a shortage of qualified teachers and student resources. The number of people completing traditional teacher preparation programs has dropped by 35% in the last decade and nearly 300,000 teachers leave the teaching profession each year. In 2024, almost three quarters of public schools in the country

reported difficulty filling teacher vacancies. The issue is particularly acute in certain subject areas; for example, the percentage of teaching positions filled with fully certified teachers was 83% for math, as compared to 77% for special education and 75% for English as a second language or bilingual education. These teacher shortages can result in an array of negative consequences for students, including larger class sizes, cancelled courses, classes staffed with teachers who are less qualified to teach certain subjects and/or temporary teachers, and significant learning disruption.

### A. Statutory Framework

To address this increasingly dire crisis, Congress established federal grant programs to train, place, and support teachers, including, as relevant here, the TQP and SEED grant programs. Under the TQP and SEED authorizing statutes, the Secretary of the Department is instructed to "award grants, on a competitive basis, to eligible partnerships," 20 U.S.C. § 1022a(a), or "entities," id. § 6672(a), for the purposes specified by the respective statutes.

#### 1. Teacher Quality Partnership ("TQP") Program

The TQP program statute is contained in Title II of the Higher Education Act, as amended on August 14, 2008, by the Higher Education Opportunity Act, Pub. L. No. 110-315. 20 U.S.C. § 1022 *et seq*. The statute authorizes the Department of Education to award grants for the purpose of recruiting and training high-quality teachers, especially in hard-to-staff areas. Specifically, the TQP statute provides that its purpose is to:

> (1) improve student achievement;
>
> (2) improve the quality of prospective and new teachers by improving the preparation of prospective teachers and enhancing professional development activities for new teachers;
>
> (3) hold teacher preparation programs at institutions of higher education accountable for preparing teachers who meet the applicable State certification and licensure requirements, including any requirements for certification obtained

> through alternative routes to certification, or, with regard to special education teachers, the qualifications described in [section 612(a)(14)(C) of the Individuals with Disabilities Education Act, 20 U.S.C. § 1412(a)(14)(C)]; and
>
> (4) recruit highly qualified individuals, including minorities and individuals from other occupations, into the teaching force.

Id. § 1022.

The TQP program authorizes the Department to award competitive grants to "eligible partnerships." Id. § 1022(a). An "eligible partnership" involves two parties: (1) a high-need local educational agency ("LEA") (i.e., a school district serving a high percentage of low-income students or has a high percentage of teachers teaching outside their certified areas), including a specific high-need school or early childhood education ("ECE") program within the district where teacher preparation or residency will take place; and (2) a partner college or university, including its teacher training department and a department of arts or sciences. Id. § 1021(6)(A). The eligible partnership may include other optional entities such as the governor of the State, the State educational agency, and others. See id. § 1021(6)(B).

Under the TQP program, an eligible partnership must use grant funds to carry out a teacher-preparation or teaching-residency program. Id. § 1022a(c). The statute specifies that grantees may prioritize recruiting individuals from "underrepresented populations," individuals who can teach in "rural and geographically isolated communities," mid-career professionals from other occupations, former military personnel, and recent college graduates. Id. § 1022a(d)(5). The statute further requires grantees to "provide assurances to the Secretary" that, *inter alia*, "general education teachers receive training in providing instruction to diverse populations" and "training provided to prospective teachers is closely linked with the needs of schools and the instructional decisions new teachers face in the classroom." Id. § 1022e(b).

TQP grants are "awarded for a period of five years." Id. § 1022b(a)(1). For eligible

partnerships not making substantial progress in their program goals "by the end of the third year," Congress authorizes the Secretary to cancel the grant. Id. § 1022c(c). The TQP grant program has been funded steadily since 2014.

### 2. Supporting Effective Educator Development ("SEED") Program

Established in 2015, the SEED program authorizes the Department of Education to award grants to fund educator training and staffing programs. The program's purpose is "to increase the number of highly effective educators by supporting the implementation of Evidence-Based practices that prepare, develop, or enhance the skills of educators." Funding Opportunity Description Purpose of Program: The SEED, 90 Fed. Reg. 11, 5846 (Jan. 17, 2025). Specifically, SEED grants seek to:

> (1) provid[e] teachers, principals, or other school leaders from nontraditional preparation and certification routes or pathways to serve in traditionally underserved local educational agencies;
>
> (2) provid[e] evidence-based professional development activities that address literacy, numeracy, remedial, or other needs of local educational agencies and the students the agencies serve;
>
> (3) provid[e] teachers, principals, or other school leaders with professional development activities that enhance or enable the provision of postsecondary coursework through dual or concurrent enrollment programs and early college high school settings across a local educational agency;
>
> (4) mak[e] freely available services and learning opportunities to local educational agencies, through partnerships and cooperative agreements or by making the services or opportunities publicly accessible through electronic means; or
>
> (5) provid[e] teachers, principals, or other school leaders with evidence-based professional enhancement activities, which may include activities that lead to an advanced credential.

20 U.S.C. § 6672(a). Congress also tasked the Secretary with ensuring, to the extent practicable, that SEED grants are distributed among "geographically diverse areas." Id. § 6672(b)(3). SEED grants are awarded initially for up to three years, which can be renewed for an additional two-

year period. Id. § 6672(b)(1)-(2). The SEED grant program has been funded steadily since 2011.

### 3. General Education Provisions Act ("GEPA")

GEPA was originally enacted as Title IV of the Elementary and Secondary Education Amendments of 1967. It outlines the rules, administrative conditions, and statutory requirements for most education programs managed by the Department of Education. Section 427 of GEPA, titled "Equity for students, teachers, and other program beneficiaries," establishes the purpose of the statute as:

> to assist the Department in implementing the Department's mission to ensure equal access to education and to promote educational excellence throughout the Nation, by:
>
> (1) ensuring equal opportunities to participate for all eligible students, teachers, and other program beneficiaries in any project or activity carried out under an applicable program; and
>
> (2) promoting the ability of such students, teachers, and beneficiaries to meet high standards.

20 U.S.C. § 1228a(a). GEPA requires any organization applying for federal education funding to explicitly develop and describe in its application the steps it will take "to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." Id. § 1228a(b).

## B. Regulatory Framework

To implement the TQP and SEED programs, as well as its other grant programs, the Department of Education has established a comprehensive regulatory framework.

### 1. The Education Department General Administrative Regulations ("EDGAR") and Agency Priorities

The Education Department General Administrative Regulations ("EDGAR") consists of

administrative regulations governing all Department of Education grant programs. They are found in Title 34 of the *Code of Federal Regulations*. As relevant here, 34 C.F.R. Part 75 governs direct grant programs, including TQP and SEED discretionary grants. The statutory application process for TQP and SEED grants is implemented in accordance with Title 34.

The regulations direct the Department to publish in the *Federal Register* proposed and final versions of agency "priorities." In the grant process, priorities are "a means of focusing a grant competition on the areas in which the [Department] is particularly interested in receiving applications." *Grant Terminology*, Dep't of Educ. (Jan. 14, 2025), https://www.ed.gov/grants-and-programs/apply-grant/pdf-form-tips. There are three types of priorities: absolute, competitive preference, and invitational. Id. Absolute priorities are those that "the applicant must address in order to be considered for funding." Id. Competitive preference priorities are those that "the applicant has the option of choosing whether or not to address and for which they may receive additional points." Id. Invitational priorities are those that "the applicant is encouraged but not required to address." Id.

### 2. Grant Application and Award Process

To solicit grant applications, the Department issues a Notice Inviting Application ("NIA") in the *Federal Register*. 34 C.F.R. § 75.105(b). The NIAs for TQP and SEED specify the priorities that the Department will rely on in making competitive selections. The Department evaluates grant applications using standardized selection criteria, which may be assigned points or weighted. See id. § 75.210. An applicant may earn up to 100 points based on the agency's selection criteria. See id. § 75.201. These include up to 30 points for the quality of the project design, up to 20 points for the quality of the project evaluation, up to 30 points for the adequacy of resources, and up to 20 points for the quality of the management plan. See id. The

Department may also consider the applicant's past performance in carrying out awards, such as the applicant's use of funds, achievement of project objectives, and compliance with grant conditions. See id. § 75.217(d)(3). In addition, the Department requires various assurances, including those applicable to federal civil rights laws that prohibit discrimination in programs receiving federal financial assistance. See id. §§ 100.4, 104.5, 106.4, 108.8, 110.23. The Department may also impose specific conditions before awarding competitive grants, depending on the risk posed by a particular applicant. See 2 C.F.R. § 200.208.

After the Department selects TQP and SEED grant recipients, grantees receive official Grant Award Notifications ("GANs") for that fiscal year. For some grant recipients, the GANs confirm funding for the coming year as part of their ongoing, multi-year grant award; for others, the GANs confirm funding for the first year of a multi-year grant award.

### 3. Uniform Guidance

The Office of Management and Budget ("OMB") has issued the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance"), 2 C.F.R. Part 200. The Uniform Guidance establishes uniform administrative requirements, cost principles, and audit requirements for federal awards to non-federal entities. The Department of Education has adopted the Uniform Guidance through its own regulations. 2 C.F.R. § 3474.

In relevant part, the Uniform Guidance instructs that a federal agency may terminate a grant award "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). If a grant is terminated, the Uniform Guidance provides the recipient with a fair opportunity to object, requiring that the Department "provide written notice of

termination to the recipient" that "include[s] the reasons for termination," and that the Department "maintain written procedures for processing objections, hearings, and appeals." Id. § 200.341(a), .342.

### C. Factual Background

#### 1. Grant Programs in Plaintiff States

At the time relevant to this action, Plaintiffs had over forty active TQP and SEED grants, totaling over $250 million. Most of these applications were submitted in response to the Department's 2022 and 2024 SEED and TQP NIAs, which incorporated final and supplemental agency priorities published in 2021. See Applications for New Awards; Teacher Quality Partnership Grant Program, 87 Fed. Reg. 10,906 (Feb. 25, 2022); Applications for New Awards; Supporting Effective Educator Development Program, 87 Fed. Reg. 19,487 (Apr. 4, 2022); Applications for New Awards; Teacher Quality Partnership Grant Program, 89 Fed. Reg. 23,573 (Apr. 4, 2024); Applications for New Awards; Supporting Effective Educator Development Program, 90 Fed. Reg. 5,845 (Jan. 17, 2025); Final Priorities – Effective Educator Development Division, 86 Fed. Reg. 36217 (July 9, 2021); Final Priorities and Definitions – Secretary's Supplemental Priorities and Definitions on Evidence-Based Literacy, Education Choice, and Returning Education to the States, 86 Fed. Reg. 70612 (Dec. 10, 2021). A small number of applications were submitted in response to an earlier 2020 NIA, which incorporated a previous set of agency priorities from 2019. See Applications for New Awards; Teacher Quality Partnership Grant Program, 85 Fed. Reg. 29,691 (May 18, 2020); Final Priority for Discretionary Grant Programs, 84 Fed. Reg. 65300 (Nov. 27, 2019); Administrative Priorities for Discretionary Grant Programs, 85 Fed. Reg. 13640 (Mar. 9, 2020).

Examples of Plaintiffs' TQP and SEED programs are as follows. In Massachusetts, the

University of Massachusetts ("UMass") Amherst received a TQP grant in 2023 for approximately $2.3 million to create a sustainable program to train paraeducators to become fully licensed early childhood educators in two high-need districts, Holyoke and Springfield. The goal of the TQP program was to train and license thirty-five new early childhood educators in these districts by the end of the five-year term, and to establish and expand the Para-to-Teacher Program for Early Childhood Education as a source of future licensed early childhood educators in other districts. UMass Boston was in the final stages of formalizing an agreement to become a subgrant recipient of a second TQP grant awarded to Boston Public Schools ("BPS") in 2023 for approximately $5.9 million to train bilingual educators. The Bilingual Inclusive Education Teacher Residency program, funded by the 2023 TQP grant, was intended to create a teacher residency program that would allow educators to earn a Master's in Special Education with licensure in Moderate Disabilities and Bilingual Education Endorsement, addressing the high number of English Language Learners in the Commonwealth's largest public-school district.

In California, California State University and the University of California received eight now-terminated TQP and SEED grants valued at about $56 million. These programs were intended to train thousands of teachers across California for high-need rural and urban school districts. The University of California, Los Angeles received a TQP grant in 2023 for approximately $8 million to establish the UCLA Cultivating Excellence program, preparing middle school teachers, leaders, and aspiring leaders to serve students more effectively in high-need school districts across Los Angeles County.

In Maryland, Frostburg State University received a five-year $3.2 million TQP grant for its Rural Educators for Appalachian Children program, which is designed to serve five school

districts. The program prioritizes the recruitment and retention of diverse and qualified teachers for students in rural communities by implementing educational programs and training for teachers to be dually certified in elementary education and special education. The program also implemented a "MegaCommunity" to provide cross-sector expertise and resources to rural districts with sparse resources. Towson University also received a one-year $849,659 TQP grant for its Preparing and Retaining Inclusive Maryland Educators program. This program helps prepare and support 400 undergraduate teacher candidates to improve the State's teacher pipeline and ability to retain special education, early childhood education, and elementary education teachers. The University of Maryland also received a three-year $4.8 million SEED grant for the School Improvement Leadership Academy, which supports and prepares principals and assistant principals in "Instructional Leadership," "Equity Leadership," and "Improvement Leadership."

In total, from 2021 to 2025, the Department awarded universities, schools, and nonprofits 162 grants (or $1,002,522,304.81) that included DEI, social-emotional learning, restorative practices, and/or youth activism as part of the programming. In fiscal year 2025, prior to termination, TQP and SEED grant recipients had been consistently submitting reports, program evaluations, and other compliance documents to the Department. Many of the grantees received multiple TQP and SEED awards over the years.

### 2. Executive Orders and Department Directive

On January 21, 2025, President Trump issued Executive Order No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." 90 Fed. Reg. 8,633 (Jan. 31, 2025). Executive Order No. 14173 requires the Director of the OMB, with the assistance of the Attorney General, to "excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures"

and to "terminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." Id. Executive Order No. 14173 also instructs federal agencies to include, in every contract or grant award, terms requiring contractual counterparties or grant recipients "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Id.

One week later, President Trump issued Executive Order No. 14190, titled "Ending Radical Indoctrination in K-12 Schooling." 90 Fed. Reg. 8,853 (Feb. 3, 2025). Executive Order No. 14190 requires the Secretary of Education, Secretary of Defense, and Secretary of Health and Human Services, in consultation with the Attorney General, to develop, within ninety days, a plan for "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology." Id.

To implement these Executive Orders, on February 5, 2025, Secretary Carter issued an internal "Directive on Department Grant Priorities," titled "Eliminating Discrimination and Fraud in Department Grant Awards." The Directive begins:

> From the Supreme Court's 1954 landmark opinion in Brown v. Board of Education to its 2023 decision in Students for Fair Admissions, Inc. v. Fellows of Harvard College, education has played a central role in this Nation's fight against discrimination. It remains a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. This includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education.

Id. Secretary Carter then instructs as follows:

> Department personnel shall conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication.

Id. The Directive concludes that "[g]rants deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements in the relevant award, agreement, or other instrument," and cites 2 C.F.R. § 200.340(a)(4)-.341 in support. Id.

### 3. Timeline of Grant Terminations

Immediately following the issuance of the Directive, the Department began reviewing existing TQP and SEED grants. The reviews were conducted by seven personnel over one week, and included reviewing each grant application's language, publicly available information about each grantee's use of federal funds, and each grant agreement's terms and conditions. The review process focused on whether a grant contained "objectionable material associated with DEI, such as cultural responsiveness, systemic privilege, racial justice, social justice, and anti-racism."

Beginning on or around February 7, 2025, TQP and SEED recipients began receiving termination letters from the Department titled "RE: Grant Award Termination" ("Termination Letter"). The Termination Letter was authored by a staff member originally from the Department of Government Efficiency. The Department also distributed a revised GAN ("Termination GAN") to most TQP and SEED grant recipients. The Termination GAN noted, "[t]he grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. § 200.340(a)(4); see also 34 C.F.R. § 75.253." Plaintiff States' grant recipients had already received an initial or continuance award and were midway into the fiscal year of their

current projects when they received the Termination Letters in February 2025. Of the recipients who filed objections, none received a response or resolution from the Department as of June 2, 2025.

On February 17, 2025, after issuing most, if not all, of the termination decisions, the Department issued a press release announcing:

> The U.S. Department of Education today announced that it has terminated over $600 million in grants to institutions and nonprofits that were using taxpayer funds to train teachers and education agencies on divisive ideologies. Training materials included inappropriate and unnecessary topics such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism; "anti-racism"; and instruction on white privilege and white supremacy.

In total, as of March 12, 2025, Defendants terminated 104 out of 109 total grants pursuant to the February 2025 Directive, including forty from Plaintiff States.[1] Since June 5, 2025, the Department has not relied on the February 2025 Directive in issuing any termination or non-continuation decisions for TQP and SEED grants.

#### 4. Post-Termination Grant Applications

In March 2025, the Department issued a notice withdrawing and cancelling the previous NIA for the SEED program. See Withdrawal of Notice Inviting Applications (NIA) and Cancellation of the Competition for the Supporting Effective Educator Development (SEED)

[1] These include two for California Polytechnic Corporation; Montclair State University; Alder Graduate School of Education; the Regents of the University of Colorado; the State of Maryland; Alder Graduate School of Education; National University; the Board of Education of City of Chicago; DePaul University; three for Reach University; Lindsay Unified School District; UMass; University of Wisconsin; two for the Research Foundation for the State of New York; College of New Jersey; UCLA; the City of Boston; two for Center for Collaborative Education; Cook County School District #104; two for California State Los Angeles University Auxiliary Services, Inc.; University Corporation at Monterey Bay; two for Chico State Enterprises; Towson University; Research Foundation for the City University of New York ("CUNY"); Tulare County Office of Education; TNTP, Inc.; National Center for Teacher Residencies, Inc.; New Leaders, Inc.; WestEd; Community Training and Assistance Center, Inc.; University of Maryland, College Park; Center for Civic Education; and UnboundEd (formerly known as Pivot).

Program, 90 Fed. Reg. 11,411 (Mar. 6, 2025). Shortly after, the agency published new proposed and final priorities. See Proposed Priorities and Definitions – Secretary's Supplemental Priorities and Definitions on Evidence-Based Literacy, Education Choice, and Returning Education to the States, 90 Fed. Reg. 21710 (May 21, 2025); Final Priorities and Definitions – Secretary's Supplemental Priorities and Definitions on Evidence-Based Literacy, Education Choice, and Returning Education to the States, 90 Fed. Reg. 43514 (Sep. 9, 2025). The new absolute priorities included: "Supporting Effective Teachers," "Supporting Effective Principals and Other School Leaders," "Promoting Evidence-Based Literacy," and "Meaningful Learning Opportunities for Students." The competitive preference priorities included: "Returning Education to the States," "Advancing Artificial Intelligence in Education," and "Career Pathways and Workforce Readiness."

In mid-2025, the Department issued NIAs soliciting TQP and SEED grant applications for fiscal year 2026 ("FY2026") based on the new priorities. See Notice Announcing Supporting Effective Educator Development Program Competition (Apr. 20, 2026); Notice Announcing Teacher Quality Partnership Program Competition, 91 Fed. Reg. 25562 (May 11, 2026). Applications for SEED grants were due June 1, 2026, and the estimated date for award announcement is September 30, 2026. Applications for TQP grants were due June 23, 2026. Plaintiff States have submitted applications for both grant programs pursuant to the FY2026 NIAs, providing nine declarations from applicants. According to Defendants, eight out of these nine declarants have received approval for funding under other programs since June 2025, including seven new grants and one continuation.

**D. Procedural History**

On March 6, 2025, Plaintiff States filed both a Complaint as well as a Motion for

Temporary Restraining Order ("TRO"). On March 10, 2025, Judge Joun entered a TRO effective until March 24, 2026, temporarily enjoining Defendants from terminating any previously awarded TQP or SEED grants for recipients in Plaintiff States. Defendants appealed the TRO to the U.S. Court of Appeals for the First Circuit, requesting a stay. On March 12, 2025, Judge Joun converted the Motion for TRO to a Motion for Preliminary Injunction ("PI"); Defendants then moved for an emergency stay of the court's TRO until the resolution of the First Circuit appeal. On March 13 and 21, 2025, the motion to stay was denied by the district court and the First Circuit, respectively.

On March 24, 2025, the district court extended the TRO until it resolved the Motion for PI, not to exceed April 7, 2025. On March 26, 2025, Defendants again attempted to stay the order pending the appeal of the TRO, this time by applying to the Supreme Court to vacate the March 10 order and March 24 extension. On April 4, 2025, the Supreme Court granted Defendants' application and stayed both the TRO and its extension pending the disposition of the appeal of the TRO in the First Circuit, as well as in the case of a disposition of a petition for a writ of certiorari based on the appeal to the Supreme Court. Upon receiving the Supreme Court's decision, Plaintiff States withdrew the TRO-turned-PI motion in the district court and it was terminated as moot by the court on April 9, 2025. Defendants submitted an unopposed Motion to Dismiss the TRO appeal in the First Circuit; on April 23, 2025, the appeal of the TRO was then voluntarily dismissed.

On May 12, 2025, Defendants submitted a Motion to Dismiss for Lack of Jurisdiction, or, in the Alternative, to Transfer to the Court of Federal Claims pursuant to the Tucker Act. After requesting that Defendants produce the Administrative Record and receiving it pursuant to the district court's order, Plaintiff States filed their Amended Complaint on June 2, 2025. In the

Amended Complaint, Plaintiff States assert six claims: (1) arbitrary and capricious agency action in violation of the APA, 5 U.S.C. § 706(2)(A); (2) agency action not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A); (3) declaratory judgment; (4) violation of the Spending Clause, U.S. Const. art. 1, § 8, cl. 1; (5) *ultra vires* action; and (6) violation of separation of powers based in U.S. Const. art. 1, § 1. Because of the Amended Complaint, Defendants' original Motion to Dismiss was terminated as moot.

On June 3, 2025, this case was reassigned to this Court after Judge Joun's recusal. On June 30, 2025, Defendants submitted a second Motion to Dismiss for Lack of Jurisdiction or, in the Alternative, to Transfer to the Court of Federal Claims, raising the same arguments as their prior Motion to Fismiss. On November 13, 2025, this Court granted in part and denied in part Defendants' Motion to Dismiss, finding that Plaintiffs' retrospective claims regarding the termination of their TQP and SEED grants sounded in contract, and therefore the Court lacked jurisdiction to hear them. Pursuant to the Tucker Act, those claims must instead be brought in the Court of Federal Claims. However, the Court, relying substantially on Justice Barrett's concurrence in Nat'l Insts. of Health v. Am. Pub. Health Ass'n ("NIH III"), 145 S. Ct. 2658 (2025), concluded that it maintains jurisdiction over Plaintiffs' prospective claims for injunctive and declaratory relief under the APA and Constitution.

Defendants filed an Answer on January 9, 2026. Plaintiffs moved for summary judgment on April 16, 2026. Law professors, including William W. Buzbee, Noah Rosenblum, and Jodi Short, filed an amicus brief in support of the constitutional claims in Plaintiffs' Motion on May 14, 2026. Defendants filed a Cross-Motion for Summary Judgment on June 1, 2026. Plaintiffs filed Notices of Supplemental Authorities on July 14, 2026, and July 22, 2026, as well as a Motion to Strike Declaration filed in support of Defendants' Reply on July 23, 2026. The Court

held a motion hearing with the parties on July 24, 2026. Defendants filed a Notice of Supplemental Authority on August 27, 2026.

## II. LEGAL STANDARD

Both parties move for summary judgment on all claims. The Court evaluates threshold jurisdictional issues under the standard summary judgment framework, while evaluating the merits of the APA claims under the APA's distinct standard of review.

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law. Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted).

Courts must consider (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001); see also Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006). Courts must evaluate "the record and [draw] all reasonable inferences therefrom in the light most favorable to the non-moving parties." Est. of Hevia v.

Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 183-84 (1st Cir. 1999)). A non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Paul, 948 F.3d at 49 (citation omitted). There must be "definite, competent evidence" in the record to support a genuine dispute of material fact Mesnick, 950 F.2d at 822.

Where, as here, there are cross-motions for summary judgment, courts "must view each motion, separately, through this prism," and "may enter summary judgment only if the record, read in this manner, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Hevia, 602 F.3d at 40 (internal citations omitted).

**B. APA Standard**

For the merits of APA claims, a motion for summary judgment is "simply a vehicle to tee up a case for judicial review." Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016). Courts "review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious" or otherwise unlawful. Id.; see Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997) (explaining court's task on summary judgment in administrative law context "is only to determine" whether agency's action was "consonant with [its] statutory powers, reasoned, and supported by substantial evidence in the record"). APA claims "are adjudicated without a trial or discovery, on the basis of an existing administrative record, [and accordingly] are properly decided on summary judgment." Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. Dep't of Transp., 524 F. Supp. 2d 642, 660 (D. Md. 2007); see also 10B Wright & Miller, Fed. Prac. &

Proc. 3d § 2733 (2007). The ordinary summary judgment standard set forth in Rule 56 "does not apply because of the limited role of a court in reviewing the administrative record." Deese v. Esper, 483 F. Supp. 3d 290, 304 (D. Md. 2020) (citation omitted).

Because the APA affords great deference to agency decisionmaking and agency actions are presumed valid, "judicial review [under the APA], even at the summary judgment stage, is narrow." Daley, 127 F.3d at 109 (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971)). Courts should "uphold an agency determination if it is 'supported by any rational view of the [administrative] record." Marasco & Nesselbush, LLP v. Collins, 6 F.4th 150, 172 (1st Cir. 2021) (quoting Atieh v. Riordan, 797 F.3d 135, 138 (1st Cir. 2015)). Even where an inquiring court disagrees with the agency's conclusions, the court cannot "substitute its judgment for that of the agency." Bos. Redevelopment Auth., 838 F.3d at 47 (quoting Daley, 127 F.3d at 109). Rather, an agency's action should only be vacated where the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658 (2007) (internal quotation marks omitted).

## III. JURISDICTION

The Court begins by assessing threshold challenges to its jurisdiction. Defendants contend that: (1) Plaintiffs fail to establish standing, (2) Plaintiffs' claims are moot because the February 2025 Directive was allegedly superseded by a subsequent June 2025 guidance document, and (3) the Court lacks jurisdiction under the APA because the February 2025 Directive is not a final agency action.

### A. Standing

Defendants first move to dismiss the action for failure to establish standing. The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. art. III, § 2, cl. 1; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). To demonstrate standing, plaintiffs must establish three familiar elements: "(1) [he] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (quoting Defs. of Wildlife, 504 U.S. at 560-61). "The standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts," as well as for each requested form of relief. Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012) (citing Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006)); Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008).

Because standing is not a "mere pleading requirement[] but rather an indispensable part of the plaintiff's case," standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation." Defs. of Wildlife, 504 U.S. at 561; see also People to End Homelessness v. Develco Singles Apartments Assoc., 339 F.3d 1, 8 (1st Cir. 2003). While at the pleading stage, "general factual allegations of injury" may suffice, at summary judgment, the specific facts establishing standing "must be 'supported adequately by . . . evidence.'" Id. (quoting Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 114, 115 n.31 (1979)).

Defendants contend that Plaintiffs lack standing to pursue prospective relief regarding the February 2025 Directive because they have failed to demonstrate an injury-in-fact. Specifically, Defendants argue that any harm from future grant terminations is not sufficiently "imminent"

because the Department is no longer implementing the February 2025 Directive.

As a threshold matter, many of Defendants' arguments concerning imminence overlap with their arguments concerning mootness. That distinction is important because the two doctrines assign different burdens of proof and implicate different inquiries. To clarify the distinction, the First Circuit has explained that a plaintiff's "personal interest at stake . . . is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter." Becker v. Fed. Election Comm'n, 230 F.3d 381, 386 n.3 (1st Cir. 2000). Accordingly, the Court assesses Plaintiffs' standing based on the facts that existed when the Complaint was filed, while subsequent factual developments are reviewed under the doctrine of mootness. In other words, to the extent Defendants contend that Plaintiffs fail to demonstrate standing because the February 2025 Directive has since been superseded or discontinued, those arguments rest on events occurring after the commencement of this case, and therefore implicate mootness, not standing.

Applying this framework, Plaintiffs have provided adequate evidence of a sufficiently imminent injury arising from the potential future termination of their TQP and SEED grants pursuant to the February 2025 Directive. A threatened future injury may establish standing where it is "certainly impending" or there is a "'substantial risk' that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013)). It does not need to be "literally certain that the harms they identify will come about." Clapper, 568 U.S. at 414 n.5. A history of "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'" and, therefore, reflects a substantial risk of harm. Driehaus, 573 U.S. at 164 (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)).

Plaintiffs' evidence establishes more than a speculative or remote possibility of future injury. At the commencement of this action, Plaintiffs had concrete, near-term plans to apply for subsequent TQP and SEED grants. In support, Plaintiffs provided evidence that they had previously applied for, and the Department approved, multi-year funding under these programs. Defendants then terminated those grants *en masse* pursuant to the February 2025 Directive. Plaintiffs subsequently submitted evidence that they have applied for FY2026 grants under TQP and SEED with similar DEI-related programming, and decisions on those applications are anticipated to be issued around October 1, 2026, which is mere weeks away. In short, Plaintiffs had a demonstrated history of applying for grants, had previously suffered termination under the February 2025 Directive, and had concrete plans to seek additional funding with applications containing similar proposals as those that were previously terminated. This establishes a meaningful risk that Plaintiffs' grant applications will be denied, or that after approval, they could again be terminated or discontinued pursuant to the Directive. See California v. Wright, 2026 WL 1915590, at *11 (N.D. Cal. July 2, 2026); New Jersey v. U.S. Off. of Mgmt. & Budget, No. 25-CV-11816, 2026 WL 2069832, at *5 (D. Mass. July 17, 2026) (finding imminence where plaintiff States maintained active grant awards, and federal agencies had previously terminated similar grant awards under challenged regulation). On this record, the threatened future denial or termination of Plaintiffs' grants is sufficiently imminent to satisfy standing.[2]

---

[2] In a notice of supplemental authority, Defendants cite the Supreme Court's recent stay in Trump v. California, No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026), in support of their argument that Plaintiffs lack standing. There, the Court held that the plaintiff States lacked standing where they "had to speculate about whether the agency would issue a final rule." Id. at *4. However, two days after the Supreme Court issued its stay, the Postal Service then published a final rule. See League of Women Voters of Mass. v. Trump, No. 26-CV-11549, 2026 WL 2620871, at *3 n.10 (D. Mass. Sep. 4, 2026). The district court then entered a second PI, which the Supreme Court *declined* to stay, suggesting that the concerns related to standing had been

In sum, Plaintiffs have adequately established standing to challenge the Secretary's Order. The threatened harm of future grant terminations or rejections is neither conjectural nor remote and is instead sufficiently concrete and imminent.

**B. Mootness**

Defendants next contend that Plaintiffs' claims are moot because the agency has issued a subsequent guidance that supersedes the February 2025 Directive. That guidance, which is an internal agency memorandum titled "Non-Competing Continuation Discretionary Grant Award Review Policy," was issued on June 6, 2025, and purportedly replaces the February 2025 Directive ("June 2025 Guidance"). As relevant here, it states:

> The purpose of this memorandum is to provide guidance to program offices regarding the review criteria, consistent with the continuation award requirements articulated in 34 CFR § 75.253, to be used in considering non-competing continuation (NCC) awards in discretionary grant portfolios and no cost extensions.
>
> . . .
>
> The Department will review all grant awards to advance the Administration's priorities of ensuring Federal funds do not support projects that: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.
>
> Consistent with these requirements, program offices must act on any relevant information that may indicate that project activities are inconsistent with Federal

---

resolved. Id.; U.S. Postal Serv. v. California, No. 26A305, 2026 WL 2687160 (U.S. Sep. 14, 2026) (mem.).

The instant case is more analogous to the facts and posture of the second PI. Defendants have already issued a mandatory Directive implementing the Executive Order and have terminated grant funding pursuant to that Directive. The Directive is thus not an "internal directive from the President to his subordinates" but an action from the agency itself that affects grant funding held by third parties. Trump v. California, 2026 WL 2473573, at *1. Trump v. California thus supports rather than undermines the conclusion that Plaintiffs have standing. See also CASA, Inc. v. Trump, No. 25-201, 2026 WL 2592706, at *1 (D. Md. Sep 2, 2026) (distinguishing Trump v. California where directive included mandatory, rather than conditional, language).

> civil rights requirements. As a general matter, grantees must not use federal funds in any manner that violates the United States Constitution, Title VI or Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq. or 42 U.S.C. § 2000e et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), section 504 of the Rehabilitation Act (29 U.S.C. § 794), or the Age Discrimination Act of 1975 (42 U.S.C. 6101 *et seq.*), Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12131 et seq.), and Boy Scouts of America Equal Access Act of 2001 (20 U.S.C. § 7905). To the extent that a grantee uses or has used grant funds in a manner that violates these laws, program offices must make appropriate recommendations, including denial of continuation funding and enforcement action . . . .

The Guidance then provides a list of examples of "discriminatory activities," including, *inter alia*:

- "Excluding participants based on race"
- "Including participants based on race"
- "Engaging in hiring or recruiting practices based on race"
- "Engaging in racial balancing (i.e., efforts to achieve a specific racial composition in a grant project that reflects a community's racial makeup)"
- "Allowing males into female-only sports"
- "Allowing males into female intimate spaces (e.g., bathrooms, locker rooms)"
- "Using racial or sex quotas for the purpose of selecting participants"

According to Defendants, since June 2025, the Department has applied the June 2025 Guidance rather than the February 2025 Directive when reviewing TQP and SEED grants.[3]

"Mootness is a jurisdictional defect, rooted in Article III case or controversy considerations." Horizon Bank & Tr. Co. v. Massachusetts, 391 F.3d 48, 53 (1st Cir. 2004) (citing United States v. Reid, 369 F.3d 619, 624 (1st Cir. 2004)); see also Matt v. HSBC Bank USA, N.A., 783 F.3d 368, 372 (1st Cir. 2015). For an Article III court to have jurisdiction, "an actual controversy" must exist "at all stages of review, not merely at the time the complaint is

[3] In support of this argument, Defendants rely on a Declaration by Murray Bessette, which is the subject of Plaintiffs' pending Motion to Strike. The Court need not reach the merits of Plaintiffs' Motion, because even considering the Declaration, Defendants have not established that Plaintiffs' claims are moot.

filed." Steffel, 415 U.S. at 459 n.10. "A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (per curiam) (quoting Murphy v. Hunt, 455 U.S. 478, 481 (1982)) (internal quotation marks omitted).

Subsequent events may moot a challenge to governmental action, such as a superseding regulation or the government's "credible disavowal" of intent to enforce a law, but only where those events eliminate the challenged conduct or otherwise deprive the court of the ability to grant meaningful relief. ACLU of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 53-55 (1st Cir. 2013); Stoianoff v. Montana, 695 F.2d 1214, 1223 (9th Cir. 1983) ("The mere existence of a [law], which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III."). By contrast, where the challenged governmental action remains operative, or where later agency action does not actually replace the earlier action, a live controversy remains because judicial relief would continue to affect the parties' rights. Littlefield v. Mashpee Wampanoag Indian Tribe, 951 F.3d 30, 34-35 (1st Cir. 2020).

Defendants contend that the June 2025 Guidance moots Plaintiffs' challenge to the February 2025 Directive because the later guidance allegedly supersedes the earlier one. However, the Court is not persuaded because the June 2025 Guidance neither expressly nor implicitly supersedes the February 2025 Directive. First, the June 2025 Guidance does not expressly rescind, replace, or even reference the February 2025 Guidance. The First Circuit rejected a similar mootness argument in Littlefield, where a federal agency contended that a decision it rendered in 2018 mooted the plaintiff's challenge to an earlier 2015 decision. There,

the court declined to find the controversy moot because the 2018 decision expressly stated that it did not "revisit or alter" the agency's earlier determination. Id. Because the earlier decision remained operative, the court concluded that the controversy remained live. Id. The same reasoning applies here. The four corners of the June 2025 Guidance contain neither an express rescission nor replacement of the February 2025 Directive, nor any explicit or implicit reference to it. Nothing in the document itself indicates that the Department intended to withdraw, supersede, or otherwise alter the February 2025 Directive. Thus, as in Littlefield, the June 2025 Guidance does not, on its face, displace the February 2025 Directive.

Second, the June 2025 Guidance does not implicitly supersede the February 2025 Directive because the two policies concern non-overlapping subject matter. Specifically, the June 2025 Guidance governs continuation, while the February 2025 Directive governs termination. These are distinct stages of the TQP and SEED grant programs that derive authority from different regulations and statutory provisions. Specifically, the February 2025 Directive cites 20 U.S.C. § 3411 and 2 C.F.R. §§ 200.339-.341 as authority. 20 U.S.C. § 3411 is the Department of Education's organic act, while 2 C.F.R. §§ 200.339-.341 is from the Uniform Guidance and contains remedies for post-award noncompliance. As such, the February 2025 Directive guides the Department's review of existing grants for mid-cycle termination. By contrast, the June 2025 Guidance relies on 34 C.F.R. § 75.253, which pertains to the continuation, rather than termination, of multi-year projects after the first budget period. As the Department itself explains, termination and discontinuation are "based on different authorities and have different timing and responses in implementation." *Department Grant Discontinuation and Termination Processes*, Dep't of Educ. (Sep. 8, 2025), https://www.ed.gov/grants-and-programs/manage-your-grant/department-grant-discontinuation-and-termination-processes.

Thus, because the June 2025 Guidance and February 2025 Directive are non-overlapping and govern distinct matters, there is no basis to conclude that the former implicitly supersedes the latter.

In any event, even assuming the June 2025 Guidance supersedes the February 2025 Directive, Defendants still fail to meet their burden of establishing mootness by voluntary cessation. Where a defendant moves to dismiss for mootness based on its own voluntary cessation of the challenged conduct during litigation, the case does not automatically become moot, as defendants may not avoid judicial review simply by temporarily altering their conduct after suit has been filed. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189-90 (2000). The First Circuit has found mootness based on voluntary cessation only in very narrow circumstances, including where the challenged conduct ceased because of reasons unrelated to the litigation, or because the challenged conduct was already scheduled to end before litigation commenced. See Catholic Bishops, 705 F.3d at 54-55. The party asserting mootness bears the "formidable burden" of demonstrating that it is "absolutely clear" the challenged conduct cannot reasonably be expected to recur. Friends of the Earth, 528 U.S. at 190. This burden "holds for governmental defendants no less than for private ones." FBI v. Fikre, 601 U.S. 234, 241 (2024) (collecting cases).

To satisfy their burden, Defendants must demonstrate that "interim relief or events have completely and irrevocably eradicated the effects" of the challenged conduct and that "there is no reasonable expectation that the alleged violation will recur." Anderson v. United States HUD, 731 F. Supp. 3d at 33 (quoting Clean Water Action v. Pruitt, 315 F. Supp. 3d 72, 87 (D.D.C. 2018)). The inquiry focuses not on whether Defendants have disavowed their prior conduct, but whether the record establishes that the challenged conduct cannot reasonably be expected to

occur again. Fikre, 601 U.S. at 244.

Here, Defendants have not demonstrated that the February 2025 Guidance absolutely and irrevocably will not be implemented again. While Defendants' counsel represented during oral argument that the Department has no intention of implementing the February 2025 Directive in the future, Defendants have not retreated from their position that the Directive's content is lawful. See Driehaus, 573 U.S. at 165 (giving weight to the fact that "respondents have not disavowed enforcement if petitioners make similar statements in the future"). Moreover, the February 2025 Directive does not contain an end date nor indicate that its implementation is time-limited. Apart from the pendency of this litigation, nothing prevents Defendants from changing course and resuming implementation of the February 2025 Directive. See Littlefield, 951 F.3d at 34-35. Thus, the record does not establish that the Department's cessation of implementing the February 2025 Directive is sufficiently durable to eliminate the possibility that Plaintiffs could again be subject to it. Accordingly, a live controversy remains between the parties, and the case is not moot.

### C. Final Agency Action

Defendants' next move to dismiss on the grounds that the February 2025 Directive does not constitute a final agency action. The APA provides for judicial review only where there is "final agency action." 5 U.S.C. § 704. To qualify as final, the challenged action must (1) "mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 178 (1997) (quoting Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970)). Importantly, "[t]he cases dealing with judicial review of

administrative actions have interpreted the 'finality' element in a pragmatic way." Abbott Lab'ys v. Gardner, 387 U.S. 136, 149 (1967). Specifically, courts consider whether the action's "impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business.'" Franklin v. Massachusetts, 505 U.S. 788, 796-97 (1992) (quoting Abbott Lab'ys, 387 U.S. at 152).

Plaintiffs have demonstrated that the February 2025 Directive is a final agency action. First, the Directive is the consummation of a decisionmaking process, not interlocutory or tentative. As the D.C. Circuit has explained, "[t]he consummation prong of the finality inquiry requires [courts] to determine 'whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue,' or is, instead, 'only the ruling of a subordinate official, or tentative.'" Nat'l Res. Def. Council v. Wheeler, 955 F.3d 68, 78 (D.C. Cir. 2020) (quoting Soundboard Ass'n v. Fed. Trade Comm'n, 888 F.3d 1261, 1267 (D.C. Cir. 2018)). Actions that bind and direct subordinate agency personnel are final, even if what they authorize is an ongoing process. See Biden v. Texas, 597 U.S. 785, 808-09 (2022) (holding internal memos were final because they "bound DHS staff" and "direct[ed] DHS personnel to take all appropriate actions"); Bowser v. Noem, No. 26-CV-10382, 2026 WL 555624, at *5 (D. Mass. Feb. 27, 2026).

Here, the Directive "speaks for the [Department], articulating the agency's overall policy and approach" with respect to DEI programs in TQP and SEED grant awards. Pub. Emps. For Env't Responsibility v. Nat'l Park Serv., No. 19-3629, 2021 WL 1198047, at *8 (D.D.C. Mar. 30, 2021). It was issued by the Secretary, the highest-ranking official at the Department, rather than by subordinate staff. Id. The Directive issues binding—not tentative—instructions to the "all [Department] personnel." Following this internal review, the Directive mandates that

"[g]rants deemed inconsistent with these priorities shall . . . be terminated." Indeed, Defendants began rescinding grants within two days of the Directive, and all forty of Plaintiff States' grants were terminated within the span of ten days. Taken together, these facts meet the first prong of the finality inquiry.

Second, the Directive constitutes an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett, 520 U.S. at 178 (quoting Port of Bos., 400 U.S. at 71). The Directive imposes legal obligations on Department of Education personnel, who must review "all new grant awards, grants that have not yet been awarded to specific individuals or entities . . . and issued grants." Pub. Emps., 2021 WL 1198047, at *9; Bennett, 520 U.S. at 178 (finding final agency action where action would "alter the legal regime to which the action agency is subject"); Washington v. Dep't of Educ. (Washington I), 813 F. Supp. 3d 1222, 1235 (W.D. Wash. 2025) (finding February 2025 Directive constitutes final agency action because it binds agency personnel). Further, the review process would result in the loss of access to grant funds for grantees, thereby affecting their legal rights. See Rhode Island v. Trump, 810 F. Supp. 3d 283, 302 (D.R.I. 2025) (finding that loss of grant funds was a "legal consequence" resulting from agency "policy to eliminate all non-statutorily required activities and functions" (citation modified)); Texas v. Cardona, 743 F. Supp. 3d 824, 838, 839-47 (N.D. Tex. 2024); Wright, 2026 WL 1915590, at *2; Washington v. U.S. Dep't of Educ. (Washington II), 167 F.4th 1241, 1245 (9th Cir. 2026). Thus, the Directive constitutes a final agency action subject to judicial review.

Citing the Seventh Circuit case of Dubey v. Dep't of Homeland Sec., 154 F.4th 534, 537 (7th Cir. 2025), Defendants argue that Plaintiffs must challenge individual terminations rather than the Directive as a whole. In Dubey, plaintiffs were noncitizens who came to the United

States as students with F-1 visas participating in optional practical training ("OPT") programs. After leaving the country for a short period, they were denied reentry on the basis that they had engaged in misrepresentation or fraud. The Seventh Circuit found that the immigration officials' fraud determinations were not "final agency actions" because they did not constitute final visa revocations. Id. at 537. Instead, they were merely "inputs" into the revocations. Id. Defendants argue that the February 2025 Directive is analogous to the fraud determinations in Dubey in that it was merely an input into individual termination decisions.

This analogy is inapt. Unlike the ad hoc, discretionary determinations by front-line immigration officials in Dubey, the February 2025 Directive originates from the Secretary, a high-level official, and is directed toward subordinate personnel. It contains mandatory directives, not interim factual findings, and establishes specific, broad-ranging criteria that result in final terminations of grant awards. The mere fact that the February 2025 Directive was issued prior to the final grant terminations does not render it immune from judicial review. Indeed, multiple circuits, including the First Circuit, have explained that an agency's action in "applying some particular measure across the board . . . [can] of course [still] be challenged under the APA." Hisp. Affs. Project v. Acosta, 901 F.3d 378, 388 (D.C. Cir. 2018) (alteration in original) (quoting Nat'l Wildlife Fed'n, 497 U.S. at 890 n.2); accord New York v. Trump, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once."); New York v. Trump, 171 F.4th 1, 17-18 (1st Cir. 2026) (finding that plaintiff states could challenge "discrete, agency-wide categorical freeze[s] that each of the Agency Defendants allegedly put in place" as final agency actions).

Defendants also cite Pacito v. Trump, 169 F.4th 895 (9th Cir. 2026). However, that case

supports Plaintiffs' argument that the February 2025 Directive is a final agency action. In that case, the court held that letters issued by an agency that terminated funding awards constituted final agency actions. See id. at 931. By contrast, the court found that an Executive Order directing only the *suspension* of awards was not final, precisely because it mandated only a temporary suspension rather than a final termination. Id. The February 2025 Directive requires that grants be terminated, not merely suspended, and so is more similar to the termination letters in Pacito than the Executive Order. Accordingly, the February Directive constitutes a final agency action.

**IV. MERITS**

Moving to the merits, Plaintiffs bring five substantive claims against the February 2025 Directive. Plaintiffs contend that the Directive is (1) arbitrary or capricious in violation of the APA; (2) contrary to law in violation of the APA; (3) in violation of the Spending Clause of the Constitution; (4) *ultra vires* in violation of Article II; and (5) in violation of the separation of powers.

As to Plaintiffs' three constitutional claims, the Court is cognizant of the doctrine of constitutional avoidance, under which "federal courts are not to reach constitutional issues where alternative grounds for resolution are available." Marasco, 6 F.4th at 178 (quoting Vaquería Tres Monjitas, Inc. v. Pagan, 748 F.3d 21, 26 (1st Cir. 2014)). Because the Court finds that "relief available under the APA adequately addresses [Plaintiffs'] remedial requests," further discussion of "the constitutional questions would be inconsistent with [the Court's] obligation to avoid doing so where a non-constitutional disposition is possible." Id. at 179. Thus, the Court addresses only Plaintiffs' APA claims.

Under the APA, 5 U.S.C. § 706(2), a reviewing court may hold unlawful agency actions

that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] without observance of procedure required by law," among others. Plaintiffs assert that the February 2025 Directive is arbitrary or capricious, as well as contrary to law.

### A. Arbitrary or Capricious (Count 1)

In Count 1, Plaintiffs contend that the February 2025 Directive is arbitrary and capricious because it (1) lacks a reasoned explanation, (2) is an unexplained departure from prior practice, (3) fails to consider substantial reliance interests, (4) fails to consider alternatives, (5) requires termination based on new priorities that are contrary to prior priorities published in the *Federal Register*, and (6) is based on policy preferences that are contrary to the TQP, SEED, and GEPA statutes, and thus is based on factors that Congress did not intend it to consider. Based on the facts and evidence presented in the Administrative Record, the Court agrees with the first four of Plaintiffs' arguments. The latter two arguments are largely duplicative of Plaintiffs' contrary-to-law arguments, and the Court finds assessment of those theories better construed under that provision of the APA. The Court thus addresses only the first four theories here.

#### 1. Lacks Reasoned Explanation

Plaintiffs first argue that the February 2025 Directive is "not 'reasonable and reasonably explained.'" Ohio v. EPA, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)). Specifically, Plaintiffs contend that the Directive fails to explain what constitutes "DEI" and why DEI programs are discriminatory under federal civil rights law. Defendants agree that the Directive applies to all DEI but assert that this is because all DEI is

inherently discriminatory.[4] According to Defendants, the government need not define "DEI" because the meaning of "discriminatory" is sufficiently self-explanatory and because the document is internal rather than external.

A foundational principle of administrative law is that an agency must "define[] and explain[] the criteria the agency is applying." Firearms Regul. Accountability Coal., Inc. v. Garland, 112 F.4th 507, 524 (8th Cir. 2024) (quoting Miss. Comm'n on Env't Quality v. E.P.A., 790 F.3d 138, 150 (D.C. Cir. 2015)). This requirement serves two important purposes. First, it provides guidance for subordinate agency personnel, thereby preventing arbitrary and capricious decisionmaking at the implementation level. See id. Second, it provides sufficient notice to regulated entities to conform their conduct accordingly. See id. In reviewing an agency's explanation, a court "evaluat[es] the agency's contemporaneous explanation in light of the existing administrative record." Dep't of Com. v. New York, 588 U.S. 752, 780 (2019). While a court's "review is deferential," it is "not required to exhibit a naiveté from which ordinary citizens are free." Dep't of Com. v. New York, 588 U.S. at 785 (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977)). "[C]onclusory statements will not do; an 'agency's statement must be one of reasoning.'" Amerijet Int'l, Inc. v. Pistole, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting Butte County v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010)).

The Eighth Circuit recently described these principles in Firearms Regulatory Accountability Coalition, 112 F.4th 507. There, the Bureau of Alcohol, Tobacco, Firearms, and Explosives promulgated a final rule reclassifying certain types of pistols and subjecting them to

---

[4] In their briefing, Defendants argue that the Directive applies only to *discriminatory* DEI activities, not *all* DEI activities. During oral argument, however, Defendants retreated from that view and clarified that their position is that the Directive applies to all DEI activities, but that is because all DEI activities are discriminatory.

stricter regulations. The rule provided no numerical threshold or other objective guidance, instead identifying factors such as "marketing," "community use," and "slideshows" depicting example firearms that the agency considered subject to reclassification. The Eighth Circuit struck down the rule, finding that these provisions would require "guesswork" that "fail[ed] to create an identifiable metric that members of the public can use to assess whether their weapon falls within the Final Rule's definition." Id. at 520. The court explained that, to permit meaningful judicial review of an agency's reasoning, a rule must provide "some metric," particularly where "the agency has not claimed that it is impossible to be more precise." Id. at 521 (quoting Tripoli Rocketry Ass'n, Inc. v. ATF, 437 F.3d 75, 81 (D.C. Cir. 2006)). Thus, a rule cannot make it "nigh impossible for a regular citizen to determine" whether the rule applies. Id. at 524 (quoting Mock, 75 F.4th at 584-85).

Here, much like in Firearms, the February 2025 Directive fails to define the scope of programs it prohibits. On its face, the language of the Directive provides little guidance. It states in a single line that "[i]llegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." It likewise announces, without further detail, that the Department seeks to ensure that grants do not fund "diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." The Directive nowhere defines "DEI" or provides examples of prohibited activities.

Defendants contend that the Directive need not define "DEI" because the term, as used in the Directive, is coextensive with "discriminatory," which is self-explanatory under federal civil rights law. However, the Court is not persuaded that "discriminatory" provides a limiting

principle for the Directive in the manner that Defendants urge. Rather than confining the Directive to actions that are traditionally understood to constitute discrimination, the record instead reflects that Defendants terminated grants with topics such as "acknowledging . . . racism" and "anti-racism"—activities expressly undertaken to oppose discrimination. It is difficult to see how topics can be "anti-racis[t]" yet simultaneously fall within the Directive's category of "discriminatory" activities. The record likewise shows that the Directive swept in topics as broad and amorphous as "Family and Community in the Classroom" and "social-emotional learning." These topics do not, on their face, have any apparent connection to discrimination. And outside of the termination decisions themselves, the Department issued a public statement declaring that the Directive terminated grants because they contained "divisive ideologies" such as "DEI," "anti-racism," "social justice activism," "Critical Race Theory," and "white privilege and white supremacy." Finally, Defendants' counsel represented that the Directive incorporates "certain discriminatory practices, even if they don't violate the law, [but] are nonetheless contrary to the Department's policies," such as "affirmative action." In this manner, the agency has represented that it understands the Directive to go "beyond merely restating settled principles of civil rights law."[5] Am. Fed'n of Tchrs. v. Dep't of Educ., 796 F. Supp. 3d 66, 80, 104 (D. Md. 2025) (granting motion for summary judgment against Department

---

[5] Defendants argue that prior grant terminations can be evaluated only in the Court of Federal Claims. However, the Court does not consider those terminations to determine whether they were lawful. Rather, the Court considers them as evidence of the Department's contemporaneous interpretation of the Directive's scope and meaning. That contemporaneous understanding is distinct from, and more probative of the Department's interpretation than, the post hoc position advanced by counsel in this litigation. See Melone v. Coit, 100 F.4th 21, 31 (1st Cir. 2024) (citing SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943)); see also Regents, 591 U.S. at 22-23 (explaining the importance of considering only contemporaneous explanations, including because it "instills confidence that the reasons given are not simply 'convenient litigating position[s]' " and promotes "the orderly functioning of the process of review" (alteration in original) (citations omitted)).

of Education's "Dear Colleague Letter," published on February 14, 2025, which required states and school districts to certify compliance with the Trump Administration's position that DEI principles violate federal antidiscrimination law); cf. Commonwealth of Massachusetts v. Trump, No. 25-CV-12162, Dkt. 105 at 34 (D. Mass. June 3, 2026) (finding final agency action based on public statements from agency leadership interpreting policy memorandum). Thus, "discriminatory" does not function as the limiting principle for the Directive in the manner that Defendants suggest.

If not "discriminatory," the only other available limiting principle in the Directive is "DEI." But that term is not self-defining; the Administrative Record lacks any evidence, and Defendants provide no argument, that the term possesses a sufficiently settled and commonly understood meaning such that agency personnel or grantees could determine its scope without further definition. To the contrary, during oral argument, Defendants' counsel alluded to the fact that the meaning of terms such as "diversity," "equity," and "inclusion," may be evolving and mean different things in different contexts, undermining any argument that these terms are self-executing. Under these circumstances, it is difficult to see how subordinate officials are expected to implement the Directive consistently or how grantees are expected to understand what programs it prohibits. See Am. Pub. Health Ass'n, 791 F. Supp. 3d at 180 ("How, then, can the Public Officials act on 'DEI' if there is no operative definition of 'DEI'? The answer is plain: they cannot, at least within the confines of the APA."); Chi. Women in Trades v. Trump, 778 F. Supp. 3d 959, 984 (N.D. Ill. 2025) ("[T]he meaning of [the anti-DEI language] is left entirely to the grantee's imagination. The Order . . . does not refer to any other source indicating what . . . might make any given 'DEI' program violate Federal anti-discrimination laws.").

In response, Defendants argue that the federal government competitive "grant criteria

need not define terms with exacting precision." NIH III, 145 S. Ct. at 2666 (Kavanaugh, J., concurring). However, the cases Defendants cite in support of this proposition involve First Amendment claims, a different doctrinal context with distinct policy concerns. In Nat'l Endowment for the Arts v. Finley, 524 U.S. 569 (1998), for example, plaintiffs challenged a federal grant program as constituting viewpoint discrimination because the governing criteria disfavored certain forms of artistic speech. Id. at 589. The Supreme Court acknowledged that the First Amendment protects private individuals from vague laws but upheld the grant statute because the federal government was acting as a sponsor rather than a regulator. Finley is distinguishable from the APA context here, as Plaintiffs do not challenge a statutory grant scheme for unconstitutional vagueness but instead seek ordinary judicial review of executive agency decisionmaking. Finley's delineation of the contours of private individuals' First Amendment rights does not bear on the public's right to transparent governance guaranteed under the APA.

In sum, because the Directive provides no discernible criteria for "DEI," and thus for determining the type of programs and activities it disfavors, it fails to provide the explanation necessary to guide implementation, give TQP and SEED grantees and applicants fair notice, and permit meaningful judicial review. Accordingly, the Directive is arbitrary and capricious.

### 2. Departure from Prior Practice

The February 2025 Directive is also arbitrary and capricious because it fails to acknowledge, much less explain, the Department's departure from its prior practice of encouraging DEI programs in TQP and SEED grants. Under the "change-in-position" doctrine, agencies may change their existing policies, but only "as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider

serious reliance interests." Doe v. Noem, 152 F.4th 272, 289 (1st Cir. 2025) (quoting FDA v. Wages & White Lion Invs., LLC, 604 U.S. 542, 568 (2025)). To satisfy this requirement, the agency must show that the new policy "is permissible under the [governing] statute, that there are good reasons for it, and that the agency *believes* it to be better" than its old policy. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (emphasis in original). It follows that "unexplained inconsistency in agency policy is a reason for holding an [action] to be an arbitrary and capricious change from agency practice." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 222 (2016).

The February 2025 Directive represents a departure from the Department's prior practice. It articulates a policy of "ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives." This position marks a substantial shift from the Department's past approach, under which it actively promoted DEI programs in TQP and SEED grant applications (and, relatedly, implicitly articulated a position that DEI programs are lawful under federal civil rights laws).

Examples of this prior position abound throughout the Administrative Record. First, the record includes two 2021 rules that the Department of Education published in the *Federal Register* establishing priorities for TQP and SEED grants. Both rules contain clear and unequivocable DEI-related competitive preference priorities. These include "Increasing Educator Diversity," "Promoting Equity in Student Access to Educational Resources [and] Opportunities," "Supporting a Diverse Educator Workforce and Professional Growth to Strengthen Student Learning," and "Meeting Student Social, Emotional, and Academic Needs." Further, in response to public comments for these priorities, the Department expressly encouraged DEI programming across various identities such as race, ethnicity, disability status,

and more. See, e.g., Administrative Record at 38 ("Overall, the Department is committed to equity and adequacy of resources for underserved students."); id. at 46 (noting that priorities "support[] projects designed to promote educational equity and adequacy in resources and opportunity for underserved students," which is defined to include "students of color and first-generation postsecondary education students"); id. at 48 (agreeing to "include approaches that are inclusive with regard to race, ethnicity, culture, language, and disability status"); id. (seeking to "[i]ncreas[e] the number of diverse educator candidates and "[a]ddress[] inequities and develop[] and implement[] pedagogical practices that are inclusive with regard to race, ethnicity, culture, language, and disability status"); id. (encouraging projects that "[c]reat[e] education or work-based settings that are supportive, positive, identity-safe and inclusive with regard to race, ethnicity, culture, language, and disability status").

In addition to these agency priorities, the Department's policy preference in support of DEI was also present in NIAs soliciting grant applications. See id. at 68 (February 25, 2022, TQP NIA); id. at 88 (April 4, 2022, SEED NIA); id. at 98 (April 4, 2024, TQP NIA). Like the priorities they incorporated, these NIAs explicitly prompted applicants to prioritize DEI programs. See, e.g., id. at 68 (explaining that the Department has a policy goal of "ensuring that underserved students have equal access to well-qualified, experienced, diverse, and effective educators"); id. (highlighting "the importance of preparing those teachers to create inclusive, supportive, equitable, unbiased, and identity-safe learning environments for their students"); id. at 88 (announcing Department's policy priority to "support[] targeted efforts . . . focused on building a more diverse educator pipeline" and "increasing the retention of a more diverse educator workforce"); id. at 89 (explaining that "teachers of color benefit all students" and that "a diverse educator workforce plays a critical role in ensuring equity in our schools"); id. at 98

(expressing that the Department "is committed to recruiting, preparing, and retaining racially, culturally, and linguistically diverse educators to the teaching workforce" and that "[t]his commitment includes promoting educator diversity and ensuring that education is a profession that people from all backgrounds can pursue").

The Department did not promulgate these priorities and NIAs supporting DEI in a vacuum. Rather, the Department relied on multiple reports and other evidence to support its conclusions. In one of its NIAs, the agency supported its conclusion that "educators need to develop skills to effectively incorporate social and emotional learning into their instructional practice" by citing "[m]ounting evidence" that "supporting social and emotional learning can contribute to overall student development." In a similar fashion, the agency cited another report on two decades of research concluding that "to meet the needs of growing numbers of marginalized students, principals should ensure fair, just, and nondiscriminatory treatment of all students, the removal of barriers, the provision of resources and supports, and the creation of opportunities with the goal of promoting equitable outcomes." Id. The Department's reliance on these various sources underscores that its prior policies were not created based on an unsupported preference, but instead were the result of an in-depth assessment of the available evidence and the Department's explanation as to why that evidence justified its approach.

Finally, the TQP and SEED grant application instructions themselves further demonstrate the Department's prior commitment to DEI programs. The instructions expressly recognize that Section 427 of GEPA applies and "requires each applicant for funds . . . to include in its application a description of the steps the applicant proposed to take to ensure equitable access to, and participation in, its Federally-assisted program." The instructions explain that GEPA "highlights six types of barriers that can impede equitable access or participation: gender, race,

national origin, color, disability, or age."[6] These instructions not only demonstrate that the Department recognized GEPA's statutory DEI requirement, but also that they expressly supported the use of programs of this type.

As illustrated by these examples, the Department previously expressly encouraged DEI programs in TQP and SEED grants through multiple rules and documents. Those prior rules did not merely endorse such programs superficially; they cited reports and statutory authority supporting the Department's conclusions, carefully considered and responded to public comments regarding the scope and purpose of the DEI priorities, and explained in detail why DEI programs are important. Yet, in a few paragraphs, the February 2025 Directive denounces these prior programs without explanation, declares them unlawful under federal civil rights law, and establishes a new policy to disfavor DEI programs. The Directive does not cite or engage with the prior priorities, NIAs, grant application instructions, or reports and studies cited therein. Nor does the Directive identify any new facts, data, or studies that would justify abandoning the findings and reasoning underlying those prior policies. See Fox Television Stations, 556 U.S. at 515 (noting that if an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy," an agency's failure to consider such factors "would be arbitrary or capricious"). For example, the Directive does not contend that the reports and studies on which the Department previously relied on were inaccurate or incomplete, or that subsequent research undermined their conclusions. Instead, it simply announces a new policy without engaging with the factual record or reasoning that supported the Department's prior approach.

[6] The application provides examples of ways an applicant can satisfy this statutory requirement, such as: "[a]n applicant that proposes a project to increase school safety might describe the special efforts it will take to address concerns of lesbian, gay, bisexual, and transgender students, and efforts to reach out to and involve the families of LGBT students." Id.

Under established APA caselaw, that failure to acknowledge and adequately explain the change in position constitutes arbitrary and capricious decisionmaking.

**3. Reliance Interests**

The February 2025 Directive is also arbitrary and capricious because there is no evidence in the Administrative Record that Defendants considered Plaintiffs' substantial reliance interests in their TQP and SEED grants. When an agency "[i]s not writing on a blank slate, it [i]s required to assess whether there [a]re reliance interests, determine whether they [a]re significant, and weigh any such interests against competing policy concerns." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 31-33 (2020) (internal quotation marks omitted). There are no "such features automatically preclud[ing] reliance interests"; instead, consideration of the significance and seriousness of reliance interests "must be undertaken by the agency in the first instance, subject to normal APA review." Id. at 31. The agency must "weigh any such interests against competing policy concerns." Doe v. Noem, 152 F.4th at 290 (quoting Wages & White Lion Invs., 604 U.S. at 568; Regents, 591 U.S. at 33). Under the APA, a reviewing court assesses an agency's action as of the time the agency acted. See Regents, 591 U.S. at 4 (quoting Michigan v. EPA, 576 U.S. 743, 758 (2015)). Accordingly, when an agency action is challenged for failing to adequately account for reliance interests, the relevant inquiry focuses on the reliance interests that existed when the agency adopted the challenged action. See id.

Here, the relevant action is the promulgation of the February 2025 Directive.[7] The Court

[7] Defendants contend that, because the Directive affects individual grants rather than the entire TQP and SEED programs, any reliance interests arise solely from discrete funding awards and therefore must be pursued in the Court of Federal Claims, pursuant to the Tucker Act. However, this argument appears to repackage Defendants' previously reject argument regarding final agency action. The agency action at issue here is the February 2025 Directive itself, which announces and implements a new, wide-reaching policy disfavoring DEI. It is not merely a collection of individual grant terminations.

therefore evaluates Plaintiffs' reliance interests that existed before the Directive was issued. Viewed in that context, the record reflects that Defendants failed to consider Plaintiffs' substantial reliance interests in TQP and SEED grant funding for DEI programs. Plaintiffs have built infrastructure, invested in personnel and resources, designed curricula, and developed educator training programs that featured DEI, all with the reasonable expectation—consistent with then-existing regulations and Department guidance—that these efforts would help them obtain continued funding. [See Dkt. 41 at 6-9 (explaining how the Directive's implementation "upended months, if not years" of work to implement funded programs)]. These are not speculative interests arising from the possibility of future approval. Rather, they are concrete, longstanding interests grounded in Plaintiffs' prior approval of TQP and SEED awards and the established final and supplemental priorities under which those grants were reviewed and awarded. This history of reliance gave Plaintiffs "a reasonable, non-speculative assumption that it will obtain future grants" under a similar framework. Ass'n of Am. Univs. v. Dep't of Energy, 789 F. Supp. 3d 118, 151 (D. Mass. 2025), appeal dismissed, No. 25-1727, 2026 WL 841632 (1st Cir. Mar. 16, 2026). The February 2025 Directive abruptly altered that framework, but nothing in the Administrative Record suggests that Defendants considered or addressed Plaintiffs' reliance interests in its promulgation.

Beyond Plaintiffs as direct grantees, countless individuals affiliated with Plaintiffs' universities, schools, and other instrumentalities also relied on these grants. For example, teachers rely on TQP and SEED grants for mentorship and career development. The Commonwealth of Massachusetts describes how they used the funds for "efforts to strengthen teacher preparation and support mentor teachers in two high-need school districts . . . including students from low-income families and students with disabilities." California reports that

teachers for special needs students in Los Angeles now have limited to no opportunities to attend training for their students' specific needs. New York, likewise, describes how in-service teachers will no longer be provided with professional learning development courses, which were designed to strengthen in-service teacher capacity. New Jersey details how new teachers must now enter their first year "without induction coaching, making it more difficult to navigate classroom challenges, refine their instructional practices, and stay in the profession long-term." Moreover, without the grant funding, all mentor training programs in New Jersey, which allow current educators to share their best practices from their classroom and professional experiences known to contribute to creating a sustainable pipeline of future teachers, completely ceased operating. Illinois similarly reports that their funding termination harms the training and funding of mentors and in-service teachers in hard-to-staff schools, who are crucial to the programs' retention rate for student teachers. In short, teachers across America had significant reliance interests in TQP and SEED grand funding, which were not addressed or considered prior to Defendants' promulgation of the February 2025 Directive.

Similarly, teachers in training and postgraduate students relied on TQP and SEED funding to embark on their careers. For example, UMass Boston worked with BPS to establish a teacher-residency program for which UMass Boston would confer a Master's Degree in Special Education to the program's participants, but this program was terminated following the Directive. California likewise reports that the February 2025 Directive resulted in the termination of the NorCAL GREAT Teacher Pipeline, which supported a teacher-residency program for 60 teacher candidates, thus "immediately ending training and teaching placements in high-need rural schools experiencing severe teacher shortages." Similarly, California's Teaching for Inclusivity and Equity Residency program, funded by TQP grants, was terminated, disrupting

a program that sought to "address critical teacher shortages in high-need, rural, and low-income school districts through year-long teacher residencies." Wisconsin also reports that they had previously used TQP funding to create a summer program for graduate student cohorts, including guaranteed paid summer internship programs, that was then terminated as a result of the February 2025 Directive.

Other educators like principals and school staff similarly relied on TQP and SEED funding to enhance their leadership skills, to fill teacher vacancies in their schools, and to fund staff salaries. Maryland, for example, reports having to terminate key aspects of their professional development and coaching program for 70 assistant principals and principals at high-need schools, and terminating six project employees who relied on the grant for their salary funding. Wisconsin describes how loss of TQP and SEED funding forced many school administrators to fill special education teacher vacancies with people who are not fully certified to support students with disabilities. In Massachusetts, BPS reports that school employees spent copious amounts of time and resources designing and managing programs policies, guidelines, employee relations, and expenditures that are now terminated. California's local school administrators relied on projects funded by TQP and SEED grants to provide them with full-time teacher students who would teach at their high-needs or high-poverty schools. California also reports that their ability to staff well-prepared leaders in middle schools, where leadership shortages are a concern, was negatively affected by the grant terminations. In Illinois, school employees who manage program logistics rely on grants to implement programming supporting the teacher pipeline and funding salaries. Thus, even beyond teachers, other individuals in Plaintiffs' school systems, such as principals, administrators, and staff relied substantially on TQP and SEED grant funds.

Above all, students—particularly high-need and low-income students—relied on the TQP and SEED funding. California reports that over 500 K-12 students faced a "disruption in educational services" and the "loss of critical educational opportunities" because of the TQP and SEED grant terminations. Meanwhile, high-need and high-poverty students, likewise, continue to be without support from qualified teachers who can meet their specific needs, and high school students in dual enrollment also lost funds for "mentoring services, textbooks, laptops [and] travel." Massachusetts asserts that the loss of funding directly threatens student achievement and the quality of their learning experiences. In particular, BPS describes the detrimental impact the loss will have on multilingual students, including the risk of increasing "dropout rates, lower earning capacity as adults," and a decrease to "the lifespan of these vulnerable students." New York reports continuing teacher shortages in high-need subject areas like "math, sciences, world languages, and English as a New Language (ENL)." New York also reports shortages in multilingual/bilingual primary and secondary schools for students with disabilities as a result of the funding terminations. In Wisconsin, students with disabilities rely on the funding to provide them with qualified teachers. Maryland reports that loss of funding will negatively impact 26,000 students, including students learning English and students with disabilities. Maryland asserts that continued grant terminations under the Directive will inevitably continue the perpetual issue of "equity in student access to educational resources."

In short, the reliance interests are many, substantial, and deep-rooted. Yet, the Administrative Record is devoid of any evidence that Defendants acknowledged or weighed any of these interests prior to issuing and implementing the February 2025 Directive. The Directive does not acknowledge the fact that thousands of teachers, as well as teachers in teacher-training pipelines, would be affected, upending the careers of much-needed educators. Nor does it

acknowledge how the mid-year, abrupt disruption of grant funding would affect graduate programs, which were subsequently put on hold or dissolved as a result. Nor does the Directive acknowledge the effects of termination of TQP and SEED grant funding on students, including those who are high-need, low-income, or are otherwise facing extreme teacher shortages. Accordingly, Defendants acted arbitrarily and capriciously in issuing the February 2025 Guidance because they failed to consider reliance interests.

#### 4. Failure to Consider Alternatives

Finally, the February 2025 Directive is arbitrary and capricious because Defendants failed to consider the more moderate alternative of providing pre-termination notice and opportunity to grantees to cure rather than immediate termination. "[W]hen an agency rescinds a prior policy[,] its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" Regents, 591 U.S. at 30 (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 54 (1983)); see also Craker v. U.S. Drug Enf't Admin., 44 F.4th 48, 63 (1st Cir. 2022). That said, "[t]he APA does not . . . require agencies to tailor their regulations [or policies] as narrowly as possible to the specific concerns that generated them." Associated Dog Clubs of N.Y. State, Inc. v. Vilsack, 75 F. Supp. 3d 83, 92 (D.D.C. 2014). While agencies need not consider every "uncommon or unknown" alternative, the agency must address "obvious" alternatives, such as those "specifically mentioned" in rulemaking proceedings or in the Administrative Record. Int'l Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 817 (D.C. Cir. 1983).

Two Supreme Court cases, State Farm and Regents, inform this ground for arbitrary and capricious review. First, in State Farm, the National Highway Traffic and Safety Administration ("NHTSA") rescinded a car-safety regulation requiring the use of airbags or seatbelts. NHTSA

determined that airbags would improve consumer safety, but that passive seatbelt restraints would not. The Supreme Court held that this reasoning supported rescinding the seatbelt requirement but did not support rescinding the airbag requirement. The agency failed to explain why it did not consider the obvious alternative of retaining an airbags-only requirement, particularly as airbags were already "within the ambit of the existing standard." 463 U.S. at 51.

Second, in Regents, the Supreme Court similarly held that an agency acted arbitrarily and capriciously for failing to consider an obvious alternative. There, the Department of Homeland Security had promulgated the Deferred Action for Childhood Arrivals ("DACA") program, which comprised two components—providing government benefits to the children of undocumented noncitizens, and exercising forbearance from enforcing immigration laws against those individuals. The agency later rescinded DACA on the ground that the provision of government benefits was "unlawful." The Supreme Court held that the rescission was arbitrary and capricious. Even if providing benefits was illegal, that did not justify the agency's decision to rescind DACA *in toto*. Because the agency terminated the program "in full 'without any consideration whatsoever' of a forbearance-only policy," the rescission was arbitrary and capricious. 591 U.S. at 30.

Defendants read State Farm and Regents narrowly, arguing that they stand for the proposition that an agency may not terminate an entire program without considering the alternative of limiting its action to one component. Defendants contend that the February 2025 Directive is distinguishable because it establishes a policy priority for one program, the TQP and SEED grants, without affecting other programs.

The Court does not read State Farm and Regents to be as limited as Defendants urge. Both cases instead reflect a broader principle that an agency acts arbitrarily and capriciously

when it fails to consider a reasonable alternative that falls within the ambit of the existing policy. Indeed, other courts have held that agencies failed to consider alternatives that are similar to those proposed by Plaintiffs here. E.g., Off. of Commc'n of United Church of Christ v. FCC, 707 F.2d 1413, 1440 (D.C. Cir. 1983) (remanding agency action where agency failed to consider modification rather than rescission); R.J. Reynolds Vapor Co. v. Food & Drug Admin., 65 F.4th 182, 191-92 (5th Cir. 2023) (finding arbitrary and capricious agency action where agency failed to consider the less extreme alternative of inviting the company to submit supplemental filings to bolster its application rather than outright rejection). In such cases, the proposed alternative is merely a less extreme modification of the agency's chosen course, rather than immediate termination of a program.

So, too, here is the case with Plaintiffs' proposed alternative to the February 2025 Directive. Defendants could have, as Plaintiffs suggest, provided the grantees with pre-termination notice and opportunity to cure any identified deficiencies in their programs. This proposed alternative was both reasonable and within the ambit of the existing policy, not "uncommon" or "unknown." The Department's own regulations contemplate pre-termination notice and opportunity to cure. For example, the OMB's Uniform Guidance authorizes the Department to impose specific conditions on TQP and SEED grantees to ensure compliance with expectations. See 2 C.F.R. § 200.208. An example of such a condition is to "[w]ithhold[] authority to proceed to the next phase until receipt of evidence of acceptable performance." Id. § 200.208(c). Section 200.339 likewise authorizes the Department to "implement specific conditions if the recipient or subrecipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." Examples of such conditions include "[t]emporarily withhold[ing] payments until the recipient or subrecipient

takes corrective action," and "[d]isallow[ing] costs for all or part of the activity associated with the noncompliance of the recipient or subrecipient." Id. The Department's own regulations thus expressly contemplate notice and withholding subsequent funding until the grantee provides evidence of compliance, rather than immediate termination of the grant.

Federal civil rights statutes reinforce that point by similarly requiring notice and opportunity to cure. Programs receiving federal funding are subject to Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, which prohibit discrimination on the basis of race and gender, respectively. See 42 U.S.C. § 2000d; 20 U.S.C. § 1681. These statutes require agencies to "(1) notify applicants and awardees of any non-compliance issues, (2) make an express finding on the record after opportunity for a hearing, and, (3) allow the applicant or awardee to voluntarily cure any such non-compliance, prior to denying or discontinuing grant funding." Council for Opportunity in Educ. v. U.S. Dep't of Educ., No. 25-CV-03491, 2026 WL 120984, at *2 (D.D.C. Jan. 16, 2026) (citing 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682; 34 C.F.R. §§ 100.6, .8(c), .9); see also County of Santa Clara v. Noem, 815 F. Supp. 3d 979, 1029 (N.D. Cal. 2025) (explaining that Title VI requires "strict procedural requirements for agencies who decide to terminate grant funding," including "provid[ing] grantees with notice and the ability to cure potential issues").

Thus, Defendants had a reasonable and previously established alternative to immediately terminating TQP and SEED grants under the February 2025 Directive: providing notice and an opportunity to cure. On review of the Administrative Record, Defendants did not consider that alternative. Under State Farm and Regents, the February 2025 Directive is thus arbitrary and capricious.

**B. Contrary to Law (Count 2)**

Moving to Count 2 of the Amended Complaint, Plaintiffs assert that the Directive violates the "contrary to law" provision of the APA. Under that provision, courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). This is because an agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute." FEC v. Cruz, 596 U.S. 289, 301 (2022). Here, Plaintiffs argue that the February 2025 Directive is contrary to three sources of law: (1) the DEI prerogatives in the TQP and SEED enabling statutes and GEPA; (2) GEPA's notice-and-comment provisions; and (3) the authorized grounds for grant termination in the OMB's Uniform Guidance, 2 C.F.R. § 200.340.

**1. Statutory DEI Directives**

Plaintiffs first argue that the February 2025 Directive conflicts with provisions of the TQP and SEED enabling statutes and GEPA. According to Plaintiffs, those provisions require grantees to pursue DEI-related programs, which the Directive contradicts by declaring such programs unlawful. Defendants respond that nothing in the Directive's text, on its face, conflicts with any of the statutory provisions Plaintiffs identify.

"A court's lodestar in interpreting a statute is to effectuate congressional intent." City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020) (citing Passamaquoddy Tribe v. Maine, 75 F.3d 784, 788 (1st Cir. 1996)). To determine this intent, the court starts with the text of the statute itself. See Stornawaye Fin. Corp. v. Hill, 562 F.3d 29, 32 (1st Cir. 2009). "The context surrounding a statutory provision and the structure of the statutory scheme as a whole often provide useful indicators of congressional intent." Barr, 954 F.3d at 32 (citing Atl. Fish Spotters

Ass'n v. Evans, 321 F.3d 220, 224 (1st Cir. 2003); Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, 989 F.2d 1266, 1270 (1st Cir. 1993)). If the statutory language supplies a plausible meaning for the disputed provision, the inquiry ends. Id. If the text is ambiguous or its plain meaning leads to an absurd result, the court may employ "[o]ther tools of statutory interpretation, such as legislative history." Id. (citing United States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987)). Courts "exercise their independent judgment" and need not "defer to an agency interpretation of the law." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412-13 (2024); see also Bruno Project Rescue Inc. v. Ctrs. for Disease Control & Prevention, No. 25-1801, 2026 WL 2017744, at *3 (1st Cir. July 13, 2026).

The Court first examines the relevant statutory language of the TQP enabling statute, the SEED enabling statute, and GEPA to determine whether they require that grant awards include DEI-related programming. The Court then considers whether the February 2025 Directive contravenes those statutory requirements.

Starting with the TQP enabling statute, multiple provisions expressly identify hiring teachers from diverse backgrounds as a statutory objective. For example, the statute provides that the TQP program's purpose is "to recruit highly qualified individuals, *including minorities* and individuals from other occupations, into the teaching force."[8] 20 U.S.C. § 1022 (emphasis added). The statute likewise encourages TQP grantees to "recrui[t] into the teaching profession"

[8] Defendants argue that the TQP statute does not require the Department to construe "minorities" as applying to racial minorities. However, an agency may not adopt a narrower, more limited definition of a term where the statute does not allow such discretion, as doing so effectively overwrites the statutory language. Cf. Whitman v. Am. Trucking Ass'ns, Inc., 531 U.S. 457, 472-73 (2001) (explaining that an agency cannot "cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute," as to do so "would *itself* be an exercise of the forbidden legislative authority" (emphasis in original)). The TQP enabling statute's reference to "minorities" does not contain any authorization for the Department to limit the term to exclude racial, or any other group of, minorities.

and to design teacher-residency programs in a manner that prioritizes "*individuals from underrepresented populations*." Id. § 1022a (emphasis added); id. § 1022a(e)(2)(A)(vi)(II); see also id. § 1022a(f) (encouraging programs that "emphasi[ze] recruiting into school leadership professions individuals from underrepresented populations"). Taken together, these provisions demonstrate that Congress intended grant awards under the TQP program to promote opportunities for minorities and other underrepresented teachers. This inherently suggests a focus on DEI. Cf. San Francisco Unified Sch. Dist. v. AmeriCorps, 789 F. Supp. 3d 716, 750 (N.D. Cal. 2025) (finding AmeriCorps statute "bakes into its core principles of diversity, equity, [and] inclusion"); Chi. Women in Trades, 778 F. Supp. 3d at 991 (noting that court "is unable to conceive of any grant issued under" the federal Women in Apprenticeship and Nontraditional Occupations Act that would not be subject to federal directive to terminate equity-related grants).

In addition to diverse teachers, the TQP enabling statute's mandate encompasses grant programs meeting the needs of diverse students. For example, the statute requires grantees with teacher development programs to "provide assurances to the Secretary" that "general education teachers receive training in *providing instruction to diverse populations*, including children with disabilities, limited English proficient students, and children from low-income families." Id. § 1022e(b)(4) (emphasis added). It likewise prioritizes programs that "promot[e] strong teaching skills and, as applicable, techniques for early childhood educators to *improve children's cognitive, social, emotional, and physical development*." Id. § 1022a(d)(1)(A)(ii) (emphasis added). These provisions further confirm that the statute reflects a clear policy favoring programs that support diversity in students and teachers.

The SEED enabling statute reflects the same statutory commitment to promoting educators and students from diverse backgrounds. It requires grantees to fund "nontraditional"

teachers and other school staff who serve in "traditionally underserved" local educational agencies. 20 U.S.C. § 6672(a)(1). Although the statute does not define "traditionally underserved," its legislative history provides useful context for understanding the term. The SEED statute was enacted in 2015 as part of the Every Student Succeeds Act (previously called the Every Child Achieves Act). See Pub. L. No. 114-95. In congressional debates, members of Congress who drafted amendments to the bill used "traditionally underrepresented" to refer to student demographics that have historically received less support and resources than other groups. See 161 Cong. Rec. S5148 (daily ed. July 16, 2015) (statement of Sen. Patty Murray) ("This amendment would give parents and communities a more holistic view to determine if a school is providing a quality learning environment for all students. And most importantly, this will help States focus resources on traditionally underserved populations so they will get the supports they need to succeed."). For example, Senator Patty Murray, then-member of the Senate Committee on Appropriations, explained that, "too often, it is students of color, kids with disabilities, English-language learners, and students from low-income backgrounds who have the least access to resources that can help them get ahead." Id. Murray cited statistics showing that "[s]tudents of color are more likely than their White peers to go to a high school that does not offer AP classes." Id. She further noted that "[s]tudents from low-income backgrounds often don't have access to the Internet or to computers, compared to their peers." Id. Senator Chris Murphy, another member of the Senate Committee on Appropriations, echoed that understanding, stating that "[w]hether we like it or not, there are these political pressures in America that cause minority kids and disabled kids and poor kids to get an education that is not equal to that of their White or nondisabled or more affluent peers." 161 Cong. Rec. S5109-10 (daily ed. July 15, 2015) (statement of Sen. Chris Murphy). He further explained, "[i]f this body

wants to stay true to its history of standing up for educational civil rights, then we have to make a stand to make sure . . . that minority and poor and disabled kids get a fair shot at a good education." Id. at S5110. In sum, this legislative history suggests that Congress intended the SEED statute's use of the term "traditionally underserved" to encompass, among others, students of color, with disabilities, and from low-income backgrounds.

Finally, GEPA likewise contains an express mandate to promote DEI in educational grant funding. It requires the Secretary to "ensure equitable access to, and equitable participation in," grant projects, including "by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a. This provision, commonly known as the "GEPA Equity Directive," was passed in 1994 as part of the Improving America's Schools Act of 1994, Pub. L. No. 103-382. See Council for Opportunity in Educ., 2026 WL 120984, at *2. Its language leaves little doubt that Congress intended educational grants subject to GEPA, including grants under TQP and SEED, to prioritize "equitable access," "equitable participation," and "overcom[ing] barriers . . . based on gender, race, color, national origin, disability, and age."

Thus, across the TQP statute, SEED statute, and GEPA Equity Directive, Congress has repeatedly directed Defendants to support grant programs that promote diversity, whether in the form of support for diverse teachers or for diverse students. The relevant statutory provisions establish more than a general preference for addressing diversity; they impose substantive requirements that Defendants must respect when administering these programs.

Having concluded that the statutes impose a diversity requirement, the Court turns to whether the February 2025 Directive complies with those requirements. It does not. On its face,

the Directive instructs Department personnel to terminate TQP grants that "promot[e] or t[ake] part in [DEI] initiatives." Defendants then terminated over a hundred grants in less than two weeks, flagging them based, at least in part, on their inclusion of "objectionable material associated with DEI" such as "anti-racism," "social-emotional learning," "justice, equity, diversity, and inclusion," "systemic privilege," "centering equity," "power imbalances," and how to better include those who "experience marginalization." By their terms, these topics address equity, access, and overcoming identity-based barriers. The Directive thus effectively makes the promotion of DEI-related programs a factor for terminating a grant, even though the statutes require grantees to prioritize funding those very objectives.

That is directly contrary to the TQP, SEED, and GEPA statutory schemes. Agencies may not choose to reject, terminate, or otherwise penalize grant applications based on the very criteria Congress expressly require the agency to promote. Because the Directive does precisely that, it conflicts with the TQP, SEED, and GEPA statutes. Cf. Thakur v. Trump, 800 F. Supp. 3d 1044, 1057 (N.D. Cal. 2025) (finding that agency acted contrary to law in denying grant based on projects' commitment to diversity because authorizing statute mandated that grant selection be based on "outreach activities to attract new entrants into the transportation field, including women and underrepresented populations").

In sum, multiple provisions of the TQP, SEED, and GEPA statutes require or direct grantees to support teachers from diverse backgrounds, as well as meet the educational needs of diverse students. The February 2025 Directive, by treating such programs as "discriminatory" and as a basis for termination, cannot be reconciled with those statutory mandates, rendering it contrary to law. As Justice Jackson explained in her dissent from the Supreme Court's stay of the TRO in this action, the Department's "undifferentiated laundry list of possible reasons for

terminating these grants," including "that the entity may have participated in unspecified DEI practices," contravenes the enabling statutes. Dep't of Educ. v. California, 604 U.S. 650, 665 (2025) (Jackson, J., dissenting). The statute "expressly contemplate[s] that grant recipients will train educators on teaching 'diverse populations' in 'traditionally underserved' schools, and on improving students' 'social, emotional, and physical development.'" Id. It is "manifestly" in violation of the APA "for the Department to terminate grants for funding diversity-related programs that the law expressly requires." Id. (citing State Farm, 463 U.S. at 43).

### 2. GEPA Notice-and-Comment Requirements

Plaintiffs next contend that the February 2025 Directive is contrary to law because Defendants failed to follow notice-and-comment procedures, as required by GEPA. The APA generally requires all rules to go through notice-and-comment rulemaking; however, it exempts, among other things, grants. 5 U.S.C. § 553(a)(2). That said, GEPA removes that exemption and requires notice-and comment-for "any generally applicable rule, regulation, guideline, interpretation, or other requirement that (1) is prescribed by the Secretary or the Department; and (2) has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program.'" Washington II, 167 F.4th at 1245 (quoting 20 U.S.C. § 1232(a)); see also 20 U.S.C. § 1232(d). If a rule satisfies these three requirements under GEPA, "the affected agency must comply" by conducting notice-and-comment. Wages & White Lion Invs., 604 U.S. at 565.

Defendants argue that the February 2025 Directive does not trigger notice-and-comment under GEPA because it has no "legally binding effect" (i.e., the third element). Specifically, according to Defendants, the Directive does not require or prohibit grantees from taking any action and therefore does not affect grantees' legal rights or obligations.

The Ninth Circuit recently considered nearly this exact dispute in Washington II. See 167 F.4th 1241. There, the plaintiff States challenged an internal Department of Education directive for failing to comply with GEPA's notice-and-comment requirements. The plaintiff States had previously been awarded multi-year educational grants to train mental health professionals to serve high-need students. On February 5, 2025, the Department issued an internal directive "calling for the re-review of all new and issued grants based on the new administration's policies." Washington I, 813 F. Supp. 3d at 1232. Pursuant to that directive, the Department discontinued 138 grants awarded to grantees in the plaintiff States. Washington II, 167 F.4th at 1245. In affirming the lower court's preliminary injunction in favor of the plaintiff States, the court concluded that the Department's "generic mass discontinuation decisions, guided by generally applicable policy criteria, seem to implicate GEPA's rulemaking requirement." Id. The court emphasized that the directive's text "mandated an across-the-board review of all new grant awards and the re-review of all issued grants in accordance with the Department's new policy objectives, resulting in the discontinuation of grants in Plaintiff States." Id. In the court's view, "the text of the directive indicates" that it had a "binding legal effect upon grant programs." Id.

In line with the Ninth Circuit, several district courts have likewise held that recent internal Department of Education directives announcing broad-sweeping grant-termination policies violate GEPA's notice-and-comment requirement. E.g., Am. Ass'n of Colls. for Tchr. Educ. v. McMahon, 770 F. Supp. 3d 822, 855 (D. Md. 2025) ("Under GEPA, 'department priorities' are established by the Secretary or Department and grant recipients must abide [by] them to avoid award cancellation—which is to say, they are legally binding on the federal award recipient. As a matter of law, therefore, such 'priorities' . . . must go through public notice and

comment rule making."); see also Council for Opportunity in Educ., 2026 WL 120984, at *13 (granting preliminary injunction and finding that Department of Education failed to follow GEPA's notice-and-comment rulemaking procedures before rescinding grants pursuant to unpublished criteria disfavoring DEI, which conflicted with existing final priorities).

The Court finds the Ninth Circuit's reasoning in Washington II persuasive here. Defendants' argument appears to repackage their arguments concerning final agency action: that the February 2025 Directive does not, itself, terminate a grant, and instead merely instructs agency personnel to review existing grants. This characterization, however, misses what the Directive actually does. It mandates an "across-the-board" review pursuant to a sweeping new policy that applies *en masse* to an entire category of grants. Washington II, 167 F.4th at 1245. It is not an individualized determination, nor is it merely the expression of a policy preference or interpretation that might affect grant programs at some later point. Within two weeks, the Department terminated 104 out of 109 TQP and SEED grant awards, comprising hundreds of millions of dollars in grants across the country. Entities seeking to avoid the consequences of the Directive thus must modify their programs to avoid termination. In that sense, the Directive imposes legally binding obligations on TQP and SEED applicants and recipients.

Moreover, the February 2025 Directive adopts a policy that renders unlawful a position the Department previously established through final rules, i.e., priorities that encouraged DEI. The Directive therefore operates, in substance, as an implicit repeal of the Department's prior priorities. It is undisputed that repealing a substantive rule alters binding legal obligations, just as a rule's initial promulgation does. See NAACP v. Trump, 298 F. Supp. 3d 209, 236 (D.D.C. 2018) ("The APA generally requires notice-and-comment procedures whenever an agency creates, amend, *or repeals* a rule." (emphasis added)), aff'd and remanded sub nom. Dep't of

Homeland Sec. v. Regents of the Univ. of California, 591 U.S. 1 (2020). That is precisely what the February 2025 Directive accomplished. The Directive announces that DEI programs are inherently discriminatory and in violation of federal civil rights law. That policy directly contravenes, and thus implicitly repeals, the Department's prior 2021 priorities, which promoted and encouraged such programs. It therefore creates binding obligations because it is "inconsistent with" an existing legal regime. Child.'s Hosp. of the King's Daughters, Inc. v. Azar, 896 F.3d 615, 620 (4th Cir. 2018).

In sum, the February 2025 Directive imposes legally binding obligations on TQP and SEED grantees. Defendants were therefore required to undergo notice-and-comment rulemaking under GEPA prior to promulgating the Directive. Because they failed to do so, they acted contrary to law. Indeed, allowing such a change through internal directives would undermine the fundamental purpose of GEPA's notice-and-comment rulemaking provision, which is to ensure thoughtful engagement with public concerns before an agency changes the substantive rules governing federal education grants. See Humane Soc'y of the United States v. U.S. Dep't of Agric., 41 F.4th 564, 568 (D.C. Cir. 2022) ("Providing for notice and comment before repeal of a final rule 'ensures that an agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal.'" (quoting Consumer Energy Council of America v. FERC, 673 F.2d 425, 446 (D.C. Cir. 1982))).

### 3. Uniform Guidance Termination Requirements

Finally, Plaintiffs contend that the February 2025 Directive is contrary to law because it violates the OMB's Uniform Guidance. Plaintiffs contend that the Uniform Guidance, which the Department of Education has adopted, does not authorize terminating grants based on non-compliance with agency priorities that were established after the grant award, as opposed to the

priorities that were in effect at the time of award issuance. The provision at issue, 2 C.F.R. § 200.340(a)(4), states, in relevant part: "The Federal award may be terminated . . . pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."[9] Plaintiffs argue that this language extends only to *existing* agency priorities at the time of the grant award. Defendants argue that it applies to both existing *and* new priorities.

Another session of this court recently considered this exact dispute in New Jersey vs. OMB, No. 25-CV-11816, 2026 WL 2069832 (D. Mass. July 17, 2026). There, twenty states, three governors, and the District of Columbia sued the federal government seeking a declaration that 2 C.F.R. § 200.340(a) does not authorize the termination of awards based on a failure to effectuate agency priorities identified after the grant was awarded. Id. at *1. Judge Talwani granted the plaintiffs' motion for summary judgment, finding that the "plain language, regulatory scheme, regulatory history, [and] the Spending Clause of the U.S. Constitution" do not authorize agencies to "terminate grants based on program goals and agency priorities identified after grants were awarded." Id. at *11.

The Court agrees with Judge Talwani's interpretation of 2 C.F.R. § 200.340(a)(4) and adopts her reasoning in full by reference here. Accordingly, the February 2025 Directive is unlawful to the extent it relies on 2 C.F.R. § 200.340(a)(4) as authority for grant terminations.

## V. SCOPE OF REMEDY

Having concluded that the Administrative Record supports that the February 2025

[9] This version of the Uniform Guidance went into effect until October 1, 2024. The prior version of 2 C.F.R. § 200.340(a) of the Uniform Guidance—effective in 2020 and the version in effect at the time of Plaintiffs' grant awards—was substantively the same. See Guidance for Grant Agreements, 85 Fed. Reg. 49506 (Aug. 13, 2020).

Directive is both arbitrary and capricious and contrary to law, the Court must next determine the appropriate scope of relief. Plaintiffs request vacatur, declaratory relief, and a permanent injunction.

**A. Vacatur**

First, Plaintiffs seek an order from the Court vacating the February 2025 Directive in its entirety. Under Section 706 of the APA, district courts are authorized to "hold unlawful and set aside agency action, findings, and conclusions" found to be in violation of the APA. 5 U.S.C. § 706(2). Courts have interpreted "set aside" to include vacatur. See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring); NIH III, 145 S. Ct. at 2662 n.1 (Barrett, J., concurring) ("If a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward."). However, vacatur is not the only avenue for relief. Instead, remand to the agency is proper "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985). Whether to vacate the action "rests in the sound discretion of the reviewing court," Cent. Me. Power Co. v. FERC, 252 F.3d 34, 48 (1st Cir. 2001), and depends on "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 967 (D.C. Cir. 1990). For example, "[f]ailure to provide the required notice and to invite public comment . . . is a fundamental flaw that normally requires vacatur of the rule." Heartland Reg'l Med. Ctr. v. Sebelius, 566 F.3d 193, 199 (D.C. Cir. 2009) (internal quotation

marks omitted).

Here, vacatur of the February 2025 Directive is appropriate. The Court has concluded that the Directive is arbitrary and capricious for failure to follow notice-and-comment and manifestly contrary to the TQP and SEED enabling statutes as well as GEPA, which are fundamental legal deficiencies that mere remand could not resolve. See Sierra Club v. U.S. Army Corps of Engrs., 909 F.3d 635, 655 (4th Cir. 2018) (noting that remand is not appropriate where the agency action was "legally deficient" because it "exceeded the [agency's] statutory authority"); see also Corner Post, 603 U.S. at 831 (Kavanaugh, J., concurring) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to individual petitioners is proscribed."). The Department's hasty implementation of the Directive over less than two weeks, the magnitude of the effects of the termination, as well as the lack of evidence of reasoned decisionmaking in the Administrative Record leave serious doubts as to the Department's choice to adopt the Directive. Relatedly, where Plaintiffs and member institutions are dispersed throughout the United States, this form of relief avoids the "'chaos and confusion' of a patchwork of [relief]." See Massachusetts v. Nat'l Inst. of Health, 770 F. Supp. 3d 277, 327-29 (D. Mass. 2025), aff'd, 164 F.4th 1 (1st Cir. 2026) (quoting Florida v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1281-82 (11th Cir. 2021)); id. at 328-29 (explaining that a "patchwork of injunctions would cause administrability problems, not only for the institutions relying on consistency to prevent the harm discussed above but also for [the agency] as it attempts to comply with varying injunctions across the country"). Finally, vacatur would not be a disruptive "interim change," as it would leave in place the statutory and regulatory framework for TQP and SEED grants, as well as the most recently promulgated agency priorities, which ordinarily govern the Department's grant

award process, including the forthcoming FY2026 grant awards. Accordingly, vacatur of the February 2025 Directive is the appropriate remedy.[10]

### B. Declaratory Relief

In addition to vacatur, Plaintiffs seek a declaration that the February 2025 Directive is unlawful. Courts may, in their reasoned discretion, issue declaratory relief as an independent form of relief. See Associated Gen. Contractors of Mass. v. Bos. Dist. Council of Carpenters, 642 F. Supp. 1435, 1441 (D. Mass. 1986) (citing Broderick v. DiGrazia, 504 F.3d 643 (1st Cir. 1974). In the context of administrative law claims, declaratory relief that governs "prospective relief" for "ongoing relationships" between an agency and grant recipients is "well within the scope of the APA." Am. Pub. Health Ass'n v. Nat'l Insts. of Health (NIH II), 145 F.4th 39, 50 (1st Cir. 2026) (citing U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 25 (1994)). Such relief "guide[s] an agency as it decides upon its future course of conduct." Id. (citing Bowen v. Massachusetts, 487 U.S. 879, 905 (1988)).

Plaintiffs maintain standing for their declaratory relief claims, as the February 2025 Directive presents "an actual controversy within the meaning of the Declaratory Judgment Act." Associated Gen. Contractors of Mass., 642 F. Supp. at 1441. Outside of their arguments concerning standing, which the Court has already addressed, Defendants raise no specific objection to declaratory judgment as an available or appropriate form of relief. Thus, the Court finds that declaratory relief is also appropriate. See Eagle-Picher Indus., Inc. v. Liberty Mut. Ins.

---

[10] Defendants suggest limiting the scope of relief to apply only to Plaintiff States and their instrumentalities, contending that Plaintiffs do not have standing to sue on behalf of non-party entities, such as private universities. However, as another session of this court recently explained, vacatur under the APA is "not party-restricted" because it operates on the underlying policy or rule, not the agency's implementation actions on individual entities. Ass'n of Am. Univs. v. Dep't of Def., 806 F. Supp. 3d 79, 122-23 (D. Mass. 2025) (collecting cases).

Co., 682 F.2d 12, 16 n.1 (1st Cir. 1982) (noting that declaratory relief was proper because it would "resolve the present controversy")

### C. Permanent Injunction

Finally, Plaintiffs seek a permanent injunction to "enjoin[] Defendants from implementing, maintaining, or reinstating in substance even if under a different name the February [Directive] for grant recipients or applicants in Plaintiff States." "Where a plaintiff seeks permanent injunctive relief, the test is the same [as for a preliminary injunction], except that 'the movant must show actual success on the merits of the claim, rather than a mere likelihood of such success.'" Caroline T. v. Hudson Sch. Dist., 915 F.2d 752, 755 (1st Cir. 1990) (quoting K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989)). The Supreme Court has cautioned that a district court that already vacates an agency action under the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of its vacatur." Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165 (2010). This is because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted" where "a less drastic remedy . . . [is] sufficient to redress" the plaintiffs' injury. Id. at 165-66.

Permanent injunctive relief is unnecessary here, as the Court is already vacating the February 2025 Directive and declaring it substantively unlawful. These remedies will adequately address Plaintiffs' harms such that their requested permanent injunction is not necessary. Vacatur will void and rescind the Directive, ensuring that Defendants can no longer terminate TQP and SEED grants under its anti-DEI policies, thus redressing Plaintiffs' threatened injuries. See Action on Smoking & Health v. C.A.B., 713 F.2d 795, 797 (D.C. Cir. 1983) ("To 'vacate[]' . . . means 'to annul; to cancel or rescind; to declare, to make, or to render,

void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'"). Enjoining Defendants from implementing or maintaining the Directive would thus be duplicative. See Ass'n of Am. Univs. v. Nat'l Sci. Found., 788 F. Supp. 3d 106, 143 (D. Mass. 2025) (declining permanent injunction where court already vacated agency action under APA and declared it unlawful); Am. Fed'n of Tchrs., 796 F. Supp. 3d at 121-22 (same).

Similarly, "[a] declaratory judgment obviates the need to enjoin defendants from implementing a substantively identical policy where a declaratory judgment declares the rights and obligations of the parties and has 'the force and effect of a final judgment or decree.'" Nat'l Sci. Found., 788 F. Supp. 3d at 143 (quoting 28 U.S.C. § 2201(a); Union de Empleados v. Int'l Longshoremen's Ass'n, 884 F.3d 48, 58 (1st Cir. 2018)). "[B]ecause '[a] declaratory judgment is binding on the parties before the court and is [preclusive] in subsequent proceedings as to the matters declared,' it can be used by a party to later obtain further relief." Id. As such, to the extent Defendants attempt to issue another policy document that likewise orders *en masse* terminations of TQP and SEED grants that promote DEI-related programs, the declaratory judgment and "principles of [preclusion] will ensure that Plaintiffs 'will have ample opportunity to challenge [such an action], and to seek appropriate preliminary relief.'" Id. (quoting Monsanto, 561 U.S. at 164). Thus, Plaintiffs' requested permanent injunctive relief is unnecessary insofar as they seek to prevent a hypothetical future policy document.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff States' Motion for Summary Judgment is **GRANTED**. Defendants' Cross-Motion for Summary Judgment is **DENIED**. Plaintiffs' Motion to Strike is **DENIED AS MOOT**.

It is hereby **ORDERED**:

1. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, the Court **VACATES** and **SETS ASIDE**, in its entirety, the Department's February 5, 2025, Directive, titled "Eliminating Discrimination and Fraud in Department Grant Awards," as arbitrary and capricious and not in accordance with law, including federal statutes and governing regulations.

2. Pursuant to 28 U.S.C. § 2201, it is **DECLARED** that the February 5, 2025, Directive is unlawful because it violates the APA.

**SO ORDERED.**

Dated: September 17, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge